# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF KENT

NATIONS HOME LOAN CORPORATION,

        Plaintiff,

v

CENTER SPECIALIST LLC,
SPATZ FAMILY DEVELOPERS LLC,
GRAND RAPIDS ASSOCIATES, L.L.C.,
GRAND RAPIDS ASSOCIATES, L.P. a/k/a
GRAND RAPIDS ASSOCIATES,
SPATZ CENTERS, INC. n/k/a
SCI MANAGEMENT INC,
RADEKE MANAGEMENT, L.L.C.,
WILLIAM SPATZ a/k/a
WILLIAM LEE SPATZ,
WENDY SPATZ, and
TODD RADEKE,

        Defendants.

Case No. 17-05495-CBB
Hon. Christopher P. Yates

REAL ESTATE LAW, PLLC
By: Tobias J. Lipski (P62859)
Attorneys for Plaintiff
P.O. Box 28027
Harsens Island, Michigan 48028
(248) 506-3309

## FIRST AMENDED COMPLAINT

A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in the 62ND-B Judicial District Court, bearing Case No. 17-3457-LT and assigned to Judge William G. Kelly. The action is longer pending.

Plaintiff, Nations Home Loan Corporation ("Plaintiff"), by and through its attorneys,

Real Estate Law, PLLC, submits the following for its Complaint against the named Defendants:

## PARTIES AND JURISDICTION

1.      Plaintiff is a for profit corporation organized under the laws of the State of Michigan.

2.      Upon information and belief, Defendant William Spatz aka William Lee Spatz ("William Spatz"), president of Spatz Centers, Inc., manager for Spatz Centers II and Spatz Centers III, managing member of Grand Rapids Associates, LLC, also currently resides in the State of Florida at 2660 S Ocean Blvd, Unit 504N, Palm Beach, Florida 33480.

3.      Upon information and belief, Defendant Wendy Spatz, owner of Spatz Centers, Inc., employee of Spatz Centers II, and resident agent for Spatz Centers III also currently resides in State of Florida at 2660 S Ocean Blvd, Unit 504N, Palm Beach, Florida 33480.

4.      Upon information and belief, Defendant Todd Radeke, manager and CEO of Radeke Management, L.L.C., currently resides within the State of Illinois and also maintains his business within Chicago, Illinois at address at 14 N. Peoria Street, Suite 3F, Chicago, Illinois 60607.

5.      Upon information and belief, Defendant Todd Radeke was employed from June 2003 to December 2015 by WS Management, Inc., whose agent was also William Spatz and was created on December 12, 2005 and allowed to dissolve on May 8, 2009 and/or WS Management LLC, which was also managed by William Spatz, created on October 28, 2010, and allowed to dissolve on April 11, 2014.

6.      Defendant Spatz Centers, Inc. n/k/a SCI Management Inc. effective October 16, 2012, and General Partner of Grand Rapids Assoc., L.P., is a foreign corporation, created on May 31, 1989 in the State of Illinois, with application submitted by Barry E. Herring, Vice President on September 8, 1994 for authority to transact business in the State of Michigan as General Partner of Grand Rapids Associates Limited Partnership, an Illinois Limited

REAL ESTATE LAW, PLLC
PO BOX 28027
Harsens Island, MI 48028
TELEPHONE (248) 506-3309
FACSIMILE (248) 856-3169

2

Partnership, with certificate of withdrawal filed in the State of Michigan by William Spatz, President, on September 22, 1995, with application submitted for authority to transact the business of property management in the State of Michigan on August 11, 1997, with authority revoked by the State of Michigan on July 15, 1999, allowed to dissolve in Illinois on October 10, 2014, nonetheless continuing to transact business within the State of Michigan in connection with real estate located within the County of Kent, State of Michigan, maintains its business address at 14 N. Peoria Street, Suite 3F, Chicago, Illinois 60607, and currently maintains a resident agent, The Corporation Company, whose address is 30600 Telegraph Road, Bingham Farms, Michigan 48025.

7.      Defendant Spatz Family Developers LLC f/k/a Spatz Centers Corp LLC ("Spatz Centers II"), is a foreign limited liability company, created in the State of Illinois on October 12, 2007, transacting business with the State of Michigan, and currently maintains a resident agent, William Spatz, with a designated address of 14 N. Peoria Street 3F, Chicago, IL 60607.

8.      Defendant Center Specialist LLC, formerly known as Spatz Centers Management, LLC ("Spatz Centers III"), is a foreign limited liability company, created in the State of Illinois on October 26, 2009, allowed to dissolve in the State of Illinois on April 11, 2014, re-created in the State of Florida on July 24, 2013, and also re-created in Illinois on September 5, 2014, transacting business with the State of Michigan and maintains its business address, at 2660 S Ocean Boulevard, Unit 504N, Palm Beach, Florida, 33480, a mailing address of 14 N Peoria Street, Unit 3F, Chicago, IL 60607, and currently maintains a resident agent, Wendy Spatz, whose address is 2660 S Ocean Boulevard, Unit 504N, Palm Beach, Florida 33480.

9.      Defendant Radeke Management, L.L.C. ("Radeke Mgt"), is a foreign limited

liability company created on May 18, 2015 transacting business within the State of Michigan as a property management company for real estate located within the County of Kent, State of Michigan. Radeke Mgt also maintains a principal business address of 2660 S. Ocean Boulevard Apt 504N, Palm Beach, Florida 33480, for its resident agent, Todd Radeke, the address of 2660 S. Ocean Boulevard, and a mailing address at 14 N. Peoria Street, Suite 3F, Chicago, Illinois 60607.

10.     Defendant Grand Rapids Associates, L.L.C. ("Grand Rapids"), is a foreign limited liability company created on October 12, 2017, with application submitted on October 23, 2007 by its managing member William Spatz to transact business in the State of Michigan using the name of Kentwood Marketplace, LLC, who maintains a resident agent, Susie Greffen, whose is 10454 Randall Road, Union Pier, Michigan 49129.

11.     Grand Rapids Assoc., L.P. a/k/a Grand Rapids Associates ("Grand Rapids Assoc., L.P.") is a foreign limited partnership organized under the existing laws in the State of Illinois on June 24, 1994, with application to transact business in the State of Michigan submitted by Barry E. Herring, Vice President of Spatz Centers, Inc., General Partner, June 29, 1994, and currently maintains a resident agent, The Corporation Company, whose address is 30600 Telegraph Road, Bingham Farms, Michigan 48025.

12.     Jurisdiction and venue are properly before this Court pursuant to M.C.L. 600.705 and 600.1621.

### GENERAL ALLEGATIONS

13.     Plaintiff incorporates the previous paragraphs as fully set forth herein.

14.     Upon information and belief, Defendants William Spatz, Todd Radeke, Wendy Spatz, Spatz Centers, Inc., Spatz Centers II, Spatz Centers III, and Radeke Mgt. have engaged

REAL ESTATE LAW, PLLC
PO BOX 28027
Harsens Island, MI 48028
TELEPHONE (248) 506-3369
FACSIMILE (248) 836-3169

4

in various, quite possibly criminal, schemes purporting to defraud creditors, the public, and both state and federal government agencies, involving use of special purpose entities to qualify for credit sufficient to purchase commercial developments and to secure tenants and rental income from tenants, then allowing developments to decay and the debtor entities to automatically dissolve, but continuing to collect revenue in the name of dissolved entities, or similar entities with similar names for the purpose of confusing and defrauding creditors, in violation of, including but not limited to, business formation state laws and presumably state and federal tax laws, and ultimately transferring and hiding assets from the creditors.

15.     William Spatz himself taunted Plaintiff to bring suit and bragged that he has been sued before and prevailed.

16.     Upon information, William Spatz and his co-conspirators believe they are untouchable.

17.     Upon information and belief, William Spatz has unlawfully has misused and abused federal bankruptcy laws for the purpose of evading financial obligations, while retaining and diverting income derived directly or directly from the commercial developments and funds from creditors.

18.     William Spatz has been subject to multiple findings in both state and federal courts over the last twenty (20 years) as a result of having made fraudulent transfers to evade creditors, including transfers to affiliated property management companies and his wife.  Such transfers included transfer of management fees, income, and compensation from limited partnerships, much like Grand Rapids Associates, L.P., to management companies, much like Radeke Mgt, and to his wife Wendy Spatz.

19.     One court found, in particular, that William Spatz made a transfer, which was a

calculated move to escape a creditor and, ultimately, fraudulent.  The same court stated that Spatz Centers, Inc. made a deliberate effort to divert funds to avoid paying the creditor.

20.     Another court found that William Spatz was able to shelter over one quarter of one million dollars from creditors by transferring stock to Wendy Spatz.

21.     Upon information and belief, William Spatz used the entities for which he serves or served as the sole member, president and/or manager, including but not limited to Spatz Centers, Inc., Spatz Centers II, Spatz Centers III, Grand Rapids Associates, L.L.C., Grand Rapids Associates, L.P. a/k/a Grand Rapids Associates, as mere instrumentalities to commit fraud, which caused unjust injury to Plaintiff and/or its predecessor in interest, as well as the state and federal government agencies.

22.     Upon information and belief, Defendants William Spatz, Todd Radeke, and Wendy Spatz, failed to maintain the legal existence of such special purpose entities in compliance with applicable law and, moreover, failed to properly report income, assets and/or expenses associated with the "dissolved" special purpose entities to the internal revenue service and the applicable local departments of treasury.

23.     Additionally, upon information and belief, William Spatz, Wendy Spatz and Todd Radeke conspired with each other defraud Plaintiff and/or its successor in interest.

24.     On or about October 16, 2007, Grand Rapids executed and delivered a note in the amount of Three Million Seven Hundred Fifty Thousand and 00/100 ($3,750,000.00) Dollars to Standard Insurance Company ("Standard") **Exhibit 1**.

25.     Defendant Wendy Spatz, also executed and delivered the note to Standard.

26.     As security for the note, on October 16, 2007 Grand Rapids executed, and apparently acknowledged said execution in the presence of notary Defendant Todd Radeke,

and delivered a mortgage to Standard, which was recorded on December 3, 2007 in Instrument No. 20071203-0114374, Kent County Records. **Exhibit 2**.

27.     As additional security for the note, on October 16, 2007, Grand Rapid executed and delivered an Assignment of Lessor's Interest in Leases, which was recorded on December 3, 2007 in Instrument No. 20071203-0114375, Kent County Records ("AL"). **Exhibit 3**.

28.     In the mortgage, William Spatz, as manager for Grand Rapids, warranted <u>having title</u> to all leases concerning the mortgaged premises, to the exclusion of all other parties. However, Grand Rapids Associates, LP was the landlord in all such leases.

29.     Defendant Grand Rapids was certified to do business in Michigan one month after having originated the subject note and mortgage, and having executed the Assignment of Leases and Rents. Grand Rapids failed to renew its authority to transact business in the State of Michigan at any point after its initial application.

30.     Grand Rapids Associates, L.P., with a mailing address c/o of Spatz Centers, Inc., failed to renew its authority to transact business in Michigan at any point after its initial application in 1994, yet executed continued to execute lease agreements with tenants at the mortgaged premises in the years including but not limited to 2001, 2007, 2011, 2012, and 2014.

31.     Spatz Centers, Inc. initially applied for authority to transact business in the state of Michigan in 1994 through William Spatz's former partner, Barry E. Herring, now managing member of Pine Tree Commercial Realty, LLC in Illinois.  Said application was subsequently withdrawn but resubmitted by William Spatz and never renewed thereafter.  William Spatz, as manager for Spatz Centers, Inc., continued to execute lease agreements concerning the mortgaged premises, as general partner for Grand Rapids Associates, L.P. in the years

REAL ESTATE LAW, PLLC
PO BOX 28027
Harsens Island, MI 48028
TELEPHONE (248) 506-3309
FACSIMILE (248) 886-3169

including but not limited to 2001, 2007, 2011, 2012, 2014

32.    Plaintiff purchased the mortgage and note receiving an assignment of the loan.
**Ex. 4.**

33.    Grand Rapids failed to make the required monthly payments, resulting in a
foreclosure of the mortgage and Plaintiff electing its remedies under the AL.

34.    Following the default, Plaintiff first elected to pursue its rights under the
assignment of rents by sending the required notices to the tenants currently leasing space.  The
tenants currently leasing space at the time of the notices were Guitar Center, Flamingo Café
and Shepherds Arm Ministry (collectively referred to hereinafter as "Tenants").

35.    On December 21, 2016, Plaintiff provided notice of the AL to the Tenants.
**Exhibit 5.**

36.    After said notice, William Spatz called Plaintiff to acknowledge receipt of the
notice of AL and too advise Plaintiff not to bother to try to collect from him because other
people have tried and failed, and to further advise Plaintiff that Plaintiff will never see a dime.

37.    Upon information and belief, none of the Tenants remitted their subsequent
rental payments to Plaintiff and instead paid their lease payments over to the landlord in their
leases, Grand Rapids Assoc., L.P. and Spatz Centers, Inc., who, after being notified of the same
by both Plaintiff and tenants, failed to turn over those lease payments to Plaintiff, thus
wrongfully converting those rental/lease payments.

38.    Grand Rapids failed to perform its obligations under the AL by failing to take
actions including but not limited to paying utilities, maintaining property insurance,
maintaining and paying for services to maintain the premises, and remediating or paying for
services to remediate hazardous conditions.

REAL ESTATE LAW, PLLC
PO BOX 2027
Harsens Island, MI 48028
TELEPHONE (248) 500-3309
FACSIMILE (248) 856-3169

8

39.     On February 22, 2017, the foreclosure sale occurred with a Sheriff's Deed on Mortgage Sale being issued to Plaintiff. **Exhibit 6.**

40.     The successful bid at the sale was Three Million Four Hundred Fifty Thousand and 00/100 ($3,450,000.00) Dollars.

41.     At the time of the foreclosure sale, Plaintiff was owed a total amount of Three Million Six Hundred Fifty-Nine Thousand Three Hundred Four and 63/100 ($3,659,304.63) Dollars, thus resulting in a deficiency owed to Plaintiff in the amount of Two Hundred Nine Thousand Three Hundred Four and 63/100 ($209,304.63) Dollars.

42.     Defendant William Spatz is liable to Plaintiff for the deficiency.

43.     Defendant Wendy Spatz is liable to Plaintiff for the deficiency.

44.     Defendant Grand Rapids is liable to Plaintiff for the deficiency.

45.     Defendant William Spatz, Radeke Mgt, Todd Radeke, Grand Rapids, Grand Rapids Assoc., L.P. and Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III are all liable to Plaintiff for wrongfully converting the lease/rental payments, entitling Plaintiff to treble damages.

46.     Additionally, William Spatz, Wendy Spatz, and Todd Radeke conspired with one another to interfere with Plaintiff's right to receive monthly rental/lease payment from the Tenants as well as their volitional acts to convert portions of the monthly rental/lease payments that were designated for common area maintenance; security deposits; and monthly payments.

47.     Plaintiff has been damaged by incurring attorney fees and costs for having to enforce the terms of the contracts.

48.     All named Defendants are liable to Plaintiff for its attorney fees and costs associated with this action.

## COUNT I – DEFICIENCY AS TO GRAND RAPIDS AND WENDY SPATZ

49.     Plaintiff reincorporates the preceding paragraphs as fully set forth herein.

50.     M.C.L. § 600.3280 specifically authorizes a mortgagee or holder of indebtedness to sue the obligor for a deficiency judgment should the sale of the property result in an amount less than the amount owed on the indebtedness.

51.     Grand Rapids, as obligor on the October 16, 2007 indebtedness, is liable to Plaintiff for the deficiency amount that resulted from the foreclosure sale.

52.     The sale amount resulting in the successful bid at the foreclosure sale was an adequate representation of the fair market value of the Property.

53.     Defendant Wendy Spatz executed the note dated October 16, 2007.

54.     According to the note, Wendy Spatz executed the note in her individual capacity.

55.     Upon information and belief, Wendy Spatz holds a legal or ownership interest in most of the entities include in this suit as defendants and their assess and, therefore, Wendy Spatz executed the note in furtherance of such interest.

56.     As parties to the note, Grand Rapids and Wendy Spatz are personally liable for the indebtedness and deficiency in the amount of $209,304.63.

WHEREFORE, Plaintiff respectfully requests the following relief:

A)     Enter a deficiency judgment against Grand Rapids in the amount of $209,304.63;

B)     Enter a deficiency judgment against Wendy Spatz in the amount of $209,304.63;

C)     Enter a judgment against Grand Rapids and Wendy Spatz for Plaintiff's

REAL ESTATE LAW, PLLC
PO BOX 28027
Harsens Island, MI 48028
TELEPHONE (248) 506-3309
FACSIMILE (248) 856-3109

damages incurred, including but not limited to reasonable attorney fees; and,

     D)    Grant any other relief this Court deems appropriate.

### COUNT II – BREACH OF CONTRACT AS TO GRAND RAPIDS

57.    Plaintiff restates the previous paragraphs as fully set forth herein.

58.    Grand Rapids failed to perform its obligations under the AL.

59.    Grand Rapids failed to continue to perform its obligations under all leases as required by the AL. **Exhibit 7, Tenant Leases.**

60.    Grand Rapids failed to adhere to the contractual requirements of maintaining the Property and engaged in a pattern or practice of misappropriating the monthly payments that were attributable to common area maintenance (also known as "CAM Payments") to the Property.

61.    Grand Rapids failed to forward all Tenant payments and security deposits to Plaintiff subsequent to Grand Rapids receipt of Plaintiff's notice of default.

62.    Grand Rapids failed to maintain insurance on the Property. **Exhibit 8.**

63.    Grand Rapids failed to control, care, manage, or repair the Property. **Exhibit 9.**

64.    Under the AL, Grand Rapids is to indemnify Plaintiff for all liability, loss, damage or expense which Plaintiff incurs arising out of the leases.

65.    Under the AL, Grand Rapids is obligated under the terms of the AL until the entire indebtedness secured by the AL is satisfied.

66.    Plaintiff has been damaged in excess of Twenty-Five Thousand and 00/100 ($25,000.00) dollars, due to the breach of Grand Rapids.

WHEREFORE, Plaintiff respectfully requests the following relief:

     A)    Enter a judgment against Grand Rapids in an amount exceeding $25,000.00

REAL ESTATE LAW, PLLC
PO BOX 29027
Harsens Island, MI 48028
TELEPHONE (248) 566-3309
FACSIMILE (248) 856-3169

including interest at the rate of 9%, as required by the AL;

    B)    Enter an order directing Grand Rapids to deliver all rents, with interest at the

rate of 9%, as required by the AL, and security deposits, to Plaintiff;

    C)    Attorneys fees with interest at the rate of 9% as required by the AL; and,

    D)    Grant any other relief this Court deems appropriate.

### COUNT III – CONVERSION AS TO WILLIAM SPATZ, WENDY SPATZ, GRAND RAPIDS, RADEKE MGT, TODD RADEKE, GRAND RAPIDS ASSOC., L.P., SPATZ CENTERS, INC., SPATZ CENTERS II, AND SPATZ CENTERS III

    67.    Plaintiff restates the previous paragraphs as fully set forth herein.

    68.    Pursuant to the AL, Grand Rapids, through its President, William Spatz, agreed to assign to Standard and its successors and assigns, rental income it received from its Tenants as additional security for the loan.

    69.    Acting within its rights under the contract, Plaintiff sought to enforce the AL following the default on the mortgage loan.

    70.    In exercising its rights under the AL, notices were provided to the Tenants.

    71.    However, Tenants did not make all payments to Plaintiff.

    72.    Upon information and belief, the Tenants did continue to pay their monthly lease payments, January and February 2017, to Grand Rapids Assoc., L.P. and Spatz Centers, Inc. after Plaintiff provided notice to the Tenants it was acting upon the AL.

    73.    Upon information and belief, those monthly payment made to Grand Rapids Associates, L.P. and Spatz Centers, Inc. were then remitted to William Spatz, Wendy Spatz, Radeke Mgt, Todd Radeke, Spatz Centers, Inc., Spatz Centers II, and/or Spatz Centers III.

    74.    Upon information and belief, William Spatz, Wendy Spatz, Radeke Mgt, Todd Radeke, Spatz Centers, Inc., Spatz Centers II, and/or Spatz Centers III contacted Tenants and

directed them to continue to make payments to William Spatz, Wendy Spatz, Radeke Mgt, Todd Radeke, Grand Rapids Assoc., L.P., Spatz Centers, Inc., Spatz Centers II, Spatz Centers III, Grand Rapids, and/or another similar sounding entity owned by William Spatz, Wendy Spatz, Todd Radeke, Spatz Centers II, and/or Spatz Centers III.

75.    Pursuant to the AL, Plaintiff was entitled to receive those funds from the Tenants.

76.    Pursuant to the AL, Plaintiff was entitled to receive all security deposits under all lease agreements with Tenants

77.    Upon information and belief, Spatz Centers III maintains a bank account for the purpose of "security deposit investments."

78.    William Spatz, Wendy Spatz, Radeke Mgt, Todd Radeke, Grand Rapids, Grand Rapids Assoc., L.P. and Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III were obligated to turn over the security deposits and any payments made by the Tenants to Plaintiff.

79.    Upon information and belief, at least one tenant on a prior occasion requested that William Spatz, Wendy Spatz, Todd Radeke, Grand Rapids Associates, L.P., Spatz Centers, Inc., Spatz Centers II, and/or Spatz Centers III return the February rent/lease payment it mistakenly made to them instead of Plaintiff. The request was futile as neither William Spatz, Wendy Spatz, Todd Radeke, Grand Rapids Associates, L.P., Spatz Centers, Inc., Spatz Centers II, or Spatz Centers III honored the request from the tenant.

80.    Plaintiff, after exercising its rights under the AL, was entitled to receive those monthly lease payments from the Tenants, and any payments sent to William Spatz, Wendy Spatz, Radeke Mgt, Todd Radeke, Grand Rapids, Grand Rapids Associates, L.P., Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III should have been remitted to Plaintiff

without delay.

81.     However, instead of remitting or forwarding those funds, William Spatz, Wendy Spatz, Radeke Mgt, Radeke, Grand Rapids, Grand Rapids Associates, L.P., Spatz Centers, Inc., Spatz Centers II, and/or Spatz Centers III kept the payments and security deposits.

82.     Additionally, upon information and belief, William Spatz, Wendy Spatz, Radeke Mgt, Todd Radeke, Grand Rapids, Grand Rapids Associates, L.P., Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III all failed to adhere to the contractual requirements of maintaining the Property and engaged in a pattern or practice of misappropriating the CAM Payments that were supposed to benefit the Tenants and Property.

83.     Upon information and belief, William Spatz, Wendy Spatz, Radeke Mgt, Radeke, Grand Rapids, Grand Rapids Assoc., L.P., Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III each has exercised dominion and control over the lease payments and security deposits inconsistent with Plaintiff's right to receive those payments.

84.     Upon information and belief, William Spatz, Wendy Spatz, Radeke Mgt, Radeke, Grand Rapids, Grand Rapids Assoc., L.P., Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III each has wrongfully converted those lease payments and security deposits for his/its/their own use since he/its/they no longer hold(s) any interest in the Property.

85.     Plaintiff has been damaged by William Spatz, Wendy Spatz, Radeke Mgt, Radeke, Grand Rapids, Grand Rapids Assoc., L.P., Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III's conversion of the rental payments by not receiving those payments and security deposits and incurring attorney fees and costs associated with exercising its rights under the AL and having to file this action.

86.     Through their actions, at a minimum, Thirty-Six Thousand Twenty-Seven and

REAL ESTATE LAW, PLLC
PO BOX 28027
Harsens Island, MI 48028
TELEPHONE (248) 506-3309
FACSIMILE (248) 836-3169

49/100 ($36,027.49) Dollars, was wrongfully converted by William Spatz, Wendy Spatz, Radeke Mgt, Radeke, Grand Rapids, Grand Rapids Associates, L.P., Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III as none of these parties that came into control with the lease payments would return them to its rightful owner, Plaintiff.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment against William Spatz, Wendy Spatz, Radeke Mgt, Radeke, Grand Rapids, Grand Rapids Associates, Grand Rapids Assoc., L.P., Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III jointly and severally liable, in the amount in excess of $25,000.00, plus Plaintiff attorney fees and costs associated with this action.

### COUNT IV – STATUTORY CONVERSION AS TO WILLIAM SPATZ, WENDY SPATZ, AND TODD RADEKE

87.     Plaintiff restates the previous paragraphs as fully set forth herein.

88.     Pursuant to M.C.L. 600.2919a(1)(b), a party who knowingly possesses converted property or aides in the concealment of converted property is liable for treble damages to the plaintiff.

89.     William Spatz knew that the monthly lease payments made by the Tenants were contractually obligated to be turned over to Plaintiff.

90.     Todd Radeke knew that the monthly lease payments made by the Tenants were contractually obligated to be turned over to Plaintiff.

91.     Wendy Spatz knew that the monthly lease payments made by the Tenants were contractually obligated to be turned over to Plaintiff.

92.     Despite knowing that the lease payments were supposed to be turned over to Plaintiff, and after a tenant requested that tenant's payment be refunded, William Spatz, Wendy Spatz, and Todd Radeke refused to remit or surrender the Tenant payments and instead kept the

REAL ESTATE LAW, PLLC
PO BOX 25027
Huntsion Island, MI 48028
TELEPHONE (248) 806-3369
FACSIMILE (248) 856-3169

payments to the detriment of Plaintiff.

93.     Upon information and belief, William Spatz, Wendy Spatz, and Todd Radeke converted some, if not all, of the payments for their own use.

94.     William Spatz, Wendy Spatz, and Todd Radeke are liable, at a minimum, to Plaintiff in the amount of One Hundred Eight Thousand Eighty-Two and 47/100 ($108,082.47) Dollars.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment against William Spatz, Wendy Spatz, and Todd Radeke, jointly and severally liable, in the amount exceeding $25,000.00, plus Plaintiff attorney fees and costs associated with this action.

## COUNT V – TORTIOUS INTERFERENCE WITH A CONTRACT AS TO WILLIAM SPATZ, WENDY SPATZ, TODD RADEKE, RADEKE MGT, SPATZ CENTERS, INC., SPATZ CENTERS II, AND SPATZ CENTERS III

95.     Plaintiff restates the previous paragraphs as fully set forth herein.

96.     Plaintiff, as assignee of a Mortgage, Rents, Security Agreement and Fixture Filing and Related Loan Documents, had a contract with Grand Rapids for the AL, which was dated October 16, 2007 and recorded on December 3, 2007, in 20071203-0114375, Kent County Records.

97.     The AL was valid at the time Radeke Mgt was the property manager of the Property, and William Spatz, Wendy Spatz, Todd Radeke, Radeke Mgt, Grand Rapids Assoc., L.P., Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III received and retained rent payments due to Plaintiff.

98.     Since the AL was recorded with the Kent County Register of Deeds, William Spatz, Wendy Spatz, Todd Radeke, Radeke Mgt, Grand Rapids Assoc., L.P., Spatz Centers,

REAL ESTATE LAW, PLLC
PO BOX 24027
Harsens Island, MI 48028
TELEPHONE (248) 506-3309
FACSIMILE (248) 856-3160

Inc., Spatz Centers II, and Spatz Centers III were on constructive notice of the contract and its contents.

99.    Additionally, on or about December 20, 2016, William Spatz, Wendy Spatz, Todd Radeke, Radeke Mgt, Grand Rapids Assoc., L.P., Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III were provided a copy of the notice of default, providing that Plaintiff was exercising its rights under the AL.

100.    On or about December 21, 2016, Plaintiff provided notice to the Tenants leasing the premises of its decision to act pursuant to the AL, and M.C.L. 554.231, *et seq.*, directing said tenants to remit future rents to Plaintiff.

101.    Upon information and belief, Radeke Mgt, Todd Radeke, Wendy Spatz, William Spatz, Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III interfered with the AL and directed the tenants to continue to remit monthly lease payments to their attention instead of remitting those payments to Plaintiff, as directed to do pursuant to the Notice of Default.

102.    The interference with the Tenants remitting payment to Plaintiff was improper interference with the AL.

103.    As a result of the interference by Radeke Mgt, Todd Radeke, Wendy Spatz, William Spatz, Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III, Tenants failed to remit the monthly lease payments Plaintiff was contractually authorized to receive as additional security for the original loan.

104.    Upon information and belief, there are expenses associated with necessary repairs to the Property; repairs that were brought to the attention of Plaintiff by a series of emails that came from Radeke Mgt, Todd Radeke, William Spatz, Spatz Centers, Inc., Spatz

Centers II, and/or Spatz Centers III.

105.    Those rental receipts received by Radeke Mgt, Todd Radeke, Wendy Spatz, William Spatz, Spatz Centers, Inc., Spatz Centers II and/or Spatz Centers III from the tenants were to be used to support and maintain the Property and go towards the outstanding balance on the loan.

106.    As a result of Radeke Mgt, Todd Radeke, Wendy Spatz, William Spatz, Spatz Centers, Inc., Spatz Centers II, and/or Spatz Centers III's conduct, Plaintiff suffered damages for having a larger deficiency upon the loan balance, for repairs and maintenance to the property and attorneys' fees and costs associated with acting upon the AL, but only receiving a less than full benefit it was entitled to receive under the contract.

107.    Plaintiff has incurred additional damages for its attorney fees and costs associated with Radeke Mgt, Todd Radeke, Wendy Spatz, William Spatz, Spatz Centers, Inc., Spatz Centers II, and/or Spatz Centers III's conduct and their interference with the AL.

WHEREFORE, Plaintiff is seeking a judgment against Radeke Mgt, Todd Radeke, Wendy Spatz, William Spatz, Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III for damages in excess of $25,000.00, plus its special damages of attorney fees and costs, Radeke Mgt, Todd Radeke, Wendy Spatz, William Spatz, Spatz Centers, Inc., Spatz Centers II and Spatz Centers III caused by tortuously interfering with the AL.

## COUNT VI – CIVIL CONSPIRACY AS TO WILLIAM SPATZ, WENDY SPATZ AND TODD RADEKE

108.    Plaintiff restates the previous paragraphs as fully set forth herein.

109.    Upon information and belief, William Spatz, Wendy Spatz and Todd Radeke conspired with each other to convert the monthly rental payments that were due to Plaintiff.

110.    Upon information and belief, William Spatz, Wendy Spatz and Todd Radeke

REAL ESTATE LAW, PLLC
PO BOX 28027
Harsens Island, MI 48028
TELEPHONE (248) 560-3309
FACSIMILE (248) 856-3169

conspired with each other to interfere with the Plaintiff's right to receive the Tenants monthly rent/lease payments.

111.    The actions by William Spatz, Wendy Spatz and Todd Radeke of converting the payments and interfering with the Plaintiff's ability to receive the rent/lease payments were improper and unlawful.

WHEREFORE, Plaintiff is seeking a judgment against Todd Radeke, Wendy Spatz and William Spatz for damages in excess of $25,000.00, plus its special damages of attorney fees and costs, they caused by their civil conspiracy to tortuously interfere and convert the rent/lease payments that were to be remitted to Plaintiff.

### COUNT VII – UNJUST ENRICHMENT AS TO WILLIAM SPATZ, WENDY SPATZ TODD RADEKE, RADEKE MANAGEMENT, SPATZ CENTERS, INC., SPATZ CENTERS II, AND SPATZ CENTERS III

112.    Plaintiff restates the previous paragraphs as fully set forth herein.

113.    Plaintiff was entitled to receive the rental payments and the security deposits that were accepted and wrongfully kept by William Spatz, Wendy Spatz, Todd Radeke, Radeke Mgt., Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III.

114.    Additionally, William Spatz, Wendy Spatz, Todd Radeke and Radeke Mgt failed to pay for utilities, property maintenance and instead kept a portion of the CAM Payments and used those funds to enrich themselves.

115.    As a result of William Spatz, Wendy Spatz, Todd Radeke, Radeke Mgts, Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III's conduct, Plaintiff was forced to expended time, energy and money, resulting in these Defendants receiving a substantial benefit that they were not entitled to receive.

REAL ESTATE LAW, PLLC
PO BOX 28027
Harsens Island, MI 48028
TELEPHONE (248) 306-3309
FACSIMILE (248) 856-3169

116.    As a matter of equity, William Spatz, Wendy Spatz, Todd Radeke, Radeke Mgt, Spatz Centers, Inc., Spatz Centers II and Spatz Centers III should not be allowed to prosper at Plaintiff's expense.

117.    William Spatz, Wendy Spatz, Todd Radeke, Radeke Mgt, Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III have received the benefit of the Plaintiff paying all of the outstanding utilities and property maintenance upon the Property.

118.    William Spatz, Wendy Spatz, Todd Radeke, Radeke Mgt, Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III have unjustly retained a benefit that was not agreed upon to the detriment of Plaintiff.

119.    William Spatz, Wendy Spatz, Todd Radeke, Radeke Mgt, Spatz Centers, Inc., Spatz Centers II, and Spatz Centers III have been unjustly enriched by their misappropriation of the CAM Payments, retaining the security deposits and accepting and retention of any lease payments.  It would be inequitable and unjust for these defendants to continue to retain those benefits without payment.

120.    As a result of these actions, William Spatz, Wendy Spatz, Todd Radeke, Radeke Mgt, Spatz Centers, Inc., Spatz Centers II and Spatz Centers III have been unjustly enriched in the minimum amount of $36,027.49.

WHEREFORE, Plaintiff respectfully requests a judgment against Defendant for unjust enrichment in the amount of $36,027.49, plus interest as well as an award for its attorneys' fees and costs associated with this action.

### COUNT VIII – FRAUD AS TO WILLIAM SPATZ, TODD RADEKE, RADEKE MGT., WENDY SPATZ, SPATZ CENTERS, INC., SPATZ CENTERS II AND SPATZ CENTERS III

121.    Plaintiff restates and incorporates by reference the allegations in the preceding

REAL ESTATE LAW, PLLC
PO BOX 20027
Harsens Island, MI 48028
TELEPHONE (248) 506-3369
FACSIMILE (248) 856-3169

paragraphs of this Complaint as though fully set forth herein.

122.    Upon information and belief, Defendants William Spatz, Todd Radeke, Wendy Spatz, Radeke Mgt., Spatz Centers, Inc., Spatz Centers II, Spatz Centers III, and Radeke Mgt. have engaged in various schemes purporting to defraud creditors, the public, and both state and federal government agencies, involving use of special purpose entities to qualify for credit sufficient to purchase commercial developments and to secure tenants and rental income from tenants, then allowing developments to decay and the debtor entities to automatically dissolve, but continuing to collect revenue in the name of dissolved entities, or similar entities with similar names for the purpose of confusing and defrauding creditors, in violation of, including but not limited to, business formation state laws and presumably state and federal tax laws, and ultimately transferring and hiding assets from the creditors.

123.    Todd Radeke notarized Williams Spatz' signature to the mortgage identified in **Exhibit 2**.

124.    Wendy Spatz executed the note identified in **Exhibit 1** and serves as the resident agent for Spatz Centers III.

125.    Upon information and belief William Spatz previously served as the resident agent for Radeke Mgt.

126.    Upon information and belief, Fraud Defendants failed to sufficiently isolate and operate said special purpose entities independently from their members, general partners, agents, parents, subsidiaries, and/or sister entities, but as part of its scheme instead used said special purpose entities as a corporate veil to create the appearance that the conduct of Fraud Defendants was instead the conduct of said special purposes entities in an attempt to shield Fraud Defendants from its obligations and liabilities.

127.    William Spatz himself taunted Plaintiff to bring suit and bragged to Plaintiff that he has been sued before and prevailed.

128.    William Spatz advised Plaintiff not to bother to try to collect from him because other people have tried and failed, and to further advise Plaintiff that Plaintiff will never see a dime.

129.    Upon information, Fraud Defendants believe they are untouchable.

130.    Upon information and belief, William Spatz has unlawfully has misused and abused federal bankruptcy laws for the purpose of evading financial obligations, while retaining and diverting income derived directly or indirectly from the commercial developments and funds from creditors.

131.    William Spatz has been subject to multiple findings in both state and federal courts over the last twenty (20) years as a result of having made fraudulent transfers to evade creditors, including transfers to affiliated property management companies and his wife.  Such transfers included transfer of management fees, income, and compensation from limited partnerships, much like Grand Rapids Associates, L.P., to management companies, much like Radeke Mgt, and to his wife Wendy Spatz. **Exhibit 10 and Exhibit 11.**

132.    One court found, in particular, that William Spatz made a transfer, which was a calculated move to escape a creditor and, ultimately, fraudulent.  The same court stated that Spatz Centers, Inc. made a deliberate effort to divert funds to avoid paying the creditor.

133.    Another court found that William Spatz was able to shelter over one quarter of one million dollars from creditors by transferring stock to Wendy Spatz.

134.    Upon information and belief, William Spatz used the entities for which he serves or served as the sole member, president and/or manager, including but not limited to

22

Spatz Centers, Inc., Spatz Centers II, Spatz Centers III, Grand Rapids Associates, L.L.C.,

Grand Rapids Associates, L.P. a/k/a Grand Rapids Associates, as mere instrumentalities to

commit fraud, which caused unjust injury to Plaintiff and/or its predecessor in interest, as well

as the state and federal government agencies.

135.    Upon information and belief, consistent with their scheme, Fraud Defendants

failed to comply with the terms of the leases with commercial tenants by failing to invest in

and/or maintain the structural integrity of the developments, including common areas.

136.    Upon information and belief, Fraud Defendants, as part of their scheme, would

allow or cause said special purpose entities to dissolve, while continuing to conduct business in

the name of such special purpose entities, retain assets in the name of such special purpose

entities, collect money, endorse checks, and otherwise represent the continued existence of

such special purpose entities to the public in the name of said special purpose entities. **Exhibits**

**12-18.**

137.    Upon information and belief, Fraud Defendants, in the course of executing their

scheme failed to maintain the legal existence of such special purpose entities in compliance

with applicable law and, moreover, failed to properly report income, assets and/or expenses

associated with the "dissolved" special purpose entities to the internal revenue service and the

applicable local departments of treasury.

138.    Upon information and belief, Fraud Defendants made material representations

to Plaintiff and/or its predecessor in interest by asserting such special purpose entities were

financially viable and independently operating from their members, general partners, agents,

parents, subsidiaries, and/or sister entities, rather than mere fictions created to conceal the

conduct of the Fraud Defendants.

139.    When Fraud Defendants made such representations, Fraud Defendants knew they were false because Fraud Defendants, upon information and believe, were acting in accordance with said scheme.  As such Fraud Defendants intended to hide said scheme.

140.    Such representations were false when Fraud Defendants made them.

141.    Fraud Defendants made such representations with the intention that they should be acted upon by Plaintiff and/or its predecessor in interest.  Fraud Defendants were aware that by making such representations it would induce Plaintiff and/or its predecessor in interest to rely upon said representations.

142.    Plaintiff and/or its predecessor in interest acted in reliance upon Fraud Defendants' representations.  Had Plaintiff and/or its predecessors known of the scheme, Plaintiff and/or its predecessors would not have become Fraud Defendants' creditor(s), at least not according to the original terms of the note.

143.    The conduct of William Spatz occurred in the course of his business.

144.    The conduct of Todd Radeke occurred in the course of his business.

145.    The conduct of Wendy Spatz occurred in the course of her business.

146.    The conduct of Radeke Mgt. occurred in the course of its business.

147.    The conduct of Spatz Centers, Inc. occurred in the course of its business.

148.    The conduct of Spatz Centers II occurred in the course of its business.

149.    The conduct of Spatz Centers III occurred in the course its business.


150.    William Spatz is personally liable to Plaintiff for the intentional conduct alleged herein.

151.    Todd Radeke is personally liable to Plaintiff for the intentional conduct alleged

REAL ESTATE LAW, PLLC
PO BOX 26027
Harsens Island, MI 48028
TELEPHONE (248) 506-3309
FACSIMILE (248) 856-3169

herein.

152.    Wendy Spatz is personally liable to Plaintiff for the intentional conduct alleged herein.

153.    As a result of Fraud Defendants' conduct, Plaintiff has been damaged in excess of Twenty-Five Thousand and 00/100 ($25,000.00) dollars.

WHEREFORE, Plaintiff is seeking a judgment against William Spatz, Todd Radeke, Wendy Spatz, Radeke Mgt. Spatz Centers, Inc., Spatz Centers II and Spatz Centers III for damages in excess of $25,000.00, plus its special damages of attorney fees and costs, they caused by their fraud.

### COUNT IX – SILENT FRAUD AS TO WILLIAM SPATZ, WENDY SPATZ, TODD RADEKE, RADEKE MGT., SPATZ CENTERS, INC., SPATZ CENTERS II AND SPATZ CENTERS III

154.    Plaintiff restates and incorporates by reference the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

155.    Upon information and belief, Defendants William Spatz, Todd Radeke, Wendy Spatz, Radeke Mgt., Spatz Centers, Inc., Spatz Centers II, Spatz Centers III, and Radeke Mgt. have engaged in various schemes purporting to defraud creditors, the public, and both state and federal government agencies, involving use of special purpose entities to qualify for credit sufficient to purchase commercial developments and to secure tenants and rental income from tenants, then allowing developments to decay and the debtor entities to automatically dissolve, but continuing to collect revenue in the name of dissolved entities, or similar entities with similar names for the purpose of confusing and defrauding creditors, in violation of, including but not limited to, business formation state laws and presumably state and federal tax laws, and ultimately transferring and hiding assets from the creditors.

REAL ESTATE LAW, PLLC
PO BOX 20127
Harsens Island, MI 48028
TELEPHONE (248) 506-1109
FACSIMILE (248) 856-1109

156.     Upon information and belief, Fraud Defendants failed to sufficiently isolate and operate said special purpose entities independently from their members, general partners, agents, parents, subsidiaries, and/or sister entities, but as part of its scheme instead used said special purpose entities as a corporate veil to create the appearance that the conduct of Fraud Defendants was instead the conduct of said special purposes entities in an attempt to shield Fraud Defendants from its obligations and liabilities.

157.     Upon information and belief, Fraud Defendants, as part of their scheme, would allow or cause said special purpose entities to dissolve, while continuing to conduct business in the name of such special purpose entities, retain assets in the name of such special purpose entities, collect money, endorse checks, and otherwise represent the continued existence of such special purpose entities to the public in the name of said special purpose entities

158.     Upon information and belief, Fraud Defendants, in the course of executing their scheme both failed to maintain the legal existence of such special purpose entities in compliance with applicable law and to properly report income, assets and/or expenses associated with the "dissolved" special purpose entities to the internal revenue service and the applicable local departments of treasury.

159.     Upon information and belief, consistent with their scheme, Fraud Defendants failed to comply with the terms of the leases with commercial tenants by failing to invest in and/or maintain the structural integrity of the developments, including common areas.

160.     Upon information and belief Fraud Defendants failed to disclose to Plaintiff and/or its predecessors in interest that such special purpose entities were not financially viable and were not independently operating from their members, general partners, agents, parent, subsidiary, and/or sister entities but were instead not mere fictions created to conceal the

conduct of the Fraud Defendants.

161.    Upon information and belief, Fraud Defendants failed to disclose to Plaintiff and/or its predecessor, the public, and state and federal government agencies all said conduct, which Plaintiff alleged herein purporting to perpetuate said scheme.

162.    Upon information and belief, Fraud Defendants had knowledge of all said conduct alleged herein.

163.    Upon information and belief, Fraud Defendants knew that failure to make such disclosure would create the false impression that Fraud Defendants and said special purpose entities were creditworthy and law-abiding applicants.

164.    When Fraud Defendants failed to make said disclosure, Fraud Defendants intended that Plaintiff and/or its predecessor in interest, the public, and state and federal government agencies rely on the false impression.

165.    Plaintiff and/or its successor in interest acted in reliance upon the false impression that Fraud Defendants and said special purpose entities were creditworthy and law-abiding applicants.  Had Plaintiff known of the scheme, Plaintiff's successor in interest would not have extended credit to Grand Rapids, at least according to the original terms in the note, and Plaintiff would not have acquired ownership of the indebtedness resulting therefrom.

166.    The conduct of Spatz Centers, Inc. occurred in the course its business.

167.    The conduct of Spatz Centers II occurred in the course its business.

168.    The conduct of Spatz Centers III occurred in the course its business.

169.    The conduct of Radeke Mgt. occurred in the course its business.

170.    The conduct of William Spatz occurred in the course of his business.

171.    The conduct of Todd Radeke occurred in the course of his business.

172.    The conduct of Wendy Spatz occurred in the course of her business.

173.    William Spatz is personally liable to Plaintiff for the intentional conduct alleged herein.

174.    Todd Radeke is personally liable to Plaintiff for the intentional conduct alleged herein.

175.    Wendy Spatz is personally liable to Plaintiff for the intentional conduct alleged herein.

176.    As a result of Fraud Defendants' conduct, Plaintiff has been damaged in excess of Twenty-Five Thousand and 00/100 ($25, 000.00) dollars.

WHEREFORE, Plaintiff is seeking a judgment against William Spatz, Wendy Spatz, Todd Radeke, Radeke Mgt., Spatz Centers, Inc., Spatz Centers II and Spatz Centers III for damages in excess of $25,000.00, plus its special damages of attorney fees and costs, they caused by their fraud.

## COUNT X – UNIFORM VOIDABLE TRANSACTIONS ACT

177.    Plaintiff restates the previous paragraphs as fully set forth herein.

178.    Upon information and belief, Grand Rapids, Grand Rapids Assoc., L.P., Spatz Centers, Inc., Radke Mgt., Wendy Spatz, Todd Radeke, and Spatz Centers III transferred the assets of, or incurred obligations on behalf of, Grand Rapids, Grand Rapids Assoc., L.P., Spatz Centers, Inc., and Spatz Centers III, with the actual intent to hinder, delay, or defraud Plaintiff and/or its predecessor in interest, without receiving a reasonably equivalent value in exchange for the transfer or obligation, were engaged or about to engage in a business or a transaction for which the remaining assets of Grand Rapids, Grand Rapids Assoc., L.P., Spatz Centers, Inc. and Spatz Centers III were unreasonably small in relation to the business or transaction and/or

REAL ESTATE LAW, PLLC
PO BOX 29027
Harsens Island, MI 48028
TELEPHONE (248) 516-3309
FACSIMILE (248) 656-3169

intended to incur, or believed or reasonably should have believed that Grand Rapids, Grand Rapids Assoc., L.P., Spatz Centers, Inc. and Spatz Centers III would incur, debts beyond Grand Rapids, Grand Rapids Assoc., L.P., Spatz Centers, Inc. and Spatz Centers III's ability to pay as they became do.

179.    Upon information and belief, the transferees or obligees of said obligations include Fraud Defendants and/or or other entities with similar names.

180.    Upon information and belief, on January 22, 2016, Wendy Spatz wired $344,000.00 from her personal account to an account held by Spatz Centers II.

WHEREFORE, Plaintiff is seeking a judgment avoiding said transfers and/or obligations, providing an attachment or other provisional remedy against the assets transfers and/or subject to such obligations, and enjoining said transferors, transferees, obligors and obligees from further disposition of the assets of transferors and obligors, and awarding Plaintiff any other relief it determines appropriate, including but not limited to levying execution on all assets of transferees and obligees, plus its special damages of attorney fees and costs.

## COUNT XI – FRAUDULENT CONVEYANCES

181.    Plaintiff restates the previous paragraphs as fully set forth herein.

182.    Upon information and belief Radeke Mgt, Todd Radeke, Wendy Spatz, William Spatz, Spatz Centers, Inc., Spatz Centers II and Spatz Centers III wrongfully received rents from tenants.

183.    Upon information and belief, Radeke Mgt, Todd Radeke, Wendy Spatz, William Spatz, Spatz Centers, Inc., Spatz Centers II and Spatz Centers III, in lieu returning said rents to Plaintiff, diverted said rents to Fraud Defendants and/or or other entities with similar

names with the intend to defraud Plaintiff.

WHEREFORE, Plaintiff is seeking a judgment declaring said rent diversion void, fraudulent, and awarding Plaintiff any other relief it determines appropriate, plus its special damages of attorney fees and costs.

## COUNT XII – CIVIL CONSPIRACY AS TO WILLIAM SPATZ, WENDY SPATZ, & TODD RADEKE

184.    Plaintiff restates the previous paragraphs as fully set forth herein.

185.    Upon information and belief, William Spatz, Wendy Spatz and Todd Radeke conspired with each other defraud Plaintiff and/or its successor in interest and perpetuate fraudulent transfers.

186.    Upon information and belief, William Spatz, Wendy Spatz and Todd Radeke conspired with each other in the execution of the scheme purporting to defraud creditors, the public, and both state and federal government agencies, involving use of special purpose entities to qualify for credit sufficient to purchase commercial developments and to secure tenants and rental income from tenants, then allowing developments to decay and the debtor entities to automatically dissolve, but continuing to collect revenue in the name of dissolved entities, or similar entities with similar names for the purpose of confusing and defrauding creditors, in violation of, including but not limited to, business formation state laws and presumably state and federal tax laws, and ultimately transferring and hiding assets from the creditors.

187.    The actions by William Spatz, Wendy Spatz and Todd Radeke were improper and unlawful.

WHEREFORE, Plaintiff is seeking a judgment against William Spatz, Wendy Spatz, and Todd Radeke for damages in excess of $25,000.00, plus its special damages of attorney

REAL ESTATE LAW, PLLC
PO BOX 20027
Hansens Island, MI 48029
TELEPHONE (248) 866-3109
FACSIMILE (248) 856-3109

fees and costs, they caused by their civil conspiracy to commit fraud.

## COUNT XIII – PIERCING THE CORPORATE VEIL

188.    Plaintiff restates the previous paragraphs as fully set forth herein.

189.    Upon information and belief, Fraud Defendants used the entities, including but not limited to Spatz Centers, Inc., Spatz Centers II, Spatz Centers III, Grand Rapids Associates, L.L.C., Grand Rapids Associates, L.P. a/k/a Grand Rapids Associates, as mere instrumentalities to commit fraud, which caused unjust injury to Plaintiff and/or its predecessor in interest, as well as the state and federal government agencies.

190.    Upon information and belief, Fraud Defendants have allowed or caused some or all of said entities to dissolve, but continue to conduct business in the name of such entities, retain assets in the name of such entities, collect money, endorse checks, and otherwise represent the continued existence of such entities to the public in the name of said entities, and have transferred the assets of said entities to Fraud Defendants with the intent to hinder, delay, or defraud creditors.

191.    Upon information and belief, Fraud Defendants have failed to maintain the legal existence of such special purpose entities in compliance with applicable law and has failed to properly report income, assets and/or expenses associated with the "dissolved" special purpose entities to the internal revenue service and the applicable local departments of treasury.

192.    Upon information and belief William Spatz, Wendy Spatz, and Todd Radeke are signers on the bank accounts for the majority, if not all, of said entities.

WHEREFORE, Plaintiff requests that any judgment entered against Spatz Centers, Inc., Spatz Centers II, Spatz Centers III, Grand Rapids Associates, L.L.C., Grand Rapids Associates, L.P. a/k/a Grand Rapids Associates, and be entered against William Spatz, Wendy Spatz, and

REAL ESTATE LAW, PLLC
PO BOX 28027
Huron Island, MI 48028
TELEPHONE (248) 516-3309
FACSIMILE (248) 856-3169

Todd Radeke.

## COUNT XIV – PIERCING THE CORPORATE VEIL
## AS TO SPATZ CENTERS II AND SPATZ CENTERS III

193.    Plaintiff restates the previous paragraphs as fully set forth herein.

194.    Upon information and belief, in addition to or in the alternative, Spatz Centers II and/or Spatz Centers III used the entities Grand Rapids Associates, L.L.C., Grand Rapids Associates, L.P. a/k/a Grand Rapids Associates, Radeke Mgt. and Spatz Centers, Inc., as mere instrumentalities to commit fraud, which caused unjust injury to Plaintiff and/or its predecessor in interest, as well as the state and federal government agencies.

195.    Upon information and belief, Spatz Centers II and/or Spatz Centers III has allowed or caused some or all of said entities to dissolve, but continues to conduct business in the name of such entities, retain assets in the name of such entities, collect money, endorse checks, otherwise represent the continued existence of such entities to the public in the name of said entities, and transferred assets from said entities to Fraud Defendants with the intent to hinder, delay, or defraud creditors.

196.    Upon information and belief, Spatz Centers II and/or Spatz Centers III each has failed to maintain the legal existence of such special purpose entities in compliance with applicable law and has failed to properly report income, assets and/or expenses associated with the "dissolved" special purpose entities to the internal revenue service and the applicable local departments of treasury.

197.    Upon information and belief Spatz Centers III maintains a bank account whose designated source of funds is "business partners."

198.    Upon information and belief William Spatz, Wendy Spatz, and Todd Radeke are all signers for the bank accounts opened in the name of Spatz Centers II and Spatz Centers

REAL ESTATE LAW, PLLC
PO BOX 28027
Harsens Island, MI 48028
TELEPHONE (248) 565-3309
FACSIMILE (248) 856-1169

III.

WHEREFORE, Plaintiff requests that the judgments entered against Grand Rapids Associates, L.L.C., Grand Rapids Associates, L.P. a/k/a Grand Rapids Associates, Radeke Mgt. and Spatz Centers, Inc. be entered against Spatz Centers II and/or Spatz Centers III.

Respectfully Submitted,

**REAL ESTATE LAW, PLLC**

By: Tobias J. Lipski (P62859)
Attorneys for Plaintiff

Dated: February 8, 2018

REAL ESTATE LAW, PLLC
PO BOX 26027
Harsens Island, MI 48028
TELEPHONE (248) 566-3399
FACSIMILE (248) 856-3169

# EXHIBIT 1

SIC Loan No. ████

# NOTE

**$3,750,000.00**                                                      **October 16, 2007**

FOR VALUE RECEIVED, the undersigned ("Borrower"), jointly and severally, promises to pay in lawful money of the United States, to the order of **Standard Insurance Company, an Oregon corporation** ("Lender"), at its office in Hillsboro, Oregon, or such other place as Lender may designate, the principal amount of a loan ("Loan") of **Three Million Seven Hundred Fifty Thousand and No/100ths** Dollars ($3,750,000.00), together with interest thereon, on the following agreements, terms and conditions.

      1.    **Payments.** Borrower shall make monthly payments of principal and interest to Lender, in amounts sufficient to fully amortize the principal balance of this Note over a twenty five (25) year amortization period in substantially equal monthly payments. Such monthly payments of principal and interest shall be in the initial amount of **Twenty Four Thousand Seven Hundred Thirty Eight and No/100ths Dollars ($24,738.00)** payable on the first day of each month, commencing with the **first day of January, 2008,** together with such other sums as may become due hereunder or under any instrument securing this Note, until the entire indebtedness is fully paid, except that any remaining indebtedness if not sooner paid shall be finally due and payable on the **first day of December, 2029,** which is the maturity date of this Note ("Maturity Date"). The monthly payment amount will change after each Rate Adjustment Date (as defined in Paragraph 2) to an amount sufficient to repay the then unpaid principal balance of this Note in full at the then current interest rate, in substantially equal monthly payments over the balance of the amortization period specified above. If applicable, until the payment is again changed, Borrower shall pay the new monthly payment each month beginning on the first day of the first calendar month after the applicable Rate Adjustment Date. Lender will mail or deliver to Borrower a notice of any changes in the interest rate applicable to this Note, and any resulting changes in the monthly payments required under this Note, prior to the date the first payment is due after the applicable Rate Adjustment Date. Every payment received with respect hereto shall be applied, in any order that may be determined by Lender in its sole discretion, to sums under this Note, including, without limitation: (a) late charges; (b) expenses paid or funds advanced by Lender with interest thereon at the Default Rate when applicable (as hereinafter defined); (c) any prepayment fees due with respect to any payment and any other fees which may remain unpaid; (d) accrued interest on the principal balance from time to time remaining unpaid; and (e) subject to the prepayment provisions herein, the principal balance hereunder.

      2.    **Interest.** The interest rate applicable to this Note will change on the applicable Rate Adjustment Date(s). The initial interest rate included in the aforesaid payments, unless adjusted as

otherwise provided in this Note, shall be calculated at the rate of **Six and One-Quarter** percent (**6.250%**) per annum ("Note Rate") upon the unpaid balance of principal of this Note. Borrower, jointly and severally, also promises to pay interest at the Note Rate from the date of disbursement of the Loan proceeds evidenced by this Note ("Disbursement Date") to the date from which interest is included in the first payment previously described. As used herein, "Rate Adjustment Date(s)" shall be as follows:

- 83 months from the First Payment Date;
- 143 months from the First Payment Date;
- 203 months from the First Payment Date;
- 263 months from the First Payment Date.

(a)     One hundred and twenty (120) days prior to each Rate Adjustment Date, Lender shall notify Borrower in writing of the Adjusted Interest Rate that will become effective in accordance with this Note, which Adjusted Interest Rate shall be Lender's then prevailing annual interest rate for similar loans with a term of five (5) years then being originated by Lender on properties comparable to the Property (as herein defined) as determined solely by Lender (such interest rate is hereinafter referred to as the "Adjusted Interest Rate").

(b)     Borrower shall have thirty (30) days from the date of receipt of such notification from Lender to accept or reject the Adjusted Interest Rate. Failure by Borrower to notify Lender of the acceptance or rejection of the Adjusted Interest Rate within such thirty (30) day period shall be deemed to be a rejection of the Adjusted Interest Rate. If the Adjusted Interest Rate is rejected by Borrower (or deemed rejected), the entire unpaid principal balance of this Note, all accrued unpaid interest hereon, and any other amounts payable hereunder or under the other Loan Documents (as hereinafter defined) shall be due and payable in full, without a Prepayment Fee, no later than the Rate Adjustment Date.

(c)     If Borrower accepts the Adjusted Interest Rate for the offered period, the Adjusted Interest Rate shall become effective on the Rate Adjustment Date and monthly installments of principal and interest shall then be due and payable in an amount to be determined that will amortize the remaining unpaid principal balance of this Note at the Adjusted Interest Rate over the remaining amortization period. In such case, Borrower shall also have the option to prepay a portion of the remaining unpaid principal balance of this Note as described in paragraph 3(e) below.

(d)     Thereafter, monthly installments of principal and interest on the unpaid principal balance of this Note, at the Adjusted Interest Rate, in the amount thus calculated, shall be due and payable in consecutive monthly installments commencing on the first day of the calendar month after the Rate Adjustment Date and continuing on the first day of each calendar month thereafter, to and including the monthly installment

of principal and interest due and payable on the earlier of the next Rate Adjustment Date or the Maturity Date.

3.    **Prepayment Restrictions; Fees.**  Borrower shall have the right to prepay, in full but not in part, the obligation evidenced by this Note upon giving Lender (i) not less than thirty (30) days' prior written notice of (a) Borrower's intention to so prepay this Note, and (b) the date upon which such prepayment will be received by Lender ("Prepayment Date"), and (ii) payment to Lender of the Prepayment Fee (as hereinafter defined), if any, then due to Lender as hereinafter provided.

(a)    As used herein, the term "Prepayment Fee" shall mean an amount which is the greater of

(i)    one percent (1%) of the outstanding principal balance of this Note at the time of prepayment, or

(ii)    the sum of:

(A)    the Present Value (as hereinafter defined) of the scheduled monthly payments due under this Note from the Prepayment Date to the earlier of the next Rate Adjustment Date or the Maturity Date.

(B)    the Present Value of the amount of principal and interest due under this Note on the earlier of the next Rate Adjustment Date or the Maturity Date (assuming all scheduled monthly payments due prior to such dates were made when due), minus

(C)    the outstanding principal balance of this Note as of the Prepayment Date.

The "Present Values" described in (A) and (B) shall be computed on a monthly basis as of the Prepayment Date discounted at a rate equal to the yield-to-maturity of the U.S. Treasury Note or Bond closest in maturity to the earlier of the next Rate Adjustment Date or the Maturity Date as reported in The Wall Street Journal (or, if The Wall Street Journal is no longer published, as reported in such other daily financial publication of national circulation which shall be designated by Lender) on the fifth business day preceding the Prepayment Date. Borrower shall be obligated to prepay this Note on the Prepayment Date set forth in the written notice to Lender required hereinabove, after such notice has been delivered to Lender.

(b)    Notwithstanding the foregoing or any other provision herein to the contrary, if Lender elects to apply insurance proceeds, condemnation awards, or any escrowed amounts, if applicable, to the reduction of the outstanding principal balance of this Note in the manner provided in the Mortgage, no Prepayment Fee shall be due or

payable as a result of such application and the monthly installments due and payable hereunder shall be reduced accordingly.

(c)    In the event the Maturity Date is accelerated by Lender at any time due to a default by Borrower in the payment of principal and/or interest due under this Note or in the performance of the terms, covenants or conditions contained in this Note, the Mortgage or any of the other Loan Documents (as hereinafter defined), then a tender of payment in an amount necessary to satisfy the entire outstanding principal balance of this Note together with all accrued unpaid interest hereon made by Borrower, or by anyone on behalf of Borrower, at any time prior to, at, or as a result of, a foreclosure sale or sale pursuant to power of sale, shall constitute a voluntary prepayment hereunder prior to the contracted Maturity Date of this Note thus requiring the payment to Lender of a Prepayment Fee equal to the applicable Prepayment Fee as set forth in paragraph (a) above; provided, however, that in the event such Prepayment Fee is construed to be interest under the laws of the State of Michigan in any circumstance, such payment shall not be required to the extent that the amount thereof, together with other interest payable hereunder, exceeds the maximum rate of interest that may be lawfully charged under applicable law.

(d)    Notwithstanding anything contained herein to the contrary, during the ninety (90) day period immediately preceding the Maturity Date of this Note, the entire outstanding principal balance and all accrued unpaid interest on this Note may be prepaid in whole, but not in part, at par, without incurring a Prepayment Fee.

(e)    Notwithstanding anything contained herein to the contrary, if Borrower accepts the Adjusted Interest Rate as provided in paragraph 2 above, Borrower shall have the right to prepay a portion of the unpaid principal balance of this Note prior to the Rate Adjustment Date, without a Prepayment Fee, provided the remaining principal balance of this Note after the prepayment may not be less than $150,000.00. Any partial prepayment must be received by Lender no less than thirty (30) days prior to the Rate Adjustment Date. Any partial prepayment will be applied to pay down the principal balance of this Note upon Lender's receipt of such prepayment. The then remaining principal balance of this Note will then be used to calculate the new monthly payment amount as described in paragraph 2(d) above.

4.    **Waiver.** To the extent permitted by law, each and every Borrower, surety, guarantor, endorser or signator to this Note, in whatever capacity, hereby waives presentment, demand, protest, notice of dishonor and all other notices, and agrees that Lender may exercise its rights hereunder in any order and at any time, and may do so, without notice to or consent of any such person, and without in any way diminishing the obligations of any such person: (a) deal with any such person with reference to this Note by way of forbearance, extension, modification, compromise or otherwise; (b) extend, release, surrender, exchange, compromise, discharge or modify any right or obligation secured by or provided by the Mortgage securing this Note ("Mortgage") or any other

instrument securing this Note; and (c) take any other action which Lender may deem reasonably appropriate to protect its security interest in the property securing this Note ("Property"). Any such action(s) taken under the preceding sentence may be taken against one, all, or some of such persons, and Lender may take any such action against one differently than another of such persons, in Lender's sole discretion.

5. **Default; Default Rate.** Time is material and of the essence hereof with respect to the payment of any sums of any nature by and the performance of all duties or obligations of the Borrower. Each of the following shall be an Event of Default under this Note: (a) failure to make any payment of principal and/or interest or any other payment required by the provisions of this Note or of any instrument securing this Note on the date such payment or payments are due; (b) failure to perform any other provision of this Note or of any instrument securing this Note; or (c) falsity in any material respect of the warranties in the Mortgage or of any representation, warranty or information furnished by Borrower or its agents to Lender in connection with the loan evidenced by this Note ("Loan"). Upon the occurrence of any Event of Default, any sum not paid as provided in this Note or in any instrument securing this Note, shall, at the option of Lender, without notice, bear interest from such due date at a rate of interest ("Default Rate") equal to four (4) percentage points per annum greater than the Note Rate, or the maximum rate of interest permitted by law, whichever is the lesser, and, at the option of Lender, the unpaid balance of principal, accrued interest, plus any other sums due under this Note, or under any instrument securing this Note shall at once become due and payable, without notice except as described in Paragraph 12, and shall bear interest at the Default Rate. If an Event of Default occurs during a period of time in which prepayment is permitted only on payment of a prepayment fee, such fee shall be computed as if the sum declared due on default were a prepayment and shall be added to the sums due and payable hereunder.

6. **Late Charges.** If any payment is not received by Lender (or by the correspondent if a correspondent has been designated by Lender to receive payments) within five (5) calendar days after its due date, Lender, at its option, may assess a late charge equal to five cents for each $1.00 of each overdue payment or the maximum late charge permitted by the laws of the state in which the Property is located, whichever is less. Such late charge shall be due and payable on demand, and Lender, at its option, may (a) refuse any late payment or any subsequent payment unless accompanied by such late charge, (b) add such late charge to the principal balance of this Note or (c) treat the failure to pay such late charge as demanded as an Event of Default hereunder. If such late charge is added to the principal balance of this Note, it shall bear interest at the Default Rate.

7. **Acknowledgments Regarding Default Rate, Late Charges and Prepayment Fees.**

(a) Borrower acknowledges and agrees that (i) a default in making the payments herein agreed to be paid when due will result in the Lender incurring additional expense in servicing the loan, loss to Lender of the use of the money due, and in frustration to Lender in meeting its other commitments, (ii) if for any reason it fails to pay any amounts due hereunder, Lender shall be entitled to damages for the detriment caused thereby, but that it is extremely difficult and impractical to ascertain the extent of

such damages, and (iii) the Default Rate and the late charge described in this Note are a reasonable estimate of such damages.

(b)     Borrower acknowledges and agrees that (i) prepayment prior to the maturity date may result in loss to Lender, (ii) the amount of the loss will depend on the interest rates at the time of prepayment, the amount of principal prepaid and the length of time remaining between the prepayment date and the scheduled maturity date, (iii) prepayment is most likely to occur when interest rates have dropped below the Note Rate, and (iv) because it is extremely difficult and impractical to ascertain now the amount of loss Lender may suffer in the event of prepayment, (A) Lender shall be entitled to damages for the loss caused by prepayment and (B) the prepayment fee described in this Note is a reasonable measure of such damages.  Borrower agrees that the prepayment fee described in this Note shall be imposed, to the extent permitted by law, whether the prepayment is voluntary, involuntary or by operation of law, in connection with an Event of Default, or required by Lender in connection with a transfer or contract to transfer the Property, **provided** that no prepayment fee shall be added to sums prepaid with casualty insurance proceeds or condemnation awards.

(c)     Borrower expressly (i) waives any right to prepay the loan evidenced hereby without payment of the prepayment fee described above in connection with a transfer or contract to transfer the Property by the undersigned, or a successor in interest of the undersigned, and (ii) agrees to pay such prepayment fee as provided above in connection with such a transfer or contract to transfer.

(d)     Borrower represents that it is a knowledgeable real estate investor and fully understands the effect of the fees, charges, waiver and agreement contained above.  Borrower acknowledges and agrees that the making of the loan by Lender at the interest rate and with the other terms described herein is sufficient consideration for such fees, charges, waiver and agreement, and that Lender would not make this loan on these terms without such fees, charges, waiver and agreement.

8.     **Expenses and Attorney Fees.** If Lender refers this Note to an attorney for collection or seeks legal advice following a default alleged in good faith under the Note; if Lender is the prevailing party in any litigation instituted in connection with the Note; or if Lender or any other person initiates any judicial or nonjudicial action, suit or proceeding in connection with the Note or the security therefor, and an attorney is employed by Lender to (a) appear in any such action, suit or proceeding, or (b) reclaim, seek relief from a judicial or statutory stay, sequester, protect, preserve or enforce Lender's interest in this Note, the Mortgage, or any other security for the Note (including but not limited to proceedings at appellate levels, under federal bankruptcy law, in eminent domain, under probate proceedings, or in connection with any state or federal tax lien), then, in any such event, Borrower shall pay **reasonable** attorney's fees and costs and expenses incurred by Lender and/or its attorney in connection with the above-mentioned events and any appeals related to such

events, including but not limited to costs incurred in searching records, the cost of title reports, the cost of appraisals, and the cost of surveyors' reports. If not paid within ten days after such fees, costs and expenses become due and written demand for payment is made upon Borrower, such amount may, at Lender's option, be added to the principal of the Note and shall bear interest at the Default Rate.

9. **No Usury.** All Agreements between the Borrower and the Lender hereof, whether now existing or whether hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of the maturity hereof, or otherwise, shall the amount paid or agreed to be paid to the Lender for the use, forbearance or detention of the money to be loaned hereunder, or advanced for the performance or payment of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to the indebtedness evidenced hereby, exceed the maximum amount permissible under applicable law. If from any circumstances whatsoever fulfillment of any provision hereof or of any such other document, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law, then ipso facto the obligation to be fulfilled shall be reduced to the limit of such validity, and if from such circumstances the Lender hereof shall ever receive anything of value deemed by applicable law to be interest in any amount that would exceed the highest lawful rate payable hereunder, an amount equal to any excessive interest shall be applied to the reduction of the principal amount owing hereunder and not to the payment of any interest, and if the amount that would be excessive interest exceeds the principal balance then owing, such excess shall be refunded to the party paying the same. It is further agreed, without limitation of the foregoing, that all calculations of the rate of interest contracted for, charged, or received under this Note, or under any instrument evidencing or securing the loan evidenced hereby, that are made for the purpose of determining whether such rate exceeds the maximum lawful contract rate, shall be made, to the extent permitted by applicable law, by amortizing, prorating, allocating, and spreading throughout the full stated term of the loan evidenced hereby, all such interest at any time contracted for, charged, or received from the Borrower or otherwise by the Lender or Lenders hereof in connection with such loan so that the rate of interest on account of such indebtedness, as so calculated, is uniform throughout the term hereof. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between the parties hereto.

10. **Security.** The indebtedness evidenced by this Note is secured by the Mortgage of even date and may be secured by other security instruments.

11. **Due on Sale or Encumbrance.** As provided in the Mortgage securing this Note, and subject to any exceptions provided therein, transfers or encumbrances of the Property, or of ownership interests in Borrower, cause all sums evidenced by this Note and/or secured by the Mortgage or by any other Loan Document to become immediately due and payable. By signing this Note, Borrower acknowledges that Borrower has received and reviewed a copy of the Mortgage and is familiar with the provisions restricting the transfer of the Property and the ownership interests therein.

Note (MI 5/04)                                    Page 7

12.   **Notice and Opportunity to Cure.** Notwithstanding any other provision of this Note, Lender shall not accelerate the sums evidenced hereby because of a nonmonetary default (defined below) by Borrower unless Borrower fails to cure the default within fifteen (15) days of the date on which Lender mails or delivers written notice of the default to Borrower. For purposes of this Note, the term "nonmonetary default" means a failure by Borrower or any other person or entity to perform any obligation contained in this Note or any other document, or instrument evidencing or securing the Loan (collectively, "Loan Documents"), other than the obligation to make payments provided for in this Note or any other Loan Document. If a nonmonetary default is capable of being cured and the cure cannot reasonably be completed within the fifteen (15) day cure period, the cure period shall be extended up to sixty (60) days so long as Borrower has commenced action to cure within the fifteen (15) day cure period, and in Lender's opinion, Borrower is proceeding to cure the default with due diligence. None of the foregoing shall be construed to obligate Lender to forebear in any other manner from exercising its remedies and Lender may pursue any other rights or remedies which Lender may have because of a default.

13.   **Commercial Purpose.** The obligation evidenced by this Note is exclusively for commercial or business purposes.

14.   **Notice.** Except as otherwise provided in this Note, all notices and consents required or permitted under this Note shall be in writing and may be telecopied, cabled, delivered by hand, or mailed by first class registered or certified mail, return receipt requested, postage prepaid, and addressed as follows:

If to Borrower:                           If to Lender:

**Grand Rapids Associates LLC**           **Standard Insurance Company**
**14 N. Peoria Street, 3F**               Attn: Mortgage Loan Servicing T3A
**Chicago, IL 60607**                     19225 NW Tanasbourne Drive
                                          Hillsboro, OR 97124

Changes in the respective addresses to which such notices may be directed may be made from time to time by either party by notice to the other parties given at least ten (10) days before such change of address it to become effective. Notices and consents given by mail in accordance with this paragraph shall be deemed to have been given three (3) days after the date of dispatch; notices and consents given by any other means shall be deemed to have been given when received.

15.   **Governing Law.** The law of the state where the Property is located shall govern the validity, interpretation, construction and performance of this Note. Borrower irrevocably submits to the jurisdiction of any state or federal court in the State where the Property is located in any action or proceeding brought to enforce or otherwise arising out of or relating to this Note, and waives any claim that such forum is an inconvenient forum.

Note (MI 5/04)                            Page 8

16. **Successors and Assigns.** Whenever used herein, the words "undersigned", "Borrower" and "Lender" shall be deemed to include their respective heirs, personal representatives, successors and assigns.

DO NOT SIGN THIS NOTE BEFORE YOU READ IT. THIS NOTE PROVIDES FOR THE PAYMENT OF A FEE IF THE NOTE IS REPAID PRIOR TO THE DATE PROVIDED FOR REPAYMENT IN THIS NOTE AND OTHER CHARGES IF PAYMENTS ARE LATE. IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTE, YOU SHOULD CONSULT YOUR ATTORNEY.

Grand Rapids Associates LLC,
an Illinois limited liability company

By: _____          _____
William Spatz, Manager                  William Spatz, Individually

                                        _____
                                        Wendy Spatz, Individually

Document Drafted By: Kham Sythavongsa

# EXHIBIT 2



20071203-0114374
Mary Hollinrake, P;1/23   3:38PM
Kent Cnty Mt Rgstr 12/03/2007 SEAL

Return to (closer 04_____)
LANDAMERICA AMERICAN
TITLE COMPANY
6029 Beltline Road  Suite 250
Dallas TX 75254

## MORTGAGE

SIC Loan No. ████████

THIS MORTGAGE made this October 16, 2007, is between **Grand Rapids Associates LLC, an Illinois limited liability company** ("Mortgagor") whose address is **14 N. Peoria Street, 3F, Chicago, IL 60607,** and **Standard Insurance Company, an Oregon corporation** ("Mortgagee") whose address is 19225 NW Tanasbourne Drive, Hillsboro, Oregon 97124.

Mortgagor irrevocably mortgages, warrants, and assigns to Mortgagee that property in the City of **Kentwood,** County of **Kent,** State of **Michigan,** described as follows ("Real Property"):

**See Exhibit "A" attached hereto and by this reference made a part hereof for legal description.**

**Commonly known as: 2891 Radcliff Avenue, Kentwood, Michigan, 49512**
**Tax Parcel Identification No.: 41-18-15-227-006**

Notice to Recorder:

THIS DOCUMENT CONSTITUTES A FIXTURE FILING UNDER THE MICHIGAN UNIFORM COMMERCIAL CODE.

Mortgagor's organizational number: 26-1164112.

Together with (a) all rents, income, contract rights, issues and profits now due or which may become due under or by virtue of any lease, rental agreement or other contract, whether written or oral, for the use or occupancy of the Real Property, or any part thereof, together with all tenant security deposits;  (b) all buildings and improvements now or hereafter thereon, and all appurtenances, easements, right in party walls, water and water rights, pumps and pumping plants and all shares of stock evidencing the same; (c) all fixtures and property now or hereafter attached to or used in the

Mortgage (MI 5/04)                    Page 1

20071203-0114374
Mary Hollinrake P:2/23    3:38PM
Kent Cnty MI Rgstr 12/03/2007 SEAL

operation of the Property, including but not limited to machinery, equipment, appliances and fixtures for generating or distributing air, water, heat, electricity, light, fuel or refrigeration, or for ventilating or sanitary purposes, or for the exclusion of vermin or insects, or for the removal of dust, refuse or garbage, all wallbeds, wallsafes, built-in furniture and installations, shelving, lockers, partitions, door stops, vaults, elevators, dumbwaiters, awnings, window shades, venetian blinds, light fixtures, fire hoses and brackets and boxes for same, fire sprinklers, alarm systems, drapery rods and brackets, screens, linoleum, carpets, plumbing, laundry tubs and trays, ice boxes, refrigerators, heating units, stoves, water heaters, incinerators, communication systems and all installations for which any such building is specifically designed; (d) all awards, compensation and settlements in lieu thereof made as a result of the taking by power of eminent domain of the whole or any part of the Real Property; (e) all trade names by which all or any part of the Real Property is known, any books and records relating to the use and operation of all or any portion of the Real Property, all present and future plans and specifications and contracts relevant to the design, construction, management or inspection of any construction on any improvements on the Real Property and all present and future licenses, permits, approvals and agreements with or from any municipal corporation, county, state or other governmental or quasi-governmental entity relevant to the development, improvement or use of all or any portion of the Real Property; and (f) all rights of Mortgagor in and to any escrow or withhold agreements, surety bonds, warranties, management contracts, leasing or sales agreements with any real estate agents or brokers, and service contracts with any entity, which are in any way relevant to the development, improvement, leasing, sale or use of the Real Property or any personal property located thereon; and all of said items whether now or hereafter installed being hereby declared to be, for all purposes of this Mortgage, a part of the realty; and all the estate, interest or other claim or demand, including insurance, in law as well as in equity, which Mortgagor now has or may hereafter acquire, in and to the aforesaid property; the specific enumerations herein not excluding the general. The Real Property and all of the foregoing shall constitute the "Property".

This Mortgage is made for the purpose of securing, in such order of priority as Mortgagee may elect: (a) payment of the indebtedness in the sum of $3,750,000.00 evidenced by that certain Note of even date herewith the signers of which are hereinafter collectively referred to as "Borrower", delivered to Mortgagee and payable to its order, with final payment due on the **first day of December, 2029**, which is the maturity date of this Mortgage, and any and all modifications, extensions or renewals thereof, whether hereafter evidenced by the Note or otherwise ("Note"); (b) payment of interest on said indebtedness according to the terms of the Note; (c) payment of all other sums, with interest as herein provided, becoming due and payable under the provisions hereof to Mortgagee; (d) performance of each and every condition, obligation, covenant, promise and agreement of Mortgagor contained herein, or in the Note, or in any loan agreement relative to any indebtedness evidenced by the Note ("Loan"), or in any security agreement or mortgage at any time given to secure any indebtedness hereby secured or any part thereof; and (e) payment of such additional sums with interest thereon as may be hereafter advanced by or borrowed from the Mortgagee, its successors or assigns, by the then record owner or owners of the Property when evidenced by another promissory note or notes which are by the terms thereof secured by this Mortgage. This Mortgage constitutes a Future Advance Mortgage under Michigan law. THE NOTE MAY CONTAIN PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE.

20071203-0114374
Mary Hollinrake P:3/23    3:38PM
Kent Cnty MI Rcstr 12/03/2007 SEAL

**Mortgagor's Covenants and Warranties.** Mortgagor hereby warrants that: (a) Mortgagor is the owner in fee simple absolute of the Property and every part thereof; (b) the Property is free, and will be kept free, from all liens and encumbrances, except those accepted by Mortgagee in writing, and Mortgagor will defend the title hereby granted to and in favor of Mortgagee as against all and every person claiming or to claim the same; (c) the loan proceeds are not for use primarily for personal, family or household purposes; (d) to the best of Mortgagor's knowledge after due inquiry into previous ownership and use of the Property, there are no Hazardous Substances (as defined below) located on the Property and Mortgagor will not place or permit to be placed on the Property any Hazardous Substances (as defined below), except in minor quantities as necessary for the operation and maintenance of the Property, used and stored in accordance with applicable law, or in the form of consumer products held for retail sale in sealed containers; (e) the Property is zoned for the existing or contemplated use of the Property; (f) the Property is in compliance with all zoning, subdivision, and environmental laws, regulations, and ordinances applicable thereto; all deed restrictions, subdivision and building ordinances and other applicable governmental laws (including the Fair Housing Act and the Americans With Disabilities Act, as each is amended from time to time) have been fully complied with; and Mortgagor has all licenses and permits required by governmental authorities with respect to the Property, its operation, improvement and use; (g) the Property has indefeasible access to public rights of way as now improved and open to public passage, and is not encroached upon by improvements or rights of others, nor do the improvements on the Property encroach upon the property of others; (h) there are no actions, lawsuits, or other proceedings pending or threatened against or affecting the Property or Borrower which might adversely affect the ability of Borrower to perform its obligations under the Note or other documents which evidence or secure the Loan ("Loan Documents"), or which might adversely affect the priority of Mortgagee's first lien on the Property; (i) consummation of the loan secured hereby and performance under the Loan Documents will not conflict with or result in a breach of any law, regulation or court order applicable to Borrower or the Property; (j) no condemnation proceeding is pending or, to the knowledge of Mortgagor, threatened with respect to the Property; (k) there has been no material adverse change in the financial condition of Mortgagor or Borrower which might adversely affect the ability of Mortgagor or Borrower to perform its obligations under the loan documents, or which might adversely affect the priority of Mortgagee's first lien on the Property; (l) all services and utilities, such as water, electricity and sewer, are available to the Property; and (m) with respect to each Mortgagor who is an individual, no part of the Property constitutes any part of Mortgagor's business homestead or residential homestead. As used in this Mortgage, Hazardous Substances means: (a) any "hazardous waste" as defined in the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.), as amended from time to time, and regulations promulgated thereunder, (b) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.), as amended from time to time, and regulations promulgated thereunder; (c) radon, asbestos, polychlorinated biphenyls (PCB's), explosives, radioactive substances, and material quantities of petroleum products; (d) any substance the presence of which on the Property is regulated by any federal, state or local law relating to the protection of the environment or public health; and (e) any other substance which by law requires special handling in its collection, storage, treatment or disposal.

**20071203-0114374**
Mary Hollinrake P:4/23    3:38PM
Kent Cnty MI Rstr 12/03/2007 SEAL

A.      Mortgagor agrees as follows:

1.      **Payment of Indebtedness; Performance of Covenants.** Mortgagor shall pay each and every installment of principal and interest on the Note and all other indebtedness secured hereby, as and when the same shall become due, and perform and observe all of the covenants, agreements and provisions contained herein, in the Note and any other instrument given as security for the payment of the Note.

2.      **Maintenance; Compliance; Inspection.** Mortgagor shall:  keep the Property in good condition and repair; not permit or suffer any extraordinary repairs or removal or demolition of, or a structural change in any building, fixture, equipment, or other improvement on the Property; comply with all laws, ordinances, regulations, covenants, conditions and restrictions affecting the Property or requiring any alteration or improvements to be made thereon (including the Fair Housing Act and the Americans With Disabilities Act, as each is amended from time to time); not commit or permit waste thereon; not commit, suffer or permit any act upon the Property in violation of law; cultivate, irrigate, fertilize, prune and do all other acts which from the character or use of the Property may be reasonably necessary, the specific enumeration herein not excluding the general; and keep the Property free from all encumbrances, except those accepted by Mortgagee in writing. Mortgagor shall permit Mortgagee, or its agents, upon reasonable prior notice, to inspect the Property, including the interior of any structure.

3.      **Hazardous Waste and Substances; Environmental Requirements.**

(a)     Mortgagor shall comply with all laws, governmental standards and regulations applicable to Mortgagor or to the Property in connection with occupational health and safety, hazardous waste and substances, and environmental matters. Mortgagor shall promptly notify Mortgagee of its receipt of any notice of (i) a violation of any such law, standard or regulation; (ii) all claims made or threatened by any third party against Mortgagor or the Property relating to any loss or injury resulting from any Hazardous Substances; and (iii) Mortgagor's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property or any part thereof to be subject to any restrictions on the ownership, occupancy, transferability or use of the Property under any environmental law. The use, generation, storage, release, threatened release, discharge, disposal or presence on, under or about the Property of Hazardous Substances by Mortgagor, Mortgagor's agents, or any tenant or sublessee occupying part or all of the Property, except in minor quantities as necessary for the operation and maintenance of the Property, used and stored in accordance with applicable law, or in the form of consumer products held for retail sale in sealed containers, shall be an event of default under this Mortgage, and Mortgagor shall not engage in or permit such activities or events to occur upon the Property.

Mortgage (MI 5/04)                     Page 4

20071203-0114374
Mary Hollinrake P:5/23   3:38PM
Kent Cnty MI Rgstr 12/03/2007  SEAL

(b)     Mortgagor shall indemnify and hold Mortgagee, its directors, officers, employees, agents, successors and assigns harmless from all loss, cost, damage, claim and expense (including attorney fees and costs, whether at trial, on appeal or otherwise) incurred by Mortgagee in connection with the falsity in any material respect of the covenants contained herein or of Mortgagor's failure to perform the obligations of this paragraph 3.

(c)     Mortgagor agrees that a receiver may be appointed to enable Mortgagee to enter upon and inspect the Property for the purpose of determining the existence, location, nature and magnitude of any past or present release or threatened release of any hazardous substance into, onto, beneath or from the Property. Any costs incurred by Mortgagee in obtaining the appointment of a receiver and performing the inspections, including reasonable attorney fees, shall be paid by Mortgagor. If not paid within ten (10) days after such fees, costs and expenses become due and written demand for payment is made upon Mortgagor, such amount may, at Mortgagee's option, be added to the Principal Balance of the Note ("Principal Balance") and shall bear interest at the Default Rate.

4.     **Casualty Loss/Restoration Construction.** Unless Mortgagee determines, pursuant to the provisions in Paragraph B.1., to apply the insurance proceeds to the reduction of the indebtedness, Mortgagor shall promptly commence and diligently pursue to completion the repair, restoration and rebuilding of any portion of the Property that has been partially damaged or destroyed in full compliance with all legal requirements and to the same condition, character and at least equal value and general utility as nearly as possible to that existing prior to such damage or destruction.   Mortgagor further agrees:   to complete same in accordance with plans and specifications satisfactory to Mortgagee, to allow Mortgagee to inspect the Property at all times during construction and to replace any work or materials unsatisfactory to Mortgagee within fifteen (15) days after notice from Mortgagee of such fact. If said work upon the construction or restoration of the building or buildings shall be discontinued for a period of fifteen (15) days, Mortgagee may, at its option, also enter into and upon the Property and complete the construction or restoration of said building or buildings. Mortgagor hereby gives to Mortgagee full authority and power to make such entry and to enter into such contracts or arrangements as may be necessary to complete or restore said building or buildings and all monies expended by Mortgagee in connection with such completion or restoration shall be added to the principal theretofore advanced under the Note and secured by these presents and shall be payable by Mortgagor on demand with interest as provided in the Note.

5.     **Insurance.**

(a)     <u>Property and Other Insurance.</u> Mortgagor shall obtain and maintain in full force and effect during the term of this Mortgage such insurance as Mortgagee may reasonably require from time to time by notice to Mortgagor, including, without limitation, insurance providing (i) protection against fire, extended coverage and other all risk

20071203-0114374
Mary Hollinrake P:6/23  3:30PM
Kent Cnty MI Rastr 12/03/2007  SEAL

perils, including flood (where required) and other coverage as deemed appropriate by Mortgagee from time to time, with endorsements for waiver of subrogation, replacement cost coverage, inflation adjustment, and vandalism and malicious mischief coverage, all in amounts not less than the full replacement cost of all improvements including the cost of debris removal, (ii) comprehensive general public liability coverage with a broad form coverage endorsement with limits of $2,000,000 for aggregate liability and a single limit of $1,000,000, and (iii) business interruption and/or rent loss insurance (equal to twelve (12) months annualized income). If any portion of the fire and other risks insured as provided herein are reinsured, the policies shall contain a so-called "cut-through" endorsement.

(b)   Insurance Companies and Policies. All such insurance shall be written by a company or companies acceptable to Mortgagee with an A- or better rating by A.M. Best Company, Inc.  The policies described in Paragraphs 5a(i) and (iii) above shall contain (i) a standard mortgagee clause naming Mortgagee as the first mortgagee with loss proceeds under the policies payable to Mortgagee, and (ii) a waiver of subrogation endorsement as to Mortgagee. The policy described in Paragraph 5a(ii) above shall name Mortgagee as an additional named insured, and the policy described in Paragraph 5a(iii) above shall provide that all proceeds be payable to Mortgagee. Each policy described above shall provide for a thirty (30) day notice of cancellation or modification, shall be satisfactory to Mortgagee as to form and substance, and shall contain endorsements that no act or negligence of Mortgagor or any occupant, and no occupancy or use of the Property for purposes more hazardous than permitted by the terms of the policy will affect the validity or enforceability of such insurance as against Mortgagee.  If any portion of the fire and other risks insured as provided herein are reinsured, the policies shall contain a so-called "cut-through" endorsement. Each policy shall be in full force and effect as of the date of this Mortgage, shall contain such additional provisions as Mortgagee deems necessary or desirable to protect its interest, and shall be accompanied by proof of premiums paid for the current policy year. All such insurance shall be written in amounts sufficient to prevent Mortgagor from becoming a co-insurer under the applicable policies. Mortgagor shall provide acceptable ACORD Form certificates evidencing insurance coverage to Mortgagee thirty (30) days prior to any policy expiration date or in the event any policy is modified or canceled.

(c)   Blanket Policy.  If a blanket policy is issued, Mortgagor shall furnish Mortgagee with a certified copy of said policy, together with a certificate indicating that Mortgagee is the insured under said policy in the proper designated amount.

(d)   Notice of Loss.  In the event of loss, Mortgagor shall immediately notify Mortgagee. Mortgagee may make proof of loss if it is not made promptly by Mortgagor.

Mortgage (MI 5/04)                          Page 6

**20071203-0114374**
Mary Hollinrake P:7/23 3:36PM
Kent Cnty MI Rgstr 12/03/2007 SEAL

(c) <u>Insurance Obtained by Third Party.</u> If insurance is provided to Mortgagee by a tenant or any party other than Mortgagor, there is a lapse in coverage, coverage is not with a company acceptable to Mortgagee with an A Category or better rating, coverage is not in an amount equal to the full replacement value of the improvements, or coverage does not in any other way meet conditions required by Mortgagee, Mortgagor will provide coverage within thirty (30) days of being notified by Mortgagee of any inadequacy in coverage. If Mortgagee does not receive proof of such coverage within thirty (30) days, Mortgagee will force place insurance until proof of coverage which meets the conditions of the loan is received. Premiums for this force place coverage are at rates higher than Mortgagor could obtain, and payment will be the responsibility of Mortgagor, provided that at Mortgagee's sole option, Mortgagee may add the cost of such premiums to the principal balance of the loan.

6. **Defense.** Mortgagor shall appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Mortgagee and shall pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding, or appeal therefrom, in which Mortgagee may appear.

7. **Taxes and Assessments.**

(a) Payment. Mortgagor shall pay, at least ten (10) days before the same shall become delinquent, all taxes and assessments affecting the Property or upon this Mortgage or the debt secured thereby, or against Mortgagee by reason of the ownership of this Mortgage and the Note, or either of them, including assessments on appurtenant water stock. Mortgagor shall also pay, when due, all encumbrances, charges and liens, with interest, on the Property or any part thereof, which appear to be prior or superior hereto and shall deliver to Mortgagee upon request the official receipt or receipts showing payment thereof, and shall pay all costs, fees and expenses of this Mortgage.

(b) Waste. The failure of the Mortgagor to pay any taxes or assessments assessed against the Property, any installment thereof or any premium payable with respect to any insurance policy covering the Property shall constitute waste and shall entitle the Mortgagee to the benefits of Section 600.2927 of the Michigan Revised Judicature Act of 1961, as amended, being MCL 600.2927. The Mortgagor hereby consents to the appointment of a receiver pursuant to any necessary court order under the Act if the Mortgagee elects to seek relief under the Act.

8. **Monthly Deposits.** Unless this covenant is prohibited by law or waived in writing by Mortgagee, Mortgagor shall pay each year to Mortgagee, together with and in addition to the monthly payments of principal and interest payable under the terms of the Note, until the Note is fully paid, in equal monthly installments, the estimated amount of the annual property taxes,

Mortgage (MI 5/04) Page 7



20071203-0114374
Mary Hollinrake P:8/23   3:38PM
Kent Cnty MI Rgstr 12/03/2007 SEAL

assessments, insurance premiums and similar charges next payable, as reasonably estimated by Mortgagee. If at any time Mortgagee determines that such payments will not be sufficient to account for each such charge on its due date, Mortgagor shall pay to Mortgagee, upon demand, additional sums as necessary to account for such deficiency. Mortgagee may retain the sums received under this paragraph 8 and apply them to such charges when they become due. Sums received shall not earn interest and may be commingled with other funds of Mortgagee. If Mortgagee is required by law to pay interest on these sums, Mortgagee may, to the extent permitted by law, impose a charge for holding and disbursing such funds. In the event of a default under the Note, this Mortgage or any other instrument securing the Note, Mortgagee may apply the sums required under this paragraph 8 (without prepayment fee and without limiting the privilege, if any, to prepay any amounts secured hereby) first to accrued interest and then to the principal balance secured hereby. As an additional covenant hereof, and in any event if the foregoing provision for prepayment is at any time prohibited by law, or waived in writing by Mortgagee, or Mortgagor fails to make payments in the full amount required under this paragraph 8, Mortgagor shall pay such charges when they are due and, upon demand, provide Mortgagee with satisfactory evidence of payment and coverage.

9.      **Leases.** Mortgagor shall fully perform all the terms and conditions on Mortgagor's part to be performed in any existing or future lease with respect to which Mortgagor is lessor covering all or a portion of the Property. Mortgagor shall not, without the prior consent of Mortgagee, terminate, cancel or accept the surrender of, or suffer or permit the termination, cancellation or surrender of such lease, except upon the expiration of the term thereof, or materially modify or alter, or suffer or permit the material modification or alteration of such lease. Mortgagor further covenants and agrees not to enter into any lease for a term in excess of three (3) years for fifteen percent (15%) or more of the net rentable area of the Property without the prior written consent of Mortgagee. Mortgagee reserves the right to declare any subordinate lease superior to the lien of this Mortgage, at its sole option.

10.     **Fees for Information.** Mortgagor shall pay Mortgagee, to the extent permitted by law, a reasonable fee, as determined by Mortgagee, for providing to Mortgagor or a third party a statement concerning the obligations secured by this Mortgage or any other information requested by Mortgagor or the third party.

11.     **Security Agreement.**

(a)     Grant of Security Interest. With respect to any portion of the Property which constitutes personal property or fixtures governed by the Uniform Commercial Code of the State of Michigan ("Code"), this Mortgage shall constitute a security agreement between Mortgagor as Debtor and Mortgagee as Secured Party, and Mortgagor hereby grants to Mortgagee a security interest in such portion of the Property. Cumulative of all other rights of Mortgagee hereunder, Mortgagee shall have all of the rights conferred upon secured parties by the Code. Mortgagor shall execute and deliver to Mortgagee all financing statements that may from time to time

20071203-0114374
Mary Hollinrake P:9/23    3:38PM
Kent Cnty MI Rostr 12/03/2007 SEAL

be required by Mortgagee to establish and maintain the validity and priority of the security interest of Mortgagee, or any modification thereof, and shall bear all costs and expenses of any searches reasonably required by Mortgagee.

(b)     **Rights of Mortgagee.**  Mortgagee may exercise any or all of the remedies of a secured party available to it under the Code with respect to such property, and it is expressly agreed that if, upon default, Mortgagee shall proceed to dispose of such property in accordance with the provisions of the Code, ten (10) days' written notice by Mortgagee to Mortgagor shall be deemed to be reasonable notice under any provision of the Code requiring such notice; provided, however, that Mortgagee may, at its option, dispose of such property in accordance with Mortgagee's rights and remedies with respect to the real property pursuant to the provisions of this Mortgage, in lieu of proceeding under the Code. Upon default, Mortgagor covenants and agrees upon demand by Mortgagee to assemble and deliver to Mortgagee all of the personal property in which Mortgagee has been granted a security interest by Mortgagor.

(c)     **Change in Mortgagor's Name.**  Mortgagor shall give advance notice in writing to Mortgagee of any proposed change in Mortgagor's name, identity, or corporate structure and shall execute and deliver to Mortgagee, prior to or concurrently with the occurrence of any such change, all additional financing statements that Mortgagee may require to establish and maintain the validity and priority of Mortgagee's security interest with respect to any Property described or referred to herein.

(d)     **Fixture Filing.**  With respect to those items of the Property that are or will become fixtures upon the Property, this Mortgage shall be effective as a financing statement files as a fixture filing from the date of its filing for record in the real estate records of the county in which the Property is situated. Information concerning the security interest created by this instrument may be obtained from Mortgagee, as Secured Party, at the address of Mortgagee stated below. The mailing address of Mortgagor, as Debtor, is as stated below.

12.     **Restrictive Uses.**  Mortgagor shall not, without Mortgagee's prior written consent, change the general nature of the occupancy of the Property, initiate, acquire or permit any change in any public or private restrictions (including without limitation a zoning reclassification) limiting the uses which may be made of the Collateral, or take or permit any action which would impair the Collateral or Mortgagee's lien or security interest in the Collateral.

13.     **Changes In Use.**  If Mortgagor, Borrower or a related entity or person occupies or leases the Property, Mortgagor shall make no change in the use or occupancy of the Property or otherwise limit the uses which may be made of the Property without Mortgagee's prior written consent.



20071203-0114374
Mary Hollinrake P:10/23   3:38PM
Kent Cnty MI Rsstr 12/03/2007 SEAL

**B.**    It is mutually agreed that:

1.    **Application of Insurance or Condemnation Proceeds.**  All sums paid under any insurance policy or condemnation award shall be paid to the Mortgagee.  Mortgagee agrees to allow the use of sums paid for repair and reconstruction of the Property provided:

(a)    there exists no default or other event which with the passing of time or the giving of notice or both would constitute a default under the Note or this Mortgage;

(b)    all proceeds and additional funds deposited by the Mortgagor with Mortgagee prior to the commencement of any repair or reconstruction are adequate, as determined by Mortgagee, to complete repair and reconstruction of the Property pursuant to plans and specifications approved by Mortgagee;

(c)    if, in Mortgagee's determination, the loan to value ratio, upon completion of repair or restoration, will exceed seventy-five percent (75%), the balance due on the Note shall be reduced to an amount which, reduces the loan to value ratio, as calculated by Mortgagee, to no more than seventy-five percent (75%).  In such a case, the remaining monthly payments of principal and interest may be adjusted to amortize the reduced principal balance over the remaining term of the Loan, at Mortgagee's discretion.  Any amount prepaid under this provision may be paid without a prepayment fee, provided however, any additional amount Mortgagor desires to prepay, if any, shall be subject to applicable prepayment fees.

(d)    disbursement procedures acceptable to Mortgagee are in place;

(e)    Mortgagee shall have received acceptable estoppels, consents and assurances from municipal authorities, tenants in the Property, and others, as Mortgagee may request; and

(f)    Mortgagee has received evidence satisfactory to it, that reconstruction and/or repair can be completed at least three (3) months prior to the date the Note secured by this Mortgage is due and payable.

If the above conditions are not satisfied as to the application of the proceeds or any awards, Mortgagee shall apply the same (after first deducting therefrom Mortgagee's reasonable expenses incurred in collecting the same, including but not limited to reasonable attorneys' fees) to the reduction of the outstanding principal balance of the Loan ("Principal Balance") without a prepayment fee or to payment of the restoration, repair, replacement or rebuilding of the property that is damaged, destroyed or taken in such manner as Mortgagee may determine.

20071203-0114374
Mary Hollinrake P:11/23   3:38PM
Kent Cnty MI Rgstr 12/03/2007  SEAL

If any proceeds are applied to the reduction of the Principal Balance, the remaining monthly payments of principal and interest will be reduced to amortize the reduced Principal Balance over the remaining amortization period of the Loan.

2.  **Non-Waiver.** No waiver of any default on the part of Mortgagor or breach of any of the provisions of this Mortgage or of any other instrument executed in connection with the indebtedness secured hereby shall be considered a waiver of any other or subsequent default or breach, and no delay or omission in exercising or enforcing the rights and powers herein granted shall be construed as a waiver of such rights and powers, and likewise no exercise or enforcement of any rights or powers hereunder shall be held to exhaust such rights and powers, and every such right and power may be exercised from time to time.

3.  **Assignment of Rents.** To further secure the amounts described herein and in the Note, Mortgagor hereby assigns the rents, income, issues and profits of the Property and hereby gives to and confers upon Mortgagee the right, power and authority, during the continuance of this Mortgage, to collect the rents, income, issues and profits of the Property, reserving unto Mortgagor the right, prior to any default by Mortgagor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, income, issues and profits as they become due and payable.  Upon any such default, Mortgagee may, at any time, without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, the solvency of Mortgagor, or the presence of waste or danger of loss or destruction of the Property, enter upon and take possession of the Property, or any part thereof, and any personal property in which Mortgagee has a security interest as additional security for the indebtedness secured by this Mortgage, and/or may, in its own name, sue for or otherwise collect such rents, income, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorneys fees, upon any indebtedness secured hereby, and in such order as Mortgagee may determine. Mortgagee may collect the rents, income, issues and profits of the Property so long as a default shall exist and during the pendency of any foreclosure proceedings and during the redemption period, and Mortgagor agrees to consent to a receiver if this is believed necessary or desirable by Mortgagee to enforce its rights under this section.  Mortgagee shall be entitled to all of the rights and benefits conferred by Act No. 210 of the Michigan Public Acts of 1953, as amended (MCL § 554.231 et. seq.).  In the exercise of any of the foregoing rights and powers, Mortgagee shall not be liable to Mortgagor for any loss or damage thereby sustained unless due solely to the willful misconduct of Mortgagee.  The entering upon and taking possession of the Property, the collection of such rents, income, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.  To the extent the provisions of this paragraph are inconsistent with the terms of a separate Assignment of Rents, if any, the terms of the Assignment of Rents shall control.

4.  **Mortgagee's Right to Cure and Defend.**  Should Mortgagor fail to make any payment or to do any act as provided in this Mortgage, in the Note or in any other instrument securing the Note, Mortgagee, but without obligation so to do and without notice to or demand upon

Mortgage (MI 5/04)                            Page 11

20071203-0114374
Mary Hollinrake P:12/23 3:38PM
Kent Cnty MI Rgstr 12/03/2007 SEAL

Mortgagor and without releasing Mortgagor from any obligation hereof, may make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof, and Mortgagor authorizes Mortgagee to enter upon the Property for such purpose. Mortgagee may, at any time prior to full payment of all sums secured by this Mortgage: appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Mortgagee; pay, purchase, contest or compromise any encumbrance, charge or lien which, in the judgment of either, appears to be prior or superior hereto; and, in exercising any power conferred by this Mortgage, pay necessary expenses, employ counsel and pay reasonable fees therefor (including fees on appeal). Mortgagor agrees to repay immediately and without demand all sums so expended by Mortgagee with interest from date of expenditure at the Default Rate as herein provided.

5. **Default; Acceleration; Default Rate.** Time is material and of the essence hereof with respect to the payment of any sums of any nature by and the performance of all duties or obligations of the Mortgagor. Each of the following shall be an "Event of Default" under this Mortgage: (a) failure of Mortgagor to make any payment of principal and/or interest or any other payment required by the provisions of the Note or of any instrument securing the Note on the date such payment or payments are due; (b) failure to perform any other provision of the Note, this Mortgage, or of any instrument securing the Note within fifteen (15) days of the date on which Mortgagee mails written notice of the default to Mortgagor; (c) a proceeding under any bankruptcy, receivership or insolvency law is instituted by or against Mortgagor; (d) the making of an assignment for the benefit of creditors by Mortgagor; (e) the imposition upon Mortgagee, under any laws, of what Mortgagee may deem to be a substantial tax upon Mortgagee by reason of its interest in this Mortgage (unless Mortgagor may lawfully pay such tax and does so); (f) if any warranty contained in this Mortgage is false in any material respect or any representation, warranty or information furnished by the Mortgagor or its agents to Mortgagee in connection with the indebtedness secured hereby is false in any material respect; or (g) if any of the following appear on the list of Specially Designated Nationals and Blocked Person that is maintained by the U. S. Treasury Department's Office of Foreign Assets Control ("OFAC") or on any other similar list maintained by any governmental entity or agency (collectively, the "SDN List"): (i) any Grantor; (ii) any principal, manager or majority shareholder of any Note signer ("Principal"); (iii) any guarantor or indemnitor, if any; or (iv) any person or entity related to any Grantor, any Principal, any guarantor, any indemnitor, the debt secured by this Mortgage or the Property. Any default under this Mortgage shall constitute a default under the Note and under all other security instruments securing the Note. Any default under such other security instruments shall constitute a default under this Mortgage. Upon default, Mortgagee may declare all sums secured hereby immediately due and payable. Any sum not paid as provided herein or in the Note or any other security instrument securing the Note shall bear interest from such due date at a rate of interest four (4) percentage points per annum greater than the Note Rate or the maximum rate permitted by law, whichever is lesser ("Default Rate"). If a default occurs during a period of time in which prepayment is permitted only on payment of prepayment fee, such fee shall be computed as if the sum declared due on default were a prepayment and shall be added to the sums due and payable under the Note. Mortgagor consent to a personal deficiency judgment for any part of the debt hereby secured which shall not be paid by the sale of the Property, unless such judgment is prohibited by law. Upon the

20071203-0114374
Mary Hollinrake P:13/23   3:38PM
Kent Cnty MI Rgstr 12/03/2007  SEAL

occurrence of [a default] [an Event of Default], at the option of the Mortgagee, Mortgagee may commence foreclosure proceedings against the Mortgaged Property through judicial proceedings or by advertisement pursuant to the statutes in such case made and provided and sell the Mortgaged Property or cause the same to be sold in accordance with such statutes in, at the option of the Mortgagee, a single parcel or several parcels. By execution of this Mortgage, the Mortgagor hereby grants to the Mortgagee the power to sell and convey the Mortgaged Property at public sale in accordance with the statutes providing therefor.

In the case of the occurrence of an Event of Default under subsection B.5(g) above, Beneficiary shall have the right to take any and all action or to make any report or notification required by OFAC or any other applicable governmental entity or agency or by the Laws relating to the SDN List.

6.      **Expenses and Attorney Fees.** If Mortgagee refers the Note or this Mortgage to an attorney for collection or seeks legal advice following a default alleged in good faith under the Note or this Mortgage; if Mortgagee is the prevailing party in any litigation instituted in connection with the Note or this Mortgage; or if Mortgagee or any other person initiates any judicial or nonjudicial action, suit or proceeding in connection with the Note, the indebtedness evidenced thereby or the security therefor (including, but not limited to, an action to recover possession of the Property after foreclosure), and an attorney is employed by Mortgagee to (a) appear in any such action, suit or proceeding, or (b) reclaim, seek relief from a judicial or statutory stay, sequester, protect, preserve or enforce Mortgagee's interest in the Note, the Mortgage or any other security for the Note (including but not limited to proceedings under federal bankruptcy law, in eminent domain, under probate proceedings, appellate reviews, or in connection with any state or federal tax lien), then, in any such event, to the extent allowed by law, Mortgagor shall pay **reasonable** attorney fees and costs and expenses incurred by Mortgagee and/or its attorney in connection with the above-mentioned events and any appeals related to such events, including but not limited to costs incurred in searching records, the cost of title reports, the cost of appraisals, the cost of surveyors' reports and the cost of environmental surveys. Mortgagor acknowledges and agrees that such fees and expenses shall be deemed to be advances to protect Mortgagee's interest in the Property, and may be charged and collected from Mortgagor in connection with a reinstatement following a default hereunder. If not paid within ten (10) days after such fees, costs and expenses become due and written demand for payment is made upon Mortgagor, such amount may, at Mortgagee's option, be added to the Principal Balance of the Note ("Principal Balance") and shall bear interest at the Default Rate.

7.      **Binding Effect; Waiver of Defenses; Interpretation.** This Mortgage applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devises, administrators, executors, successors and assigns. The right to plead any Statute of Limitations in any suit brought upon the Note or the indebtedness thereby evidenced or to foreclose or enforce this Mortgage or arising therefrom or by reason of any default of Mortgagor, is hereby waived to the full extent permissible by law. The term Mortgagee shall mean the owner and holder, including pledgees, of the Note secured hereby, whether or not named as Mortgagee herein. In this Mortgage, whenever

20071203-0114374
Mary Hollinrake P:14/23   3:38PM
Kent Cnty MI Rgstr 12/03/2007 SEAL

the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

8.     **Due on Sale or Encumbrance.**

(a)     <u>Generally.</u>  The loan evidenced by the Note ("Loan") is personal to Mortgagor and not assignable.  In making it, Mortgagee has relied on Mortgagor's credit, Mortgagor's interest in the Property, and the financial market conditions at the time the Loan is made.  Except as described in paragraphs B.8 (c) and (d) below, in the event of a sale, conveyance, transfer or encumbrance, directly or indirectly, either voluntarily, involuntarily or by operation of law, of the title to or possession of all or part of the Property (a "Transfer"), Mortgagee may declare the entire balance of this Loan immediately due and payable.  In such event, and to the extent permitted by law, a prepayment charge calculated in accordance with the prepayment provisions of the Note shall be added to the sum due and payable.  Alternatively, the provisions in the Note, the Mortgage and any other instrument securing the Note may be modified, at Mortgagee's sole option, to conform to provisions being offered by Mortgagee in similar Loans at the time Mortgagee's waiver is sought, or in the event Mortgagee is not offering similar Loans at such time, on such reasonable terms as Mortgagee may determine.

(b)     <u>Transfer Examples.</u>  For the purpose of, and without limiting the generality of the foregoing, the occurrence at any time of any of the following events, shall constitute a Transfer:

(i)     Any sale, conveyance, assignment or other transfer of, or the grant of a security interest in, all or any part of the legal and/or equitable title to the Real Property;

(ii)     Any sale, conveyance, assignment or other transfer of, or the grant of a security interest in, any share of stock of Mortgagor if Mortgagor is a corporation;

(iii)     Any sale, conveyance, assignment or other transfer of, or the grant of a security interest in, any general partnership interest in Mortgagor if Mortgagor is a partnership; or

(iv)     Any sale, conveyance, assignment or other transfer of, or the grant of a security interest in, any member's interest in Mortgagor if Mortgagor is a limited liability company.

Notwithstanding the foregoing, transfers between or among <u>existing</u> shareholders, partners, or members of Mortgagor shall <u>not</u> constitute Transfers so long as the Loan

20071203-0114374
Mary Hollinrake P:15/23 3:38PM
Kent Cnty MI Rastr 12/03/2007 SEAL

is not in default at the time of such transfers and Mortgagee receives prompt written notice of such transfers.

(c)     <u>Permitted Borrower Release and Third-Party Transfer.</u> If Mortgagor makes a written request to Mortgagee ("Transfer Request") for a third-party transfer, Mortgagee will waive its acceleration and prepayment call rights under Paragraph B.8(a), and release Borrower from liability for the Loan, if the Loan is not then in default and the following conditions are met:

     (i)     The following items, all of which must be satisfactory to Mortgagee, in its sole and absolute discretion, shall be submitted to Mortgagee with the Transfer Request:

         (A)     The identity and organizational documents for the purchaser of the Property;

         (B)     The financial statements, financial strength, tax returns and credit history of the purchaser;

         (C)     The current rent roll for the Property;

         (D)     The operating statements for the Property:

             (i)     A current year-to-date; and

             (ii)     The two most recent years/historical;

         (E)     The current leases for the Property;

         (F)     A current environmental inspection report for the Property;

         (G)     The sale agreement and related documents; and

         (H)     A detailed description of the source of the purchaser's equity in the Property.

     (ii)     The purchaser evidences a history of property management satisfactory to Mortgagee or contracts for management of the Property with a property management firm satisfactory to Mortgagee.

     (iii)     If the amount then due on the Note exceeds seventy percent (70%) of the sale price of the Property, Mortgagor shall pay down the balance due on the Note

20071203-0114374
Mary Hollinrake P:16/23   3:39PM
Kent Cnty MI Rcstr 12/03/2007 SEAL

to an amount which does not exceed seventy percent (70%) of the sales price and the remaining monthly payments of principal and interest may be adjusted to amortize the reduced principal balance over the remaining term of the Loan, at Mortgagee's discretion. Any amount prepaid under this provision may be paid without a prepayment fee, provided however, any additional amount Mortgagor or the purchaser desires to prepay, if any, shall be subject to applicable prepayment fees.

(iv)    The purchaser and Borrower promptly sign and deliver to Mortgagee, Mortgagee's assumption and release documents.

(v)    Mortgagor furnishes to Mortgagee, at Mortgagor's expense, an endorsement to Mortgagee's title insurance policy insuring the continued validity, enforceability, and priority of the Mortgage following the assumption and release. The form and content of the endorsement shall be satisfactory to Mortgagee. If required by the Mortgagee or the title insurer, the Mortgagor shall furnish estoppels and subordination agreements from tenants of the Property and other necessary parties in form and substance acceptable to the Mortgagee and the title insurer.

(vi)    In the event the Loan was made with a requirement imposed upon the Mortgagor to complete any specified repairs of the Property, the Mortgagor shall not be entitled to a consent by Mortgagee pursuant to the terms of this provision until such repairs have been completed to Mortgagee's satisfaction.

(vii)    The Mortgagee may, at its option, require tax reserves as referred to in paragraph A.8 of this Mortgage, whether or not previously waived conditionally or otherwise as a condition to its consent.

(viii)    Mortgagee is paid a lump sum fee of one percent (1%) of the Principal Balance.

(ix)    The payment of a transfer fee to Mortgagee's designated servicing agent in an amount equal to one percent (1%) of the Principal Balance.

(x)    Without limiting the generality or effect of the foregoing, waiver by Mortgagee of its right to accelerate the Loan upon any transfer or contract to transfer, or to require satisfaction of the conditions set forth in this subparagraph, shall not be deemed a waiver by Mortgagee of its right to accelerate the Loan upon any other transfer or contract to transfer or of its right upon such transfer or contract to transfer to require satisfaction of the conditions set forth above in this subparagraph.

20071203-0114374
Mary Hollinrake P:17/23    3:38PM
Kent Cnty MI Rgstr 12/03/2007 SEAL

(d)    <u>Permitted Related-Party Transfer.</u>  If Mortgagor (including existing shareholders, members or partners) makes a Transfer Request for a related-party transfer, Mortgagee will waive its acceleration and prepayment call rights under Paragraph B.8(a), if the Loan is not then in default and the following conditions are met:

(i)    Mortgagee is paid a lump sum fee of $1,000.00;
Lender will waive the $1,000 Related-Party Transfer fee on transfers by non-managing members to their spouse or issue.

(ii)    Mortgagor and the transferee promptly sign and deliver to Mortgagee, Mortgagee's assumption documents whereby the transferee assumes liability for payment and performance of the Note, the Mortgage, and any other security instruments securing the Note, all to the same extent and tenor of Mortgagor's liability, which shall remain primary and will not be released; and

(iii)    The transferee is:

(a)    The spouse and/or issue of Mortgagor;

(b)    The trustee(s) of a testamentary trust for the benefit of the spouse and/or issue of Mortgagor, that succeeded to Mortgagor's interest upon Mortgagor's death, divorce or legal separation;

(c)    The trustee(s) of an inter vivos trust established by Mortgagor for estate planning purposes, provided that Mortgagor is a trustee of such trust at the time of transfer; or

(d)    A new entity established for estate planning purposes, composed of Mortgagor, Mortgagor's principals, and/or Mortgagor's spouse and/or issue.

9.    **Deficiency.**  Except as limited by Partial or Limited Recourse provisions, if any, in the Note, Mortgagor consents to a personal deficiency judgment for any part of the debt hereby secured which shall not be paid by the sale of the Property, unless such judgment is prohibited by law. Any Mortgagor who is a married person hereby expressly agrees that recourse may be had against his or her other property, however owned, but without hereby creating any lien or charge thereon, for any deficiency due after sale of the Property; except that this provision shall not apply in the case of a Mortgagor who executes this Mortgage but not the Note secured hereby.

10.    **Waiver of Rights Regarding Property.**  To the extent permitted by law, Mortgagor hereby releases and waives (a) all rights to any homestead exemption in the Property; (b) all rights

Mortgage (MI 5/04)                              Page 17

20071203-0114374
Mary Hollinrake P:18/23  3:38PM
Kent Cnty MI Rgstr 12/03/2007 SEAL

of dower and curtsy in the Property; and (c) all rights to possession of the Property during any period allowed by law for redemption.

11.   **Waiver of Right to Marshal.** Mortgagor, for Mortgagor and for all persons hereafter claiming through or under Mortgagor or who may at any time hereafter become holders of liens junior to the lien of this Mortgage, hereby expressly waives and releases all rights to direct the order in which any of the Property shall be sold in the event of any sale or sales pursuant hereto and to have any of the Property and/or any other property now or hereafter constituting security for any of the indebtedness secured hereby marshaled upon any foreclosure of this Mortgage or of any other security for any of said indebtedness.

12.   **Severability.** In the event any provision contained in this Mortgage shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Mortgage, but this Mortgage shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

13.   **Signature on Mortgage Only.** Notwithstanding any other provision of this Mortgage, any person who executes this Mortgage, but not the Note secured hereby, shall have no personal liability on the Note or for any deficiency judgment which may be obtained upon foreclosure of this Mortgage. Such persons jointly and severally waive presentment, demand, protest and all notices and agree that Mortgagee, without notice to them or their consent, and upon such terms as Mortgagee may deem advisable, and without affecting in any way Mortgagee's rights hereunder as against the Property, may:

(a)   Extend, release, surrender, exchange, compromise, discharge or modify any right or obligation secured by or provided by this Mortgage or any other instrument securing this loan, or

(b)   Take any other action which Mortgagee may deem reasonably appropriate to protect its security interest in the Property.

14.   **Governing Law.** The law of the State of Michigan shall govern the validity, interpretation, construction and performance of this Mortgage. Mortgagor irrevocably submits to the jurisdiction of any state or federal court in the State where the Property is located in any action or proceeding brought to enforce or otherwise arising out of or relating to this Mortgage, and waives any claim that such forum is an inconvenient forum.

15.   **Financial Statements.** Within sixty (60) days of the close of each calendar year, Mortgagor shall furnish Mortgagee, at Mortgagor's expense, all in a form satisfactory to Mortgagee and certified by Borrower or guarantors, as the case may be, with (a) annual statement of operations of the Property, stating that such annual statement presents fairly the financial condition of the Property being reported upon and has been prepared in accordance with sound accounting principles consistently applied, (b) the financial statement for any tenants in whom Mortgagor and/or Borrower



20071203-0114374
Mary Hollinrake P:19/23   3:38PM
Kent Cnty MI Rastr 12/03/2007  SEAL

has a controlling interest, and (c) Borrower's financial statement, if Borrower is not an individual. The annual operating statement shall include an annual rent schedule, and a schedule of gross receipts of each tenant who is obligated to pay additional rent based on a percentage of gross receipts.

16.   **Notice and Opportunity to Cure.**  Notwithstanding any other provision of this Mortgage, Mortgagee shall not accelerate the sums secured hereby because of a nonmonetary default (defined below) unless Mortgagor fails to cure the default within fifteen (15) days of the earlier of the date on which Mortgagee mails or delivers written notice of the default to Mortgagor. For purposes of this Mortgage, the term "nonmonetary default" means a failure by Mortgagor or any other person or entity to perform any obligation contained in the Note or any other document, or instrument evidencing or securing the Loan (collectively, "Loan Documents"), other than the obligation to make payments provided for in the Note or any other Loan Document. If a nonmonetary default is capable of being cured and the cure cannot reasonably be completed within the fifteen (15) day cure period, the cure period shall be extended up to sixty (60) days so long as Mortgagor has commenced action to cure within the fifteen (15) day cure period, and in Mortgagee's opinion, Mortgagor is proceeding to cure the default with due diligence. No notice of default and no opportunity to cure shall be required if during any 12-month period Mortgagee has already sent a notice to Mortgagor concerning default in the performance of the same obligation. None of the foregoing shall be construed to obligate Mortgagee to forebear in any other manner from exercising its remedies and Mortgagee may pursue any other rights or remedies which Mortgagee may have because of a default.

17.   **Notice.**  Except as otherwise provided in this Mortgage, all notices and consents required or permitted under this Mortgage shall be in writing and may be telecopied, cabled, delivered by hand, or mailed by first class registered or certified mail, return receipt requested, postage prepaid, and addressed as listed in the first Paragraph of this Mortgage. Changes in the respective addresses to which such notices may be directed may be made from time to time by any party by notice to the other parties given at least ten (10) days before such change of address is to become effective. Notices and consents given by mail in accordance with this paragraph shall be deemed to have been given three (3) days after the date of dispatch; notices and consents given by any other means shall be deemed to have been given when received.

18.   **Dissemination of Information.**  If Mortgagee determines at any time to sell, transfer or assign the Note or this Mortgage and the other security documents, and any or all servicing rights with respect thereto, or to grant participations therein, Mortgagee may provide to any prospective purchaser, transferee, assignee, participant or rating agency and their agents and successors, all documents and information Mortgagee now has or may hereafter acquire relating to this loan, Mortgagor, Borrower, any guarantors and/or indemnitors, if applicable, and the Property.

19.   **ERISA.**  Borrower shall not engage in any transaction which could cause this loan or any action taken hereunder to be a non-exempt prohibited transaction under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Borrower is not an employee



20071203-0114374
Mary Hollinrake P:20/23   3:36PM
Kent Cnty MI Rgstr 12/03/2007  SEAL

benefit plan or a governmental plan under ERISA. Borrower's assets do not constitute plan assets under ERISA. Borrower shall indemnify and hold Mortgagee harmless for any and all ERISA or state-related liability or losses.

    20.    **Non-Foreign Person.** Mortgagor is not a "foreign person" as defined by the IRS.

    21.    **Entire Agreement.** This Mortgage, the Note and any other loan documents securing the Note constitute the entire and complete agreement of the parties with respect to the subject matter hereof, and supersede all prior or contemporaneous understandings, arrangements and commitments, all of which, whether oral or written, are merged herein. This Mortgage shall bind and inure to the benefit of the parties to this Mortgage and any successor or assignee acquiring an interest hereunder consistent with paragraph B.8 above.

///

///

///

///

///

///

///

///

///

[SIGNATURE ON FOLLOWING PAGE]

SIGNATURE OF MORTGAGOR

Grand Rapids Associates LLC,
an Illinois limited liability company

By: _____
    William Spatz, Manager

Mortgage (MI 5/04)             Page 20

**20071203-0114374**
Mary Hollinrake P:21/23   3:38PM
Kent Cnty MI Rgstr 12/03/2007 SEAL

MORTGAGOR'S ADDRESS:

**Grand Rapids Associates LLC**
14 N. Peoria Street, 3F
Chicago, IL 60607

MORTGAGEE'S ADDRESS:

**Standard Insurance Company**
Attn: Mortgage Loan Servicing T3A
19225 NW Tanasbourne Drive
Hillsboro, OR 97124

Document Drafted By: Kham Sythavongsa
and When Recorded Return To:
**STANCORP MORTGAGE INVESTORS, LLC**
19225 NW TANASBOURNE DRIVE
HILLSBORO, OR 97124
ATTN: **COMPLIANCE, T3A**

**AFFIX NOTARIAL ACKNOWLEDGMENTS FOR EACH MORTGAGOR
IN SIZE AND FORM AS REQUIRED BY STATE LAW.**

Mortgage (MI 5/04)                    Page 21



20071203-0114374
Mary Hollinrake P:22/23   3:38PM
Kent Cnty MI Rgstr 12/03/2007  SEAL

STATE OF ILLINOIS

COUNTY OF  C᎐ᴐ/ƈ

I,  TODD RADEKE , a Notary Public, certify that William Spatz, the
Manager of Grand Rapids Associates, LLC, an Illinois limited liability company
Personally known to me to be the same person whose name(s) is subscribed to
The foregoing instrument, appeared before me this day in person, and acknowledged that

he signed and delivered the instrument as his free and voluntary act,

for the uses and purposes therein set forth.

Dated:  11/8/07

_____
Notary Public

SEAL

OFFICIAL SEAL
TODD RADEKE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-16-2008

EXHIBIT "A"

LOAN NO. ▓▓▓▓▓

DATED: October 16, 2007

20071203-0114374
Mary Hollinrake P:23/23   3:38PM
Kent Cnty MI Rcstr 12/03/2007   SEAL

That part of the NE 1/4, Section 15, T6N, R11W, City of Kentwood, Kent County, Michigan, described as: Commencing at the N 1/4 corner of Section 15; thence S 86 degrees 31 minutes 43 seconds E 1323.30 feet along the North line of said NE 1/4; thence S 00 degrees 00 minutes W 82.41 feet along the East line of the W 1/2 of said NE 1/4 to the place of beginning of this description; thence S 86 degrees 37 minutes 30 seconds E 147.26 feet along the Southerly line of 28th Street; thence S 00 degrees 00 minutes W 199.92 feet; thence N 90 degrees 00 minutes E 200.12 feet; thence S 00 degrees 13 minutes 32 seconds E 450.14 feet along the West line of Radcliff Drive (60.00 feet wide); thence N 86 degrees 31 minutes 43 seconds W 323.28 feet along the Northerly line of 29th Street (60.00 feet wide); thence Westerly 98.23 feet along said Northerly line on an 864.39 foot radius curve to the left, the chord of which bears N 89 degrees 47 minutes 04 seconds W 98.18 feet; thence N 00 degrees 00 minutes E 89.78 feet; thence N 90 degrees 00 minutes E 50.50 feet; thence N 00 degrees 00 minutes E 153.41 feet; thence N 90 degrees 00 minutes E 36.48 feet; thence N 00 degrees 00 minutes E 257.00 feet; thence S 90 degrees 00 minutes W 15.00 feet; thence N 00 degrees 00 minutes E 138.59 feet along the East line of the W 1/2 of said NE 1/4 to the place of beginning.

Together with a non-exclusive easement for driveway purposes as contained in the instrument recorded in Liber 2335, Page 41.

Subject to and together with easements for driveway and Parking as contained in the instruments recorded in Liber 2237, Page 125; Liber 2237, Page 396; Liber 2237, Page 403; and Liber 3773, Page 600.

Subject to and together with an easement for wall and Roof Abutment as contained in the instrument recorded in Liber 3773, Page 555.


Except that part described as follows:

Commencing at the Northeast corner of Section 15, T6N, R11W, City of Kentwood, Kent County, Michigan; thence North n88° 23' 08" West 976.63 feet along the North line of said Section 15; thence South 02° 05' 05"East 670.15 feet along the West right of way line of Radcliff Avenue (60 feet wide) for Point of Beginning and reference point "A"; thence South 02° 05' 05" East 50.00 feet along said West right of way line to the intersection of said West right of way line with the North right of way line of 29th Street (60 feet wide); thence North 88° 23' 08" West 323.27 feet along said North right of way line; thence Westerly along said North right of way line 98.91 feet on a 864.39 foot radius curve to the left, delta=06° 33' 24", long chord bearing South 88° 20' 10" West 98.86 feet; thence North 01° 46' 08" West 10.02 feet; thence Easterly parallel with and 10 feet North of said North right of way line 99.50 feet on a 874.39 foot radius curve to the right, delta=06° 31' 13", long chord bearing North 88° 21' 16" East 99.45 feet; thence South  88° 23' 08" East 282.64 feet parallel with and 10 feet North of said North right of way line; thence North 44° 45' 53" East 54.68 feet to Point of Beginning.

# EXHIBIT 3



20071203-0114375
Mary Hollinrake P:1/9    3:38PM
Kent Cnty MI Rsstr 12/03/2007 SEAL

# ASSIGNMENT OF LESSOR'S INTEREST IN LEASES

SIC Loan No. ▆▆▆▆▆▆▆

THIS ASSIGNMENT made this **October 16, 2007,** is between **Grand Rapids Associates LLC, an Illinois limited liability company** ("Assignor") whose address is listed on the signature page of this Assignment and **Standard Insurance Company, an Oregon corporation,** ("Assignee") whose address is listed on the signature page of this Assignment.

Assignor, for good and valuable consideration, receipt of which is acknowledged, grants, transfers and assigns to Assignee all of Assignor's right, title and interest in and to **any existing and all future recorded and/or unrecorded leases** entered into on all or any part of the subject property referenced below during the term of this Assignment, together with (a) all rents, income, contract rights, issues, security deposits and profits arising from the leases and renewals thereof; (b) all rents, income, contract rights, issues, security deposits and profits for the use and occupation of the premises described in the leases or in the deed of trust (which term shall be construed to include a mortgage, as the case may be) described below and from all leases upon the real property described below, or any part thereof, which are now executed or which may hereafter during the term of this Assignment be executed; and (c) the guaranties of tenants' performance under the leases, if any. The leases described above, any extensions or renewals thereof and any lease subsequently executed during the terms of this Assignment covering the real property described below are hereinafter collectively referred to as the "Lease".

This Assignment is made for the purpose of securing, in such order of priority as Assignee may elect:

    (a)    Payment of the indebtedness evidenced by a certain Mortgage Note, including any extensions, replacements, substitutions or renewals thereof (the "Note"), in the original principal sum of **Three Million Seven Hundred Fifty Thousand and No/100ths Dollars ($3,750,000.00)** made by the Assignor first referenced above to Assignee, dated October 16, 2007, and secured by a Mortgage (the "Mortgage") on

Return to (close: *04*    )
LANDAMERICA AMERICAN
TITLE COMPANY
6029 Beltline Road  Suite 250
Dallas, TX 75254

20071203-0114375
Mary Hollinrake P:2/9    3:38PM
Kent Cnty MI Rsstr 12/03/2007 SERL

real property situated in the City of Kentwood, County of Kent, State of Michigan, described as follows (the "Real Property"):

**See Exhibit "A" attached hereto and by this reference made a part hereof for legal description.**

The Note may also be secured by a security agreement or agreements covering personal property located on or related to the Real Property and by other security instruments. The Mortgage, Security Agreement(s) and other security instruments are hereinafter collectively referred to as the "Security Instruments";

    (b)    Payment of all other sums with interest thereon becoming due and payable to Assignee under the provisions of this Assignment or of the Note or the Security Instruments; and

    (c)    Performance and discharge of each and every condition, obligation, covenant, promise and agreement of Assignor contained herein or in the Note or the Security Instruments.

Assignor agrees as follows:

    1.    **Assignor's Warranties.** Assignor warrants that: (a) Assignor has good title to the Lease hereby assigned and good right to assign the same, and no other person, firm or corporation has any right, title or interest therein; (b) Assignor has duly and punctually performed all the terms, covenants, conditions and warranties of the Lease on Assignor's part to be kept, observed and performed; (c) Assignor has not previously sold, assigned, transferred, mortgaged or pledged the rents from the Real Property, whether now due or hereafter to become due; (d) the Lease is valid and enforceable and has not been altered, modified or amended in any manner whatsoever save as herein set forth; (e) the Lessee named therein is not in default under any of the terms, covenants, or conditions thereof; and (f) no rent reserved in the Lease has been assigned or anticipated and no rent for any period subsequent to the date of this Assignment has been collected in advance of the time when the same became due under the terms of the Lease.

    2.    **Assignor's Covenants of Performance.** Assignor covenants with Assignee: (a) to observe and perform all the obligations imposed upon the Lessor under the Lease and not to do or permit to be done anything to impair the security thereof; (b) not to collect any of the rent, income and profit arising or accruing under the Lease or from the Real Property in advance of the time when the same shall become due; (c) not to execute any other assignment of lessor's interest in the Lease or assignment of rents arising or accruing from the Lease or from the Real Property; (d) not to materially alter, modify or change, or suffer or permit the material modification or alteration of the terms of the Lease or cancel or terminate the same or accept a surrender thereof without the prior written consent of Assignee; (e) at Assignee's request, to assign and transfer to Assignee any and all subsequent leases upon all or any part of the Real Property and to execute and deliver at the request of Assignee all such further assurances and assignments in the premises as Assignee shall from time to time require;



20071203-0114375
Mary Hollinrake P:3/9      3:38PM
Kent Cnty MI Regtr 12/03/2007 SEAL

(f) to enforce or secure the performance of each and every obligation, term, covenant, promise, condition and agreement in the Lease by any tenant to be performed, and to notify Assignee of the occurrence of any default under the Lease; (g) to appear in and defend any action or proceeding arising under, occurring out of, or in any manner connected with the Lease or the obligations, duties or liabilities of Assignor, but in all cases at the expense of Assignor; (h) to pay all costs and expenses of Assignee, including attorney's fees in a reasonable sum, in any action or proceeding in which Assignee may appear in connection herewith or in any appeal therefrom; (i) not to enter into any lease for a term in excess of three (3) years for fifteen percent (15%) or more of the net rentable area of the Real Property without the prior written consent of Assignee; and (j) neither to create nor permit any lien, charge or encumbrance upon its interest as lessor of the Lease except the lien of the Security Instruments or as permitted in the Security Instruments.

    **3.**    **Application of Rents.**  All rents received by Assignor prior to the occurrence of a default and the payment of any indebtedness secured hereby or in the performance of any obligation, term, covenant, condition or warranty herein, in the Note, Mortgage, or Lease shall be held by Assignor as a trust fund to be applied, **firstly** to the payment of taxes and assessments upon the Real Property before penalty or interest is due thereon; **secondly** to the cost of insurance, maintenance and repairs required by the terms of the Mortgage; **thirdly** to the satisfaction of all obligations specifically set forth in the Lease; and **fourthly** to the payment of interest and principal becoming due on the Note and Mortgage, before using any part of the same for any other purposes.

    **4.**    **Rights of Assignee.**  Upon or at any time after default in the payment of any indebtedness secured hereby or in the observance or performance of any obligation, term, covenant, condition or warranty herein, in the Note and Mortgage or in the Lease, Assignee, at its option and without notice, shall have the complete right, power and authority hereunder to exercise and enforce any or all of the following rights and remedies at any time:

    (a)    to collect the rents without taking possession, and to demand, collect, receive, sue for, attach and levy against the rents in Assignee's own name; to give proper receipts, releases and acquittances therefor; and after deducting all necessary and proper costs and expenses of operation and collection as determined by Assignee, including attorney's fees, to apply the net proceeds thereof, together with any funds of Assignor deposited with Assignee, upon any indebtedness secured hereby and in such order as Assignee may determine;

    (b)    to declare all sums secured hereby immediately due and payable and, at its option, exercise all or any of the rights and remedies contained in the Note and Mortgage;

    (c)    without regard to the adequacy of the security or the solvency of Assignor, with or without any action or proceeding through any person or by agent, or by a receiver to be appointed by a court, and without regard to Assignor's possession, to enter upon, take possession of, manage and operate the Real Property or any part thereof, make, modify, enforce, cancel, or accept surrender of any lease now or hereafter in effect on the Real Property or any part thereof, remove and evict any lessee or tenant; increase



20071203-0114375
Mary Hollinrake P:4/9    3:38PM
Kent Cnty MI Rgstr 12/03/2007   SEAL

or decrease rents; decorate, clean and repair; and otherwise do any act or incur any reasonable costs or expenses as Assignee shall deem proper to protect the security hereof, as fully and to the same extent as Assignor could do if in possession; and in such event, to apply the rents so collected in such order as Assignee shall deem proper to the operation and management of the Real Property, including the payment of reasonable management, brokerage and attorneys fees, payment of the indebtedness under the Note and Mortgage, and payment to a reserve fund for replacements, which fund shall not bear interest;

(d)    require Assignor to transfer all security deposits to Assignee, together with all records evidencing such deposits; and

(e)    Assignee may collect the rents, income, issues and profits of the Real Property and Leases so long as a default shall exist and during the pendency of any foreclosure proceedings and during the redemption period, and Assignor agrees to consent to a receiver if this is believed necessary or desirable by Assignee to enforce its rights under this section. Assignee shall be entitled to all of the rights and benefits conferred by Act No. 210 of the Michigan Public Acts of 1953, as amended (MCL 554.231 et. seq.).

5.    **Default Not Cured By Collection.** The collection of rents and application as aforesaid and/or the entry upon and taking possession of the Real Property shall not cure or waive any default; or waive, modify or affect any notice of default required under the Note and Mortgage; or invalidate any act done pursuant to such notice. The enforcement of any right or remedy by Assignee, once exercised, shall continue until Assignee shall have collected and applied such rents as may have cured (for the time) the original default. Although the original default be cured and the exercise of any such right or remedy be discontinued, the same or any other right or remedy hereunder shall not be exhausted and may be reasserted at any time and from time to time following any subsequent default. The rights and powers conferred on Assignee hereunder are cumulative and not in lieu of any other rights and powers otherwise granted Assignee.

6.    **Effect of Assignment.** The acceptance by Assignee of this Assignment, with all of the rights, powers, privileges and authority so created, shall not, prior to entry upon and taking possession of the Real Property by Assignee, be deemed or construed to constitute Assignee a "Mortgagee in Possession".

Assignee shall not be liable for any loss sustained by Assignor resulting from Assignee's failure to let the Real Property after default or from any act or omission of Assignee in managing the Real Property after default unless such loss is caused by the willful misconduct and bad faith of Assignee. Assignee shall not be obligated to perform or discharge, nor does Assignee undertake to perform or discharge, any obligation, duty, or liability under the Lease or under or by reason of this Assignment, or to assume any obligation or responsibility for any security deposits or other deposits delivered to Assignor by any lessee and not assigned and delivered to Assignee. This Assignment shall not operate to place responsibility for the control, care, management or repair of the Real Property upon

20071203-0114375
Mary Hollinrake P:5/9    3:38PM
Kent Cnty MI Rgstr 12/03/2007  SEAL

Assignee, nor for the carrying out of any of the terms and conditions of the Lease; nor shall it operate to make Assignee responsible or liable for any waste committed on the Real Property by the tenants or any parties or for any dangerous or defective condition of the Real Property, or for any negligence in the management, upkeep, repair or control of the Real Property, resulting in loss or injury or death to any tenant, licensee, employee or stranger.

7. **Indemnification.** Assignor hereby agrees to indemnify and hold Assignee harmless from any and all liability, loss, damage or expense which Assignee may incur under or by reason or in defense of any and all claims and demands whatsoever that may be asserted against Assignee by third parties arising out of the Lease, including, but not limited to, any claims by any tenants of credit for rental for any period under any lease more than one (1) month in advance of the due date thereof paid to and received by Assignor, but not delivered to Assignee. Should Assignee incur any such liability, loss, damage or expense, the amount thereof (including attorneys fees, whether incurred at trial, on appeal or otherwise) with interest thereon at the Default Rate (as defined in the Note) shall be payable to Assignee immediately without demand, and shall be secured as a lien hereby and by the Mortgage.

8. **Termination of Assignment, Payment of Rent.** Upon payment in full of the principal sum, interest and indebtedness secured hereby and by the Security Instruments, this Assignment shall become and be void and of no effect, but the affidavit, certificate, letter or statement of any officer, agent or attorney of Assignee showing any part of said principal, interest or indebtedness to remain unpaid shall be and constitute conclusive evidence of the validity, effectiveness and continuing force of this Assignment and any person may, and is hereby authorized to, rely thereon. Assignor hereby authorizes and directs the lessee named in the Lease or any other or future lessee or occupant of the premises described therein or in the Mortgage, upon receipt from Assignee of written notice to the effect that Assignee is then the holder of the Note and Security Instruments and that a default exists thereunder or under the Assignment, to pay over to Assignee all rents, income, contract rights, issues, security deposits and profits arising or accruing under the Lease or from the premises described therein or in the Mortgage and to continue to do so until otherwise notified by Assignee.

9. **Assignee's Right to Deal With Security.** Assignee may take or release other security for the payment of the principal sum, interest and indebtedness, may release any party primarily or secondarily liable therefor and may apply any other security held by it to the satisfaction of such principal sum, interest or indebtedness without prejudice to any of its rights under this Assignment.

10. **Cross Default.** Breach of any term, covenant, and condition herein contained by Assignor shall likewise constitute a default under the Note and each of the Security Instruments, and a default under any of said documents shall constitute a default hereunder.

11. **No Waiver.** Nothing contained in this Assignment and no act done or omitted by Assignee pursuant to the powers and rights granted it hereunder shall be deemed to be a waiver by Assignee of its rights and remedies under the Note and Security Instruments; this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Assignee under the terms of the Note and Security Instruments. The right of Assignee to collect the principal sum,



20071203-0114375
Mary Hollinrake P:6/9    3:30PM
Kent Cnty MI Rastr 12/03/2007  SEAL

interest, and indebtedness and to enforce any other security therefor held by it may be exercised by Assignee either prior to, simultaneously with, or subsequent to any action taken by it hereunder.

12. **Conflict With Mortgage.** In the case of any conflict between the terms of this instrument and the terms of the Mortgage, the terms of this Assignment shall prevail.

13. **Notices.** All notices required or permitted under this Assignment shall be in writing and may be telecopied, cabled, delivered by hand, or mailed by first class registered or certified mail, return receipt requested, postage prepaid, and addressed as follows:

If to Assignor:                         If to Assignee:
Grand Rapids Associates LLC              **Standard Insurance Company**
14 N. Peoria Street, 3F                  Attn: Mortgage Loan Servicing T3A
Chicago, IL 60607                        19225 NW Tanasbourne Drive
                                         Hillsboro, OR 97124

Changes in the respective addresses to which such notices shall be directed may be made from time to time by either party by notice to the other party given at least ten (10) days before such change of address I s to become effective. Notices given by mail in accordance with this provision shall be deemed to have been given three (3) days after the date of dispatch; notices given by any other means shall be deemed to have been given when received.

14. **Severability.** If any provision of this Assignment or the application thereof to any entity, person or circumstance shall be held to be invalid, illegal or unenforceable in any respect, the remainder of this Assignment and the application of such provisions to other entities, persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

15. **Construction.** Whenever used herein whenever the context so requires, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders. All obligations of each Assignor hereunder shall be joint and several.

16. **Governing Law.** The law of the state in which the Real Property is located shall govern the validity, interpretation, construction and performance of this Assignment. Assignor irrevocably submits to the jurisdiction of any state or federal court in the State where the Property is located in any action or proceeding brought to enforce or otherwise arising out of or relating to this Assignment, and waives any claim that such forum is an inconvenient forum.

17. **Entire Agreement.** This Assignment constitutes the entire and complete agreement concerning the assignment of rents and leases between the parties hereto. No variations, modifications or changes herein or hereof shall be binding upon any party hereto unless set forth in a document duly executed by or on behalf of such party.

Assignment of Lessor's Interest in Leases (MI 5/04)          Page 6



20071203-0114375
Mary Hollinrake P:7/9      3:38PM
Kent Cnty MI Rgstr 12/03/2007  SEAL

18.    **Assignment Binds Successors.** This Assignment, together with the covenants and warranties herein contained, shall inure to the benefit of Assignee and any subsequent holder of the Note and Mortgage and shall be binding upon Assignor, Assignor's heirs, personal representatives, successors and assigns, all tenants and their subtenants and assigns, and any subsequent owner of premises described in the Mortgage.

SIGNATURE OF ASSIGNOR

Grand Rapids Associates LLC,
an Illinois limited liability company

By: _____
William Spatz, Manager

ASSIGNOR'S ADDRESS:

**Grand Rapids Associates LLC**
**14 N. Peoria Street, 3F**
**Chicago, IL 60607**

ASSIGNEE'S ADDRESS:

**Standard Insurance Company**
**Attn: Mortgage Loan Servicing T3A**
**19225 NW Tanasbourne Drive**
**Hillsboro, OR 97124**

Document Drafted By: Kham Sythavongsa
and When Recorded Return To:
**STANCORP MORTGAGE INVESTORS, LLC**
**19225 NW TANASBOURNE DRIVE**
**HILLSBORO, OR 97124**
**ATTN:  COMPLIANCE, T3A**

AFFIX NOTARIAL ACKNOWLEDGMENT FOR
EACH ASSIGNOR AS REQUIRED BY LAW.

**20071203-0114375**
Mary Hollinrake P:8/9   3:38PM
Kent Cnty MI Rgstr 12/03/2007  SEAL

STATE OF ILLINOIS
COUNTY OF  Cerr V

I,  TODD RADEKE , a Notary Public, certify that William Spatz , the

Manager of Grand Rapids Associates, LLC, an Illinois limited liability company

Personally known to me to be the same person whose name(s)  is subscribed to

The foregoing instrument, appeared before me this day in person, and acknowledged that

he signed and delivered the instrument as his free and voluntary act,

for the uses and purposes therein set forth.

Dated:  11/8/07

_____
Notary Public

SEAL

OFFICIAL SEAL
**TODD RADEKE**
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-16-2008



EXHIBIT "A"

LOAN NO. 

DATED: October 16, 2007

20071203-0114375
Mary Hollinrake P:9/9     3:38PM
Kent Cnty MI Rgstr 12/03/2007  SEAL

That part of the NE 1/4, Section 15, T6N, R11W, City of Kentwood, Kent County, Michigan, described as: Commencing at the N 1/4 corner of Section 15; thence S 86 degrees 31 minutes 43 seconds E 1323.30 feet along the North line of said NE 1/4; thence S 00 degrees 00 minutes W 82.41 feet along the East line of the W 1/2 of said NE 1/4 to the place of beginning of this description; thence S 86 degrees 37 minutes 30 seconds E 147.26 feet along the Southerly line of 28th Street; thence S 00 degrees 00 minutes W 199.92 feet; thence N 90 degrees 00 minutes E 200.12 feet; thence S 00 degrees 13 minutes 32 seconds E 450.14 feet along the West line of Radcliff Drive (60.00 feet wide); thence N 86 degrees 31 minutes 43 seconds W 323.28 feet along the Northerly line of 29th Street (60.00 feet wide); thence Westerly 98.23 feet along said Northerly line on an 864.39 foot radius curve to the left, the chord of which bears N 89 degrees 47 minutes 04 seconds W 98.18 feet; thence N 00 degrees 00 minutes E 89.78 feet; thence N 90 degrees 00 minutes E 50.50 feet; thence N 00 degrees 00 minutes E 153.41 feet; thence N 90 degrees 00 minutes E 36.48 feet; thence N 00 degrees 00 minutes E 257.00 feet; thence S 90 degrees 00 minutes W 15.00 feet; thence N 00 degrees 00 minutes E 138.59 feet along the East line of the W 1/2 of said NE 1/4 to the place of beginning.

Together with a non-exclusive easement for driveway purposes as contained in the instrument recorded in Liber 2335, Page 41.

Subject to and together with easements for driveway and Parking as contained in the Instruments recorded in Liber 2237, Page 125; Liber 2237, Page 396; Liber 2237, Page 403; and Liber 3773, Page 600.

Subject to and together with an easement for wall and Roof Abutment as contained in the Instrument recorded in Liber 3773, Page 555.


Except that part described as follows:

Commencing at the Northeast corner of Section 15, T6N, R11W, City of Kentwood, Kent County, Michigan; thence North n88° 23' 08" West 976.63 feet along the North line of said Section 15; thence South 02° 05' 05"East 670.15 feet along the West right of way line of Radcliff Avenue (60 feet wide) for Point of Beginning and reference point "A"; thence South 02° 05' 05" East 50.00 feet along said West right of way line to the intersection of said West right of way line with the North right of way line of 29th Street (60 feet wide); thence North 88° 23' 08" West 323.27 feet along said North right of way line; thence Westerly along said North right of way line 98.91 feet on a 864.39 foot radius curve to the left, delta=06° 33' 24", long chord bearing South 88° 20' 10" West 98.86 feet; thence North 01° 46' 08" West 10.02 feet; thence Easterly parallel with and 10 feet North of said North right of way line 99.50 feet on a 874.39 foot radius curve to the right, delta=06° 31' 13", long chord bearing North 88° 21' 16" East 99.45 feet; thence South  88° 23' 08" East 282.64 feet parallel with and 10 feet North of said North right of way line; thence North 44° 45' 53" East 54.68 feet to Point of Beginning.

Tax Parcel # 41-18-15-227-006

# EXHIBIT 4

# ASSIGNMENT OF SELLER'S INTEREST

**Prepared By:**
Barry L. Groce
McEwen Gisvold LLP
1100 SW Sixth Avenue, Suite 1600
Portland, Oregon 97204

```
201612090106379
Electronic Recording
Mary Hollinrake        Pages: 6      02:40PM
Kent Cnty MI Rgstr      12/09/2016       SEAL
```

When recorded, return to:
Nations Home Loan Corporation
4540 Echo Rd
Bloomfield Hills, Michigan 48302

---

## ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING AND RELATED LOAN DOCUMENTS

FOR VALUE RECEIVED, the undersigned (hereinafter collectively "Assignor") hereby grants, assigns and transfers to Nations Home Loan Corporation, a Michigan corporation, ("Assignee"), all of Assignor's interest under the following loan documents:

| Mortgagor | Loan Number | Date of Recording | Recording No. |
|---|---|---|---|
| Grand Rapids Associates, LLC, an Illinois limited liability company | ▉▉▉▉ | **Mortgage**<br>December 3, 2007<br><br>**Assignment**<br>December 3, 2007 | **Mortgage**<br>20071203-0114374<br><br>**Assignment**<br>20071203-0114375 |

Tax Account Number: 41-18-15-227-006
Commonly known as: 2891 Radcliff Avenue, Kentwood, Michigan 49512
See Exhibit "A" attached hereto and by this reference made a part hereof for legal description.

All as described in the Official Records in the Office of the County Recorder of Kent County, Michigan, together with the note(s) described therein, the money due and to become due therein with interest, all rights accrued to or to accrue under the Mortgage, and all rights under the separate Assignment of Lessor's Interest in Leases of even date with the Mortgage.

See following page for Assignor and Assignee Addresses.

Dated effective: December 9, 2016

This instrument filed for record by Fidelity National Title as an accommodation only. It has not been examined as to its execution or as to its effect upon the title.

**STANDARD INSURANCE COMPANY,**
an Oregon corporation

By: _____
Name: _____
Title: _____

ATTEST:

By: _____
Name: _____
Title: _____

**LIBERTY LIFE ASSURANCE COMPANY OF BOSTON,**
a New Hampshire stock life insurance company
**LIBERTY MUTUAL FIRE INSURANCE COMPANY,**
a Wisconsin stock insurance company
**LIBERTY MUTUAL INSURANCE COMPANY,**
a Massachusetts stock insurance company
**PEERLESS INSURANCE COMPANY,**
a New Hampshire stock insurance company

By:  StanCorp Mortgage Investors, LLC,
      an Oregon limited liability company,
      Attorney In Fact

By: _____
Name: _____
Title: _____

ATTEST:

By: _____
Name: _____
Title: _____

**UNITED OF OMAHA LIFE INSURANCE COMPANY,**
a Nebraska corporation

By: _____
Name: Jerry F. Cihal, Director – Mortgage
      and Real Estate Investments

STATE OF OREGON              )
                            ) ss.
COUNTY OF WASHINGTON        )

    This is to certify that on this _6th_ day of December, 2016, before me appeared _AMY PRAZEY_ and _BLAKE BEANSLOSSOM_, both to me personally known, who being duly sworn did say that the former is the _ASSISTANT VICE PRESIDENT_ and that the latter is the _DIRECTOR_ of STANDARD INSURANCE COMPANY, an Oregon corporation, and that the said document was signed in behalf of said corporation by authority and each of them acknowledged said document to be the free act and deed of said corporation.

    IN WITNESS HEREOF, I have hereunto set my hand and affixed my official seal, the day and year first above written.

Notary Public in and for the State of Oregon

Residing at _CLARK COUNTY, WA_

My commission expires: _July 9, 2019_

STATE OF OREGON              )
                            ) ss.:
County of Washington        )

    This is to certify that on this _6th_ day of December, 2016, before me appeared _AMY PRAZEY_ and _BLAKE BEANSLOSSOM_, both to me personally known, who being duly sworn did say that the former is the _ASSISTANT VICE PRESIDENT_ and that the latter is the _DIRECTOR_ of StanCorp Mortgage Investors, LLC, an Oregon limited liability company, Attorney In Fact for LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, a New Hampshire stock life insurance company, LIBERTY MUTUAL FIRE INSURANCE COMPANY, a Wisconsin stock insurance company, LIBERTY MUTUAL INSURANCE COMPANY, a Massachusetts stock insurance company, and PEERLESS INSURANCE COMPANY, a New Hampshire stock insurance company, who, being duly sworn, did depose and say they executed the within instrument; and that they signed their names thereto by said authority.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal, the day and year first above written.

Notary Public for the State of Oregon

Residing at _CLARK COUNTY, WA_

My Commission Expires: _July 9, 2019_

STATE OF NEBRASKA                    }
                                     } ss.
COUNTY OF DOUGLAS                    }


This is to certify that on this 7th day of December, 2016, before me appeared
Jerry Cihal, to me personally known, who being duly sworn did say she\he is
the Director of UNITED OF OMAHA LIFE INSURANCE COMPANY, a
Nebraska corporation, and that the said document was signed on behalf of said corporation by authority
and acknowledged said document to be the free act and deed of said corporation.


IN WITNESS HEREOF, I have hereunto set my hand and affixed my official seal, the day and
year first above written.

                                    _____
                                    Notary Public in and for the State of Nebraska

                                    Residing at _____ Omaha NE _____
                                    My commission expires: July 3, 2018

General Notary - State of Nebraska
MARGARET KUMKE
My Comm. Exp. July 3, 2018.

EXHIBIT "A"

LOAN NO. ██████████

That part of the NE 1/4, Section 15, T6N, R11W, City of Kentwood, Kent County, Michigan, described as: Commencing at the N 1/4 corner of Section 15; thence S 86 degrees 31 minutes 43 seconds E 1323.30 feet along the North line of said NE 1/4; thence S 00 degrees 00 minutes W 82.41 feet along the East line of the W 1/2 of said NE 1/4 to the place of beginning of this description; thence S 86 degrees 37 minutes 30 seconds E 147.26 feet along the Southerly line of 28th Street; thence S 00 degrees 00 minutes W 199.92 feet; thence N 90 degrees 00 minutes E 200.12 feet; thence S 00 degrees 13 minutes 32 seconds E 450.14 feet along the West line of Radcliff Drive (60.00 feet wide); thence N 86 degrees 31 minutes 43 seconds W 323.28 feet along the Northerly line of 29th Street (60.00 feet wide); thence Westerly 98.23 feet along said Northerly line on an 864.39 foot radius curve to the left, the chord of which bears N 89 degrees 47 minutes 04 seconds W 98.18 feet; thence N 00 degrees 00 minutes E 89.78 feet; thence N 90 degrees 00 minutes E 50.50 feet; thence N 00 degrees 00 minutes E 153.41 feet; thence N 90 degrees 00 minutes E 36.48 feet; thence N 00 degrees 00 minutes E 257.00 feet; thence S 90 degrees 00 minutes W 15.00 feet; thence N 00 degrees 00 minutes E 138.59 feet along the East line of the W 1/2 of said NE 1/4 to the place of beginning.

Together with a non-exclusive easement for driveway purposes as contained in the instrument recorded in Liber 2335, Page 41.

Subject to and together with easements for driveway and Parking as contained in the instruments recorded in Liber 2237, Page 125; Liber 2237, Page 396; Liber 2237, Page 403; and Liber 3773, Page 600.

Subject to and together with an easement for wall and Roof Abutment as contained in the instrument recorded in Liber 3773, Page 555.


Except that part described as follows:

Commencing at the Northeast corner of Section 15, T6N, R11W, City of Kentwood, Kent County, Michigan; thence North n88° 23' 08" West 976.63 feet along the North line of said Section 15; thence South 02° 05' 05"East 670.15 feet along the West right of way line of Radcliff Avenue (60 feet wide) for Point of Beginning and reference point "A"; thence South 02° 05' 05" East 50.00 feet along said West right of way line to the intersection of said West right of way line with the North right of way line of 29th Street (60 feet wide); thence North 88° 23' 08" West 323.27 feet along said North right of way line; thence Westerly along said North right of way line 98.91 feet on a 864.39 foot radius curve to the left, delta=06° 33' 24", long chord bearing South 88° 20' 10" West 98.86 feet; thence North 01° 46' 08" West 10.02 feet; thence Easterly parallel with and 10 feet North of said North right of way line 99.50 feet on a 874.39 foot radius curve to the right, delta=06° 31' 13", long chord bearing North 88° 21' 16" East 99.45 feet; thence South  88° 23' 08" East 282.64 feet parallel with and 10 feet North of said North right of way line; thence North 44° 45' 53" East 54.68 feet to Point of Beginning.

# EXHIBIT 5

**SCHNEIDERMAN**
**& SHERMAN** P.C.

23938
Research
Drive
Suite 300
Farmington
Hills, MI
48335

*Telephone:*   248.539.7400

*Toll Free:*   866.867.7688

*Facsimile:*   248.539.7401

www.sspclegal.com

attorneys@sspclegal.com

December 21, 2016

Guitar Center
Roberto Guerrero
Director of Real Estate
5795 Lindero Canyon Rd.
Westlake Village, CA 91362

Re:   Property Address: 2891 RADCLIFF AVENUE SE KENTWOOD, MI 49512
      Our File No. MB.000008

Dear Mr. Guerrero:

I represent Nations Home Loan Corporation, which holds the promissory note, Mortgage and Assignment of Lessor's Interest in Leases ("A/L") related to the above referenced property (collectively "Loan Documents").

Grand Rapids Associates LLC is in default under the Loan Documents, and as a result, Nations Home Loan Corporation is exercising its right to collect the lease payments in accordance with the Mortgage and A/L.   Therefore, from the date of this notice and forward, all payments required under your lease with Grand Rapids Associates LLC must be paid to Nations Home Loan Corporation and sent to the following address:

**Nations Home Loan Corporation**
**4540 Echo Rd**
**Bloomfield Hills MI 48302**

Finally, pursuant to MCL 554.231 et. seq., please find enclosed a copy of the Notice of Default, Mortgage, A/L, and Assignment of Seller's Interest.

1

Please feel free to contact me should you have any questions or concerns regarding this notice.


Sincerely,

SCHNEIDERMAN & SHERMAN, P.C.


Tobias J. Lipski
(248) 415-0529


TJL/sra

Enclosures

2

# SCHNEIDERMAN
# & SHERMAN P.C.

| | | |
|---|---|---|
| 23938 Research Drive | Telephone: | 248.539.7400 | www.sspclegal.com |
| Suite 300 Farmington | Toll Free: | 866.867.7688 | attorneys@sspclegal.com |
| Hills, MI 48335 | Facsimile: | 248.539.7401 |

December 21, 2016

George and Lois Anderson
(DBA Greater Works Ministries)
2897 Radcliff Ave. SE
Grand Rapids, Michigan 49546

Re:    Property Address: 2891 RADCLIFF AVENUE SE KENTWOOD, MI 49512.
       Our File No. MB.000008

Dear Mr. and Ms. Anderson:

I represent Nations Home Loan Corporation, which holds the promissory note, Mortgage and Assignment of Lessor's Interest in Leases ("A/L") related to the above referenced property (collectively "Loan Documents").

Grand Rapids Associates LLC is in default under the Loan Documents, and as a result, Nations Home Loan Corporation is exercising its right to collect the lease payments in accordance with the Mortgage and A/L.   Therefore, from the date of this notice and forward, all payments required under your lease with Grand Rapids Associates LLC must be paid to Nations Home Loan Corporation and sent to the following address:

**Nations Home Loan Corporation**
**4540 Echo Rd**
**Bloomfield Hills MI 48302**

Finally, pursuant to MCL 554.231 et. seq., please find enclosed a copy of the Notice of Default, Mortgage, A/L, and Assignment of Seller's Interest.

1

Please feel free to contact me should you have any questions or concerns regarding this notice.

Sincerely,

SCHNEIDERMAN & SHERMAN, P.C.

Tobias J. Lipski
(248) 415-0529

TJL/sra

Enclosures

2

## SCHNEIDERMAN & SHERMAN P.C.

| 23938 Research Drive Suite 300 Farmington Hills, MI 48335 | | |
|---|---|---|
| Telephone: | 248.539.7400 | www.sspclegal.com |
| Toll Free: | 866.867.7688 | attorneys@sspclegal.com |
| Facsimile: | 248.539.7401 | |

December 21, 2016

Saban Sehmehmedovic
(DBA Drina Cafe)
2776 Paddington Dr. SE
Kentwood, MI 49512

Saban Sehmehmedovic
(DBA Drina Cafe)
2981 Radcliff Ave. SE
Grand Rapids, MI 49546

Re:   Property Address: 2891 RADCLIFF AVENUE SE KENTWOOD, MI 49512
      Our File No.  MB.000008

Dear Mr. Sehmehmedovic:

I represent Nations Home Loan Corporation, which holds the promissory note, Mortgage and Assignment of Lessor's Interest in Leases ("A/L") related to the above referenced property (collectively "Loan Documents").

Grand Rapids Associates LLC is in default under the Loan Documents, and as a result, Nations Home Loan Corporation is exercising its right to collect the lease payments in accordance with the Mortgage and A/L. Therefore, from the date of this notice and forward, all payments required under your lease with Grand Rapids Associates LLC must be paid to Nations Home Loan Corporation and sent to the following address:

**Nations Home Loan Corporation**
**4540 Echo Rd**
**Bloomfield Hills MI 48302**

Finally, pursuant to MCL 554.231 et. seq., please find enclosed a copy of the Notice of Default, Mortgage, A/L, and Assignment of Seller's Interest.

1

Please feel free to contact me should you have any questions or concerns regarding this notice.

Sincerely,

SCHNEIDERMAN & SHERMAN, P.C.

Tobias J. Lipski
(248) 415-0529

TJL/sra

Enclosures

2

# EXHIBIT 6





Liza Posthumus Lyons P:1/10 3:57PM
Kent Cnty Mt Rostr 02/28/2017  SEAL



2017FEB 23  AM 11:30

**20170228-0017462**

| | |
|---|---|
| CONSIDERATION | $3,450,000.00 |
| COUNTY TAX | $3,795.00 |
| STATE TAX | $0.00 |
| TOTAL TAX | $3,795.00 |

### SHERIFF'S DEED ON MORTGAGE SALE

This Indenture made the 22nd day of February, 2017, between **Patrick McCullough**, a Deputy Sheriff in and for Kent, Michigan, party of the first part and Nations Home Loan Corporation, party of the second part (hereinafter called the grantee) whose address is c/o 4540 Echo Road, Bloomfield Hills, MI 48302.

WITNESSETH, that whereas, GRAND RAPIDS ASSOCIATES LLC, AN ILLINOIS LIMITED LIABILITY COMPANY, made a certain mortgage to STANDARD INSURANCE COMPANY, AN OREGON CORPORATION (hereinafter called the mortgagee), which was duly recorded in Document No. 20071203-0114374, and was assigned by said mortgagee to Nations Home Loan Corporation, as assignee, Kent County Records

WHEREAS, said mortgage contained a power of sale which has become operative by reason of a default in the condition of said mortgage, and

WHEREAS, no suit of proceedings at law or in equity to recover the debt secured by said mortgage or any part thereof, and

WHEREAS, the party foreclosing has represented that it is either the owner of the indebtedness or of an interest in the indebtedness secured by the mortgage or the servicing agent of the mortgage, and

WHEREAS, by virtue of said power of sale, and pursuant to the statute of the State of Michigan in such case made and provided, a notice was duly published and a copy thereof was duly posted in a conspicuous place upon the premises described in said mortgage that said premises, or some part of them, would be sold on the 22nd day of February, 2017 the lobby of the Kent County Courthouse in Grand Rapids, Michigan, that being the place of holding the Circuit Court for Kent County, whereas the premises are situated and

WHEREAS, pursuant to said notice I did at 10:00 in the forenoon on the day aforesaid, expose for sale at the public vendue the said lands and tenements hereinafter described, and on such sale did strike off and sell the said lands and tenements to the grantee for the sum of $3,450,000.00 (Three Million Four Hundred Fifty Thousand Dollars and No Cents), that being the highest bid therefore and the grantee being the highest bidder, and

WHEREAS, said lands and tenements are situated in the CITY of Kentwood, Kent County, Michigan, more particularly described as follows:

### SEE ATTACHED EXHIBIT "A" LEGAL DESCRIPTION

A/K/A 2691 RADCLIFF AVENUE SE, KENTWOOD, MI 49512
***This instrument is exempt from state transfer tax under MCL 207.526 (v).

Drafted by and when recorded return to:
Erica Nichols,
Schneiderman & Sherman, P.C.,
23938 Research Drive, Suite 300
Farmington Hills, Michigan 48335
MB.000008

**20170228-0017462**
Lisa Posthumus Lyons P:2/10  3:57PM
Kent Cnty MI Rcstr 02/28/2017  SEAL

Now, this indenture Witnesseth, That I, the Deputy Sheriff aforesaid, by virtue of and pursuant to the statute in such case made and provided, and in consideration of the sum of money so paid aforesaid, have granted, conveyed, bargained and sold, and by this deed do grant, convey bargain and sell unto the grantee, its successors and assigns, Forever, All the estate, right title and interest which the said Mortgagor had in said land and tenements and every part thereof, on the 15th day of October, 2007 that being the date of said mortgage, or at anytime thereafter, To Have and to Hold the said lands and tenements and every part thereof to the said grantee, its successors and assigns forever, to their sole use, benefit and behoove forever, as fully and absolutely as I the Deputy Sheriff aforesaid, under the authority aforesaid, might, could or ought to sell the same.

IN WITNESS WHEREOF, I HAVE SET MY HAND AND SEAL THE DATE AND YEAR FIRST ABOVE WRITTEN.

_____(Seal)
Deputy Sheriff in and for the County of Kent

**Patrick McCullough**

STATE OF MICHIGAN
COUNTY OF Kent          ss.

On this 22nd day of February, 2017, before me, a Notary Public in and for said County of Kent, came **Patrick McCullough**, a Deputy Sheriff of said County, known to me to be the individual described in and who executed the above conveyance, and who acknowledged that he/she executed the same to be his/her free act and deed as such Deputy Sheriff.

_____
Notary Public, Kent County, Michigan
My Commission expires _____
Acting in _____ County, Michigan

JUDI L ANDERSON
Notary Public - Michigan
Newaygo County
My Commission Expires Aug 5, 2018
Acting in the County of _____

File No. MB.000008
Mortgagor Name: GRAND RAPIDS ASSOCIATES LLC
Property Address: 2891 RADCLIFF AVENUE SE, KENTWOOD, MI 49512

Drafted by and when recorded return to:
Erica Nichols,
Schneiderman & Sherman, P.C.
23938 Research Drive, Suite 300
Farmington Hills, Michigan 48335

MB.000008

EXHIBIT "A"
LEGAL DESCRIPTION

20170228-0017462
Lisa Posthumus Lyons P:3/18 3:57PM
Kent Cnty MI Rgstr 02/28/2017 SEAL

That part of the Northeast 1/4, Section 15, Town 6 North, Range 11 West, City of Kentwood, Kent County, Michigan, described as: Commencing at the North 1/4 corner of Section 15; thence South 86°31'43" East 1323.30 feet along the North line of said Northeast 1/4; thence South 00°00' West 82.41 feet along the East line of the West 1/2 of said Northeast 1/4 to the place of beginning of this description; thence South 86°37'30" East 147.26 feet along the Southerly line of 28th Street; thence South 00°00' West 199.92 feet; thence North 90°00' East 200.12 feet; thence South 00°13'32" East 450.14 feet along the West line of Radcliff Drive (60.00 feet wide); thence North 86°31'43" West 323.28 feet along the Northerly line of 29th Street (60.00 feet wide); thence Westerly 98.23 feet along said Northerly line on an 864.39 foot radius curve to the left, the chord of which bears North 89°47'04" West 98.18 feet; thence North 00°00' East 89.78 feet; thence North 90°00' East 50.50 feet; thence North 00°00' East 153.41 feet; thence North 90°00' East 36.48 feet; thence North 00°00' East 257.00 feet; thence South 90°00' West 15.00 feet; thence North 00°00' East 138.59 feet along the East line of the West 1/2 of said Northeast 1/4 to the place of beginning.

Together with a non-exclusive easement for driveway purposes as contained in the instrument recorded in Liber 2335, Page 41.

Subject to and together with easements for driveway and parking as contained in the instruments recorded in Liber 2237, Page 125; in Liber 2237, Page 396; in Liber 2237, Page 403 and in Liber 3773, Page 600.

Subject to and together with an easement for wall and roof abutment as contained in the instrument recorded in Liber 3773, Page 655.

EXCEPT: That part described as follows: Commencing at the Northeast corner of Section 15, Town 6 North, Range 11 West, City of Kentwood, Kent County, Michigan; thence North 89°23'08" West 976.63 feet along the North line of said Section 15; thence South 02°05'05" East 670.16 feet along the West right of way line of Radcliff Avenue (60 feet wide) for point of beginning and Reference Point "A"; thence South 02°05'05" East 50.00 feet along said West right of way line to the intersection of said West right of way line with the North right of way line of 29th Street (60 feet wide); thence North 88°23'08" West 323.27 feet along said North right of way line; thence Westerly along said North right of way line 98.91 feet on a 864.39 foot radius curve to the left, delta = 06°33'24", long chord bearing South 88°20'10" West 98.86 feet; thence North 01°46'06" West 10.02 feet; thence Easterly parallel with and 10 feet North of said North right of way line 99.50 feet on a 874.39 foot radius curve to the right, delta = 06°31'13", long chord bearing North 88°21'15" East 99.45 feet; thence South 88°23' 08" East 282.64 feet parallel with and 10 feet North of said North right of way line; thence North 44°45'53" East 54.66 feet to point of beginning.

Tax/Parcel I.D. No. 41-16-15-227-006

A/K/A 2891 RADCLIFF AVENUE SE, KENTWOOD, MI 49512

File No. MB.000006
Mortgagor Name: GRAND RAPIDS ASSOCIATES LLC
Property Address: 2891 RADCLIFF AVENUE SE, KENTWOOD, MI 49512

Schneiderman • GRAND RAPIDS ASSOCIATES

**AFFIDAVIT OF PUBLICATION**

(Affidavit of Publisher)



STATE OF MICHIGAN, } ss.
COUNTY OF KENT

20170228-0017462
Lisa PosUsgeus Lyons P:4/10 3:57PM
Kent Cnty MI Rastr 07/29/2017  SEAL

The undersigned, an employee of the publisher of Grand Rapids Legal News, having knowledge of the facts, being duly sworn deposes and says that a notice, a true copy of which is annexed hereto, was published in Grand Rapids Legal News a newspaper circulated in Kent County on January 25, February 1, February 8, February 15, 2017 A.D.

_____
Nancy Rykse

Subscribed and sworn before me on this 15th day of February 2017 A.D.

_____
Judi L. Anderson

Notary Public Newaygo County, Michigan. My commission expires: August 5, 2018 Acting in Kent County, Michigan.

Attorney:       Schneiderman & Sherman, P.C. - Schneiderman & Sherma
AttorneyFile#:   MB.000008
Notice#:        1302752

MB.000008

Schneiderman - GRAND RAPIDS ASSOCIATES

**EVIDENCE OF SALE**

(Affidavit of Posting)

STATE OF MICHIGAN,
    )ss.
COUNTY OF __Kent__

20170228-0017462
Lisa Posthumus Lyons P:5/10  3:57PM
Kent Cnty MI Rgstr 02/28/2017 SEAL

Erich T. Hein _____ being duly sworn, deposes

that on the __1__ day of ___February___ ___2017___ A.D.,

he/she posted a notice, a true copy of which is annexed hereto, in
a conspicuous place upon the premises described in said notice
by attaching the same in a secure manner to

2891 Radcliffe SE Guitar     Kentwood, MI
Center

ERICH T. HEIN

Subscribed and sworn before me on this

__4__ day of __Feb__ ___2017__ D.

KIM D. HORAN

                    Montcalm
Notary Public _____ County, Michigan.
                    March 17     2020
My commission expires: _____
                    Kent
Acting in _____ County, Michigan.

CHECK IF
☐ Multi-Unit          ☐ Vacant
☐ Multi-Address       ☐ Upper Unit    ☐ Lower Unit
☐ Condo               ☐ Unit 1        ☐ Unit 2        ☐ Unit A    ☐ Unit B
                      ☐ Mobile/Manufactured Home      ☐ No Dwelling

Attorney Office:  Schneiderman & Sherman, P.C. - Schneiderma
Attorney File#:   MB.000008
Notice#:          1302752

Schneiderman - GRAND RAPIDS ASSOCIATES

EVIDENCE OF SALE

(Affidavit of Posting)

20170228-0017462
Lisa Posthumus Lyons P:8/10  3:57PM
Kent Cnty MI Rcd:02/28/2017  SEAL

STATE OF MICHIGAN,
ss.
COUNTY OF ____Kent____

Erich T. Hein _____ being duly sworn, deposes

that on the __1__ day of ___February___ __2017__ A.D.,

he/she posted a notice, a true copy of which is annexed hereto, in
a conspicuous place upon the premises described in said notice
by attaching the same in a secure manner to

2891 Radcliffe SE          Kentwood, MI
Flamingo Cafe

_____
ERICH T. HEIN

Subscribed and sworn before me on this

__4__ day of __Feb__ __2017__ A.D.

KIM B. HORAN  _____

Montcalm
Notary Public _____ County, Michigan.
                          March 17      2020
My commission expires: _____.
                          Kent
Acting In _____ County, Michigan.

CHECK IF          ☐ Vacant
☐ Multi-Unit      ☐ Upper Unit   ☐ Lower Unit
☐ Multi-Address   ☐ Unit 1       ☐ Unit 2        ☐ Unit A  ☐ Unit B
☐ Condo           ☐ Mobile/Manufactured Home     ☐ No Dwelling

Attorney Office: Schneiderman & Sherman, P.C. - Schneiderma
Attorney File#:   MB.000008
Notice#:          1302752

MB.000008

Schneiderman - GRAND RAPIDS ASSOCIATES

**EVIDENCE OF SALE**

(Affidavit of Posting)

20170228-0017462
Lisa Posthumus Lyons P:7/10 3:57PM
Kent Cnty MI Rgstr 02/28/2017 SEAL

STATE OF MICHIGAN,
ss.
COUNTY OF ~~Kent~~

Erich T. Hein _____ being duly sworn, deposes

that on the __1__ day of __February__ __2017__ A.D.

he/she posted a notice, a true copy of which is annexed hereto, in a conspicuous place upon the premises described in said notice by attaching the same in a secure manner to

2891 Radcliffe SE            Kentwood, MI
Shepherds arm

_____
ERICH T. HEIN

Subscribed and sworn before me on this

__4__ day of __Feb__ __2017__ A.D.

_____
~~KIM B. HORAN~~

            Montcalm
Notary Public _____ County, Michigan.

My commission expires: __March 17__ __2020__
            Kent
Acting in _____ County, Michigan.

CHECK IF          ☐ Vacant
☐ Multi-Unit      ☐ Upper Unit   ☐ Lower Unit
☐ Multi-Address   ☐ Unit 1       ☐ Unit 2       ☐ Unit A   ☐ Unit B
☐ Condo           ☐ Mobile/Manufactured Home     ☐ No Dwelling

Attorney Office: Schneiderman & Sherman, P.C. - Schneiderma
Attorney File#: MB.000008
Notice#: 1302752

MB.000008

(Affidavit of Auctioneer)

2017022B-0017462
Lisa Posthumus Lyons P:07:10 3:57PM
Kent Cnty MI Recipr 02/20/2017 SEAL

STATE OF MICHIGAN )
COUNTY OF KENT ) ss

Patrick McCullough , being first duly sworn, deposes and says that he/she is a Deputy Sheriff of said Kent county; that he/she acted as auctioneer, and made the sale as described in the annexed deed pursuant to the annexed printed notice; that said sale was opened at 10:00 AM on the 22nd day of February, 2017, at the lobby of the Kent County Courthouse in Grand Rapids, Michigan, that that being the place of holding the Circuit Court in said Kent County, and said sale was kept open for the space of one hour; that the highest bid for the land and tenements therein described was the sum of $3,450,000.00 (Three Million Four Hundred Fifty Thousand Dollars and No Cents), made by Nations Home Loan Corporation, that said sale was in all respects open and fair and that he/she did strike off and sell the said lands and tenements fairly and in good faith, as deponent verily believes.

Patrick McCullough ,
Deputy Sheriff for Kent County,

Subscribed and sworn to before me this 22nd day of February, 2017.

Notary Public in _____ County, Michigan
My Commission Expires: _____
Acting in _____ County, Michigan

JUDI L ANDERSON
Notary Public - Michigan
Newaygo County
My Commission Expires Aug 6, 2018
Acting in the County of Kent

STATE OF MICHIGAN, )
COUNTY OF KENT ) ss.

I DO HEREBY CERTIFY, that the last day to redeem is 08/23/2017, subject to tolling under the provisions of the Servicemembers Civil Relief Act, if applicable, after which, if there has been no redemption, the Sheriff's Deed will become operative, unless extinguished pursuant to MCL 600.3238 or unless determined abandoned under MCL 600.3241a, and in the latter case, the redemption period shall be the latter of 30 days from the date of sale or 15 days from the date of posting and mailing of notice of abandonment.

Deputy Sheriff for Kent County, Michigan
Patrick McCullough ,

This instrument drafted by:
Erica Nichols (P80833)
Schneiderman & Sherman, P.C.
23938 Research Drive, Suite 300
Farmington Hills, MI 48335

ATTN PURCHASERS: This sale may be rescinded by the foreclosing mortgagee. In that event, your damages, if any, shall be limited solely to the return of the bid amount tendered at sale, plus interest. Please be advised that all third party bidders are responsible for preparing and recording the Sheriff's Deed. SCHNEIDERMAN & SHERMAN, P.C. Hereby expressly disclaims all liability relating to the foreclosure, preparation and recording of the Sheriff's Deed.

File No. MB.000008
Mortgagor Name: GRAND RAPIDS ASSOCIATES LLC
Property Address: 2891 RADCLIFF AVENUE SE, KENTWOOD, MI 49512

**NON-MILITARY AFFIDAVIT**

State of Michigan      }
                     } ss.
County of Oakland    }

20170228-0017462
Lisa Posthumus Lyons P:0/10 3:57PM
Kent Cnty MI Rastr 02/28/2017  SEAL

       The undersigned, being first duly deposed, says that upon investigation he, is informed and believes that none of those person(s) named in the attached notice of mortgage foreclosure, nor any person upon whom any of those person(s) named were dependent, were in the military service of the United States at the time of sale or for the twelve (12) months prior thereto.

       Deponent further states that this affidavit is made for the purpose of preserving a record and clearing title by virtue of (a) the Servicemembers Civil Relief Act (formerly entitled Soldiers' and Sailors' Civil Relief Act of 1940), as amended; (b) the Military Reservist Act of 1991; and (c) Sections 3185 and 3285 of the Michigan Revised Judicature Act (MCL 600.3185 and 600.3285).

Dated this _____ day of _____, 20___.  FEB 1 7 2017

_____
Erica Nichols (P80833), of Schneiderman & Sherman, P.C.
Attorney for Nations Home Loan Corporation

Subscribed and sworn to before me this _____ day of _____ FEB 1 7 2017 _____.

_____
Kim Harrington, Notary Public
Oakland County, Michigan
My Commission Expires: June 26, 2021
Acting in Oakland County, Michigan

File No. MB.000008
Mortgagor Name: GRAND RAPIDS ASSOCIATES LLC
Property Address: 2891 RADCLIFF AVENUE SE, KENTWOOD, MI 49512



20170228-0017462
Lisa Posthumus Lyons P:10/10 3:57PM
Kent Cnty MI Rcdr 02/28/2017 SEAL

### AFFIDAVIT OF PURCHASER AT FORECLOSURE SALE
### TO BE RECORDED WITH SHERIFF'S DEED

On _____ FEB 1 7 2017 _____, Erica Nichols , of Schneiderman & Sherman, P.C., an attorney for Nations Home Loan Corporation, being duly sworn, states as follows:

1.   This Affidavit is given pursuant to Act No. 538 of Michigan Public Acts of 2004 to amend 1961 Public Act 236 by amending MCL 600.2567, 600.3140, 600.3240, 600.6062 and 600.6066, section 2567 as amended by 2002 Public Act 698 and section 2340 as amended by 2000 Public Act 380.

2.   I am authorized to submit this Affidavit on behalf of Nations Home Loan Corporation, (the "Purchaser"). I have knowledge of the facts stated herein and am competent to testify concerning such facts regarding a foreclosure sale scheduled for February 22, 2017, with respect to certain real property commonly known as: 2891 RADCLIFF AVENUE SE, KENTWOOD, MI 49512. THIS AFFIDAVIT MAY ONLY BE RECORDED AND USED BY THE PURCHASER DESCRIBED HEREIN IN THE EVENT IT IS THE SUCCESSFUL PURCHASER OF THE PROPERTY. NO OTHER PURCHASER MAY UTILIZE THIS AFFIDAVIT.

3.   The last day to redeem the Property is 08/23/2017, subject to tolling under the provisions of the Servicemembers Civil Relief Act, if applicable, after which, if there has been no redemption, the Sheriff's Deed will become operative, unless extinguished pursuant to MCL 600.3238 or unless determined abandoned under MCL 600.3241a, and in the latter case the redemption period shall be the latter of 30 days from the date of sale or 15 days from the date of posting and mailing of notice of abandonment.

4.   The amount necessary to redeem the Property is $3,450,000.00, plus interest at a per diem rate of $850.68 from the date of sale to the date of redemption, plus any additional amounts that may be added pursuant to MCLA Section 600.3240(4). ANY REDEEMING PARTY SHOULD NOTE THAT THIS AMOUNT MAY INCREASE to include any amounts paid by the Purchaser described herein for taxes, amounts necessary to redeem senior liens, condominium assessments, homeowner association assessments, community association assessments, insurance premiums, or any other amounts as provided by MCLA 600.3240(4), as well as attorneys fees, costs, and interest thereon at the interest rate specified in the mortgage from the date of the payment to the date of redemption.

5.   The Purchaser described herein has designated Schneiderman & Sherman, P.C. as its designee responsible to assist an appropriate person redeeming the Property in computing the exact amount required to redeem the Property and to receive redemption funds. If you choose to utilize this assistance, please contact our redemption specialists at Schneiderman & Sherman, P.C., 23938 Research Drive, Suite 300, Farmington Hills, Michigan 48335, telephone (248) 539-7400 x 188. Pursuant to statute, a fee of $200.00 will be charged to use the assistance of Schneiderman & Sherman, P.C.

FURTHER DEPONENT SAYETH NOT.

STATE OF MICHIGAN   )
                    )
COUNTY OF OAKLAND)

By: _____
Erica Nichols (P80833), of Schneiderman & Sherman, P.C.
Attorney for Nations Home Loan Corporation

On this _____ day of _____ FEB 1 7 2017 _____, 2017, before me, a Notary Public, personally appeared Erica Nichols, of Schneiderman & Sherman, P.C., an attorney for Nations Home Loan Corporation, who executed the above Affidavit of Purchaser and being personally known and duly sworn did acknowledge the same to be his free act and deed.

_____
Kим Harrington, Notary Public
Oakland County, Michigan
My Commission Expires: June 28, 2021
Acting in Oakland County, Michigan

Drafted by and when recorded return to:
Erica Nichols (P80833)
Schneiderman & Sherman, P.C.
23938 Research Drive, Suite 300
Farmington Hills, Michigan 48335
MB.000008

# EXHIBIT 7

## SHORT TERM LEASE AGREEMENT

This **AGREEMENT**, made and entered into this ___ day of _____, 2012, by and between __ GRAND RAPIDS ASSOCIATES __ by Spatz Centers, Inc., as agent for owner ("Lessor"), and __ GEORGE & LOIS ANDERSON __ ("Lessee").

### W I T N E S S E T H

1. **PREMISES:** Lessor hereby grants to Lessee the right to occupy and use subject to all of the terms and conditions herein stated, that portion of the Shopping Center known as ("Premises"), Space __7__ ("Leased Premises").

2. **TERM:** Subject to the terms and conditions hereof, the term of this Lease Agreement shall commence on 1/2/13 and shall terminate 12/31/13.

3. **PAYMENTS:** Lessee shall pay to Lessor, at the execution hereof, the sum of $550 per month. The fixed rent shall be payable to Lessor at 14 North Peoria St., Suite 3F, Chicago, Illinois 60607 and shall be due the first of each month.

4. **USE:** Lessee shall use the premises for __ CHURCH RELATED ACTIVITIES __.

5. **SECURITY DEPOSIT:** To secure the full and timely performance of all the covenants and conditions contained herein, Lessee does hereby deposit the sum of $550 with Lessor as a security deposit. Lessee agrees that said security deposit may be applied to cure a breach of any of the covenants and conditions contained herein, including, but not limited to, damage to the property. Lessor agrees to promptly return to Lessee any unused portion of the security deposit at the expiration of the term hereof provide Lessee has complied with all the terms and conditions herein stated.

6. **PERMITS:** Lessee represents that it has or will obtain all applicable licenses, permits, and registrations and shall comply with all rules, regulations, and ordinances or governmental authorities having jurisdiction over the shopping center and for the use and occupancy of the premises.

7. **INSURANCE:** Before commencing any use hereunder, Lessee shall furnish to Lessor Certificates of Insurance issued by the company or companies issuing such insurance that the following coverage is in full force and effect and naming __ GRAND RAPIDS ASSOCIATES __ and Spatz Centers, Inc., as additional insured thereunder and providing that no such insurance may be canceled without a ten (10) day written notice to Lessor sent by Certified Mail, returned receipt requested, at Lessor's principal office: 14 N. Peoria, Suite 3F, Chicago, IL 60607-2646. The insurance coverage shall include the following: (i) A comprehensive general liability policy, including bodily injury liability, property damage all in broad form having a minimum limit of $1,000,000.00 for injury or death to one person, and property damage with a minimum limit of $500,000.00, and (ii) Workmen's Compensations insurance as required by the laws of the State of __MI__.

8. **INDEMNIFICATION:**  Lessee shall indemnify and save harmless Lessor and its Agent or their officers, directors, partners, agents, employees, and customers, (hereinafter collectively referred to as "Indemnities") from and against any loss, damage, claim demand, liability, or expense by reason or damage caused to any person or property on or in the Leased Premises.  In the event Licensor or its indemnities shall be made a party to any litigation commenced by or against Lessee, Lessee shall protect Lessor and/or the Indemnities and hold same harmless and shall pay all costs, expense, and reasonable attorneys fees, incurred or paid by Lessor of its agents in connection with such litigation.

9. **RULES & REGULATIONS:**  Lessee shall at all times during its use of the premises provide sufficient supervision and maintain adequate control of its employees, guests, or invitees.  Lessee agrees that it shall comply with all the rules and regulations imposed by Lessor for the Shopping Center.

10. **ADDITIONAL LESSOR'S RIGHT:**   Lessor further reserves the right to cancel this Agreement at any time and at Lessor's sole election and reserves the absolute right to relocate the Premises of Lessee from time to time to any place within the mall, but upon thirty (30) days prior written notice, and the Lessee of such cancellation or relocation agrees to cease operation immediately upon being so notified by the Lessor.  Upon cancellation, or at the termination of this Lease Agreement, Lessee agrees to remove its goods and effects; to repair any damaged caused by such removal, and return the premises in a clean condition and in good order and acknowledges that any personal property not removed within two (2) working days following such cancellation and/or termination of this Lease Agreement shall be deemed to have been abandoned by Lessee, and Lessor may dispose of said property as it deems appropriate.  Lessee further acknowledges that Lessor is not obligated to conduct any type of sale of said abandoned personal property.

11. **ADDITIONAL RESTRICTIONS:**  The use of megaphones, audio equipment, flashing lights, or any other appliance or apparatus which may in Lessor's sole judgment create a nuisance or annoy the public or other merchants in the Shopping Center is strictly prohibited. Lessee, its agents, and/or employees are expressly prohibited from soliciting business in the parking area or other areas of the Shopping Center.

12. **LESSEE'S WORK:**  Subject to Lessor's approval, Lessee, at Lessee's sole cost and expense, shall take good care of the Leased Premises and the pipes, plumbing, glass store-fronts, electric wiring, air conditioning and heating equipment, appliances and appurtenances belonging thereto and shall make us and when need, all repair necessary to keep the same in good order. Lessee shall make all repairs, alteration, additions or replacements to the Leased Premises whether interior or exterior, structural or nonstructural required by any law or ordinance or any order or regulation of any public authority necessary because of Lessee's use or occupancy of the Leased Premises;  keep the Leased Premises equipped with all safety appliance so required because of such use or occupancy; to procure all licenses and permits required for any such use or occupancy; and to comply with the orders and regulations of all governmental authorities.

13. **LESSOR'S WORK:**  NONE, Lessee to take the Leased Premises in its "as is" condition.

14. **UTILITIES:**  During the term of this Lease, Lessee shall pay for all utility charges to the Leased Premises during the term of this Lease.

15. **LIENS:**  Lessee agrees to do all things necessary to prevent the filing of mechanics liens against the Premises or any other portion of the Shopping Center or the interest of Lessor or owners of any ground or underlying lessors or the interest of any mortgages or holders of any deed of trust encumbering the Shopping Center by reason of any work, labor, services, or materials performed or supplied to Lessee. If any lien shall be filed, Lessee shall cause the same to be vacated or record within ten (10) days after filing or Lessor shall have the right, but not be obligation to pay same and thereafter be entitled to reimbursement from Lessee.

16. **ASSIGNMENT:** Lessee shall have no right to assign, encumber, or otherwise transfer this Lease Agreement or any interest therein nor sublet or otherwise allow any part of the premises to be used by others in whole or in part.

17. **DEFAULTS:** In the event Lessee shall default in the performance of any of the covenants or agreements of this Lease Agreement, or if Lessee shall become bankrupt or insolvent, or any debtor proceedings to be taken by or against Lessee, then Lessor, in addition to any and all other legal remedies it may have whether at law or in equity, may terminate this Agreement and repossess the premises, all without notice (subject to laws) in which event Lessee shall pay to Lessor all costs and expenses incurred by Lessor in connection therewith including any and all legal fees. If any rent payments are received after the 10th day of the month, Lessee agrees to pay a penalty of 4% of the delinquent amount per month plus an interest of 4% over the prime rate charge by the largest bank in the state. If a check does not clear for any reason, the lessee will pay an additional penalty of $35.00 per occurrence. Any disputes will be handled through binding arbitration when available at Lessor's sole discretion and both parties waive any and all rights to a Jury Trial.

18. **SURRENDER:** Upon expiration and/or sooner termination of this Lease, Lessee shall surrender to Lessor the Leased Premises in as good condition as originally received. If Lessee does not surrender the Leased Premises when required, Lessee agrees to pay Lessor the sum of $1,100 per month plus any additional damages until such time as the Leased Premises is vacated.

19. **SUCCESSORS & ASSIGNS:** This lease shall be binding and inure to the benefit of the parties hereto and their respective successors, assigns, heirs, executors, administrators and legal representatives.

20. **NOTICES FROM ONE PARTY TO THE OTHER:** Any notice or demand from Lessor to Lessee or from Lessee to Lessor shall be mailed overnight delivery or certified mail, return receipt requested, addressed, if to Tenant, at the following address of Tenant: 4765 Hunsberger Ave. NE Grand Rapids, MI 49525 or Tenant's space or such other address as Tenant shall have designated by notice in writing to Landlord or to the Tenant at the address of the store, and, if to Landlord, to the place then established for the payment of Fixed Annual Minimum Rent, or such other address or addresses as Landlord shall have designated by notice in writing to Tenant. Notice shall be deemed effective three (3) days after depositing same in the U.S. Mail, properly addressed having all proper postage affixed thereto or upon receipt by the recipient, whichever is sooner.

21. **ENTIRE AGREEMENT:** This documents contains the entire Agreement between the parties and all prior contemporaries oral or written agreements are merged herein and no amendment to this lease shall be effective unless in writing and signed by the parties hereto.

**IN WITNESS WHEREOF,** Lessor and Lessee have caused this instrument to be executed the day and year first above written.

**IN WITNESS WHEREOF,** Lessor and Lessee have caused this instrument to be executed the day and year first above written.

**LESSOR**

          **LESSEE:**

GRAND RAPIDS ASSOCIATES         GEORGE & LOIS ANDERSON

By Spatz Centers, Inc.,
Agent for Owner

By: _____

Its: _____
_____

By: _____

By: _____

**THIS FORM TO BE USED IF TENANT IS A SOLE PROPRIETORSHIP OR PARTNERSHIP OR INDIVIDUAL**

STATE OF *MI* } SS
COUNTY OF *Kent*

*George Anderson and Lois Anderson*
personally known to me to be the same person whose name is subscribed to the foregoing License Agreement, appeared before me this day in person and acknowledge that he signed, sealed and delivered said License Agreement as his free and voluntary act, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal this *31st* day of *Dec*, 20*12*.

MY COMMISSION EXPIRES _____

_____
NOTARY PUBLIC

## AMENDMENT TO LEASE

THIS AMENDMENT TO LEASE (the "Amendment") is entered into, and effective as of April 25, 2011, by and between GRAND RAPIDS ASSOC., L.P., an Illinois limited partnership ("Landlord") and GUITAR CENTER STORES, INC., a Delaware corporation ("Tenant"):

### RECITALS:

WHEREAS, Tenant and Landlord entered into a Lease Agreement dated July 18, 2001 which was thereafter amended on or about August 29, 2001 (the "Lease") for certain premises in the shopping center known as Kentwood Market Place (the "Premises"); and

WHEREAS, Landlord and Tenant would like to extend the Lease for the First Option Period under terms and conditions different from those set forth in the Lease.

NOW, THEREFORE, in consideration of the foregoing, and other good and valuable consideration, the sufficiency of which is hereby acknowledged by the parties, the parties agree as follows:

1.  <u>Lease Extension</u>.  Landlord and Tenant hereby agree that the First Extension Option is hereby duly exercised at the Base Rent figures set forth below (and not those provided in the Lease).  The First Extension Term extends the Lease for the First Option Term Rent from November 1, 2011 through October 31, 2016.

2.  <u>Base Rent Schedule for the First Extension Term</u>.  The following shall be the Base Rent Schedule for the First Extension Term and hereby deletes and replaces the First Option Term Rent that was previously set forth in the Lease.

| Period | Annually/SF of Premises | Annually | Monthly |
|---|---|---|---|
| 11/1/2011 – 10/31/2016 | $10.50 | $119,868.00 | $9,989.00 |

3.  <u>Second Extension Option Term Rent</u>.  All terms and conditions, including the Base Rent for the Second Extension Option, if exercised, shall remain as set forth in the Lease.

4.  <u>Incorporation of Recitals</u>.  The recitals to this Second Amendment are an integral part hereof and are hereby incorporated herein verbatim as part of this Second Amendment as if set forth herein.

5.  <u>Counterparts</u>.  This Second Amendment may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

6.  <u>Consent of Lender</u>.  Landlord represents that it has obtained any and all necessary and required consents of any holder of a Security Device where the terms of any mortgage or non-disturbance agreement requires such consent for effectiveness of this Second Amendment.

7.  <u>Ratification</u>.  Except as modified herein, the Lease shall remain as first written and is hereby ratified and confirmed.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]



<u>VIA Overnight MAIL</u>
April 26, 2011

Bill Spatz
Grand Rapids Association, LP an Illinois Limited Partnership
14 N. Peoria Unit 3F
Chicago, IL 60607

RE:    Amendment To Lease-Guitar Center Grand Rapids, MI Store #338

Dear Mr. Spatz:

Enclosed please find two (2) executed ink-originals of the Amendment To Lease for the Grand
Rapids Guitar Center Store #338.

Please execute the enclosed Lease Amendments and return one (1) fully executed original back
to our office.

Should you have any questions or concerns regarding this matter please contact Dan Smith at
818-735-8800, Ext. 2344.


Thank you.

Sincerely,

Donna Shadley
Administrative Assistant
dshadley@guitarcenter.com


5795 Lindero Canyon Rd. Westlake Village, CA. 91362-4013
Phone: (818) 735-8800 Fax: (818) 735-7923

## SECOND AMENDMENT TO LEASE

This Second Amendment to Lease (this "Amendment") is entered into as of _March 19_, 2014 ("Effective Date"), by and between GRAND RAPIDS ASSOC., L.P., an Illinois limited partnership ("Landlord") and GUITAR CENTER STORES, INC., a Delaware corporation ("Tenant"), with respect to the following facts:

A.      Landlord and Tenant are parties that certain Lease, dated June 15, 2005 (the "Original Lease"), as amended by that certain Letter Agreement dated August 28, 2001 (the "Letter Agreement"), and as further amended by that certain Amendment to Lease, dated April 25, 2011 (the "First Amendment, and together with the Letter Agreement and Original Lease, the "Lease") for approximately 11,416 square feet of premises located at 2891 Radcliff Avenue SE, Kentwood, MI 49512 (the "Premises").

B.      Landlord and Tenant wish to amend the Lease to provide for additional use of the Premises as lesson rooms.

C.      All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Lease.

NOW THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements hereinafter set forth, the parties hereto hereby agree as follows:

1.      Permitted Use.  Notwithstanding anything in the Lease to the contrary, as of the Effective Date, Tenant may use the Premises for the purpose of providing lessons and instruction of musical instruments. Accordingly, Paragraph 1.8 of the Original Lease is hereby deleted and replaced with the following:

> "The Premises shall be used and occupied for the sale, rental, and repair of (both new and previously-owned) guitars; amplifiers; keyboards; drums and percussion; band and orchestra equipment; live sound (public address systems and equipment); DJ equipment; stage, theater, DJ and special effects lighting; equipment, computers, hardware and software for (any and all) entertainment, music, audio and/or video recording, performance, editing and instructional applications; other musical instruments and related products; music books and sheet music; music and video software; instructions and music lessons; rehearsal studios; and other accessories and items related thereto, and/or items which are a technological evolution of the foregoing ("Permitted Use")."

2.    Consent of Lender. Landlord represents that it has, to the extent required, obtained the consent of any holder of any ground lease, mortgage, deed of trust, or other security device to this Amendment and to all the terms and conditions set forth herein.

3.    Ratification. Except as specifically amended hereby, the Lease shall remain in full force and effect and is hereby ratified and confirmed.

4.    Conflict. In the event of a conflict between the provisions of the Lease and this Amendment, the provisions of this Amendment shall control.

5.    Counterparts. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the Effective Date.

LANDLORD:                              TENANT:

GRAND RAPIDS ASSOC., L.P.,             GUITAR CENTER STORES, INC.,
an Illinois limited partnership        a Delaware corporation

By: _____         By: _____
Name: _____              Name: _____
Title: _____               Title: _____

# GUITAR CENTER, INC.



March 20, 2014


GRAND RAPIDS ASSOC
14 N PEORIA UNIT 3F
CHICAGO, IL 60607

Attention: Bill Spatz

Enclosed, please find your copy of the amendment executed by Guitar Center Stores, Inc.

Should you have any additional questions or concerns regarding this matter, please feel free to contact me at (818) 735-8800 Ext. 2439.

Thank you,

Casey Wheatman
Lease Administrator
Casey.Wheatman@guitarcenter.com


Enclosure



# Commercial Real Estate Lease

### Multi-Tenant Lease – Net

By and Between:

**GUITAR CENTER STORES, INC. ("Tenant"),**
a Delaware corporation

and,

**GRAND RAPIDS ASSOC., L.P. ("Landlord"),**
an Illinois limited partnership.



**GUITAR CENTER STORES, INC.
COMMERCIAL MULTI-TENANT LEASE-NET**

## 1. Basic Provisions ("Basic Provisions")

*1.1    Parties.*    This Lease ("Lease"), dated for reference purposes only, July 18, 2001, is made by and between GRAND RAPIDS ASSOC., L.P., an Illinois limited partnership ("Landlord") and GUITAR CENTER STORES, INC., a Delaware corporation ("Tenant") (collectively the "Parties" or individually a "Party").

*1.2    Premises.*    That certain portion of the Shopping Center, including all improvements therein or to be provided by Landlord under the terms of this Lease, located at the southwest corner of 28th St., and Radcliff Ave., Grand Rapids, Michigan, as outlined on **EXHIBIT A – SITE PLAN**, attached hereto, and generally described as retail space of approximately 11,416 square feet ("Premises"), which is part of a larger 47,266 square foot Shopping Center, known as Kentwood Market Place ("Shopping Center"). In addition to Tenant's rights to use and occupy the Premises as hereinafter specified, Tenant shall have non-exclusive rights to the Common Areas (as defined in Paragraph 2.6 below). (See Paragraph 2 for further provisions.)

*1.3    Term.*    Ten (10) years ("Original Term") commencing upon delivery of possession of the Premises to Tenant, with Landlord's Work, as set forth in **EXHIBIT B – LANDLORD'S WORK**, attached hereto, ("Commencement Date") and ending on the tenth (10th) anniversary of the first full month following the Commencement Date  ("Expiration Date"). (See Paragraph 3 for further provisions.)

*1.4    Options.*    Tenant shall have two – five (5) year options to extend the term of this Lease. (See Paragraph 39 for further provisions.)

*1.5    Base Rent.*    As set forth in the Rent Schedule in Section 1.6, below, ("Base Rent"), payable on the 1st day of each month commencing one hundred twenty (120) days after the completion of all of the following (a) delivery of possession of the Premises to Tenant in broom-clean condition, and otherwise in as-is condition except as provided in Paragraphs 2.2 and 2.3, (b) receipt of a non-disturbance agreement, in favor of Tenant, executed by Landlord and Landlord's mortgagee, and (c) Landlord's approval of Tenant's improvement plans ("Rent Commencement Date").

<u>1.6    Rent Schedule:</u>

| Period | Annually / SF | Annually | Month |
|---|---|---|---|
| Years 1-5 | $10.00 | $114,160.00 | $9,513.33 |
| Years 6-10 | $11.00 | $125,576.00 | $10,464.67 |

2

| Option 11-15 | $12.50 | $142,700.00 | $11,891.67 |
| Option 16-20 | $14.00 | $159,824.00 | $13,318.67 |

**1.7** *Lease Contingency.* Tenant's covenants and responsibilities under this Lease are contingent upon and subject to Tenant's receipt of all permits and approvals required for Tenant to construct its interior improvements, signage and open for business within the Premises.

**1.8** *Permitted Use.* For the purpose of the sale, rental, and repair of guitars, amplifiers, keyboards, percussion, pro audio, DJ equipment, and other musical instruments and related products, music books and sheet music, software and other accessories and items related thereto. (See Paragraph 6 for further provisions.)

**1.9** *Insuring Party.* Landlord is the "Insuring Party" unless otherwise stated herein. (See Paragraph 8 for further provisions.)

**1.10** Brokers. Tenant is represented by Jack Uhazie of Lormax Properties ("Tenant's Broker"). Landlord is represented by Spatz Centers, Inc. ("Landlord's Broker").

**1.11** Tenant's Share of Common Area Operating Costs. Twenty four and fifteen one-hundredths percent (24.15%) (11,416 / 47,266) ("Tenant's Share") as determined by pro-rata square footage of the Premises as compared to the total square footage of the Shopping Center. Tenant's Share shall be subject to reduction if Landlord increases the total square footage of the Shopping Center.

**1.12** Conditions Precedent to the Validity of this Lease.

(a) *Landlord's Prior Lease Termination.* Landlord shall use its best efforts and diligence to obtain and provide to Tenant, within ten (10) days of the execution of this Lease, a copy of evidence of the termination of any and all existing leases on the Premises. A duly and fully executed termination agreement, contingent upon Tenant's waiver of its termination right under subsection 1.12 (b) below, and further contingent upon mutual agreement of the Parties, as to the final total of Landlord's Shell Work under subsection 1.12 (c) below, shall be considered acceptable to satisfy the requirements of this subsection 1.12 (a), if provided to Tenant within the deadline set forth herein. If Landlord shall fail to provide evidence of the termination of any and all existing leases on the Premises within ten (10) days of the execution of this Lease, then Tenant shall have the option to terminate this Lease by giving written notice to Landlord within sixty (60) days thereafter, in which case this Lease shall immediately and automatically terminate, and neither Party shall have any obligation to the other Party hereunder. If Tenant shall fail or elect not to terminate as set forth in the preceding sentence, but Landlord is still unable, despite Landlord's best efforts and diligence, to provide evidence of the termination of any and all existing leases on the Premises within sixty (60) days of the execution of this Lease, then this Lease shall immediately and automatically terminate, and neither Party shall have any obligation to the other Party hereunder. Notwithstanding the foregoing, if Landlord shall provide evidence of the termination of any and all existing leases on the Premises prior to the deadline set forth herein, and provided that Tenant has not previously provided Landlord with a notice of termination under the terms of this subsection 1.12 (a) then Tenant's right to terminate under the terms of this subsection 1.12 (a) shall become void.

3

(b) *Tenant's Site Visit.* Tenant shall at Tenant's option, conduct a visit to the Premises for the purposes of determining the Premises' condition and suitability for, among other purposes, Tenant's intended use and intended remodeling plans. If Tenant shall elect, in Tenant's sole discretion to terminate this Lease, Tenant may do so in writing, within thirty (30) days of the execution of this Lease, in which case this Lease shall immediately and automatically terminate, and neither Party shall have any obligation to the other Party hereunder. If Tenant shall fail or elect not to terminate within thirty (30) days of the execution of this Lease, then Tenant's termination right under this subsection 1.12 (b) shall expire.

(c) *Rent Credit for Landlord's Shell Work.* Tenant shall obtain an estimate for the total cost of Landlord's Shell Work, which Landlord's Shell Work is more specifically set forth in Subsection 7.5 below, and shall provide a copy of same to Landlord. The Parties shall execute a letter agreement setting forth the estimate, as the agreed total of Landlord's Shell Work, and such amount shall be due Tenant from Landlord in the form of a credit against Rent and Additional Rent owing from Tenant to Landlord under this Lease, which credit shall be applied to the earliest unpaid amounts owing, or to become owing under this Lease. If Landlord has any objections as to the total of the estimate, then the Parties shall use reasonable good faith efforts and diligence to negotiate a timely, reasonable, and mutually acceptable amount. If, despite the good faith efforts and diligence of both Parties, the Parties are unable to arrive at a reasonable and mutually acceptable amount within ten (10) days of Landlord's receipt of the estimate, then, unless the Parties shall agree in writing to extend the deadline for the agreement of the final and total cost of Landlord's Shell Work, this Lease shall immediately and automatically terminate, and neither Party shall have any obligation to the other Party hereunder.

## 2. Premises.

**2.1     Letting.**     Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. Unless otherwise provided herein, any statement of square footage set forth in this Lease, or that may have been used in calculating rental, is an approximation which Landlord and Tenant agree is reasonable and the rental based thereon is not subject to revision whether or not the actual square footage is more or less.

**2.2     Condition.**     Landlord shall deliver the Premises to Tenant clean and free of debris, on the Commencement Date, and warrants to Tenant that the existing roof membrane, plumbing, electrical, fire sprinkler system, lighting, air conditioning, heating, and loading doors, if any, in the Premises, other than those constructed by Tenant, shall be in good operating condition on the Commencement Date. Landlord represents and warrants that the structural integrity of the Premises and the Shopping Center, including, without limitation, the foundation, roof, and any load bearing or retaining walls, is free from any latent or patent defects. If a non-compliance with said warranty exists as of the Commencement Date, Landlord shall promptly after receipt of written notice from Tenant setting forth with specificity the nature and extent of such non-compliance, rectify same at Landlord's expense. Landlord represents and warrants that Landlord has right and title to Premises and the land on which the Premises and all common areas are constructed, and further has the legal right to lease same to Tenant.

**2.3     Compliance with Covenants, Restrictions, Laws, and Building Codes.** Landlord warrants to Tenant that the improvements on the Premises comply with any and all applicable covenants or restrictions of record and applicable laws, rules, building codes, zoning, regulations and ordinances in effect on the Commencement Date including, without limitation, the Tenant's intended use of the Premises. Said warranty does not apply to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Tenant. If the Premises do not comply with said warranty, Landlord shall, except as otherwise provided in this Lease, promptly after receipt of written notice from

4

Tenant setting forth with specificity the nature and extent of such non-compliance, rectify the same at Landlord's expense. Landlord shall be liable for any alterations improvements or modifications required to comply with any laws, rules, or regulations promulgated or enacted after the date of this Lease. Tenant shall be responsible for modifications required to bring Tenant's alterations into compliance with any laws, rules or regulations promulgated or enacted after the date of this Lease, if required by law. Landlord shall be responsible for the compliance of the Premises and the Shopping Center and the means of access thereto from a public way with the requirements of the American with Disabilities Act (42 U.S.C. Section 12101 et.seq.) and the regulations and Accessibility Guidelines for Shopping Centers and Facilities pursuant thereto. Landlord represents and warrants that there are no covenants, conditions, restrictions, or agreements in existence which will in any way adversely affect Tenant's intended use of the Premises or the Common Areas.

    2.4    Vehicle Parking.    Landlord represents and warrants that Landlord has not and will not and will not grant exclusive parking rights to any entity. In the event that Tenant notifies Landlord of any abuse or overuse of the parking areas, Landlord shall take all steps necessary to end the abuse of the parking areas.

    2.5    Common Areas - Definition.    The term "Common Areas" is defined as the lobby areas, parking areas, landscape areas, sidewalks, trash areas, roadways, driveways, and/or loading docks, if any, and any other areas adjacent to the Shopping Center in which the Premises are located, and any other areas adjacent to the Shopping Center which are for the common and joint use of the tenants of the Shopping Center and their respective employees, suppliers, shippers, customers, contractors, and invitees.

    2.6    Common Areas - Tenant's Rights.    Landlord hereby grants to Tenant, for the benefit of Tenant and its employees, suppliers, shippers, contractors, customers, and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist.

## 3.    Term.

    3.1    Term.    The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

    3.2    Delay in Possession.    If for any reason Landlord cannot deliver possession of the Premises to Tenant in broom-clean condition and otherwise as agreed in Paragraphs 2.2 and 2.3 hereof on or before October 1, 2001 ("Delivery Date"), Landlord shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease, or the obligations of Tenant hereunder, or extend the term hereof, but in such case, Tenant shall not be obligated to pay rent or perform any other obligation of Tenant under the terms of this Lease until Landlord delivers possession of the Premises to Tenant in broom-clean condition and otherwise as agreed in Paragraphs 2.2 and 2.3 hereof. If possession of the Premises is not delivered to Tenant within thirty (30) days after the Delivery Date in broom-clean condition and otherwise as agreed in Paragraphs 2.2 and 2.3 hereof, Tenant may, at its option, by notice in writing to Landlord within thirty (30) days thereafter, cancel this Lease, in which event the Parties shall be discharged from, all obligations hereunder. Except as may be otherwise provided, and regardless of when the term actually commences, if possession is not tendered to Tenant in broom-clean condition and otherwise as agreed in Paragraphs 2.2 and 2.3 hereof by the Delivery Date, and Tenant does not terminate this Lease, as aforesaid, the period free of the obligation to pay Base Rent and any Operating Expenses, if any, that Tenant would otherwise have enjoyed shall run from the date of delivery of possession in broom-clean condition and otherwise as agreed in Paragraphs 2.2 and 2.3 hereof and continue for a period equal to what Tenant would otherwise have enjoyed

5

under the terms hereof. In addition, Tenant shall receive an additional day for day abatement of Base Rent and Operating Expenses for each day after the Delivery Date that Tenant has not received possession of the Premises in broom-clean condition and otherwise as agreed in Paragraphs 2.2 and 2.3 hereof.

## 4. Rent.

    4.1    <u>Base Rent.</u> Tenant shall cause payment of Base Rent and other rent or charges, as the same may be adjusted from time to time, to be received by Landlord in lawful money of the United States on or before the day on which it is due under the terms of this Lease. Base Rent and all other rent and charges for any period during the term hereof which is for less than one (1) full calendar month shall be prorated based upon the actual number of days of the calendar month involved. Payment of Base Rent and other charges shall be made to Landlord at its address stated herein or to such other persons or at such other addresses as Landlord may from time to time designate in writing to Tenant.

    4.2    <u>Common Area Operating Costs</u>

        *(a)*    *Common Area Operating Costs Defined.*    Landlord shall maintain and repair, or cause to be maintained or repaired, the Common Area serving the Premises. All costs and expenses incurred by Landlord with respect to the maintenance, repair, and operation of the Common Area are hereinafter referred to as the "Common Area Operating Costs" and/or "CAM's" and shall be limited to, the following: external lighting repair and replacement, garbage removal, landscaping, the cost of maintenance and repair of the Common Areas, cleaning of the Common Areas, snow and ice removal, painting of Common Areas (including striping), paving, sanitary control, fire protection for the Common Areas, sewage charges, non-structural maintenance and repairs of exterior wall surfaces, insurance required to be carried by Landlord under this Lease, depreciation of machinery and equipment owned and used for the operation, repair and maintenance of the Common Areas, rental charges for machinery and equipment owned and used for the operation, repair and maintenance of the Common Areas, wages and benefits of personnel required to maintain the Common Areas (but only to the extent of their time spent maintaining the Shopping Center, a ten percent (10%) administrative fee based on CAM's (excluding depreciation and insurance) (which administrative fee is included in the $2.52 amount and the CAM Cap set forth in Section 5 below), and water charges.

        *(b)*    *Payment of Common Area Operating Costs.*    Commencing as of the Rent Commencement Date, Tenant shall pay to Landlord, in addition to the rent specified in the Lease, as further and additional rent, Tenant's proportionate share of the Common Area Operating Costs. Landlord shall bill Tenant monthly (together with reasonable supporting documentation) for its proportionate share of the Common Area Operating Costs, and Tenant shall promptly make payment thereof within fifteen (15) days of billing; provided, however, that Landlord shall have the right, at Landlord's election, to collect the Common Area Operating Costs in advance on a monthly basis according to Landlord's estimate as to the amount thereof for the next year, in which event Tenant shall pay to Landlord each calendar month, at the same time and in the same manner as the monthly payments of rent, a sum equal to the amount estimated each year by Landlord, and of which Tenant has been given notice, to be 1/12th of Tenant's Share of the Common Area Operating Costs. In the event Landlord elects to collect said sums on an advance estimated basis, Landlord shall provide to Tenant a breakdown of the actual costs incurred within sixty (60) days following the end of each calendar year, together with reasonable supporting documentation and if Tenant's Share of the actual costs for any calendar year exceeds the amount paid by Tenant in advance to Landlord, Tenant shall promptly reimburse Landlord for the amount of the excess; provided that if Tenant's Share for any calendar year is less than the amount previously paid by Tenant, Landlord shall grant Tenant a credit

therefore, without interest thereon.

    *(c)   Auditing and Verification.*   Lessee, or its representative, shall have the right to examine Lessor's books and records with respect to the items in any statement of actual reimbursable maintenance costs, insurance, taxes, or any other Additional Rent charges or expenses during normal business hours at any time within ninety (90) days following the furnishing by Lessor to Lessee of said statement. . All costs incurred in connection with Lessee's verification of Lessor's statement shall be borne by Lessee: provided, however, that if Lessee's verification discloses 5% or higher overpayment, Lessor shall pay the reasonable and actual cost of such verification by a firm of certified public accountants.  Unless Lessee shall take written exception to any item within one hundred eighty (180) days after submission of such statement, said statement shall be considered as final and accepted by Lessee.

**5.  Cap on Operating Expenses.  The combined total of Tenant's Share of reimbursable CAM's (see the provisions set forth in Section 4 of this Lease), Real Estate Taxes (see the provisions set forth in Section 10 of this Lease), and Insurance (see the provisions set forth in Section 8 of this Lease) (collectively referred to as "Operating Expenses"), shall not exceed $2.52 per square foot, annually during the first twelve (12) months of this Lease. Tenant's Share of Operating Expenses, excluding Real Estate Taxes, insurance and snow removal, shall not increase more than 5% over the prior year's amount in any succeeding year, on a cumulative basis (i.e., year three Operating Expenses shall not exceed a 10% increase over year one Operating Expenses).**

**6.  Use.**

    <u>6.1</u>   <u>Use.</u>  Tenant shall use and occupy the Premises only for the purposes set forth in Paragraph 1.8, or any other use which is comparable thereto. Tenant shall not use or permit the use of the Premises in a manner that creates waste or a nuisance, or that disturbs owners and/or occupants of, or causes damage to, neighboring premises or properties.  Landlord hereby agrees to not unreasonably withhold or delay its consent to any written request by Tenant, Tenants assignees or subtenants, and by prospective assignees and subtenants of the Tenant, its assignees and subtenants, for a modification of said permitted purpose for which the premises may be used or occupied, so long as the same will not impair the structural integrity of the improvements on the Premises, the mechanical or electrical systems therein, is not significantly more burdensome to the Premises and the improvements thereon, does not violate any other tenant's then existing exclusive uses within the Shopping Center, and is otherwise permissible pursuant to this Paragraph 6.  If Landlord elects to withhold such consent, Landlord shall within ten (10) business days give a written notification of same, which notice shall include an explanation of Landlord's reasonable objections to the change in use. Landlord's failure to respond shall be deemed approval.

    <u>6.2</u>   <u>Hazardous Substances.</u>

    *(a)*   *<u>Reportable Uses Require Consent.</u>*  The term "Hazardous Substance" as

used in this Lease shall mean any product, substance, chemical, material or waste whose presence, nature, quantity and/or intensity of existence, use, manufacture, disposal, transportation, spill, release or effect, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for liability of Landlord to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substance shall include, but not be limited to, hydrocarbons, petroleum, gasoline, crude oil or any products, by-products or fractions thereof. Tenant shall not engage in any activity in, on or about the Premises which constitutes a Reportable Use (as hereinafter defined) of Hazardous Substances without the express prior written consent of Landlord and compliance in a timely manner (at Tenant's sole cost and expense) with all Applicable Law (as defined in Paragraph 6.3). "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority. Reportable Use shall also include Tenant's being responsible for the presence in, on or about the Premises of a Hazardous Substance with respect to which any Applicable Law requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Tenant may, without Landlord's prior consent, but in compliance with all Applicable Law, use any ordinary and customary materials reasonably required to be used by Tenant in the normal course of Tenant's business permitted on the Premises, so long as such use is not a Reportable Use and does not expose the Premises or neighboring properties to any meaningful risk of contamination or damage or expose Landlord to any liability therefor. In addition, Landlord may (but without any obligation to do so) condition its consent to the use or presence of any Hazardous Substance, activity or storage tank by Tenant upon Tenant's giving Landlord such additional assurances as Landlord, in its reasonable discretion, deems necessary to protect 'Itself, the public, the Premises and the environment against damage, contamination or injury and/or liability therefrom or therefor, including, but not limited to, the installation (and removal on or before Lease expiration or earlier termination) of reasonably necessary protective modifications to the Premises.

       **(b)**   _Duty to Inform Landlord._  If Tenant knows, or has reasonable cause to believe, that a Hazardous Substance, or a condition involving or resulting from same, has come to be located in, on, under or about the Premises, other than as previously consented to by Landlord, Tenant shall immediately give written notice of such fact to Landlord. Tenant shall also immediately give Landlord a copy of any statement, report, notice, registration, application, permit, business plan, license, claim, action or proceeding given to, or received from, any governmental authority or private party, or persons entering or occupying the Premises, concerning the presence, spill, release, discharge of, or exposure to, any Hazardous Substance or contamination in, on, or about the Premises, including but not limited to all such documents as may be involved in any Reportable Uses involving the Premises.

       **(c)**   _Indemnification._  Tenant shall indemnify, protect, defend and hold Landlord, its agents, employees, lenders and ground lessor, if any, and the Premises, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, costs, claims, liens, expenses, penalties, permits and attorney's and consultant's fees arising out of or involving any Hazardous Substance or storage tank brought onto the Premises by or for Tenant or under Tenant's control. Tenant's obligations under this Paragraph 6 shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Tenant, and the cost of investigation (including consultant's and attorney's fees and testing), removal, remediation, restoration and/or abatement thereof, or of any contamination therein involved, and shall survive the expiration or earlier termination of this Lease. No termination, cancellation or release agreement entered into by Landlord and Tenant shall release Tenant from its obligations under this Lease with respect to Hazardous Substances or storage tanks, unless specifically so agreed by Landlord in writing at the time of such agreement. Tenant shall not be responsible for and Landlord shall indemnify,

8

protect, defend and hold Tenant, its agents, employees, lenders and ground lessor harmless from and against any and all loss of rents and/or damages, liabilities, judgments, costs, claims, liens, expenses, penalties, permits and attorney's and consultant's fees arising out of or involving any Hazardous Substance or storage tank at the Premises or the Shopping Center, or at any adjacent property not brought thereon by or for Tenant or under Tenant's control.

      **6.3**    **Tenant's Compliance with Law.** Except as otherwise provided in this Lease, Tenant shall, at Tenant's sole cost and expense, fully diligently, and in a timely manner, comply with all "Applicable Law," which term is used in this Lease to include all laws, rules, regulations, ordinances, directives, covenants, easements and restrictions of record, permits, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Landlord's engineers and/or consultants, relating in any manner to the Premises (including but not limited to matters pertaining to (i) industrial hygiene, (ii) environmental conditions on, in, under or about the Premises, including soil and groundwater conditions, and (iii) the use, generation, manufacture, production, installation, maintenance, removal, transportation, storage, spill or release of any Hazardous Substance or storage tank), now in effect or which may hereafter come into effect, and whether or not reflecting a change in policy from any previously existing policy. Tenant shall, within ten (10) days after receipt of Landlord's written request, provide Landlord with copies of all documents and information, including, but not limited to, permits, registrations, manifests, applications, reports and certificates, evidencing Tenant's compliance with any Applicable Law specified by Landlord, and shall immediately upon receipt, notify Landlord in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving failure by Tenant or the Premises to comply with any Applicable Law.

      **6.4**    **Inspection; Compliance.** Landlord and Landlord's Lender(s) (as defined in Paragraph 8.3(a)) shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times, for the purpose of inspecting the condition of the Premises and for verifying compliance by Tenant with this Lease and all Applicable Laws (as defined in Paragraph 6.3), and to employ experts and/or consultants in connection therewith and/or to advise Landlord with respect to, Tenant's activities, including but not limited to the installation, operation, use, monitoring, maintenance, or removal of any Hazardous Substance or storage tank on or from the Premises. The costs and expenses of any such inspections shall be paid by the party requesting same, unless a Default or Breach of this Lease, violation of Applicable Law, or a contamination, caused or materially contributed to by Tenant is found to exist or be imminent, or unless the inspection is requested or ordered by a governmental authority as the result of any such existing or imminent violation or contamination. In any such case, Tenant shall upon request reimburse Landlord or Landlord's Lender, as the case may be, for the costs and expenses of such inspections.

# 7.  Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.

## 7.1  Tenant's Obligations.

      (a)    *Tenant's Repairs.* Subject to the provisions of Paragraphs 2.2 (Landlord's warranty as to condition), 2.3 (Landlord's warranty as to compliance with covenants, etc), 7.2 (Landlord's obligations to repair), 9 (damage and destruction), and 14 (condemnation), Tenant shall, at Tenant's sole cost and expense and at all times, keep the Premises and every part thereof in good order, condition and repair, including, lighting facilities, fixtures, walls (interior only), windows, doors, and floor coverings, subject to normal wear and tear. Tenant, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices.

*(b)* *Tenant's Maintenance Contracts.* Tenant shall, at Tenant's sole cost and expense, procure and maintain contracts, in customary form and substance for, and with contractors specializing and experienced in, the inspection, maintenance and service of the heating, air conditioning and ventilation equipment for the entire term of the Lease, including option periods, if exercised.

*(c)* *Emergency Repairs by Tenant.* In the event of an emergency (any event that in Tenant's reasonable opinion poses a potential threat to life and/or property), and/or in the event that Landlord shall fail to perform any of Landlord's responsibilities within the applicable cure period, then Tenant shall have the right, but not the obligation to make the necessary and appropriate repairs, or to take the necessary appropriate action, on behalf of Landlord, and Landlord shall promptly reimburse Tenant the full cost of such repairs or action. If Landlord shall fail to full reimburse Tenant for such costs, Tenant may, but shall not be required to deduct such amounts from any amounts owing or to become owing from Tenant to Landlord.

**7.2   Landlord's Obligations.**      Landlord shall, at Landlord's sole cost and expense, maintain, repair and replace (as necessary) plumbing and electrical systems under, and outside of the Premises, roof and roof membrane, foundation, slab, exterior walls, load bearing walls, and retaining walls, structural components, exterior surfaces of the Premises and the Shopping Center, and Landlord shall be responsible for the cost of and the correction of any latent defects of the structural portions of the Premises or the Shopping Center. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises. Notwithstanding the foregoing, costs associated with non-structural maintenance and repairs of exterior wall surfaces shall be included in CAM costs, as set forth in subsection 4.2 (a) above. **Landlord shall pay for repair or replacement of HVAC units above $500.00.**

**7.3   Utility Installations; Trade Fixtures; Alterations.**

*(a)* *Definitions; Consent Required.* The term "Utility Installations" is used in this Lease to refer to all carpeting, window coverings, air lines, power panels, electrical distribution, security, fire protection systems, lighting fixtures, heating, ventilating, and air conditioning equipment, plumbing, and fencing in, on or about the Premises. The term "Trade Fixtures" shall mean Tenant's machinery, personal property, and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the improvements on the Premises from that which are provided by Landlord under the terms of this Lease, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Tenant Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Tenant that are not yet owned by Landlord as defined in Paragraph 7.4(a). Tenant shall not make any material Alterations or Utility Installations in, on, under or about the Premises without Landlord's prior written consent. Tenant may, however, make non-structural Utility Installations to the interior of the Premises (excluding the roof), as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing bearing walls, and the cost thereof during any twelve (12) month period of this Lease does not exceed $75,000.

*(b)* *Consent.* Any Alterations or Utility Installations that Tenant shall desire to make and which require the consent of the Landlord shall be presented to Landlord in written form with proposed detailed plans. All consents given by Landlord, whether by virtue of Paragraph 7.3(a) or by subsequent specific consent, shall be deemed conditioned upon: (i) Tenant's acquiring all applicable permits required by governmental authorities, (ii) the furnishing of copies of such permits together with a copy of the plans and specifications for the Alteration or Utility Installation to Landlord prior to commencement of the work

10

thereon, and (iii) the compliance by Tenant with all conditions of said permits in a prompt and expeditious manner. Any Alterations or Utility Installations by Tenant during the term of this Lease shall be done in a good and workmanlike manner, with good and sufficient materials, and in compliance with all Applicable Law. In the event that Landlord fails to approve, or reasonably reject with specificity Tenant's Plans within ten (10) days of receipt of same, Landlord's approval shall be deemed given. Landlord shall cooperate with Tenant's efforts to obtain the required permits and approvals to commence Tenant's Work and Landlord's Shell Work.

    *(c)*    *Indemnification.*  Tenant shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Tenant at or for use on the Premises, which claims are or may be secured by any mechanics' or materialmen's lien against the Premises or any interest therein. Tenant shall give Landlord not less than ten (10) days notice prior to the commencement of any work in, on or about the Premises, and Landlord shall have the right to post notices of non-responsibility in or on the Premises as provided by law. If Tenant shall, in good faith, contest the validity of any such lien, claim or demand, then Tenant shall, at its sole expense defend and protect itself, Landlord and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof against the Landlord or the Premises.

### 7.4    Ownership; Removal; Surrender; and Restoration.

    *(a)*    *Ownership.*  All Alterations and Utility Installations made to the Premises by Tenant shall be the property of and owned by Tenant, but considered a part of the Premises. Unless removed by Tenant without materially damaging the Premises, all Tenant Owned Alterations and Utility Installations shall, at the expiration or earlier termination of this Lease, become the property of Landlord and remain upon and be surrendered by Tenant with the Premises.

    *(b)*    *Surrender/Restoration.*  Tenant shall surrender the Premises by the end of the last day of the Lease term or any earlier termination date, with all of the improvements, parts and surfaces thereof clean and free of debris in and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice or by Tenant performing all of its obligations under this Lease. Except as otherwise agreed or specified in writing by Landlord, the Premises, as surrendered, shall include the Utility Installations. The obligation of Tenant shall include the repair of any damage occasioned by the installation, maintenance or removal of Tenant's Trade Fixtures, furnishings, equipment, and Alterations and/or Utility Installations, as well as the removal of any storage tank installed by or for Tenant, and the removal, replacement, or remediation of any soil, material or ground water contaminated by Tenant, all as may then be required by Applicable Law and/or good service practice. Tenant's Trade Fixtures shall remain the property of Tenant and shall be removed by Tenant subject to its obligation to repair the Premises pursuant to this Lease.

### 7.5    Landlord's Shell Work.

    (a)    Performance / Landlord's Contribution. Tenant shall perform the shell work set forth in **EXHIBIT B – LANDLORD'S SHELL WORK,** on behalf of, and at the cost of Landlord. Tenant shall pay the cost of all of Landlord's Shell Work, with the understanding that Landlord shall reimburse Tenant fully for the total actual cost of Landlord's Shell Work paid by Tenant, in the form of free Rent. Beginning as of the Rent Commencement Date, Rent and Additional Rent shall abate entirely, until such time as the abated Rent and Additional Rent equals the total actual cost of Landlord's Shell Work paid by Tenant

("Shell Reimbursement"). In the event that the Shell Reimbursement has not been fully satisfied prior to any event which gives rise to a right of termination of this Lease, then Landlord shall immediately pay the remaining unpaid balance of the Shell Reimbursement to Tenant, in lieu of rent credit.

(b)   Estimation of Costs / Change Orders. Upon completion of Tenant's Plans, Tenant shall obtain a separate bid from Tenant's contractor for Landlord's Shell Work. Notwithstanding anything to the contrary set forth in this Lease, the Shell Reimbursement shall include any change orders relating to Landlord's Shell Work for required field changes, unforeseen conditions, inspector changes, plan check changes, fire marshal changes, or otherwise, excepting only those changes made by Tenant which were not required, but merely desired by Tenant.

## 8. Insurance; Indemnity.

**8.1**   *Payment For Insurance.* Regardless of whether the Landlord or Tenant is the Insuring Party, Tenant shall pay as additional rent all insurance required under this Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Landlord in excess of reasonable limits of liability insurance carried by other Landlords of other Shopping Centers of comparable quality in the Grand Rapids market. However, with respect to insurance required to be carried by Landlord, Tenant shall not be responsible for any reimbursement thereof until, and except for such amounts accruing on and after the Rent Commencement Date. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term. Payment shall be made by Tenant to Landlord together with and in the same manner as the Common Area Operating Costs.

**8.2**   Liability Insurance.

(a)   *Carried by Tenant.* As of the Commencement Date, Tenant shall obtain and keep in force during the term of this Lease a Commercial General Liability policy of insurance protecting Tenant and Landlord (as an additional insured) against claims for bodily injury, personal injury and property damage based upon, involving or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an "Additional Insured-Managers or Landlords of Premises" Endorsement and contain the "Amendment of the Pollution Exclusion" for damage caused by heat, smoke or fumes from a hostile fire. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Tenant's indemnity obligations under this Lease. The limits of said insurance required by this Lease or as carried by Tenant shall not, however, limit the liability of Tenant nor relieve Tenant of any obligation hereunder. All insurance to be carried by Tenant shall be primary to and not contributory with any similar insurance carried by Landlord, whose insurance shall be considered excess insurance only.

(b)   *Carried By Landlord.* Landlord shall also maintain liability insurance described in Paragraph 8.2(a), above, in addition to, and not in lieu of, the insurance required to be maintained by Tenant.

**8.3**   Property Insurance-Shopping Center, Improvements and Rental Value.

12

(a) *Shopping Center and Improvements.* The Insuring Party shall obtain and keep in force during the term of this Lease a policy or policies in the name of Landlord, with loss payable to Landlord and to the holders of any mortgages, deeds of trust or ground leases on the Premises ("Lender(s)"), insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full replacement cost of the Premises, as the same shall exist from time to time, or the amount required by Lenders, but in no event more than the commercially reasonable and available insurable value thereof if, by reason of the unique nature or age of the improvements involved, such latter amount is less than full replacement cost. If Landlord is the Insuring Party, however, Tenant Owned Alterations and Utility Installations shall be insured by Tenant under Paragraph 8.4 rather than by Landlord. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake), including coverage for any additional costs resulting from debris removal and reasonable amounts of coverage for the enforcement of any ordinance or law regulating the reconstruction or replacement of any undamaged sections of the Premises required to be demolished or removed by reason of the enforcement of any Shopping Center, zoning, safety or land use laws as the result of a covered cause of loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall be equal to $10,000 per occurrence, and Landlord shall be liable for such deductible amount in the event of an Insured Loss, as defined in Paragraph 9.1 (c).

(b) *Rental Value.* The Insuring Party shall, in addition, obtain and keep in force during the term of this Lease a policy or policies in the name of Landlord, with loss payable to Landlord and Lender(s), insuring the loss of the full rental and other charges payable by Tenant to Landlord under this Lease for one (1) year (including all real estate taxes, insurance costs, and any scheduled rental increases). Said insurance shall provide that in the event the Lease is terminated by reason of an Insured Loss, the period of indemnity for such coverage shall be extended beyond the date of the completion of repairs or replacement of the Premises, to provide for one full year's loss of rental revenues from the date of any such loss. Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected rental income, property taxes, insurance premium costs and other expenses, if any, otherwise payable by Tenant, for the next twelve (12) month period. Landlord shall be liable for any deductible amount in the event of such loss.

**8.4    Tenant's Property Insurance.** Subject to the requirements of Paragraph 8.5, Tenant at its cost shall either by separate policy or at Landlord's option, by endorsement to a policy already carried, maintain insurance coverage on all of Tenant Owned Alterations and Utility Installations in, on, or about the Premises similar in coverage to that carried by the Insuring Party under Paragraph 8.3. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $10,000 per occurrence. The proceeds from any such insurance shall be used by Tenant for the restoration of Tenant Owned Alterations and Utility Installations. Tenant shall be the Insuring Party with respect to the insurance required by this Paragraph 8.4 and shall provide Landlord with written evidence that such insurance is in force.

**8.5    Insurance Policies.** Insurance required hereunder shall be in companies duly licensed to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least B+, V, or such other rating as may be reasonably required by a Lender having a lien on the Premises, as set forth in the most current issue of "Best's Insurance Guide." Neither Party shall do or permit to be done anything which shall invalidate the insurance policies referred to in this Paragraph 8. Each Party shall cause to be delivered to the other Party certified copies of policies of

13

such insurance or certificates evidencing the existence and amounts of such insurance with the insured and loss payable clauses as required by this Lease.  No such policy shall be cancelable or subject to modification except after thirty (30) days prior written notice to the other Party.  Each Party shall at least thirty (30) days prior to the expiration of such policies, furnish the other Party with evidence of renewals or "insurance binders" evidencing renewal thereof.  If the Insuring Party shall fail to procure and maintain the insurance required to be carried by the Insuring Party under this Paragraph 8, the other Party may, but shall not be required to, procure and maintain the same on a thirty (30) day prior written notice.

**8.6    Waiver of Subrogation.**  Without affecting any other rights or remedies, Tenant and Landlord ("Waiving Party") each hereby releases and relieves the other, and waive their entire right to recover damages (whether in contract or in tort) against the other, for loss of or damage to the Waiving Party's property arising out of or incident to the perils required to be insured against under Paragraph 8.  The effect of such releases and waivers of the right to recover damages shall not be limited by the amount of insurance carried or required, or by any deductibles applicable thereto.

**8.7    Indemnity.**

        **(a)    Indemnification of Landlord.**        Except for Landlord's willful misconduct, gross negligence, and/or breach of express warranties, Tenant shall indemnify, protect, defend and hold harmless the Premises, Landlord and its agents, Landlord's master or ground Landlord, partners and Lenders, from and against any and all claims, loss of rents and/or damages, costs, liens, judgments, penalties, permits, attorney's and consultant's fees, expenses and/or liabilities arising out of, involving, or in dealing with, the occupancy of the Premises by Tenant, the conduct of Tenant's business, any act, omission or neglect of Tenant, its agents, contractors, employees or invitees, and out of any Default or Breach by Tenant in the performance in a timely manner of any obligation on Tenant's part to be performed under this Lease.  The foregoing shall include, but not be limited to, the defense or pursuit of any claim or any action or proceeding involved therein, and whether or not (in the case of claims made against Landlord) litigated and/or reduced to judgment, and whether well founded or not.  In case any action or proceeding be brought against Landlord by reason of any of the foregoing matters, Tenant upon notice from Landlord shall defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord and Landlord shall cooperate with Tenant in such defense.  Landlord need not have first paid any such claim in order to be so indemnified.

        **(b)    Indemnification of Tenant.**        Landlord shall hold harmless, defend with competent counsel reasonably satisfactory to Tenant, and indemnify Tenant and its representative from all liability, penalties, losses, damages, costs, expenses (including attorneys' fees and expert's fees), causes of action, claims, and/or judgments arising by reason of any death, bodily injury, personal injury, or property damage resulting from Landlord or its representatives (other than Tenant's willful misconduct or gross negligence) occurring in or about or resulting from an occurrence in or about the Premises during the Term or while Tenant is in possession of the Premises.  The provisions of this paragraph shall survive termination of the Lease with respect to events occurring prior to such termination.

**8.8    Exemption of Landlord from Liability.**  Except for Landlord's willful misconduct, gross negligence, or breach of any representations or warranties hereunder, Landlord shall not be liable for injury or damage to the persons or goods, wares, merchandise, or other property of Tenant, Tenant's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising

14

upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places, and regardless of whether the cause of such damage or injury or the means of repairing the same is accessible or not.  Landlord shall not be liable for any damages arising from any act or neglect of any other tenant of Landlord or be liable for injury to Tenant's business or for any loss of income or profit therefrom.

## 9.  Damage or Destruction.

### 9.1   Definitions.

(a)    *"Premises Partial Damage"* shall mean damage or destruction to the improvements on the Premises, other than Tenant Owned Alterations and Utility Installations, the repair cost of which damage or destruction is less than 50% of the then Replacement Cost of the Premises immediately prior to such damage or destruction, excluding from such calculation the value of the land and Tenant Owned Alterations and Utility Installations.

(b)    *"Premises Total Destruction"* shall mean damage or destruction to the Premises, other than Tenant Owned Alterations and Utility Installations the repair cost of which damage or destruction is 50% or more of the then Replacement Cost of the Premises immediately prior to such damage or destruction, excluding from such calculation the value of the land and Tenant Owned Alterations and Utility Installations.

(c)    *"Insured Loss"* shall mean damage or destruction to improvements on the Premises, other than Tenant Owned Alterations and Utility Installations, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d)    *"Replacement Cost"* shall mean the cost to repair or rebuild the improvements owned by Landlord at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of applicable building codes, ordinances or laws, and without deduction for depreciation.

(e)    *"Hazardous Substance Condition"* shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance as defined in Paragraph 6.2(a), in, on, or under the Premises.

### 9.2    Partial Damage - Insured Loss.  If a Premises Partial Damage that is an Insured Loss occurs, then Landlord shall, at Landlord's expense, repair such damage (but not Tenant's Trade Fixtures or Tenant Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Tenant shall, at its election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Landlord shall make the insurance proceeds available to Tenant on a reasonable basis for that purpose.  Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds as and when required to complete said repair.  In the event, however, the shortage in proceeds was due to the fact that, by reason of the unique

15

nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Landlord shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Tenant provides Landlord with the funds to cover same, or adequate assurance thereof, within ten (10) days following receipt of written notice of such shortage and request therefor. If Landlord receives said funds or adequate assurance thereof within said ten (10) day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If Landlord does not receive such funds or assurance within said period, Landlord may nevertheless elect by written notice to Tenant within ten (10) days thereafter to make such restoration and repair as is commercially reasonable with Landlord paying any shortage in proceeds, in which case this Lease shall remain in full force and effect. If in such case Londlord does not so elect, then this Lease shall terminate sixty (60) days following the occurrence of the damage or destruction. Unless otherwise agreed, Tenant shall in no event have any right to reimbursement from Landlord for any funds contributed by Tenant to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3 rather than Paragraph 9.2.

9.3 **Partial Damage or Total Destruction - Uninsured Loss.** If a Premises Partial Damage or Premises Total Destruction that is not an Insured Loss occurs, unless caused by a willful act of Tenant (in which event Tenant shall make the repairs at Tenant's expense and this Lease shall continue in full force and effect, but subject to Landlord's rights under Paragraph 13), Landlord may at Landlord's option, either: (i) repair such damage as soon as reasonably possible at Landlord's expense, in which event this Lease shall continue in full force and effect, or (ii) give written notice to Tenant within thirty (30) days after receipt by Landlord of knowledge of the occurrence of such damage of Landlord's desire to terminate this Lease as of the date sixty (60) days following the giving of such notice. In the event Landlord elects to give such notice of Landlord's intention to terminate this Lease, Tenant shall have the right within ten (10) days after the receipt of such notice to give written notice to Landlord of Tenant's commitment to pay for the repair of such damage totally at Tenant's expense and without reimbursement from Landlord. Tenant shall provide Landlord with the required funds or satisfactory assurance thereof within thirty (30) days following Tenant's said commitment. In such event this Lease shall continue in full force and effect, and Landlord shall proceed to make such repairs as soon as reasonably possible and the required funds are available. If Tenant does not give such notice and provide the funds or assurance thereof within the times specified above, this Lease shall terminate as of the date specified in Landlord's notice of termination.

9.4 **Total Destruction.** If Premises Total Destruction that is an Insured Loss occurs, Tenant may at its option, within thirty (30) days after the date of occurrence of such damage, either (i) terminate this Lease effective the date of occurrence of such damage by giving written notice to the Landlord, or (ii) request that Landlord, at Landlord's expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect.

9.5 **Damage Near End of Term.** If at any time during the last six (6) months of the term of this Lease there is damage for which the cost to repair exceeds one (1) month's Base Rent, whether or not an Insured Loss, Landlord may, at Landlord's option, terminate this Lease effective sixty (60) days following the date of occurrence of such damage by giving written notice to Tenant of Landlord's election to do so within thirty (30) days after the date of occurrence of such damage. Provided, however, if Tenant at that time has an exercisable option to extend this Lease or to purchase the Premises, then Tenant may preserve this Lease by, within twenty (20) days following the occurrence of the damage, or before the expiration of the time provided in such option for its exercise, whichever is earlier ("Exercise Period"), exercising such option. If Tenant duly exercises such option during said Exercise Period, Landlord shall, at Landlord's expense repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Tenant fails to exercise such option and provide such funds or assurance during said Exercise Period, then Landlord may at Landlord's option terminate this Lease as of the expiration of said sixty (60) day period

following the occurrence of such damage by giving written notice to Tenant of Landlord's election to do so within ten (10) days after the expiration of the Exercise Period, notwithstanding any term or provision in the grant of option to the contrary.

### 9.6    Abatement of Rent; Tenant's Remedies.

   **(a)    Rent Abatement.**    In the event of damage described in Paragraph 9.2 (Partial Damage - Insured), whether or not Landlord or Tenant repairs or restores the Premises, the Base Rent, Real Property Taxes, insurance premiums, and other charges, if any, payable by Tenant hereunder for the period during which such damage, its repair or the restoration continues (not to exceed the period for which rental value insurance is required under Paragraph 8.3(b)), shall be abated in proportion to the degree to which Tenant's use of the Premises is impaired. Except for abatement of Base Rent, Real Property Taxes, insurance premiums, and other charges, if any, as aforesaid, all other obligations of Tenant hereunder shall be performed by Tenant, and Tenant shall have no claim against Landlord for any damage suffered by reason of any such repair or restoration.

   **(b)    Tenant's Remedies – Failure to Repair.**    If Landlord shall be obligated to repair or restore the Premises under the provisions of this Paragraph 9 and shall not commence, in a substantial and meaningful way, the repair or restoration of the Premises within thirty (30) days after such obligation shall accrue and/or complete the repair within ninety (90) days (with respect to a Premises Partial Damage) or one hundred eighty (180) days (with respect to Premises Total Destruction) after the occurrence of such damage, Tenant may, at its election, give written notice to Landlord and to any Lenders of which Tenant has actual notice of Tenant's election to: (i) terminate this Lease on a date not less than thirty (30) days following the giving of such notice, or (ii) use the proceeds of such insurance to perform the repairs or restorations of the Premises. If Tenant gives such notice to Landlord and such Lenders and such repair or restoration is not commenced within thirty (30) days after receipt of such notice, this Lease shall terminate as of the date specified in said notice. If Landlord or a Lender commences the repair or restoration of the Premises within thirty (30) days after receipt of such notice, this Lease shall continue in full force and effect. "Commence" as used in this Paragraph shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

### 9.7    Hazardous Substance Conditions.    If a Hazardous Substance Condition occurs, unless Tenant is legally responsible therefor (in which case Tenant shall make the investigation and remediation thereof required by Applicable Law, and this Lease shall continue in full force and effect, but subject to Landlord's rights under Paragraph 13), Landlord may at Landlord's option either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Landlord's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to investigate and remediate such condition exceeds twelve (12) times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Tenant within thirty (30) days after receipt by Landlord of knowledge of the occurrence of such Hazardous Substance Condition of Landlord's desire to terminate this Lease as of the date sixty (60) days following the giving of such notice. In the event Landlord elects to give such notice of Landlord's intention to terminate this Lease, Tenant shall have the right within ten (10) days after the receipt of such notice to give written notice to Landlord of Tenant's commitment to pay for the investigation and remediation of such Hazardous Substance Condition totally at Tenant's expense and without reimbursement from Landlord except to the extent of an amount equal to twelve (12) times the then monthly Base Rent or $100,000, whichever is greater. Tenant shall provide Landlord with the funds required

of Tenant or satisfactory assurance thereof within thirty (30) days following Tenant's said commitment. In such event this Lease shall continue in full force and effect, and Landlord shall proceed to make such investigation and remediation as soon as reasonably possible and the required funds are available. If Tenant does not give such notice and provide the required funds or assurance thereof within the times specified above, this Lease shall terminate as of the date specified in Landlord's notice of termination. If a Hazardous Substance Condition occurs for which Tenant is not legally responsible, there shall be abatement of Tenant's obligations under this Lease to the same extent as provided in Paragraph 9.6(a).

9.8    Termination - Advance Payments.  Upon termination of this Lease pursuant to this Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Tenant to Landlord.

9.9    Waive Statutes.  Landlord and Tenant agree that the terms of this Lease shall govern the effect of any damage to or destruction of the Premises with respect to the termination of this Lease and hereby waive the provisions of any present or future statute to the extent inconsistent herewith.

# 10. Real Property Taxes.

## 10.1    Payment of Real Property Taxes.

(a)    *Payment of Taxes*  Beginning as of the Rent Commencement Date, Tenant shall pay its prorata share of the Real Property Taxes, as defined in Paragraph 10.2, due and owing during the Lease Term, including any option periods if duly exercised. Landlord shall promptly furnish Tenant with satisfactory evidence that such taxes have been paid. If any such taxes to be paid by Tenant shall cover any period of time prior to or after the expiration or earlier termination of the term hereof, Tenant's share of such taxes shall be equitably prorated to cover only the period of time within the tax fiscal year this Lease is in effect, and Landlord shall reimburse Tenant for any overpayment after such proration. If Tenant shall fail to pay any Real Property Taxes required by this Lease to be paid by Tenant, Landlord shall have the right to pay the same, and Tenant shall reimburse Landlord therefor upon demand.

(b)    *Advance Payment*.  In order to insure payment when due and before delinquency of any or all Real Property Taxes, Landlord shall estimate the current Real Property Taxes applicable to the Premises, and to require such current year's Real Property Taxes to be paid in advance to Landlord by Tenant monthly in advance with the payment of the Base Rent. The monthly payment shall be that equal monthly amount which, over the number of months remaining before the month in which the applicable tax installment would become delinquent (and without interest thereon), would provide a fund large enough to fully discharge before delinquency the estimated installment of taxes to be paid. When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payment shall be adjusted as required to provide the fund needed to pay the applicable taxes before delinquency. If the amounts paid to Landlord by Tenant under the provisions of this Paragraph are insufficient to discharge the obligations of Tenant to pay such Real Property Taxes as the same become due, Tenant shall pay to Landlord, upon Landlord's demand, such additional sums as are necessary to pay such obligations. All moneys paid to Landlord under this Paragraph may be intermingled with other monies of Landlord and shall not bear interest. Tenant shall receive a credit for any overpayment.

10.2    Definition of "Real Property Taxes.  As used herein, the term "Real Property Taxes" shall include any form of real estate tax or assessment, general, special, ordinary or extraordinary, and any license fee, commercial rental tax, improvement bond or bonds, levy or tax due and owing (other than

18

inheritance, personal income or estate taxes) imposed upon the Premises by any authority having the direct or indirect power to tax, including any city, state or federal government, or any school, agricultural, sanitary, fire, street, drainage or other improvement district thereof, levied against any legal or equitable interest of Landlord in the Premises or in the real property of which the Premises are a part, Landlord's right to rent or other income therefrom, and/or Landlord's business of leasing the Premises.

10.3 **(Intentionally Deleted).**

10.4 **Personal Property Taxes.** Tenant shall pay prior to delinquency all taxes assessed against and levied upon Tenant Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Tenant contained in the Premises or elsewhere. When possible, Tenant shall cause its Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Landlord. If any of Tenant's said personal property shall be assessed with Landlord's real property, Tenant shall pay Landlord the taxes attributable to Tenant within ten (10)days after receipt of a written statement setting forth the taxes applicable to Tenant's property or, at Landlord's option, as provided in Paragraph 10.1(b).

## 11. Utilities.

11.1 **Payment for Utilities.** Tenant shall pay for all water, gas, heat, light, power, telephone, and other utilities and services supplied to the Premises, together with any taxes thereon. Landlord shall, at Landlord's sole cost, provide separate meters for all utilities for the Premises.

11.2 **Interruption of Service.** Notwithstanding anything to the contrary contained in the Lease, in the event Tenant is without utilities such that Tenant is unable to conduct business in the Premises, and the interruption was caused by any act or omission of Landlord or Landlord's contractors, employees, property managers, agents, or representatives, Tenant shall be entitled to an abatement of Base Rent, Common Area Operating Costs, Taxes and any other charges hereunder until such time as the utility services have been restored

## 12. Assignment and Subletting.

12.1 **Landlord's Consent Required.** Tenant shall not voluntarily or by operation of law assign, transfer, mortgage or otherwise transfer or encumber (collectively, "assignment") or sublet all or any part of Tenant's interest in this Lease or in the Premises without Landlord's prior written consent given under and subject to the terms of Paragraph 36. Notwithstanding anything contained herein to the contrary, Tenant may, without Landlord's consent, assign this Lease or sublet the Premises to: (i) any parent, subsidiary, or affiliate of Tenant or Tenant's parent corporation; (ii) any successor to Tenant, by way of merger, reorganization, consolidation, sale of assets, sale of capital stock or the like; or (iii) an entity which controls, is controlled by, or is under common control with Tenant, provided, however, that in the event of an assignment: (a) the surviving entity assumes the Lease, and, in the case of an assignment or sublet, (b) Landlord receives notice of the assignment, or subletting, and a copy of the assignment and assumption agreement, or sublease.

12.2 Terms and Conditions Applicable to Assignment and Subletting.

(a) *Conditions of Subletting and Assignment.* Any assignment or subletting shall not: (i) be effective without the express written assumption by such assignee or subtenant of

19

the obligations of Tenant under this Lease, (ii) release Tenant of any obligations hereunder, or (iii) alter the primary liability of Tenant for the payment of Base Rent and other sums due Landlord hereunder or for the performance of any other obligations to be performed by Tenant under this Lease.

     **(b)**   *Landlord's Rights.*   Landlord may accept any rent or performance of Tenant's obligations from any person other than Tenant pending approval or disapproval of an assignment.  Neither a delay in the approval or disapproval of such assignment nor the acceptance of any rent or performance shall constitute a waiver or estoppel of Landlord's right to exercise its remedies for the Default or Breach by Tenant of any of the terms, covenants or conditions of this Lease.

     **(c)**   *Future Consent.*   The consent of Landlord to any assignment or Subletting shall not constitute consent to any subsequent assignment or subletting by Tenant or to any subsequent or successive assignment or subletting by the subtenant.

     **(d)**   *Landlord's Remedies.*   In the event of any Default or Breach of Tenant's obligations under this Lease, Landlord may proceed directly against Tenant or any one else responsible for the performance of the Tenant's obligations under this Lease, including the subtenant, without first exhausting Landlord's remedies against any other person or entity responsible therefor to Landlord, or any security held by Landlord or Tenant.

     **(e)**   *Landlord's Approval.*   Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Landlord's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or subtenant, including but not limited to the intended use and/or required modification of the Premises, if any, together with a non-refundable deposit of $500 as reasonable consideration for Landlord's considering and processing the request for consent.  Tenant agrees to provide Landlord with such other or additional information and/or documentation as may be reasonably requested by Landlord.

     **(f)**   *Assumption of Terms and Conditions.*   Any assignee of, or subtenant under, this Lease shall, by reason of accepting such assignment or entering into such sublease, be deemed, for the benefit of Landlord, to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Tenant during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Landlord has specifically consented in writing.

     <u>12.3   Additional Terms and Conditions Applicable to Subletting.</u>  The following terms and conditions shall apply to any subletting by Tenant of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

     **(a)**   *Subtenant's Attornment.*   In the event of a Breach by Tenant in the performance of its obligations under this Lease, Landlord, at its option and without any obligation to do so, may require any subtenant to attorn to Landlord, in which event Landlord shall undertake the obligations of the sublandlord under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Landlord shall not be liable for any prepaid rents or security deposit paid by such subtenant to such sublandlord or for any other prior Defaults or Breaches of such sublandlord under such sublease.

     **(b)**   *Landlord's Consent.* Any matter or thing requiring the consent of the sublandlord under a sublease shall also require the consent of Landlord herein.

(c)     *Further Assignment.*     No subtenant shall further assign or sublet all or any part of the Premises without Landlord's prior written consent.

(d)     *Subtenant's Right to Cure.* Landlord shall deliver a copy of any notice of Default or Breach by Tenant to the subtenant, who shall have the right to cure the Default of Tenant within the grace period, if any, specified in such notice. The subtenant shall have a right of reimbursement and offset from and against Tenant for any such Defaults cured by the subtenant.

## 13. Default; Breach; Remedies.

13.1   Default; Breach.  A "Default" is defined as a failure by the Tenant to observe, comply with or perform any of the terms, covenants, conditions, or rules applicable to Tenant under this Lease. A "Breach" is defined as the occurrence of any one or more of the following Defaults, and, where a grace period for cure after notice is specified herein, the failure by Tenant to cure such Default prior to the expiration of the applicable grace period, shall entitle Landlord to pursue the remedies set forth in Paragraphs 13.2 and/or 13.3:

(a)     *Monetary Defaults.*  Except as expressly otherwise provided in this Lease, the failure by Tenant to make any payment of Base Rent, Additional Rent or any other monetary payment required to be made by Tenant hereunder, whether to Landlord or to a third party, as and when due within ten (10) days of written notice, the failure by Tenant to provide Landlord with reasonable evidence of insurance or surety bond required under this Lease, or the failure of Tenant to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of ten (10) days following written notice thereof by or on behalf of Landlord to Tenant.

(b)     *Non-Monetary Defaults.*     A Default by Tenant as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, that are to be observed, complied with or performed by Tenant, other than those described in subparagraphs (a), (b) or (c), above, where such Default continues for a period of thirty (30) days after written notice thereof by or on behalf of Landlord to Tenant; provided, however, that if the nature of Tenant's Default is such that more than thirty (30) days are reasonably required for its cure, then it shall not be deemed to be a Breach of this Lease by Tenant if Tenant commences such cure within said thirty (30) day period and thereafter diligently prosecutes such cure to completion.

(c)     *Bankruptcy / Receivership.* The occurrence of any of the following events: (i) The making by Tenant of any general arrangement or assignment for the benefit of creditors; (ii) Tenant's becoming a "debtor" as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within thirty (30) days; or (iv) the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days; provided, however, in the event that any provision of this subparagraph (c) is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(d)     *False Financial Statements.*     The discovery by Landlord that any financial statement given to Landlord by Tenant was materially false.

21

13.2   **Remedies.**   If Tenant fails to perform any affirmative duty or obligation of Tenant under this Lease, within ten (10) days after written notice to Tenant (or in case of an emergency, without notice), Landlord may at its option (but without obligation to do so), perform such duty or obligation on Tenant's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. The costs and expenses of any such performance by Landlord shall be due and payable by Tenant to Landlord upon invoice therefor. In the event of a Breach of this Lease by Tenant, as defined in Paragraph 13.1, with or without further notice or demand, and without limiting Landlord in the exercise of any right or remedy which Landlord may have by reason of such Breach, Landlord may:

(a)   *Termination of Possession.*   Terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease and the term hereof shall terminate and Tenant shall immediately surrender possession of the Premises to Landlord. In such event Landlord shall be entitled to recover from Tenant: (i) the worth at the time of the award of the unpaid rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Tenant proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Tenant proves could be reasonably avoided; and (iv) any other amount necessary to compensate Landlord for all the detriment proximately caused by the Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom. The worth at the time of award of the amount referred to in provision (iii) of the prior sentence shall be computed by discounting such amount at the Prime Rate of the Federal Reserve Bank of San Francisco at the time of award plus three percent (3%). Efforts by Landlord to mitigate damages caused by Tenant's Default or Breach of this Lease shall not waive Landlord's right to recover damages under this Paragraph. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Landlord shall have the right to recover in such proceeding the unpaid rent and damages as are recoverable therein, or Landlord may reserve therein the right to recover all or any part thereof in a separate suit for such rent and/or damages. If a notice and grace period required under subparagraphs 13.1 (b), (c) or (d) was not previously given, a notice to pay rent or quit, or to perform or quit, as the case may be, given to Tenant under any statute authorizing the forfeiture of leases for unlawful detainer shall also constitute the applicable notice for grace period purposes required by subparagraphs 13.1 (b), (c) or (d). In such case, the applicable grace period under subparagraphs 13.1 (b), (c) or (d) and under the unlawful detainer statute shall run concurrently after the one such statutory notice, and the failure of Tenant to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Landlord to the remedies provided for in this Lease and/or by said statute.

(b)   *Other Remedies.*   Pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the state wherein the Premises are located.

(c)   *Loss Rent.*   Notwithstanding anything to the contrary set forth herein, Landlord shall not be entitled to any amount of loss rent which could have been reasonably avoided.

13.3   **Late Charges.**   Tenant hereby acknowledges that late payment by Tenant to Landlord of rent and other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Landlord by the terms of any ground lease, mortgage or trust deed covering the Premises. Accordingly, if any installment of rent or any other sum due from Tenant shall not be received by Landlord or Landlord's designee within ten

22

(10) days after such amount shall be due, then Tenant shall pay to Landlord a late charge equal to five percent (5%) of such overdue amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant. Acceptance of such late charge by Landlord shall in no event constitute a waiver of Tenant's Default or Breach with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for three (3) consecutive installments of Base Rent, then notwithstanding Paragraph 4.1 or any other provision of this Lease to the contrary, Base Rent shall, at Landlord's option, become due and payable quarterly in advance.

    **13.4 Breach by Landlord.** Landlord shall not be deemed in breach of this Lease unless Landlord fails within a reasonable time to perform an obligation required to be performed by Landlord. For purposes of this Paragraph 13.5, a reasonable time shall in no event be less than thirty (30) days after receipt by Landlord of written notice specifying wherein such obligation of Landlord has not been performed; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days after such notice are reasonably required for its performance, then Landlord shall not be in breach of this Lease if performance is commenced within such thirty (30) day period and thereafter diligently pursued to completion. Upon such failure shall have the option but not the obligation to cause such repair and deduct such reasonable amount from the Base Rent. Notwithstanding the foregoing, if the obligation in question of Landlord includes structural or roof repairs, the cure period shall be five (5) days.

## 14. Condemnation.

If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (all of which are herein call "condemnation"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than ten percent (10%) of the floor area of the Premises, or more than twenty-five percent (25%) of the land area not occupied by any building, but including any parking area, is taken by condemnation, Tenant may, at Tenant's option, to be exercised in writing within ten (10) days after Landlord shall have given Tenant written notice of such taking (or in the absence of such notice, within ten (10) days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Tenant does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent, any other rent, charges, or expenses due hereunder shall be reduced in the same proportion as the rentable floor area of the Premises taken bears to the total rentable floor area of the Shopping Center located on the Premises. Any award for the taking of all or any part of the Premises under the power of eminent domain or any payment made under threat of the exercise of such power shall be the property of Landlord, whether such award shall be made as compensation for the taking of the fee, or as severance damages; provided, however, that Tenant shall be entitled to any compensation awarded to Tenant for Tenant's relocation expenses, diminution in value of the leasehold, Tenant Owned Alterations, Utility Installations, and/or loss of Tenant's Trade Fixtures. In the event that this Lease is not terminated by reason of such condemnation, Landlord shall to the extent of its net severance damages received, over and above the legal and other expenses incurred by Landlord in the condemnation matter, repair any damage to the Premises caused by such condemnation, except to the extent that Tenant has been reimbursed therefor by the condemning authority. Landlord shall be responsible for the payment of any amount in excess of such net severance damages required to complete such repair.

## 15. Broker's Fee.

    **15.1 Hold Harmless.** Tenant and Landlord each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder in connection with the negotiation of this Lease and/or the consummation of the transaction contemplated hereby, and that no broker or other person, firm or

23

entity other than said named Brokers is/are entitled to any commission or finder's fee in connection with said transaction. Tenant and Landlord do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto. Landlord shall be responsible for all commissions owing the Brokers in connection with this transaction.

     15.2  Agency Relationships.    Landlord and Tenant hereby consent to and approve all agency relationships, including any dual agencies, indicated in Paragraph 1.10.

**16.**  **Estoppel Statement.**    Each Party (as "Responding Party") shall within ten (10) business days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a reasonable and customary estoppel statement.

**17.**  **Landlord's Liability.**    The term "Landlord" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Tenant's interest in the prior lease. Upon such transfer or assignment, the prior Landlord shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Landlord. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Landlord shall be binding only upon the Landlord as hereinabove defined.

**18.**  **Severability.**    The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

**19.**  **Interest on Past - Due Obligations.**    Any monetary payment due Landlord hereunder other than late charges, not received by Landlord within thirty (30) days following written notice of the date on which it was due, shall bear interest from the thirty-first (31st) day after it was due at the rate of 8% per annum, but not exceeding the maximum rate allowed by law, in addition to the late charge provided for in Paragraph 13.3.

**20.**  **Time of Essence.**    Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

**21.**  **Rent Defined.**    All monetary obligations of Tenant to Landlord under the terms of this Lease are deemed to be rent.

**22.**  **No Prior or Other Agreements.**  This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective.

**23.**  **Notices.**
    23.1  Methods of Delivery.    All notices required or permitted by this Lease shall be in writing and may be delivered in person (by hand or by messenger or overnight courier service) or may be sent by certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notice purposes. Either Party may by written notice to the other specify a different address for

notice purposes. A copy of all notices required or permitted to be given to Landlord hereunder shall be concurrently transmitted to such party or parties at such addresses as Landlord may from time to time hereafter designate by written notice to Tenant.

23.2   **Time of Receipt.**   Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, three days from the date of deposit into the U.S. Mail.   Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given twenty-four (24) hours after delivery of the same to the United States Postal Service or courier. If any notice is transmitted by facsimile transmission or similar means, the same shall be deemed served or delivered upon telephone confirmation of receipt of the transmission thereof, provided a copy is also delivered via one of the above methods. If notice is received on a Sunday or legal holiday, it shall be deemed received on the next business day.

**24.   Waivers.**   No waiver by Landlord of the Default or Breach of any term, covenant or condition hereof by Tenant, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Tenant of the same or of any other term, covenant or condition hereof. Landlord's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Landlord's consent to, or approval of, any subsequent or similar act by Tenant, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent. Regardless of Landlord's knowledge of a Default or Breach at the time of accepting rent, the acceptance of rent by Landlord shall not be a waiver of any preceding Default or Breach by Tenant of any provision hereof, other than the failure of Tenant to pay the particular rent so accepted. Any payment or partial payment given Landlord by Tenant may be accepted by Landlord on account of moneys or damages due Landlord, notwithstanding any qualifying statements or conditions made by Tenant in connection therewith, which such statements and/or conditions shall not operate to eliminate any default and shall be of no force or effect whatsoever unless specifically agreed to in writing by Landlord at or before the time of deposit of such payment.

**25.   Recording.**   Either Landlord or Tenant shall, upon request of the other, execute, acknowledge and deliver to the other a short form memorandum of this Lease for recording purposes. The Party requesting recordation shall be responsible for payment of any fees or taxes applicable thereto.

**26.   Right to Holdover.**   In the event that Tenant holdover, then the Base Rent payable from and after the time of the expiration or earlier termination of this Lease shall be increased to one hundred twenty-five percent (125%) of the Base Rent applicable during the month immediately preceding such expiration or earlier termination.

**27.   Cumulative Remedies.**   No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

**28.   Covenants and Conditions.**   All provisions of this Lease to be observed or performed by Tenant are both covenants and conditions.

**29.   Binding Effect; Choice of Law.**   This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

**30.    Subordination; Attornment; Non-Disturbance.**

    **30.1    Subordination.**  Subject to Section 30.3 herein, this Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed by Landlord upon the real property of which the Premises are a part, to any and all advances made on the security thereof, and to all renewals, modifications, consolidations, replacements and extensions thereof. Tenant agrees that the Lenders holding any such Security Device shall have no duty, liability or obligation to perform any of the obligations of Landlord under this Lease. If any Lender shall elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device and shall give written notice thereof to Tenant, this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

    **30.2    Attornment.**  Subject to the non-disturbance provisions of Paragraph 30.3, Tenant agrees to attorn to a Lender or any other party who acquires ownership of the Premises by reason of a foreclosure of a Security Device, and that in the event of such foreclosure, such new owner shall not: (i) be liable for any act or omission of any prior Landlord or with respect to events occurring prior to acquisition of ownership, (ii) be subject to any offsets or defenses which Tenant might have against any prior Landlord, or (iii) be bound by prepayment of more than one (1) month's rent.

    **30.3    Non-Disturbance.**  Notwithstanding anything to the contrary set forth in this Lease, with respect to Security Devices entered into by Landlord, Tenant's subordination of this Lease shall be subject to receiving assurance (a "non-disturbance agreement") from the holder of such Security Device which provides that if Landlord's interest in the Premises is sold or conveyed upon the exercise of any remedy provided in any Security Device or by deed in lieu thereof, or if the holder of the Security Device takes possession of the Premises thereto, that Tenant's possession and this Lease, including any Options to extend the term hereof, will not be disturbed and Tenant shall be entitled the right of quiet enjoyment. Landlord shall provide, within twenty (20) days of the execution of this Lease, a non-disturbance agreement, reasonably acceptable in form and substance to Tenant, executed by Landlord, Landlord's Lender and Tenant.

    **30.4    Self-Executing.**  The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Landlord, Tenant, or a Lender in connection with a sale, financing or refinancing of the Premises, Tenant and Landlord shall execute such further writings as may be reasonably required to separately document any such subordination or non-subordination, attornment and/or non-disturbance agreement as is provided for herein.

**31.    Attorney's Fees.**  If any Party brings an action or proceeding to enforce the terms hereof or declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorney's fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "Prevailing Party" shall include, without limitation, a Party who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party of its claim or defense. The attorney's fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorney's fees reasonably incurred.

**32.    Landlord's Access; Showing Premises; Repairs.**  Landlord and Landlord's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times, upon twenty-four (24) hour notice during normal business hours and without interfering

with Tenant's business for the purpose of showing the same to prospective purchasers or lenders, and of making such alterations, repairs, improvements or additions to the Premises or to the Shopping Center, as Landlord may reasonably deem necessary.

**33.    (Intentionally Omitted)**

**34.    Signs.** Tenant shall have the right to install and Tenant shall maintain any sign, lettering, and/or advertising media upon or at the Premises and the Shopping Center which is in compliance with any applicable law. Tenant shall have the right to Peter Piper's former positioning and size on all pylon, pole and monument signs, if any.

**35.    Termination; Merger.** Unless specifically stated otherwise in writing by Landlord, the voluntary or other surrender of this Lease by Tenant, the mutual termination or cancellation hereof, or a termination hereof by Landlord for Breach by Tenant, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, Landlord -shall, in the event of any such surrender, termination or cancellation, have the option to continue any one or all of any existing subtenancies. Landlord's failure within ten (10) days following any such event to make a written election to the contrary by written notice to the holder of any such lesser interest, shall constitute Landlord's election to have such event constitute the termination of such interest.

**36.    Consents.** Wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed.

**38.    Landlord's Restriction.    Landlord will not construct any building or other structures, or enter into any agreements, easements or restrictions of any type or nature, which will materially diminish Tenant's visibility, access to the Premises, the number and proximity of parking spaces to the Premises, or which will expand Tenant's responsibilities or liabilities, or reduce or diminish Tenant's rights under this Lease, or otherwise adversely impact Tenant's intended use of the Premises.**

**38.    Quiet Possession.** Upon payment by Tenant of the rent for the Premises and the observance and performance of all of the covenants, conditions and provisions on Tenant's part to be observed and performed under this Lease, Tenant shall have quiet possession of the Premises for the entire term hereof subject to all of the provisions of this Lease.

**39.    Options.**

    **39.1    Definition.** As used in this Paragraph 39 the word "Option" means the right to extend the term of this Lease or to renew this Lease.

**39.2    Option to Extend.**

            *(a)    Option Periods.* Landlord hereby grants to Tenant two (2) options ("First

27

Extension Option" and "Second Extension Option", respectively) to extend the Term of the Lease for an additional five (5) years each ("First Option Term" and "Second Option Term", respectively), commencing as of the end of the Original Term set forth in Paragraph 1.3 of the Lease.

(b)     *Exercise Notice.*     To exercise the First Extension Option and the Second Extension Option, Tenant must give written notice of exercise ("Exercise Notice") to Landlord no earlier than three hundred (300) days and no later than the date which is one hundred eighty (180) days prior to the expiration of (i) the Original Term of the Lease with respect to exercising the First Extension Option, or (ii) the First Option Term with respect to exercising the Second Extension Option. Tenant cannot exercise the Second Extension Option without first having exercised the First Extension Option.

(c)     *First Option Term Rent.*     If Tenant properly and timely exercises the First Extension Option, then the Term of the Lease shall be extended by the First Option Term and all terms and conditions of this Lease shall remain in full force and effect, with the exception of the amount of the monthly Base Rent which shall be as set forth in Paragraph 1.6 above.

(d)     *Second Option Term Rent.*     If Tenant properly and timely exercises the Second Extension Option, then the Term of the Lease, as extended, shall be further extended by the Second Option Term and all terms and conditions of this Lease shall remain in full force and effect, with the exception of the amount of the monthly Base Rent which shall be as set forth in Paragraph 1.6 above.

39.3   Multiple Options.   In the event that Tenant has any Multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options to extend or renew this Lease have been validly exercised.

39.4   Effect of Default on Options.

(a)     *Periods of Default / Breach.*     Tenant shall have no right to exercise an Option, notwithstanding any provision in the grant of Option to the contrary: (i) during the period of time any monetary obligation due Landlord from Tenant is unpaid, or (ii) during the time Tenant is in Breach of this Lease.

(b)     *No Extension of Option Deadline.* The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Tenant's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

**40.   Representations, Warranties, and Covenants.** Except as specifically provided hereunder, any and all representations, warranties, and/or covenants made by the Tenant shall not survive the termination of the Lease.

**41.   Security Measures.**   Tenant hereby acknowledges that the rental payable to Landlord hereunder does not include the cost of guard service or other security measures, and that Landlord shall have no obligation whatsoever to provide same. Tenant assumes all responsibility for the protection of the Premises, Tenant, its agents and invitees and their property from the acts of third parties.

**42.   Reservations.**   Landlord reserves to itself the right, from time to time, to grant, without the consent or joinder of Tenant, such easements, rights and dedications that Landlord deems necessary, and to

28

cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Tenant. Tenant agrees to sign any documents reasonably requested by Landlord to effectuate any such easement rights, dedication, map or restrictions.

**43.   Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay under the provisions of this Lease.

**44.   Authority.** If either Party hereto is a corporation, trust, or general or limited partnership, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. If Tenant is a corporation, trust or partnership, Tenant shall, within thirty (30) days after request by Landlord, deliver to Landlord evidence satisfactory to Landlord of such authority.

**45.   Conflict.** Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

**46.   Offer.** Preparation of this Lease by either Party or their respective agent and submission of same to other Party shall not be deemed an offer to lease to Tenant. This Lease is not intended to be binding until executed by all Parties hereto.

**47.   Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification.

**48.   Multiple Parties.** Except as otherwise expressly provided herein, if more than one person or entity is named herein as either Landlord or Tenant, the obligations of such Multiple Parties shall be the joint and several responsibility of all persons or entities named herein as such Landlord or Tenant.

**49.   Plans of Tenant Improvements.** Notwithstanding anything to the contrary set forth in Paragraph 7.3 of the Lease, this provision shall apply to the tenant improvements to be performed by Tenant prior to the Commencement Date. The Tenant shall submit a copy of any drawings or specifications ("Plans") for the construction of Tenant's leasehold improvements showing all work performed by or on behalf of Tenant to prepare the Premises for Tenant's occupancy. Tenant shall cause the Tenant-Owned Alterations and/or Utility Installations to be constructed and installed by a general contractor selected by Tenant and the cost thereof shall be paid by Tenant, including the cost of insurance and permits, if any.

**50.   Landlord's Waiver.** Within ten (10) days after request therefore by Lessee, Lessor shall execute a statement (hereinafter referred to as "Lessor's Waiver") in recordable form and deliver to Lessee, which provides, inter alia: (a) that Lessee's now-owned and hereafter acquired goods, merchandise, inventory, together with all additions, substitutions, replacements, and improvements to the same (hereinafter referred to as "Goods") shall remain personal property of Lessee; (b) that Lessor disclaims any interest in the Goods and will not assert any statutory or possessory lien against any of the Goods; and (c) that Lessee's lender shall have the right to keep possession of the Premises for up to ninety (90) days by paying the rent

29

owing under this Lease for such period.  Lessor further agrees to execute and deliver to Lessee within ten (10) days after request therefore by Lessee such other documents or instruments as Lessee or Lessee's lender may reasonably request in connection with the status of this Lease and Lessee's Goods.

**51.  Knowledge of Use.**  Lessor acknowledges that noises and vibrations may emanate from the Premises in connection with Lessee's operations and demonstration of musical instruments.  Such noises or vibrations shall not be construed as a nuisance or a violation of this Lease.

**52.  Non-Compete.**  Lessor shall not permit any tenant at the Shopping Center or at any other Shopping Center within three (3) miles of the Building which is owned by Lessor or by any of its representatives to conduct any business which, in any manner engages in the sale, rental, or repair of guitars, keyboards, drums, amplifiers, professional audio equipment, and any other musical instruments, sheet music, software and/or music books and any related products or accessories related thereto.

**53.  First Offering.**  In the event that any space, up to 1,500 square feet, which is contiguous to the Premises shall become available during the term of this Lease, including any extensions, if exercised, Landlord shall first offer the space to Tenant, before entering into negotiations with any other party(ies), and Tenant shall have ten (10) business days to enter into good faith negotiations with Landlord, at Tenant's sole discretion.  If Tenant shall fail or elect not to enter into negotiations with Landlord within ten (10) business days of receipt of notification of the availability of such space from Landlord, then Tenant shall be deemed to have waived its right to first offering for such space.

LANDLORD AND TENANT HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.  THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LANDLORD AND TENANT WITH RESPECT TO THE PREMISES.

The parties hereto have executed this Lease at the place on the dates specified above to their respective signatures.

| | |
|---|---|
| Executed at _____ | Executed at _____ |
| on _7/17/01_ | on _____ |
| by LANDLORD: | by TENANT: |
| | GUITAR CENTER STORES, INC., |
| | a Delaware corporation |
| By: _____ | By: _____ |
| Name Printed: _____ | Name Printed: _Bruce L. Ross_ |
| Title: _____ | Title: _President_ |
| Address: _14 N. Peoria_ | Address: 5795 Lindero Canyon Road, |
| _Chicago, IL 60607_ | Westlake Village, CA  91362 |
| Tel. No.: _____ | Tel. No.: (818)735-8800 |

30

Fax No.:                              Fax No.:  (818)735-8822

31



## EXHIBIT A – SITE PLAN



## EXHIBIT B – LANDLORD'S WORK

Landlord shall reimburse Tenant to perform the following work (including, without limitation preparation of any required construction plans or documents, and obtaining any necessary permits or approvals in connection therewith), which reimbursement shall be in the form of additional free rent equal to the total cost of the following work, plus any change orders (see Section 7.5 of this Lease for additional provisions):

1. Demolition – Landlord shall demolish all interior improvements.
2. Smooth Cement Floor – Concrete floor shall be level and ready to accept Tenant's floor coverings. Landlord shall remove all existing floor coverings and patch any irregularities to provide a smooth, level, and stable surface for Tenant's floor coverings. The floor in Tenant's Warehouse area shall be sealed using a sealant approved by Tenant's architect.
3. Water and Sewer / Restrooms – Landlord shall provide separate men and women's restrooms in compliance with all codes, laws and other requirements (including without limitation the Americans with Disabilities Act, "ADA"). The fixtures, floor treatments, wall coverings, the placement and configuration, of which shall all be consistent with Tenant's final construction plans. Water and waste lines shall also be stubbed to Tenant's Janitor Closet, if any, pursuant to Tenant's final construction plans.
4. Walls – Interior furred perimeter walls to be sheetrocked to the deck. Exterior walls and shared demising walls shall be insulated in compliance with local requirements and to satisfy Landlord and any requirements of the lease and any other tenants' leases as to sound attenuation.
5. Roof – Landlord to deliver Premises with roof in watertight condition. All existing openings not servicing working equipment shall be secured with security bars. The structure and load-bearing capacity shall be sufficient, or shall be modified to be sufficient to carry the load of Tenant's HVAC equipment (including ductwork), sprinkler distribution, t-bar ceiling, lighting equipment, and other such fixtures.
6. Loading Doors / Fire Exits - Landlord to provide Tenant with one pair of 3'-0" by 7'-0" insulated flush steel loading doors at rear loading area. Landlord to provide Tenant with one 3'-0" by 7'-0" insulated flush steel exit door, with appropriate security hardware, as per Tenant's final construction plans. Emergency exits / hallways to be provided in compliance with all applicable codes and Tenant's final construction plans. Emergency exits shall be provided with Detex-type alarm/panic bar.
7. HVAC – Landlord to provide new Lennox gas-fired, high-efficiency, roof-top units, with economizers and duct detectors (as per Tenant's Mechanical Engineering Plans), approximately 35 tons, zoned per engineering plan, programmable thermostats, unit tonnage and placement to be as per Tenant's Plans. Tenant shall provide all duct work per Tenant's final plans.
8. Electrical – Landlord to provide, at minimum, 600 amp, 3-phase service at 120/208V, or 350 amp 3-phase service at 277/480V.
9. Gas Service – supplied to HVAC units and hot-water heater.
10. Utility Meters – separate meters to be provided by Landlord.
11. Telephone Conduit – 2" conduit run from building central telephone room to Tenant's Tele-Data Room.
12. Fire Protection – Wet type sprinkler, as per code. Recessed chrome heads. Installation shall be complete including service backflow preventer, mains, branches and heads. Fire Alarm System provided by Landlord, tied to house system.
13. Entry Doors – Two 4'-0" wide by 8'-0" high, anodized aluminum, tempered clear insulating glass doors. Doors to be placed and spaced in accordance with Tenant's final construction plans.
14. Allowances – Standard t-bar ceiling and 2x4 fluorescent fixture allowance.

**All items above, subject to quality, type or location selection issues shall be as determined by Tenant's Final Construction Plans or Tenant's Final Specifications.**

33

## RIDER TO COMMERCIAL REAL ESTATE LEASE

Pursuant to that certain Commercial Real Estate Lease, dated as of July 18, 2001 (the "Lease"), by and between GUITAR CENTER STORES, INC., a Delaware corporation ("Tenant"), and GRAND RAPIDS ASSOC., L.P., an Illinois limited partnership ("Landlord") the following is hereby incorporated into the body of the Lease, as if set forth therein at length.

**54. Storage Bins.** Tenant shall have the right to place storage bins in the Common Areas directly behind the Premises provided that: (i) Tenant shall position the bins such that they do not interfere with other tenants' loading areas, or access to other tenant's premises; (ii) it is not a code violation; and, (iii) Tenant first seeks Landlord's approval, which approval shall not be unreasonably withheld, conditioned, or delayed.

Agreed:

Landlord:                                          Tenant:

By: _____                      By: _____

Printed Name: _____                      Printed Name: _____
        Wm Katz                                             BRUCE L. ROSS

Title: _____                     Title: _____
        Pres of GP                                         PRESIDENT

Date: _____                      Date: _____
        7/19/01                                            7/18/01

LANDLORD: GRAND RAPIDS ASSOCIATES, LP

TENANT: SABAN SEHMEHMEDOVIC

TENANT'S TRADE NAME: _Doors_

SHOPPING CENTER: KENTWOOD MARKETPLACE

LEASE DATE: _12/10/07_

## LEASE INDEX

| A | ARTICLE | SECTION | PAGE |
|---|---------|---------|------|
| Address, Guarantor | I | 1.1 r. | 2 |
| Address, Landlord | I | 1.1 a. | 1 |
| Address, Tenant | I | 1.1 b. | 1 |
| Affirmative Covenants | VIII | 8.1 | 7 |
| Applicable Law and Construction | XI | 11.9 | 19 |
| Assignment | VIII | 8.2 e. | 13 |
| Attornment (Binding Effect of Lease) | XI | 11.1218 | |

| B | | | |
|---|---|---|---|
| Bankruptcy and Insolvency | X | 10.1 c -d | 15 |
| Basic Lease Provisions | I | 1.1 | 1 |
| Brokerage | XI | 11.5 | 19 |

| C | | | |
|---|---|---|---|
| Commencement Certificate | Exhibit D | | |
| Commencement Date | II | 2.3 | 3 |
| Common Areas and Facilities, Description of | V | 5.1 | 6 |
| Common Areas, Definition | V | 5.1 | 6 |
| Common Areas, Maintenance of | V | 5.1 | 6 |
| Common Areas, Use of | V | 5.2 | 6 |
| Common Area Costs, Definition | V | 5.3 | 6 |
| Common Area Costs, Calculation | V | 5.3 b. | 6 |
| Completion Date | II | 2.4 | 3 |
| Control of Tenant | VIII | 8.2 e.(ii) | 13 |

| D | | | |
|---|---|---|---|
| Default, Definition in Event of | X | 10.1 | 15 |
| Default, Landlord's Right to Cure | X | 10.15 | 18 |
| Default Rate, Definition | IV | 4.1 a. | 4 |
| Default, Remedies in Event of | X | 10.2 | 16 |
| Deficiency, Definition | X | 10.5 a. | 16 |

| E | | | |
|---|---|---|---|
| Eminent Domain | IX | 9.2 | 15 |
| Estoppel Certificates | XI | 11.7 | 19 |
| Excavation | VIII | 8.1 m. | 10 |
| Exterior Walls, Definition | VIII | 8.1 f.(ii) | 8 |

_Part of This lease is an addendum — page 25 —_

_S.S._

1

**F**

| | | | |
|---|---|---|---|
| Financial Statements | VIII | 8.1 r. | 11 |
| Fire or Other Casualty | IX | 9.1 | 14 |
| Force Majeure | XI | 11.10 | 19 |

**G**

| | | | |
|---|---|---|---|
| Gross Sales, Definition | IV | 4.3 | 5 |
| Gross Sales, Radius Inclusion | IV | 4.4 d. | 5 |
| Guarantor | I | 1.1 q. | 1 |
| Guaranty | | | 23 |

**H**

| | | | |
|---|---|---|---|
| Holdover by Tenant | X | 10.14 | 18 |

**I**

| | | | |
|---|---|---|---|
| Indemnification of Landlord | VIII | 8.1 k.(i) | 9 |
| Insurance, Landlord's | VIII | 8.1 p. | 11 |
| Insurance, Tenant's | VIII | 8.1 k.(i) | 9 |
| Insurance, Tenant's Pro Rata Share | VIII | 8.1 k. (ii) | 10 |

**L**

| | | | |
|---|---|---|---|
| Landlord's Improvements | Exhibit C-1 | | |
| Landlord's Work | Exhibit C | | |
| Lease, Short Form | XI | 11.8 | 19 |
| Lease Term | II | 2.5 | 3 |
| Lease Year, Definition | IV | 4.2 | 4 |
| Lease Year, Partial | IV | 4.2 | 4 |
| Leased Premises | II | 2.2 | 3 |
| Leased Premises, Access To | VIII | 8.1 m. | 10 |
| Leased Premises, Floor Area | II | 2.2 | 3 |
| Liens | VIII | 8.1 j. | 9 |

**M**

| | | | |
|---|---|---|---|
| Maintenance of Records and Examination | IV | 4.4 e. | 5 |
| Modification, Financing | VIII | 8.1 o.(ii) | 11 |
| Mutual Waiver of Subrogation Right | XI | 11.1 | 18 |

**N**

| | | | |
|---|---|---|---|
| Negative Covenants | VIII | 8.2 | 12 |
| Notices | XI | 11.4 | 19 |
| No Waiver | X | 10.11 | 17 |

**O**

| | | | |
|---|---|---|---|
| Operation of Business | VIII | 8.1 e. | 8 |
| Operation of Tenant | VIII | 8.1 d. | 8 |

**P**

| | | | |
|---|---|---|---|
| Passageways | XI | 11.2 | 18 |
| Permitted Use | VIII | 8.1 b. | 8 |
| Percentage Rent, Payment | IV | 4.1 b.(iv) | 4 |
| Percentage Rent, Rate | I | 1.1 k. | 1 |
| Percentage Rent, Sales Base | I | 1.1 l. | 1 |
| Plan of Leased Premises | Exhibit B | | |
| Pre-Commencement Date Obligations | III | 3.1 | 4 |

**Q**

| | | | |
|---|---|---|---|
| Quiet Enjoyment | XI | 11.13 | 20 |

**R**

| | | | |
|---|---|---|---|
| Refurbishing | VIII | 8.1 f.(iii) | 8: |
| Relationship of the Parties | XI | 11.6 | 19 |
| Remedies Cumulative | X | 10.13 | 18 |
| Rent, Additional Definition | IV | 4.4 b. | 5 |
| Rent, Fixed Annual Minimum | IV | 4.1 a. | 4 |
| Rent, Fixed Annual Minimum Per Square Foot | II | 2.2 c. | 3 |
| Rent, Percentage | IV | 4.1 b. | 4 |
| Repairs, Definition | VIII | 8.1 f.(i) | 8 |
| Repairs, by Landlord | VII | | 7 |
| Repairs, by Tenant | VIII | 8.1 f.(i) | 8 |
| Rules and Regulations | VIII | 8.1 u. | 12 |

**S**

| | | | |
|---|---|---|---|
| Security Deposit | X | 10.16 | 18 |
| Shopping Center | II | 2.1 | 3 |
| Signs | VIII | 8.1 v. | 12 |
| Site Plan of Shopping Center | Exhibit A | | |
| Subletting | VIII | 8.2 e. | 13 |
| Subordination | VIII | 8.1 o. | 11 |
| Surrender of Premises | VIII | 8.1 n. | 10 |

**T**

| | | | |
|---|---|---|---|
| Taxes, Personal Property, Tenant | VIII | 8.1 p. | 11 |
| Taxes, Real Estate, Definition | VIII | 8.1 p. | 11 |
| Taxes, Real Estate, Tenant's Pro Rata Share | VIII | 8.1 p. | 11 |
| Tenant's Conflicts | XI | 11.3 | 19 |
| Tenant's Trade Name | I | 1.1 e. | 1 |
| Tenant's Work | Exhibit C | | |

**U**

| | | | |
|---|---|---|---|
| Utilities | VI | 6.1 | 7 |

**V**

| | | | |
|---|---|---|---|
| Voting Stock, Definition | VIII | 8.2 c.(ii) | 13 |

**W**

| | | | |
|---|---|---|---|
| Waste or Nuisance | VIII | 8.2 a. | 12 |

LEASE

This LEASE made as of this ___ day of _DE-JAN '07_, 2007, between __GRAND RAPIDS ASSOCIATES, L.P. by_, _Suitt Center, Inc. ("Landlord") and ___ SABAN SEHMEHMEDOVIC, ("Tenant"). In consideration of the mutual covenants and agreements herein contained, Landlord and Tenant agree to the following:

## ARTICLE I.

### BASIC LEASE PROVISIONS AND ENUMERATION OF EXHIBITS.

**Section 1.1 Basic Lease Provisions.**

| | | |
|---|---|---|
| a. | ADDRESS OF LANDLORD: (Section 11.4) | 14 N. Peoria St., Suite 3P<br>Chicago, Illinois 60607-2646 |
| b. | ADDRESS OF TENANT: (Section 11.4) | 2776 PADDINGTON DR. SE<br>KENTWOOD, MI 49512 |
| c. | TENANT'S TRADE NAME: | *Drina* |
| d. | NAME OF SHOPPING CENTER: | KENTWOOD MARKETPLACE |
| e. | LOCATION OF SHOPPING CENTER: | KENTWOOD, MI |
| f. | LEASE TERM: (Section 2.5) | five (5) years |
| | LEASE YEARS: (plus a Partial Year, if any, prior to the first Lease Year) (Section 2.5) | five (5) years |
| g. | COMMENCEMENT DATE: (Section 2.3) | *120 days fm lease date* |
| h. | FIXED ANNUAL MINIMUM RENT: (Section 4.1 a) | Year 1: $15,750 annually<br>Year 2: $16,226 annually<br>Year 3: $16,716 annually<br>Year 4: $17,220 annually<br>Year 5: $17,738 annually |

*[handwritten notes in right margin:]*  *- 1312.50  - 1352.17  - 1393.00  - 1435.00  - 1478.17*

*[handwritten notes at bottom left:]*
*YR 1 - 1262.50*
*2 - 1307.17*
*3 - 1348.00*
*4 - 1,393.00*
*5 - 1,433.17*

*ELSS Geração*
*(45.00)*

| | | |
|---|---|---|
| | XED ANNUAL MINIMUM RENT PER FLOOR AREA: | Year 1: $11.25 psf<br>Year 2: $11.59 psf<br>Year 3: $11.94 psf<br>Year 4: $12.30 psf<br>Year 5: $12.67 psf |
| | LOOR AREA OF ___ (Section 2.2) | 1,400 sq. ft. |
| | IT RATE: | N/A |
| | IT SALES BASE: | N/A |
| | IT PERIOD: | N/A |

4

(Section 4.1 b)

n.  PERMITTED USE:  *coffee shop*
    (Section 8.1 B)

o.  PERIOD ALLOWED TO TENANT FOR   90 days
    COMPLETION OF TENANT'S WORK:
    (Section 3.1)

p.  SECURITY DEPOSIT:   $1,600  ~~1312.~~ 00   *monthly amount*
    (Section 10.16)                            *[signature]*

q.  GUARANTOR(S):   N/A

r.  ADDRESS OF GUARANTOR(S):   N/A

s.  ROOM NUMBER OF LEASED PREMISES:   "H"

t.  COMPLETION DATE:   "as is"
    (Section 2.4)

u.  MINIMUM MONTHLY PER SQUARE FOOT   N/A
    PAYMENT OF COMMON AREA COST:
    (Section 5.3 b)

v.  MINIMUM INSURANCE LIMITS: INJURY TO
    OR DEATH OF PERSON PER OCCURRENCE:   250,000

    OR BLANKET OF:   1,000,000
    (Section 8.1 k.l)

w.  MINIMUM MONTHLY PER SQUARE FOOT   N/A
    PAYMENT TOWARDS TENANT SHARE OF
    REAL ESTATE TAXES:
    (Section 8.1 p)

x.  MINIMUM MONTHLY PER SQUARE FOOT   N/A
    PAYMENT TOWARDS TENANT SHARE OF
    INSURANCE:
    (Section 5.3 b)

Section 1.2 Enumeration of Exhibits.  The exhibits enumerated in this Section and attached to this Lease are incorporated in this Lease by this reference and are intended and shall be construed as part of this Lease.

Exhibit A.   Site Plan of Shopping Center

Exhibit B.   Plan of Leased Premises.

Exhibit C.   Description of Landlord and Tenant's Work

Exhibit D.   Commencement Certificate

Exhibit E.   ~~Tenant Estoppel~~ N/A

Exhibit F.   Guaranty

Rider 1

*S. S.*

## ARTICLE II

### LEASED PREMISES AND TERM

**Section 2.1 Shopping Center.** Landlord is the owner or agent for owner or ground lessee of a tract of land located as provided in Section 1.1.c. which tract is sometimes hereinafter referred to as "Landlord's Tract". Landlord's Tract and all improvements and appurtenances constructed thereon from time to time are sometimes hereinafter referred to as "the Shopping Center". Tenant hereby acknowledges and agrees that:

    a.      Exhibits A and B are for informational purposes; and are intended only as a general description of contemplated, but not covenanted, improvements to be made as part of the Shopping Center.

    b.      Specific names, locations, dimensions of any stores, entrances or improvements are not intended to be nor should be or have been relied upon and are subject to change, modification, alteration and deletion by Landlord or other parties, and is not a representation or warranty as to the opening or continued operation of any store named or depicted on any exhibits hereto.

    c.      Landlord reserves the right to change the number and location of buildings, building dimensions, store dimensions and location, and the identity and type of other tenancies and occupancies, provided only that the size and location of the Leased Premises (as hereinafter defined), reasonable access to the Leased Premises and the parking facilities provided from time to time shall not be materially impaired. Landlord and Tenant hereby acknowledge that the Shopping Center is a shopping center within the meaning of Section 365 of the Federal Bankruptcy Code. [See attached Rider 1].

**Section 2.2 Leased Premises.**

    a.  Landlord hereby leases and demises to Tenant, and Tenant hereby leases from Landlord, subject to and with the benefit of the terms of this Lease, the Room Number as set forth in Section 1.1.s, having a floor area as set forth in Section 1.1.j, as measured from the center line of all common walls and to the outside of all exterior walls and outlined in red on Exhibit B hereto (hereinafter referred to as the "Leased Premises"). In computing the Floor Area of the Leased Premises no deduction or exclusion shall be made for areas or space occupied by columns, stairs, escalators, elevators, interior partitions, mezzanines, basements, vaults or other interior construction or equipment installed, placed or employed in the Leased Premises.

    b.      If, prior to the Commencement Date or at any time during the Lease Term, Tenant constructs a mezzanine or employs anything similar which has the effect of increasing the sales, display, storage or office area of the Leased Premises, then the floor area of the Leased Premises, as indicated in the Basic Lease Provision, shall be increased by an amount equal to the square footage of such mezzanine or similar improvement or structure (whether the same is structural by otherwise) and the Fixed Annual Minimum Rent and all Additional Rent (as hereinafter defined) to be paid by Tenant hereunder, based upon the Floor Area of the Leased Premises, shall be increased accordingly.

    c.      After the Commencement Date as hereinafter defined, Landlord, or Landlord's architect or agent, or employee(s) may enter the Leased Premises and determine the actual "as built" floor area of the Leased Premises, and if such determination shall yield an amount less than or greater than the floor area as set forth in the Basic Lease Provisions, then Landlord and Tenant shall execute and deliver to each other an amendment to this Lease stating the actual floor area of the Leased Premises as determined by said "as built" determination, and the Fixed Annual Minimum Rent and all Additional Rent to be paid by Tenant pursuant to the terms of this Lease shall be revised accordingly and be payable effective as of said Commencement Date.

**Section 2.3 Commencement Date.** The obligation of the Tenant to pay Fixed Annual Minimum Rent, Percentage Rent and Additional Rent as herein provided and to commence retail operations in the Leased Premises shall commence on the Commencement Date as set forth in Section 1.1.g. The parties, hereto, agree that, upon the Commencement Date or at the latest thirty (30) days thereafter, upon the request of the other party, they will execute and deliver a Commencement Certificate, setting forth the Commencement Date and the expiration date of this Lease in the form as the attached Exhibit D.

**Section 2.4 Completion Date.** Landlord shall use reasonable efforts to substantially complete construction of the Leased Premises on or before the date set forth in Section 1.1.t, which time shall be subject to extensions or provided in Section 11.10. The Completion Date is the date Tenant is notified by Landlord or Landlord's architect that Landlord's work in the Leased Premises has been substantially completed. The date of notification shall be deemed to be the date of delivery by Landlord, provided, however, Landlord's work shall be deemed substantially complete if actual completion thereof is delayed by failure of Tenant to complete its work in strict accordance with Exhibit C or any other delays caused by Tenant. Notwithstanding the foregoing, in no event shall Landlord be liable for any direct or indirect, foreseen or unforeseen damages, costs, or expenses suffered or incurred by Tenant by reason of such delay(s), and in no event, except as provided in Article XI Section 11.10(d) as amended here in, shall Tenant have any rights to terminate or cancel this Lease by reason of Landlord's failure to substantially complete construction as provided in this Lease. If space is not completed by Landlord within 120 days this Lease becomes null and void.

**Section 2.5 Lease Term.** The Lease Term shall be for that number of Lease Years (as that term is hereinafter defined in Section 4.2) set forth in Section 1.1.f beginning on the Commencement Date and expiring following the expiration of the full number of Lease Years set forth in Section 1.1.f., unless otherwise terminated or extended as provided in this Lease.

## ARTICLE III

### OBLIGATIONS OF TENANT BEFORE COMMENCEMENT DATE

**Section 3.1 Pre-Commencement Date Obligations.** Tenant shall perform diligently such of its obligations contained in this Lease as are to be performed by it prior to the Commencement Date and shall complete its work within

6

the time period stated in Section 1.1.o. Tenant shall also observe and perform all of its obligations under this Lease (except its obligations to pay Fixed Annual Minimum Rent and Percentage Rent) from the date (Completion Date) upon which the Leased Premises are made available to Tenant for its work, until the Commencement Date.

## ARTICLE IV

## METHOD OF RENT PAYMENT, DETERMINATION OF PERCENTAGE RENT

**Section 4.1 The Rent; Fixed Annual Minimum.**    Tenant agrees to pay to Landlord, or to such other person or entity as Landlord may direct, without demand, deduction, set-off, or abatement, at such place as Landlord, by notice in writing to Tenant from time to time may direct, at the following rates and times:

a.    Fixed Annual Minimum Rent, in advance in equal monthly installments on the first day of each calendar month of the Lease Term in the amount set forth in Section 1.1.h. For any portion of a partial calendar month included at the beginning of the Lease Term, one-thirtieth of such a monthly payment for each day of such month, shall be payable on the first day of such month. All past due Fixed Annual Minimum Rent, and Additional Rent payable to Landlord pursuant to the terms of this Lease shall bear interest at the rate of fifteen (15%) percent per annum, or, if the maximum legal rate is greater or lower, then at such maximum legal rate, from the due date until paid by Tenant (such interest hereinafter referred to as "Default Rate") unless paid in full with 10 days of the due date. In addition to the above, if any rent payments are received after the 10th of the month, Lessee agrees to pay a penalty of 4% of the amount owed, as a service fee. If a check does not clear for any reason, the Lessee will pay an Additional penalty of $35.00 per occurrence.

b.    (i)    In addition to the Fixed Annual Minimum Rent, Tenant shall pay to Landlord a Percentage Rent, such Percentage Rent shall be a percent (as set forth in Section 1.1.k) of the amount by which the Gross Sales (hereinafter defined) made during each Lease Year exceeds the Percentage Rent Sales Base, as set forth in Section 1.1.l. If the above sections are marked "n/a", then the term "Percentage Rent" will be deemed deleted in the entire Lease.

(ii)    If the Fixed Annual Minimum Rent during any Lease Year shall abate, be reduced or unpaid, then the Percentage Rent Sales Base shall be reduced in the same proportion that the amount of Fixed Annual Minimum Rent which shall have been abated, reduced or unpaid bears to the Fixed Annual Minimum Rent set forth in Section 1.1.h. However, in no event shall this be deemed or construed as allowing, establishing or acquiescing to any abatement, reduction or non-payment of the Fixed Annual Minimum Rent except as otherwise provided in this Lease.

(iii)    If any Lease Year consists of less than 365 days, then the Percentage Rent Sales Base over which Percentage Rent shall be due and payable as provided for in Section 4.1 (b) (i), shall be reduced by a fraction. The numerator of such fraction shall be the difference between 365 and the number of days in that Lease Year. The denominator of such fraction shall be 365.

(iv)    Percentage Rent shall be determined and paid, without any prior demand therefore, within fifteen (15) days after the Gross Sales shall exceed the Percentage Rent Sales Base and thereafter within fifteen (15) days after the last day of each Percentage Rent Period as set forth in Section 1.1.m.

At the end of each Lease year the Percentage Rent shall be adjusted and the balance of the Percentage Rent due, if any, shall be paid to Landlord within sixty (60) days after the end of such lease year, including the last Lease Year hereof, as to which Tenant's obligation shall survive the expiration or sooner termination of the Lease Term. If at the end of any Lease Year, the amount of the Percentage Rent paid by Tenant exceeds the total amount of such Percentage Rent required to be paid by Tenant during or for such Lease Year, Tenant shall receive a credit equivalent to such excess, which may be deducted by Tenant from the next accruing payment of Percentage Rent, or during the last Lease Year and provided Tenant has not failed to perform any of its obligations under this Lease, Landlord will refund such excess to Tenant within sixty (60) days following Landlord's receipt of Tenant's statement of Gross Sales covering the last Lease Year. Each Lease Year shall be considered as an independent account period for the purpose of computing the amount of Percentage Rent due, if any.

**Section 4.2 Lease Year.**   The term "Lease Year" shall be defined as a period of twelve (12) full consecutive calendar months commencing on the Commencement Date.

**Section 4.3 Definition of Gross Sales.** The term "Gross Sales" is hereby defined as the total amount, in dollars, of the actual sales price, whether for cash or on credit or partly for cash and partly on credit or, in whole or in part by computer, electronic or telephone funds transfer, or all sales of merchandise and services, and all other receipts of all business conducted in or from the Leased Premises and all mail or telephone orders received or filled at or from the Leased Premises and all deposits not refunded to purchasers and all others taken in and from the Leased Premises whether or not said orders are filled elsewhere and receipts or sales by any sublessee, concessionaire, licensee and any other persons or persons doing business in or from the Leased Premises. Gross Sales shall not include any sums collected and paid out by Tenant for any sales or retail excise tax imposed by any duly constituted governmental authority, nor shall it include any exchange of goods or merchandise between the stores of Tenant where such exchange of goods or merchandise is made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which has theretofore been made at, in, or from the Leased Premises, or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at, in, or from the Leased Premises, nor the amount of returns to shippers or manufacturers, nor the amount of any cash or credit refund made upon any sales made by Tenant from the Leased Premises and therefore reported as sales by Tenant, nor sales of fixtures which are not a part of Tenant's stock in trade. Each sale upon installment or credit shall be treated as a sale for the full price in the month during which such sale shall be made, irrespective of the time when Tenant may receive payment from its customer.

**Section 4.4 Maintenance of Records and Examination. a.**    Tenant shall utilize cash registers or other recording devices, approved by Landlord, equipped with sealed continuous totals to record all Gross Sales, and Tenant shall keep on the Leased Premises (or such other reasonable location as Landlord is so notified by Tenant) for at least

7

S. S.

twenty-four (24) months after the expiration of each Lease Year or partial Lease Year, records conforming to generally accepted accounting practices showing all of the Gross Sales made at, in, from, and upon the Leased Premises for each Lease Year or partial Lease Year, including all sales tax reports, sales slips, sales checks, bank deposit records, inventory and receiving records, and other supporting data. Within fifteen (15) days after the end of each calendar month, or portion thereof in the Lease Term, Tenant shall furnish Landlord a statement (hereinafter referred to as the annual statement) certified by an independent Certified Public Accountant, of Tenant's Gross Sales and Tenant, at no cost to Landlord, shall make all such records available for such examination at Landlord's principal office. If any such audit discloses that the actual Gross Sales by Tenant exceeded those reported, Tenant shall forthwith pay the Percentage Rent due on said excess, and if such audit discloses that the actual Gross Sales exceeded those as reported by more than $500.00, Tenant shall pay the cost of such audit and examination. If such audit discloses that the actual Gross Sales exceeded those as reported by more than $2,000.00 such event shall be an "Event of Default" as set forth in ARTICLE X of this Lease. In any event, should such audit disclose any understatement of Gross Sales, Tenant shall pay, in addition to the Percentage Rent, interest on said additional Percentage Rent then due, at the Default Rate from the date such payment was due until same is paid.

    b.    All financial obligations, except Fixed Annual Minimum Rent, on the part of the Tenant to pay, reimburse or contribute to the Landlord shall be deemed to be "Additional Rent" and if not paid, reimbursed or contributed timely, shall, at the option of Landlord, be an Event of Default. Additional rent shall include, but is not limited to, Tenant's share of real estate taxes, insurance and Common Area Costs.

    c.    The obligation for the timely and full payment of Fixed Annual Minimum Rent, and Additional Rent is independent of all obligations of the Landlord and no offset, deduction, set-off or abatement shall be allowed or permitted unless otherwise specifically provided in this Lease.

    d.    In recognition of the fact that this Lease provides for a Percentage Rent based on Gross Sales, if Tenant or any affiliated entity (and if Tenant or such affiliated entity is a corporation, the directors, shareholders or officers) shall be interested directly or indirectly in any other business(es) or store(s) of a similar nature as contemplated in this Lease within a radius of five (5) miles from the furthest point of the Shopping Center from the Leased Premises and closest to said business (es) or store (s), then all Gross Sales from such business(es) or store (s) included in said radius shall be included in the Tenant's Gross Sales in determining the Percentage Rent due and payable to Landlord under this Lease.


# INTENTIONALLY OMITTED


## ARTICLE V

### COMMON AREAS AND FACILITIES

    Section 5.1 Description of Common Areas and Facilities.  Landlord shall make or cause to be made available and cause to be kept in good order and repair, such areas and facilities of common benefit to the tenants and occupants of Landlord's Tract, as Landlord shall from time to time, deem appropriate. The "common areas", as herein referred to, shall consist of roof(s), downspouts, gutters, all parking areas, streets, sidewalks, malls, if any, enclosed and otherwise, driveways, loading platforms, canopies, shelters, landscaped areas, service drives and all other facilities available for common use, all as the same exist, from time to time, and be available to all tenants and occupants in the Shopping Center, their employees, agents, customers, licensees and invitees subject to those reasonable rules and regulations promulgated by Landlord for the use of such common areas

    Section 5.2 Use of Common Areas.

    a.    Tenant and its permitted concessionaires, officers, employees, agents, customers and invitees shall have

8

the non-exclusive right, in common with Landlord and all others to whom Landlord has granted or may hereafter grant rights, to use the common areas, subject to such reasonable regulations as from time to time Landlord may impose including the designation of adequate specific areas in which vehicles owned or operated by Tenant, its permitted concessionaires, officers, employees, agents and contractors must be parked. Within five (5) days of the Landlord's written request, Tenant shall supply to Landlord the license plate number of each car owned, operated, or used by any officer, employee agent, concessionaire and contractor working for Tenant in or at the Leased Premises, and shall notify Landlord within five (5) days after any changes thereto. Tenant shall abide by such regulations established for use of the common areas and shall cause its concessionaires, licensees, officers, employees, agents, contractors, customers and invitee to conform thereto. If Tenant or its officers, agents, concessionaires, licensees, contractors or employees shall park such vehicle(s) in an area which has not been designated for parking by respective agents, employees, officer, licensees, concessionaires and contractors, Landlord shall have the right to charge Tenant a sum not to exceed $50.00 per day for each vehicle so parked if violation continues for three (3) days after written notification by Landlord, and Tenant shall pay same to Landlord within ten (10) days of receipt of notice of said violation. Said charges shall be deemed Additional Rent and Landlord shall have all rights and remedies as herein provided for non-payment of rent.

b.      At any time, Landlord may temporarily close any common area(s) to make repairs or changes thereto, and from time to time, in order to prevent the acquisition of public rights in such area, or to discourage non-customer parking; Landlord may do such other acts in and to the common areas as in its judgment may be desirable.

c.      Tenant shall not interfere, at any time, with the rights of Landlord or other tenants, occupants and their respective permitted concessionaire, officers, licensees, employees, agents, contractors, customers and invitees, to use any part of the common areas. Failure of Tenant to abide by Landlord's reasonable rules and regulations shall be an Event of Default.

Section 5.3 Common Area Costs.

a.      "Common Area Costs" is defined as all costs and expenses incurred by Landlord in the performance of its obligations pursuant to Section 5.1 hereof, including total costs and expenses incurred in operating, managing, equipping, cleaning, lighting, repairing, replacing and otherwise maintaining the common areas, and maintaining order and, if provided, security and public safety therein, including, without limitation; personal property taxes; surcharges levied upon or assessed against parking spaces or areas; payments toward mass transit or car pooling facilities or otherwise as required by Federal, State or local governmental authorities; costs and expenses in connection with maintaining Federal, State or local governmental ambient air and environmental standards; the costs of all materials, equipment supplies and services purchased or hired therefore; the cost and expense of landscaping, gardening and planting, cleaning, removal of snow and ice, painting (including striping), decorating, paving, lighting, sanitary control and removal of trash, garbage and other refuse; fire protection; water and sewage charges; the cost of all types of insurance coverage carried by Landlord including, without limitation, fire, rent, public liability, personal and bodily injury and property damage liability, automobile coverage, vandalism and malicious mischief and all broad form coverages, and sign insurance, all in limits and with companies selected by Landlord; installing and renting of signs; maintenance and repair of the utility systems serving the Shopping Center, including water, sanitary sewer and storm water lines and other utility lines, pipes and conduits; depreciation of machinery, apparatus and equipment owned or used in the operation, maintenance and repair of the common areas, and rental charges for such machinery and equipment; the cost of personnel (including applicable payroll taxes, workmen's compensation insurance and disability) to implement all of the foregoing, including the policing of the common areas, if provided, and the direction of traffic and parking of automobiles on the parking areas thereof; administrative costs attributable to common areas plus an overhead cost equal to eighteen percent (18%) of said total operating costs (but there shall be excluded from "Common Area Costs" the original cost of constructing the common areas).

b.      Effective upon the Commencement Date, Tenant shall pay monthly to Landlord, as Additional Rent hereunder, Tenant's share of the Common Area Costs (based upon Landlord's estimates) which share of Common Area Costs shall be the product which results by multiplying such Common Area Costs (less any contributions therefore made by any anchor store or stores) by a percentage, the numerator of which shall be the Floor Area of the Leased Premises and the denominator being the floor area of all stores or store spaces then existing in said Shopping Center (exclusive of the building areas occupied by the contributing anchor store or stores) and exclusive of any free standing building shown on Exhibit "A" attached hereto, which are occupied and open for business on the first day of the Lease Year or partial Lease Year covered by these Common Area Costs including the Leased Premises. Notwithstanding any other provisions of this ARTICLE V, in no event will Tenant's share of the total Common Area Costs be less than the minimum payment as set forth in Section 1.1.u.

Following the end of each Lease Year, Landlord shall furnish to Tenant a statement prepared by a Certified Public Accountant or an officer of Landlord, showing the total Common Area Costs for the Lease Year immediately preceding, and the amount of Tenant's share of Common Area Costs. If Tenant's share of such Common Area Costs for such Lease Year shall exceed Tenant's payment(s) so made, Tenant shall pay to Landlord the deficiency, if any, within ten (10) days after receipt of said statement or credit Tenant if there is an excess. Tenant acknowledges and agrees that Landlord has made no representation or agreements of any kind as to the total dollar amount of any Common Area Costs to be paid by Tenant nor has Landlord given any estimates of Tenant's share, thereof. If Tenant's share of such common area cost for such lease year shall be less than Tenant's payment, Landlord shall return to Tenant any difference within ten (10) days after receipt of statement.

ARTICLE VI

UTILITY SERVICES

Section 6.1 Utilities.

a.      Throughout the Tenant's occupancy of the Leased Premises, whether prior to, during or after the Lease Term, Tenant shall provide and pay for its own water meter, water meter pit, and other meters, heat air conditioning,

9

S.S.

water, gas, electricity and all other utilities, and shall pay all water and sewage charges, rentals and taxes imposed by governmental authority or otherwise.

b.   If Tenant receives utilities through a meter which meter records utilities also supplied to other tenants of the Shopping Center, then Tenant shall pay Landlord, as Additional Rent, within five (5) days after demand therefore, a sum equivalent to its proportionate share of the total utility meter charges thereof. Tenant's proportionate share of such charges shall be determined by multiplying the total charges incurred by Landlord for said utilities by a fraction, the numerator of which shall be the Floor Area of the Leased Premises, and the denominator of which shall be the total Floor Area of all Leased occupied stores within that portion of the Shopping Center included and connected to the same utility meter(s) as the Leased premises. If Tenant shall fail to pay timely the Additional Rent for utilities as herein provided, such failure shall be an Event of Default and, in addition to and not in lieu of other rights the Landlord shall now or hereafter have, Landlord may cease supplying such utility(ies) to the Leased Premises, and Landlord shall not be responsible nor liable for any damages or injury occasioned by reason of such cessation. In addition, to ensure future payments, if and when Landlord again supplies such utility(ies) to Tenant, Tenant shall deposit with Landlord an amount equal to two (2) months' estimated charges for such utility(ies) from which deposit Landlord may, but shall not be obligated to, deduct the amount of any utility charges not timely paid by Tenant.

c.   Notwithstanding anything contained in this Lease to the contrary, in no event shall Landlord be responsible nor liable for any damages or injures sustained by Tenant or those claiming by, through or under Tenant, on account of the interruption, discontinuance, quality or quantity of any utility used in or for the Leased Premises, whether or not supplied by Landlord, and notwithstanding the reason or cause of such interruption, discontinuance, quality or quantity of such service unless due to Landlord's gross negligence or wilful misconduct.

d.   Tenant shall pay for all utilities used in the Leased Premises from and after the completion date.

Section 6.2 Agency or Independent Contractor.  All services which Landlord is required or elects to furnish pursuant to this Lease may be furnished by any agent or agents employed by Landlord or by an independent contractor.

## ARTICLE VII

### REPAIRS BY LANDLORD

Landlord covenants at its expense to keep the foundations of the Leased Premises and the structural soundness of the concrete floors (provided Landlord has initially provided Tenant with said floors) and roofs and exterior walls (as defined in ARTICLE VIII, Subsection 8.1.F (ii)) thereof, and the roof in good order, repair and condition, unless any work is required because of any act, omission or negligence of Tenant, or any of its concessionaires or their respective employees, agents, invitees, licensees or contractors. Landlord shall not be required to commence any such repair until a reasonable time after receipt of written notice from Tenant specifying that same is necessary. The provisions of this ARTICLE VII shall not apply in the case of damage or destruction by fire or other casualty or a taking under the power of eminent domain, in any of which events the obligations of Landlord shall be controlled by ARTICLE IX. Except as provided in this ARTICLE VII, and subject, however, to the provisions of Section 11.1 hereof in the case of insured damages, all other repairs, replacements or improvement in, on or to the Leased premises shall be the responsibility and liability of the Tenant.

## ARTICLE VIII

### TENANT'S ADDITIONAL COVENANTS

Section 8.1 Affirmative Covenants.  Tenant covenants, at its sole cost and expense, and at all times during the Lease Term and such other time as Tenant occupies the Leased Premises or any part thereof:

a.   To perform promptly all of the obligations of Tenant set forth in this Lease, and to pay when due the Fixed Annual Minimum Rent, Percentage Rent and Additional Rent which by the terms of this Lease are to be paid by Tenant, without any abatement, counter-claim, set-off, reduction, or deduction whatsoever except as otherwise specifically provided in this Lease.

b.   To use the Leased Premises only for the Permitted Use as set forth in Section 1.1.n. hereof; to operate its business in the Leased Premises under Tenant's Trade Name provided in Section 1.1.c, and to conduct its business at all times in a high grade and reputable manner so as to produce the maximum volume of sales and transactions and to help establish and maintain a high reputation for the Shopping Center.

c.   To refer to the Shopping Center by the name set forth in Section 1.1.d. or such other name(s) as the Landlord may from time to time designate and use any identifying logo(s) of same in designating the location of the Leased Premises in all advertising, stationery, other printed material and all other references to location; to include the address and identity of its business activity in the Leased Premises in all advertisements made by Tenant in which the address and identity of any other business activity of like character conducted by Tenant within the Metropolitan Area in which the Shopping Center is located shall be mentioned and to use in such advertising, only the Tenant's Trade Name as set forth in Section 1.1.c.

d.   Except when and to the extent that the Leased Premises are untenantable by reason of damage by fire or other casualty, to use and continuously operate for the purpose set forth in Section 1.1.n. all of the Leased Premises, other than such minor portions thereof as are reasonably required for storage and office purposes; to use such storage and office space only in connection with the business conducted by Tenant in the Leased Premises; to furnish and install all trade fixtures which may be necessary or desirable for carrying on Tenant's business; to carry a full and complete stock of seasonable merchandise offered for sale at competitive prices; to maintain adequate trained personnel for efficient service to customers; to open for business and remain open during the entire Lease Term on all business days and during such business hours as Landlord shall determine; and to light its display windows and signs, if any, during any hours when the

10

Leased Premises, is open to the public.

    e.    To store in the Leased Premises only such merchandise as is to be offered for sale at retail within a reasonable time after receipt; to store all trash and refuse in adequate containers within the Leased Premises or outside of same at such locations Landlord shall determine, which Tenant shall maintain in a neat and clean condition and so as not to be visible to members of the public in the Shopping Center and so as not to create any health or fire hazard, and to attend to the daily disposal thereof in the manner designated by Landlord; to keep all drains inside the Leased Premises clean; to receive and deliver goods and merchandise only in the manner and at such times and in such areas as may be designated by Landlord; and to conform to all reasonable rules and regulations which Landlord may make in the management and use of the Shopping Center and to require all of Tenant's employees to conform to such rules and regulations.  If the Leased Premises are used for the sale of food for consumption in or at the Leased Premises, the Shopping Center or elsewhere, such as for a restaurant or snack bar, Tenant shall store all trash, refuse and garbage in a garbage storeroom or compartment which Tenant shall install and keep in repair at its sole expense.

    f.    (I)    Throughout the Lease Term, Tenant shall take good care of the Leased Premises and the *interior only* pipes, plumbing, glass store-fronts, electric wiring, air conditioning and heating equipment, boilers, motors, engines, tanks, machinery, fixtures, appliances and appurtenances belonging thereto or installed for the use or used in connection with the Leased Premises, and shall, at Tenant's own expense, by contractors or mechanics approved by Landlord, make as and when needed, all repairs appurtenances necessary to keep the same in good order.  When used in this Lease, the term "repairs" shall include all replacements, renewals, alterations, additions, and betterment.  All repairs made by Tenant shall be at least equal in quality and class to the original work.

    (II)    As used in this Lease, the term "exterior walls" shall not be deemed to include the store-front or store-fronts, plate glass, window cases or window frames, doors or door frames.  Landlord shall be under no obligation to make any repairs, alterations, renewals, replacements or improvements in, to or upon the Leased Premises at any time except as in this Lease expressly set forth.

    (III)    ~~After the first five (5) years of the Lease Term, upon the request of Landlord, Tenant shall refurbish all or any portion of the interior of the Leased Premises so that the furnishings, furniture, flooring, wall fixtures and coverings, equipment, and other appurtenances in the Leased Premises shall be restored to substantially the same condition and appearance as the same existed upon Tenant's initial opening for business to the public.  If, at the time of such refurbishing, the unexpired portion of the Lease Term will be less than five (5) years, Tenant shall have the option to extend the Lease Term so that the unexpired portion will be five (5) years from the completion of the refurbishing; provided that for any period which extends beyond the original Lease Term, the Fixed Annual Minimum Rent shall be the total of the aggregate of the Fixed Annual Minimum Rent and Percentage Rent paid by Tenant for the calendar year immediately preceding Landlord's request for refurbishing.~~

    g.    To make all repairs, alterations, additions or replacements to the Leased Premises whether interior or exterior, structural or nonstructural required by any law or ordinance or any order or regulation of any public authority necessary because of Tenant's use or occupancy of the Leased Premises; to keep the Leased Premises equipped with all safety appliance so required because of such use or occupancy; to procure all licenses and permits required for any such use or occupancy; and to comply with the orders and regulations of all governmental authorities.

    h.    If the Leased Premises is or becomes infested with vermin, Tenant shall cause the same to be exterminated from time to time to the satisfaction of Landlord, at Tenant's sole cost and expense, and shall employ such exterminators and such exterminating company or companies as Landlord shall approve.

    i.    To procure all necessary permits and approvals before undertaking any repairs, alterations, modifications or remodeling ("work") within the Leased Premises and to do all of such work in a good and workmanlike manner, employing materials of good quality; to perform such work only with contractors and plans previously approved, which approval will not be unreasonably withheld, in writing by Landlord; to comply with all governmental requirements; and to hold harmless, indemnify, protect and, at Landlord's option, defend Landlord and Landlord's beneficiaries and agents from all injuries, losses, claims or damages to any person or property occasioned by or resulting from such work.

    j.    To do all things necessary to prevent the filing of any mechanic's or other lien against the Leased Premises or any other portion of the Shopping Center or the interest of Landlord, or any ground or underlying lessors thereof, or the interest of any mortgagees or holders of any deeds of trust covering any portion of the Shopping Center by reason of any work, labor, services, or materials performed or supplied, or claimed to have been performed for or supplied to Tenant or anyone holding the leased premises, or any part thereof, by, through or under Tenant.  If any such lien shall at any time be filed, Tenant shall either cause the same to be vacated and canceled of record within ten (10) days after the date of the filing thereof or, if Tenant in good faith determines that such lien should be contested, Tenant shall furnish such security, by surety bond or otherwise, as may be necessary or be prescribed by law to release the same as a lien and to prevent any foreclosure of such lien during the pendency of such contest.  If Tenant shall fail to vacate or release such lien in the manner and within the time period aforesaid, such failure shall be an Event of Default, and in addition to all other rights and remedies available to Landlord resulting therefrom, Landlord may, but shall not be under any obligation to, vacate or release said lien either by paying the amount claimed to be due, or by procuring the release of such lien by giving security or in such other manner as may be prescribed by law.  Tenant shall reimburse Landlord, upon demand, all sums disbursed or deposited by Landlord pursuant to the foregoing provisions of this paragraph, including Landlord's cost and expenses and reasonable attorneys' fees incurred in connection therewith, with interest thereon at the Default Rate.  However, nothing contained herein shall imply consent or be construed as an agreement on the part of Landlord or any ground or underlying lessors, or mortgagees, or holders of deeds of trust covering any portion of the Shopping Center, to subject their respective estates or interests to liability under any mechanic's or other lien law, whether or not the performance or the furnishing of such work, labor, services or materials to Tenant or anyone holding the Leased premises, or any part thereof, through or under Tenant, shall have been consented to by Landlord or any of such parties.

    k.    (I)    To hold harmless, indemnify and protect and, at Landlord's option, defend Landlord

11

S. S.

Landlord, beneficiaries, mortgagees and ground lessors, if any, and agents and their respective successors and assigns, from all injuries, losses, claims or damages to any person or property while on the Leased Premises or any other part of the Shopping Center occasioned by any act or omission or negligence of Tenant, or any party claiming by, through or under Tenant; to maintain by responsible companies, reasonably approved by Landlord, public liability insurance, insuring Landlord, Landlord's beneficiaries and agents, and if so requested, any mortgagee, ground lessor and other parties as their interest may appear, against all claims, demands, or actions for injury to, or death, in an amount of not less than that set forth in Section 1.1.v. arising out of any one occurrence, and for damage to property in an amount of not less than that set forth in Section 1.1.v. arising out of anyone occurrence, made by or on behalf of any person, firm or corporation, arising from, related to, or connected with the conduct and operation of Tenant's business in the Leased Premises, and anywhere upon the Shopping Center; (Landlord shall have the right to direct Tenant to increase said amounts whenever it considers same reasonably inadequate) and in addition, and in like amounts, Tenant shall obtain coverage for Tenant's contractual liability under the aforesaid hold harmless clause. If Tenant maintains its own boilers, machinery, or compressors within the Leased Premises, Tenant, at its sole cost and expense, shall maintain boiler, machinery and/or compressor insurance insuring against loss or damage to persons or property resulting from same, in limits equal to the amounts set forth in Section 1.1.v. Tenant shall maintain plate glass insurance covering all exterior plate glass in the Leased Premises, and fire, extended coverage, vandalism and malicious mischief insurance and such other insurance as Landlord may from time to time require covering all of Tenant's stock in trade, fixtures, furniture, furnishings, floor coverings and equipment in the Leased Premises to the extent of one hundred percent (100%) of their full replacement cost. All of said insurance shall be in form and written by responsible companies reasonably satisfactory to Landlord, and shall provide that said policies will not be subject to cancellation, termination or change except after at least thirty (30) days prior written notice to Landlord. The policies or duly executed certificates for the same (which certificates shall evidence the waiver of subrogation hereinafter required) together with satisfactory evidence of the payment of the premium thereon, shall be deposited with Landlord before Tenant begins Tenant's Work, and upon renewals of such policies, not less than thirty (30) days prior to the expiration of the term of such policies; and if Tenant fails to comply with such requirements, which failure shall be an Event of Default, Landlord may obtain such insurance and keep the same in effect, in which event, Tenant shall pay Landlord the premium cost thereof, upon demand, with interest at the Default Rate. Each such payment shall constitute Additional Rent payable by Tenant under this Lease, and Landlord shall not be limited in the proof of any damages which Landlord may claim against Tenant arising out of or by reason of Tenant's failure to provide and keep in force the insurance as aforesaid, to the amount of insurance premium or premiums not paid or incurred by Tenant and which would have been payable upon such insurance. In addition to any and all other rights and remedies available to Landlord under the terms of this Lease, or at law or in equity, Landlord shall also be entitled to recover as damages for such breach, the uninsured amounts of any loss, to the extent of any deficiency in the insurance required by the provision of this Lease.

ll)     Tenant shall also pay to Landlord, as Additional Rent, Tenant's pro rata share of premiums for fire, rental, liability and other types of insurance that Landlord, in its sole judgment shall carry, (subject to endorsements) during the Lease Term. Tenant's pro rata share shall be based on the ratio of the total Floor Area of the Leased Premises to the total Floor Area of all leased open and occupied space in Landlord's Tract as of the first day of such Lease year, but excluding buildings occupied by anchor store(s). Tenant shall pay to Landlord as Additional Rent its share of all insurance premiums within ten (10) days after receipt of a bill therefore, from Landlord, and this covenant shall survive the expiration or earlier termination of the Lease Term.

l.     Landlord and Landlord's agents and employees shall not be liable for, and Tenant waives all claims for damage to person or property sustained by Tenant, or any person claiming by, through or under Tenant, resulting from any accident or occurrence in or upon the Leased Premises, or the building of which it forms a part, or any other part of the Shopping Center, including, but not limited to, claims for damage resulting from: (i) any equipment or appurtenances becoming out of repair; (ii) Landlord's failure to keep the Shopping Center, said building or the Leased Premises in repair; (iii) injury or damage done or occasioned by wind, water, or other natural element; (iv) any defect in or failure of plumbing, heating, or air-conditioning equipment, electric wiring or installation thereof, gas, water and steam pipes, stairs, railings, or walks; (v) broken glass; (vi) the backing up of any sewer pipe or downspout; (vii) the bursting, leaking or running of any tank, tub, washstand, sprinkler system, water closet, waste pipe, drain or any other pipe or tank in, upon, or about such building or Leased Premises; (viii) the escape of steam or hot water; (ix) water, snow or ice being upon or coming through the roof, skylight, trapdoor, stairs, walks or any other place upon or near such building or the Leased Premises or otherwise; (x) the falling of any fixtures, plaster or stucco; and (xi) any act, omission or negligence of tenants or of other persons or occupants of the Shopping Center or said building, or of adjoining or contiguous buildings or of owners of adjacent or contiguous property except due to the gross negligence or willful misconduct of Landlord, its agents or employees.

m.     Landlord and/or its authorized representatives shall have the right to enter upon the Leased Premises during all reasonable hours upon 24 hour notice, except for emergencies, and on reasonable advance notice for the purpose of inspection or exhibiting the same to prospective purchasers, mortgagees and tenants. Landlord and/or its authorized representatives shall have the right to enter upon the Leased Premises for the purpose of maintaining and repairing all equipment in, upon, above or under the Leased Premises as may be necessary for the servicing of the Leased Premises or other portions of the Shopping Center. Landlord and/or its authorized representatives shall also have the right to enter upon the Leased Premises during all reasonable hours, (and in emergencies at all times) for the purpose of making any repairs thereto and thereon or to the building of which it forms a part, as Landlord may deem necessary, and for any other lawful purpose, and in connection therewith, Landlord shall have the right reasonably to bring and store materials, tools and equipment in, through or above the Leased Premises that may be required therefore, without the same constituting any actual or constructive eviction of Tenant from the Leased Premises or any part thereof. However, nothing herein shall be deemed to impose any duty upon Landlord to do any work which, under any provisions of this Lease, Tenant shall be required to perform, and the performance thereof by Landlord shall not constitute a waiver of Tenant's failure to perform same. In no event shall Landlord be liable for any inconvenience, disturbance, loss of business or other damages to Tenant

S.S.

by reason of the performance by Landlord of any work in, upon, above, under or about the Leased Premises, or for bringing and storing materials, tools and equipment in, through, above or below the Leased Premises during the course thereof, and the obligations of Tenant under this Lease shall not be affected thereby in any manner whatsoever, nor shall the same constitute any ground for an abatement of any rent, charges or other sums reserved hereunder.  If after reasonable advance notice from Landlord, Tenant or Tenant's employees shall not be personally present to permit an entry into the Leased Premises, Landlord may enter the same by the use of reasonable force or otherwise without rendering Landlord liable therefore and without in any manner affecting Tenant's obligations under this Lease. During the period commencing six (6) months prior to the expiration of the Lease Term (or any renewal term thereof), Landlord may place upon the exterior of the Leased Premises "For Lease", "To Let" or "For Rent" signs of reasonable size which signs shall not be removed, obliterated or hidden by Tenant.  If any excavation shall be made upon land adjacent to the Leased Premises, Tenant shall permit the party authorized to cause such excavation to be made to enter upon the Leased Premises for the purpose of performing such work as may be reasonably necessary to preserve the wall of the building of which the Leased Premises forms a part from damage and to support the same by proper foundations and shoring, and Tenant hereby waives all claims for inconvenience, disturbance, loss of business or other damages, against Landlord therefore, and without in any manner affecting Tenant's obligations under this Lease and the same shall not constitute any ground for an abatement of any Fixed Annual Minimum Rent and Additional Rent reserved hereunder.

n.        To remove, at the termination of this Lease, provided Tenant is not in default, such of Tenant's movable trade fixtures, and other personal property as are not permanently affixed to the Leased Premises; to remove such of the alterations and additions made by or for Tenant and signs of Tenant as Landlord may request; to repair any damage caused by such removal; and peaceably to yield up the Leased Premises and all alterations and additions therein (except such as Landlord has requested Tenant to remove) and all fixtures, furnishing, floor coverings and equipment which are permanently affixed to the Leased Premises, including carpet, which, for the purpose of this Lease shall be deemed to be permanently affixed to the Leased Premises, which shall thereupon become the property of the Landlord, in clean and good order, repair and condition, damage by fire or other unavoidable casualty excepted.  Any personal property of Tenant not removed at such termination shall, at Landlord's option, become the property of the Landlord to be disposed of at Landlord's sole discretion.

o.        (i)        Without the need for further documentation or consent by Tenant, the rights and interest of Tenant under this Lease shall be subject and subordinate to any mortgages or trust deeds heretofore or hereafter placed upon the Landlord's Tract, and to any advances made thereunder, and to the interest thereon, and all extensions, renewals, refinancing and modifications thereof.  Any mortgagee or trustee may elect also to give the rights and interest of Tenant under this Lease priority over the lien of its mortgage(s) or trust deed(s).

(ii)        Landlord's execution and delivery of this Lease is made subject to and conditioned upon the approval of Landlord's financing institution.  If any financing institution requires any modifications of the terms and provisions of this Lease as a condition to such financing as Landlord may desire, then Tenant shall execute and deliver such modification as may be required for such purposes.  If Tenant fails to do so within ten (10) days after demand in writing, Tenant does hereby make, constitute and irrevocably appoint Landlord as its attorney-in-fact, and, in its name, place and stead so to do.  Such modification or modifications shall not affect any of the provisions of the Lease relating to the amount of Fixed Annual Minimum Rent, Percentage Rent, or Additional Rent, the purposes for which the Leased Premises may be used, the size or location of the Leased Premises, the Commencement Date of the Lease Term, or the improvements to be made by Landlord to the Leased Premises prior to delivery of possession.

p.        Tenant shall pay to Landlord as Additional Rent, Tenant's prorata share of the real estate taxes during the Lease Term and any renewal or extension thereof.  For purposes of this Section the term "real estate taxes" shall include all real estate taxes and assessments, both general and special, water and sewer rents and other governmental impositions and charges of every kind and nature whatsoever which may be assessed against the Shopping Center, extraordinary as well as ordinary, foreseen and unforeseen, and each and every installment thereof which shall or may during the Lease Term, be levied, assessed, imposed, become due and payable, or liens upon, or arising in connection with, the use, occupancy or possession of or become due or payable out of or for, the Shopping Center of any part thereof, and all costs including reasonable attorneys' fees incurred by Landlord in contesting or negotiating the same with the appropriate governmental authorities  Tenant's prorata share shall be equal to the product obtained by multiplying such real estate taxes by a fraction, the numerator of which shall be the Floor Area of the Leased Premises and the denominator of which shall be the Floor Area of constructed, leased, open and occupied stores in the Shopping Center as of the day of assessment which is included in said tax bills, deducting therefrom the areas contained in all buildings occupied by anchor store's in the Shopping Center and deducting the areas shown as the free standing buildings on Exhibit "A".  In the event that the Shopping Center is subdivided further by the local taxing authority subsequent to execution of this Lease, Tenant's pro-rata share of real estate tax payments shall be revised so that the amount is determined by multiplying the real estate taxes of the remaining parcel times a fraction the numerator of which is the floor area of the Leased Premises and the denominator of which is the remaining constructed, leased and occupied stores in the Shopping Center exclusive of those parcels separately assessed.  Nothing herein contained shall be construed to include as a tax which shall be the basis of real estate taxes, any inheritance, estate, succession, transfer, gift, franchise, corporation, income or profit tax or capital levy that is or may be imposed upon Landlord, provided, however, that, if at any time during the Lease Term the methods of taxation prevailing at the commencement of the Lease Term shall be altered so that in lieu of, in addition to, or as a substitute for the whole or any part of the real estate taxes now levied, assessed or imposed on real estate as such, there shall be levied, assessed or imposed (i) a tax or taxes on the rents received from such real estate, or (ii) a license fee measured by the rents receivable by Landlord from the Shopping Center or any portion thereof, or (iii) a tax or license fee imposed upon Landlord which is otherwise measured by or based in whole or in part upon the Shopping Center or any portion thereof, then the same shall be included in the computation of real estate taxes hereunder, to be computed as if the amount of such tax or fee so payable were that due if the Shopping Center were the only property of Landlord subject thereto.  Tenant agrees to pay to the Landlord the amount set forth in Section 1.1.w. on the first day of each calendar month as its estimated payment of first Lease Year's taxes.  For each Lease Year thereafter, Tenant shall pay to the Landlord monthly, one-twelfth (1/12th) of the amount of the Tenant's tax liability for the preceding calendar year as the preceding calendar year or any portion thereof and any amount paid by Tenant which exceeds the actual amount due shall

13

S. S.

be credited on the next succeeding payment due pursuant to this Section if Tenant has paid less than the amount due, Tenant shall pay as Additional Rent the difference within ten (10) days of receipt of notice from Landlord and this covenant shall survive the expiration or earlier termination of the Lease Term. If the Lease Term shall begin or end other than on the first or last day of calendar year, real estate taxes shall be billed and adjusted on the basis of such fraction of a calendar year. Should the taxing authority include in such real estate taxes, machinery, equipment, fixtures, equipment and any other personal property installed or located within the Leased Premises and all alterations, additions or improvements of whatsoever kind of nature, if any made by Tenant to the Leased Premises, all such taxes will be the sole responsibility of the Tenant. Any excess amounts paid by Tenant will be returned to Tenant within ten (10) days of any reconciliations.

~~Tenant shall also pay to Landlord, as Additional Rent, Tenant's pro rata share of premiums for fire, rental, liability and other types of insurance that Landlord, in its reasonable sole judgement shall carry, (with all its endorsements) during the Lease Term. Tenant's pro rata share be based on the rent of the total Floor Area of the Leased Premises to the total Floor Area of all Lease open and occupied stores in Landlord's Tract as of the first day of such Lease year, but excluding buildings occupied by anchor store(s). Tenant shall pay to Landlord as Additional Rent its share of all insurance premiums within ten (10) days after receipt of a bill therefore, from Landlord, and this covenant shall survive the expiration or earlier termination of the Lease Term.~~

q.    To remain primarily obligated under this Lease, notwithstanding any assignment or sublease or any indulgence granted by Landlord to Tenant or to any assignee or sublessee.

r.    To promptly furnish Landlord, from time to time, whenever requested by Landlord, financial statements in form satisfactory to Landlord reflecting Tenant's current financial condition, setting forth, without limitation thereby, Tenant's assets, liabilities, revenues, expenses and costs, and cash flow. If Tenant shall be a corporation, the stock of which is traded on a national securities exchange, this provision shall be satisfied by the submission of an annual report prepared for Tenant's shareholders.

s.    (i)    Prior to the Commencement Date and thereafter throughout the Lease Term, Tenant, at Tenant's sole cost and expense, shall promptly comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state, municipal and local governments, departments, commissions, boards and officers, and all orders, rules and regulations of the National Board of Fire Underwriters, the local Board of Fire Underwriters, and any other body or bodies exercising similar functions, foreseen or unforeseen, ordinary as well as extraordinary, which may be applicable to Tenant's use of the Leased Premises and to all or any parts thereof and all facilities used in connection therewith and the sidewalks, area-ways, passageways, curbs and vaults, if any, adjoining the Leased Premises to the extent they are reserved primarily for the use of Tenant, or to the use or manner of use of the Leased Premises, or the owners, tenants or occupants thereof, whether or not any such law, ordinance, order, rule, regulation or requirement shall interfere with the use and enjoyment of the Leased Premises.

(ii)    Tenant shall observe and comply with the requirements of all policies of public liability, fire and all other policies of insurance at any time in force with respect to the Shopping Center, Landlord's Tract or any part thereof.

(iii)    Tenant shall pay all costs, expenses, claims, fines, penalties and damages that may in any manner arise out of, or be imposed because of the failure of Tenant to comply with the provisions of this Lease, and Tenant shall indemnify the Landlord, Landlord's beneficiary, mortgagee(s) and ground lessor(s), if any, and their respective agents and employees from all liability therefrom. Tenant shall promptly give notice to Landlord of any violation received by Tenant. Without diminishing the obligation of Tenant, if Tenant shall at anytime after five (5) days notice from Landlord fail or neglect to comply, or promptly commence to comply with any of said laws, rules, requirements, orders, directions, ordinances or regulations concerning or affecting the Leased Premises, or the use and occupancy thereof, as herein before provided, and, if a stay or continuance is necessary, shall have failed to obtain a stay or continuance thereof, Landlord shall have the right, but not the obligation, to comply therewith, and all fees, costs and expenses incurred by Landlord shall be borne and paid by Tenant on demand and upon Tenant's failure so to pay, Landlord may pay the same, and any payments so made by Landlord together with interest thereon at the Default Rate shall immediately become due and payable by Tenant as Additional Rent.

t.    To strictly comply with all further rules and regulations for the use and occupancy of the Shopping Center as Landlord, in its sole discretion reasonably exercised, from time to time promulgates for the best interests of the Shopping Center. Landlord shall have no liability for violation by any other tenant or occupant of the Shopping Center of any rules or regulations, nor shall such violation or the waiver thereof excuse Tenant from strict compliance therewith.

u.    To install, prior to the Commencement Date, a sign or signs in accord with the provision of Exhibit C, and at all times during the Lease Term, when Tenant is open for business, to operate and maintain same, at Tenant's sole cost and expense in good working order. Tenant agrees not to post any hand drawn paper signs on any part of the Leased Premises. Tenant also agrees not to cover more than ~~twenty-five percent (25%)~~ _five (5%)_ of the windows with signs.

v.    To comply with all local and federal laws and regulations prohibiting the manufacture, use and disposal of any hazardous material. Tenant also agrees not to use any hazardous material including asbestos for the completion of its Tenant's improvements or for any other reason. Tenant agrees to hold Landlord harmless and indemnify Landlord against any damages incurred because of any violation by Tenant of any Environmental Law. The term "Environmental Law" shall mean all federal, state and local environmental health and safety statutes, ordinances, codes, rules, regulations, orders and decrees regulating, relating to or imposing liability or standards concerning or in connection with hazardous materials.

Section 8.2 Negative Covenants.  Tenant covenants at all times during the Lease Term and such other times as Tenant occupies the Leased Premises or any part thereof:

a.    Not to: injure, overload, deface, or otherwise harm the Leased Premises or commit any nuisance; annoy tenants or occupants in or operating as a part of the Shopping Center or owners or occupants of neighboring property; use the Leased Premises for any extra-hazardous purpose or in any manner that will suspend, void or make inoperative any

14

S. S.

policy or policies of insurance carried by Tenant, Landlord or any tenant or occupant in or operating as a part of the Shopping Center or in any manner which will increase the cost of any of Landlord's insurance; burn any trash or refuse within the Shopping Center; sell, distribute or give away any alcoholic liquors or beverages; sell, distribute or give away any product which tends to create a nuisance in the common areas; make any use of the Leased Premises which is improper, offensive, or contrary to any law, ordinance or regulation of any governmental authority; conduct or permit any going-out-of-business, bankruptcy, fire or auction sales in the Leased Premises; use any system for the reception of music which has not first been approved by Landlord; use any advertising such as hand-bills, flashing or searchlights, loud speakers, phonographs, sound amplifiers or radio or television receiving equipment in a manner to be seen or heard outside the Leased Premises; load, unload, or park any truck or other delivery vehicle in any area of the Shopping Center other than the area or areas designated therefore by Landlord; use any sidewalks, walkways, or other common areas in or a part of the Shopping Center for the storage or disposal of trash or refuse or the keeping or displaying of any merchandise or other object, including, by way of example, but not limitation, the use of any of the foregoing for any news stand, cigar stand, sidewalk shop, or any business, occupation, or undertaking (such uses of such areas being reserved to Landlord and its designees); place any fence, structure, barricade, building, improvement, division rail, or obstruction of any type or kind on any part of the common areas; use the courts or walks for any purpose other than pedestrian traffic; install or use any sign or other advertising device on the exterior of the Leased Premises (other than a store identity sign approved by Landlord); use or permit the use of any portion of the Leased Premises as living quarters, sleeping apartments, or lodging rooms; do any act tending to injure the reputation of the Shopping Center.

      b.      Except as otherwise provided herein, Not to: permit the painting or placing of any exterior signs, place cards or other advertising medial, awnings, aerials, antenna or the like on or attached to the Leased Premises, without other advertising media to the windows.

      c.      Not to operate any coin or token operating vending machine or similar device for the sale or any goods, wares, merchandise, food, beverages, or services to the general public, including, but not limited to, pay telephones, pay lockers, pay toilets, scales, amusement devices and machines for the sale of beverages, food, candy, cigarettes or other commodities.

      d.      Not to operate or use, or permit or suffer to be operated or used, all or any part of the Leased Premises as or for a discount house, Army-Navy store, surplus store, bargain store, or any similar use or a store engaged in a business impairing the tenant balance or mix of the Shopping Center determined by Landlord.

      (1)      Tenant shall not voluntarily, involuntarily or by operation of law assign, transfer, mortgage or otherwise encumber this Lease or any interest of Tenant herein, in whole or in part, nor sublet the whole or any part of the Leased Premises, or permit the Leased Premises or any part thereof to be used or occupied by others, without the prior written consent of Landlord which consent shall not be unreasonably withheld. The consent by Landlord to an assignment or subletting shall not in any way be construed to relieve Tenant from obtaining the express prior written consent of Landlord to any further assignment or subletting for the use of any part of the Leased Premises, nor shall the collection of rent by Landlord from any assignee, sublessee or other occupant, be deemed a waiver of this covenant or the acceptance of said assignee, sublessee, or occupant as Tenant, or a release of Tenant from the further performance by Tenant of the covenants in this Lease on the part of Tenant to be performed. Any subletting or assignment, if consented to, shall be subject to and conditioned upon the following:

      (1)      at the time of any proposed subletting or assignment, Tenant shall not have failed to perform any of the terms, provisions or conditions of this Lease to be performed by Tenant; and

      (2)      the sublessee or assignee shall occupy the Leased Premises and conduct its business therein in accordance with the Permitted Use (Section 1.1.n.) and have significant previous retailing experience; and

      (3)      if the Fixed Annual Minimum Rent and Additional Rent required to be paid by any such sublessee or assignee exceed the Fixed Annual Minimum Rent and Additional Rent reserved hereunder from Tenant, then Tenant shall pay to Landlord monthly the entire amount of such excess, which shall be deemed Additional Rent; and

      (4)      prior to occupancy by said assignee or sublessee, Tenant and its assignee or sublessee shall execute, acknowledge and deliver to Landlord a fully executed counterpart of a written assignment of lease or sublease, as the case may be, duly consented to by Guarantor, if any, the terms of which shall include by way of example but not limitation the following: (x) in the event of an assignment, Tenant will assign to such assignee the entire interest of Tenant in and to this Lease, together with all prepaid rents hereunder, and the assignee will accept said assignment and assume and agree to perform, directly for the benefit of Landlord and those claiming by, through or under Landlord, except Tenant, all of the terms, covenants and conditions of this Lease on the part of Tenant to be performed; (y) in the event of a subletting, the sublease in all respects will be subject and subordinate to all of the terms, covenants and conditions of this Lease on the part of Tenant to be performed, except the payment of Fixed Annual Minimum Rent, Percentage Rent and Additional Rent reserved hereunder, which Tenant shall continue to be obligated to pay and shall pay to Landlord unless Landlord shall otherwise agree to accept same from said subtenant as agent for Tenant; and

      (5)      Notwithstanding any such assignment or subletting under the terms of this paragraph 8.2.E.o, both Tenant and Guarantor, if any, will so acknowledge (except in the event of an acquisition, merger or consolidation of Tenant, provided the net worth of such successor or acquiring party shall be at least equal to the net worth of Tenant at the time of such acquisition, merger or consolidation which net worth shall be evidenced by financial statements submitted by Tenant and certified by a Certified Public Accountant (if Tenant is a corporation, Tenant's chief financial officer)) that, notwithstanding such assignment or sublease, and the consent of Landlord thereto, neither Tenant nor Guarantor, if any, will be released or discharged from any liability whatsoever under this Lease and Guarantee and both Tenant and Guarantor will continue to be primarily liable hereunder with the same force and effect as though no assignment or sublease had been made; and

      (6)      Tenant shall pay to Landlord the sum of Five Hundred Dollars ($500.00) for administrative costs and attorneys' fees incurred by Landlord in connection with such assignment or subletting.

15



(ii)     If Tenant or Guarantor, if any, is a corporation or partnership, and if at anytime during the Lease Term the person or persons who, on the date of this Lease, own or owns a majority of the voting shares of such corporation or partnership interests of such partnership, as the case may be, cease or ceases to own a majority of such shares (whether such sale occurs at one time or at intervals so that, in the aggregate, such a transfer shall have occurred), or such partnership interest as the case may be (except as the result of transfer by gift or inheritance) or if the Guarantor, if any, of this Lease is dissolved, dies, becomes incompetent or insolvent, Tenant shall so notify Landlord and Landlord shall have the right at its option, to terminate this Lease by written notice to Tenant given thirty (30) days after Landlord shall have received said notice. Notwithstanding anything contained herein to the contrary, the provision of this subparagraph 8.2.e.(ii), shall not be applicable if Tenant is a corporation, all outstanding voting stock of which is listed on a national securities exchange (as defined in the Securities Exchange Act of 1934, as amended). For the purposes of this Subparagraph 8.2.e.(ii), stock ownership shall be determined in accordance with the principles set forth in the Internal Revenue Code of and the term "voting stock" shall refer to shares of stock regularly entitled to vote for the election of directors of the corporation.

(iii)     If Tenant receives Landlord's consent pursuant to Subparagraph 8.2.e.(i) above, or if Landlord does not terminate this Lease pursuant to Subparagraph 8.2.e.(ii) above, the Fixed Annual Minimum Rent payable thereafter shall be no less than the greater of:

(1)     an amount equal to the average combined Fixed Annual Minimum Rent and payable by Tenant during the three (3) Lease Years immediately preceding any such assignment, subletting, or transfer; or

(2)     the highest annual combined Fixed Annual Minimum Rent and payable by Tenant during any previous Lease Year since the Commencement Date, if Tenant, at the time of the subletting, transfer or assignment, has been occupying the Leased Premises for less than three (3) Lease Years; or

(3)     an amount determined by increasing the Fixed Annual Minimum Rent payable pursuant to Section 1.1.h. by the percentage increase in the Index (as defined in Section 4.2) published closest to the month in which the Commencement Date occurs to the Index published closest to the last month immediately preceding any such assignment, subletting, or transfer.

Tenant and any transferee shall promptly execute an agreement prepared by Landlord amending this Lease to provide for the payment of the revised Fixed Annual Minimum Rent during the remainder of the Lease Term, and all costs with respect thereto shall be paid by Tenant to Landlord, forthwith, on demand as Additional Rent. All of the other terms, covenants and conditions of this Lease shall continue in full force and effect and unamended.

(iv)     If Tenant intends to assign this Lease, sublet or part with possession of all or any portion of the Leased Premises, or to transfer this Lease in any other manner, in whole or in part, or any estate or interest hereunder, then and so often as such event shall occur, Tenant shall give prior written notice to Landlord of such intent, specifying therein the proposed assignee, subtenant, or transferee, and all terms and conditions of such assignment, sublease or transfer, and within thirty (30) days thereafter, Landlord may notify Tenant in writing either, that:

(1)     it consents or does not consent in accordance with the provisions and qualifications in this Subparagraph 8.2.E.; or

(2)     it elects to cancel this Lease. If Landlord elects to cancel this Lease as aforesaid, Tenant shall notify Landlord in writing, within fifteen (15) days after receipt by Tenant of such notice by Landlord of the intention by Tenant to refrain from such assignment, subletting or transfer, or to accept the cancellation of this Lease. If Tenant fails to deliver such notice within said period of fifteen (15) days, this Lease will thereby be terminated upon the expiration of the said fifteen (15) day period. If Tenant advises Landlord it intends to refrain from such assignment, subletting or transfer then Landlord's cancellation of this Lease as aforesaid shall be voided for that instance.

(v)     Landlord and Tenant hereby agree and acknowledge that the assurance required under Section 365 of the Federal Bankruptcy Code (the "Code") as a condition to any assignment hereof by Tenant's Trustee in bankruptcy (the "Trustee") shall be inadequate, within the meaning thereof: (i) without satisfying the standards of adequacy set forth in the code unless evidenced by the balance sheet, income statement and cash flow statement of said assignee certified by an independent Certified Public Accountant; and (ii) in order to maintain the Tenant mix and balance of the Shopping Center, without the agreement by the assignee or the Trustee to conduct its business in the same manner as the Tenant.

## ARTICLE IX

## DAMAGE OR TAKING AND RESTORATION

Section 9.1  Fire or Other Casualty.  If the Leased Premises or the building of which it forms a part are damaged by fire or any other insured casualty to an extent which is less than twenty-five percent (25%) of the cost of replacement of the Leased Premises, the damage shall be repaired by Landlord within a reasonable time period thereafter but in no event shall Landlord be required to commence such repairs until such time as Landlord has received the proceeds of all applicable insurance therefore, and further provided, that in no event shall Landlord be obligated to expend for such repairs an amount in excess of the net insurance proceeds received as a result of such damage. In no event shall Landlord be required to repair or replace the stock-in-trade, fixtures, furniture, furnishings, floor coverings and equipment of Tenant. In the event of any damage and (a) Landlord is not required to repair, or (b) the Leased Premises shall be damaged to the extent of twenty-five percent (25%) or more of the cost of replacement, or (c) the building which the Leased Premises are a part is damaged to the extent of twenty-five percent (25%) or more of the cost of replacement, notwithstanding the extent of damage, if any, to the Leased Premises or (d) the buildings (taken in the aggregate) in or operating as a part of the Shopping Center shall be damaged to the extent of more than twenty-five percent (25%) of the

16

F.S.

aggregate cost of replacement, Landlord may elect either to repair or rebuild the Leased Premises or the building or buildings, or to terminate this Lease upon giving notice of such election, in writing, to Tenant within ninety (90) days after the occurrence of the event causing the damage. If the casualty, repairing, or rebuilding shall render the Leased Premises untenantable, in whole or in part, and the damage shall not have been due to the default, willful acts, omission or neglect of Tenant or its agents, contractors, concessionaires, licensees, employees or servants, then a proportionate abatement shall be computed on the basis of the relation with the Floor Area of the Leased Premises as set forth in Section 1.1. (j). If Landlord is required, or elects to repair the Leased Premises as herein provided, Tenant shall promptly repair or replace its stock in trade, fixtures, furniture, furnishings, floor coverings and equipment, and if Tenant has closed, Tenant shall promptly reopen for business. If Tenant shall fail to proceed with the repairs and restoration which it is obligated to make pursuant to this Section 9.1, then Tenant shall assign to Landlord all Tenant's applicable rights and claims to insurance proceeds; failure to do so shall be an Event of Default.

Section 9.2 Eminent Domain. If the whole of the Leased Premises shall be taken by any public authority under the power of eminent domain, or similar proceeding or conveyance in lieu thereof, the Leased Term shall cease as of the day possession shall be taken by such public authority, and Tenant shall pay the Fixed Annual Minimum Rent, Percentage Rent and Additional Rent up to that date with an appropriate refund by Landlord of such Fixed Annual Minimum Rent, Percentage Rent and Additional Rent as may have been paid in advance for any period subsequent to the date possession is taken. If less than all of the Floor Area of the Leased Premises shall be so taken, and Landlord does not elect to terminate this Lease, then the Lease Term shall cease only to the portion so taken, as of the day possession shall be taken by such public authority, and Tenant shall pay the Fixed Annual Minimum Rent, Percentage Rent and Additional Rent up to that date with appropriate refund by Landlord of such Fixed Annual Minimum Rent, Percentage Rent and Additional Rent as may have been paid in advance for said portion taken, for any period subsequent to the date possession is taken, and thereafter the Fixed Annual Minimum Rent shall be adjusted. If Landlord does not elect to terminate as herein provided, Landlord shall make all necessary repairs or alterations to the building of which the Leased Premises is a part so as to constitute the remaining Leased Premises a complete architectural unit; provided however, Landlord shall not be obligated to undertake any such repairs and alterations if the cost thereof exceeds Landlord's awards. If the Floor Area of the Leased Premises, after the taking, is no longer reasonably suitable for the purposes set forth in this Lease, as determined by Landlord, in its reasonable business judgment, then Landlord shall have the right to terminate the Lease and the Lease Term shall cease and Tenant shall pay the Fixed Annual Minimum Rent, Percentage Rent and Additional Rent up to the day possession is taken, with an appropriate refund by Landlord of such Fixed Annual Minimum Rent, Percentage Rent and Additional Rent as may have been paid in advance for any period subsequent to the date of the taking of possession. If more than twenty-five percent (25%) of the floor area of the building in which the Leased Premises are located, or more than twenty-five percent (25%) of the aggregate floor area of all the buildings in the Landlord's Tract shall be taken under the power of eminent domain, Landlord may, by notice in writing to Tenant, delivered on or before the day of surrendering possession to the public authority, terminate this Lease and the Fixed Annual Minimum Rent, Percentage Rent and Additional Rent shall be paid or refunded as the case may be as of the date of termination. All compensation awarded for any taking under the power of eminent domain, whether for the whole or a part of Leased Premises, shall be the property of Landlord, whether such damages shall be awarded as compensation for diminution in the value of the leasehold or in the fee of the Leased Premises, or otherwise, and Tenant hereby assigns to Landlord all of the Tenant' rights, title and interest, in and to any and all such compensation; provided, however, that Landlord shall not be entitled to any award specifically made to Tenant for the taking of Tenant's trade fixtures, furniture and the cost of their removal or relocation, or the unamortized portion of that portion of the Leasehold improvements made by and for Tenant at Tenant's sole cost without reimbursement, in whole or in part, by Landlord.

## ARTICLE X

## EVENTS OF DEFAULT--REMEDIES

Section 10.1 The occurrence of any one or more of the following may be deemed and is herein sometimes referred to as an "Event of Default".

a.   A failure in the timely payment of any installment of Fixed Annual Minimum Rent, Percentage Rent or Additional Rent or any part, thereof, and such failure shall continue for a period of ten (10) days after notice from Landlord to Tenant specifying such failure. (The parties hereto agree and acknowledge that such continuance after notice to Tenant's Trustee shall negate the prompt character of any curing or compensation under Section 365 of the Federal Bankruptcy Code);

b.   A failure by Tenant in the performance or compliance with any of the terms, conditions, agreements or covenants of this Lease (other than those referred to in the foregoing paragraph) for a period of ten (10) days after notice from Landlord to Tenant specifying such failure. (Unless such failure cannot, with due diligence on the part of the Tenant, be cured within said ten (10) day period, same shall not be an Event of Default if within said ten (10) day period Tenant uses its best efforts to proceed to cure same and thereafter continuously prosecutes the curing of same with due diligence. The parties, hereto, agree and acknowledge that such failure by the Tenant's Trustee shall negate the prompt character of any curing or compensation under Section 365 of the Federal Bankruptcy Code;

c.   (i)   The filing of an application by Tenant for a consent to the appointment of a receiver, trustee or liquidator of itself or of all of its assets; or

(ii)   The filing by Tenant of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing its inability to pay its debts as they become due; or

(iii)   The making by Tenant of a general assignment for the benefit of creditors; or

(iv)   The filing by Tenant of an answer admitting the material allegations of or consenting to or defaulting in answering a petition filed against it in any bankruptcy proceeding; or

d.   The entry of an order, judgment or decree by any court of competent jurisdiction adjudging Tenant a

17

G. S.

bankrupt or appointing a receiver, trustee or liquidator of it, or all of its assets, and such order, judgment or decree continuing unstayed and in effect for any period of sixty (60) consecutive days;

    e.    If Tenant shall abandon the Premises;

    f.    If this Lease or the estate of Tenant hereunder shall be transferred, assigned or subleased to or shall pass to or devolve upon any person or party, except in a manner herein expressly permitted; or

    g.    If a levy under execution or attachment shall be made against Tenant or its property and such execution or attachment shall not be vacated or removed by court order, bonding or otherwise within a period of thirty (30) days from the date of said levy.

Notwithstanding any provision hereof to the contrary, all references in Paragraph e of this Section 10.1 to Federal Bankruptcy Code and to activities thereunder shall be inoperative unless the prohibition against termination of leases under the Federal Bankruptcy Code is ineffective pursuant to an exemption from said prohibition set forth in Section 365 of the Federal Bankruptcy Code or in any other provision of federal law.

Section 10.2 If an Event of Default shall occur, Landlord, at anytime thereafter, by giving written notice to Tenant stating that this Lease and the term hereby demised shall expire and terminate on the date specified in such notice, and upon the date specified in such notice, this Lease and the term hereby demised, and all rights of the Tenant under this Lease shall expire and terminate as if that date were the date herein definitely fixed for the termination of the term of this Lease, and Tenant shall quit and surrender the Leased Premises but Tenant shall remain liable as hereinafter provided.

Section 10.3 If this Lease be terminated pursuant to this ARTICLE X, or by summary proceedings or otherwise, or if the Leased Premises or any part thereof shall be abandoned by Tenant, or shall become vacant during the term hereof, Landlord may in its own name, or as agent for Tenant if this Lease not be terminated, or if this Lease be terminated, on its own behalf, relet the additional premises or any part thereof, or said Leased Premises with additional premises for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the term of this Lease) and on such conditions (which may include concessions or free rent and alterations of the Leased Premises) as Landlord, in its sole discretion, may determine and Landlord may collect and receive the rents therefore. Landlord shall in no way be responsible or liable for any failure to relet the Leased Premises or any part thereof, or of any failure to collect any rent due upon such reletting.

No re-entry by Landlord, whether had or taken under summary proceedings or otherwise, shall absolve or discharge Tenant from any liability hereunder.

Section 10.4 Upon the expiration or sooner termination of this Lease, Tenant shall quit and peacefully surrender the Leased Premises to Landlord, and Landlord, upon or at any such expiration or termination, may without further notice, enter upon and re-enter the Leased Premises and possess and repossess itself thereof, by force, summary proceedings, ejectment or otherwise, and may dispossess Tenant and remove Tenant and all other persons and property from the leased Premises and may have, hold and enjoy the Leased Premises and the right to receive all rental income of and from the same.

Section 10.5 No such expiration or termination of this Lease pursuant to ARTICLE X, or summary proceedings, abandonment or vacancy, shall relieve Tenant of its liability and obligations under this Lease, whether or not the Leased Premises shall be relet. In any such event Tenant shall pay Landlord the Fixed Annual Minimum Rent, and Additional Rent required to be paid by Tenant up to the time of such event. Thereafter:

    a.    Tenant, until the end of the term of this Lease, or what would have been such term in the absence of any such event, shall be liable to Landlord as damages for Tenant's default, the equivalent of the amount of the Fixed Annual Minimum Rent, Percentage Rent and Additional Rent which would be payable under this Lease by Tenant if this Lease were still in effect, less the proceeds if any (after deducting all Landlord's expenses in connection with such reletting, including, without limitation, all repossession costs, brokerage and management commissions, operating expenses, legal expenses, reasonable attorneys' fees, alteration costs, and expenses of preparation for such reletting) of any reletting effected pursuant to the provisions of Section 10.3 (hereinafter sometimes referred to as "Deficiency"); and

    b.    Tenant shall pay the Deficiency to Landlord monthly on the days on which the Fixed Annual Minimum Rent would have been payable under this Lease if this Lease were still in effect, and Landlord shall be entitled to recover from Tenant, monthly, the Deficiency as the same shall arise; and

    c.    At any time after the expiration or termination of this Lease pursuant to this ARTICLE X, in lieu of collecting any further Deficiency as aforesaid, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord, on demand, as damages, in addition to the damages provided for in Section 10.9, damages computed in the manner set forth in Section 10.6, minus any of the Deficiency previously paid by Tenant.

Section 10.6 a. In case of an Event of Default, Landlord shall immediately, with notice or other action by Landlord, become entitled to recover from Tenant, as damages, in addition to any damages becoming due under Section 10.8 and 10.9, an amount equal to the difference between the Fixed Annual Minimum Rent, and Additional Rent reserved in this Lease from the date of Event of Default to the date of the expiration of the original term demised and the then fair and reasonable rental value of the Leased Premises for the same period. Said damages shall become due and payable to Landlord immediately upon such Event of Default and without regard to whether this Lease be terminated or not, and if this Lease be terminated, without regard to the manner in which it is terminated. In the computation of such damages, the difference between any installment of Fixed Annual Minimum Rent, and Additional Rent thereafter becoming due and the fair and reasonable rental value of the Leased Premises for the period for which such installment was payable, shall be discounted to the date of such Event of Default at the rate of not more than four percent (4%) per annum.

    b.    If and so long as the term of this Lease shall continue, the Fixed Annual Minimum Rent, and Additional Rent reserved herein for the unexpired term of the Leased shall, after an Event of Default be reduced by the amount of

18

such damages as may be paid to Landlord, such and Additional Rent thereafter becoming due. During the continuance of the Lease after such an Event of Default, and until such damages are paid to Landlord, the whole amount of each installment of Fixed Annual Minimum Rent, and Additional Rent herein reserved shall be due and payable at the time herein specified, and if, by reason of the subsequent payment of damages, and the resulting reduction in Fixed Annual Minimum Rent, and Additional Rent, Landlord shall have received a sum in excess of all installments, as so reduced, becoming due after the Event of Default and before the collection of such damages, such excess shall be refunded upon the receipt of such damages.

Section 10.7 If the Leased Premises or any part thereof be relet by Landlord for the unexpired term of this Lease, or any part thereof, before presentation of proof of such damages to any court, commission or tribunal, the amount of Fixed Annual Minimum Rent, and Additional Rent reserved upon such reletting shall be the fair and reasonable rental value for the part of the whole of the Leased Premises so relet during the term of the reletting. Nothing herein contained shall limit or prejudice the right of Landlord to prove for and obtain as damages, by reason of such termination, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount be greater, equal to, or less than the amount of the difference referred to above.

Section 10.8 If this Lease be terminated by summary proceedings or otherwise, or if the Leased Premises are abandoned or become vacant, and whether or not the Premises be relet, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord, in addition to any damages becoming due under this ARTICLE X, the following: an amount equal to all expenses, if any, including reasonable counsel fees, incurred by Landlord in recovering possession of the Leased Premises, and all reasonable costs and charges for the care of the Leased Premises while vacant, which damages shall be paid and payable by Tenant to Landlord at such time or times as such expenses are incurred by Landlord.

Section 10.9 If this Lease is terminated pursuant to ARTICLE X, or if Tenant shall vacate or abandon the Leased Premises, then and in either of such events, Tenant covenants and agrees in addition to and not in lieu of any other covenant in this Lease:

a.      That the Leased Premises shall be in the same condition as that in which Tenant has agreed to surrender them to Landlord at the original expiration of the Lease Term hereof;

b.      That Tenant, on or before such termination, abandonment or vacation, shall perform all covenants contained in this Lease for the making of any improvements, alteration or betterment to the Leased Premises, or for restoring or rebuilding any part thereof; and

c.      That, for the breach of any covenant above stated in this Section 10.9, Landlord shall be entitled to recover, and Tenant shall pay, with notice or other action by Landlord the then cost of performing such covenant.

Section 10.10 Tenant hereby expressly waives, so far as permitted by law, the service of any notice of intention to re-enter the Leased Premises provided for in any statute, and except as herein otherwise provided, Tenant, for and on behalf of itself, and all persons claiming by, through, or under Tenant (including any leasehold mortgagee or other creditor), also waives any and all right of redemption, re-entry, or repossession, in the event Tenant shall be dispossessed by a judgment, or by warrant of any court or judge, or in the event of re-entry or repossession by Landlord, or in the event of any expiration or termination of this Lease. The terms "enter", "re-enter", "entry", or "re-entry", as used in this Lease are not restricted to their legal meanings.

Section 10.11 No failure by Landlord to insist upon the strict performance of any agreement, term, covenant, or condition hereof, or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial Fixed Annual Minimum Rent, Additional Rent during the continuance of any such breach, shall constitute a waiver of any such breach of such agreement, term, covenant, or condition. No agreement, term, covenant, or condition hereof, to be performed or complied with by Tenant, and no breach thereof, shall be waived, altered, or modified, except by a written instrument executed by Landlord. No waiver of any breach shall affect or alter this Lease, but each and every agreement, term, covenant, and condition hereof, shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

Section 10.12 If any Event of Default or threatened Event of Default by Tenant of any of the agreements, terms, covenants, or conditions contained in this Lease shall occur, Landlord shall be entitled to enjoin such Event of Default or threatened Event of Default, and shall have the right to invoke any right and remedy allowed at law or in equity, or by statute or otherwise, as though re-entry, summary proceedings, and other remedies were not provided for in this Lease.

Section 10.13 Remedies Cumulative. Each right and remedy provided for in this Lease shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now, or hereafter existing, at law or in equity, or by statute or otherwise, and the exercise or beginning of the exercise by Landlord of any one or more of the rights or remedies provided for in this Lease, as now or hereafter existing at law or in equity, or by statute or otherwise, shall not preclude the simultaneous or later exercise by the Landlord of any or all other rights or remedies provided for in this Lease, at now or hereafter existing at law or in equity or by statute or otherwise.

Section 10.14 Holdover by Tenant. If Tenant remains in possession of the Leased Premises after the expiration of the tenancy created hereunder without the execution of a new Lease, Tenant, at the option of Landlord, shall be deemed to be occupying the Leased Premises as a Tenant from month-to-month, at twice the Fixed Annual Minimum Rent and, with any to all the other conditions, provisions, and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy.

Section 10.15 Landlord's Right to Cure Defaults. Landlord may, but shall not be obligated to, cure, at any time, with notice, any Event of Default by Tenant under this Lease; and whenever Landlord so elects, all costs and expenses incurred by Landlord, including without limitation, reasonable attorneys' fees, together with interest on the amount of the costs and expenses so incurred at the Default Rate, shall be deemed Additional Rent and shall be paid by Tenant to Landlord on demand.

19

Section 10.16 Security Deposit. To secure the full and timely performance by Tenant of all of the covenants, conditions, and agreements set forth in this Lease on the part of the Tenant to be fulfilled, kept, observed, and performed, including, but without limiting the generality of the foregoing, such covenants, conditions, and agreements in this Lease which became applicable upon the termination of this Lease by re-entry or otherwise, Tenant does hereby deposit with and pledge and deliver to the Landlord the sum set forth in Section 1.1.p, as a Security Deposit. Landlord hereby accepts and acknowledges receipt thereof and Tenant agrees: (a) that such deposit or any portion thereof may be applied to the curing of any Event of Default that may exist, without prejudice to any other remedy or remedies that the Landlord may have on account thereof, and upon such application, Tenant shall pay Landlord, on demand, as Additional Rent the amount so applied, which shall be added to the Security Deposit so the same will be restored to its original amount; (b) that should the Leased Premises be conveyed by Landlord, the Security Deposit or any portion thereof may be transferred to Landlord's transferee, and if the same be transferred as aforesaid, Tenant hereby releases the transferring Landlord from any and all liability with respect to the Security Deposit and its application or return, and Tenant agrees to look to such transferee for such application or return; (c) that Landlord or its beneficiaries, if any, shall not be obligated to hold said Security Deposit in a separate fund, but on the contrary, may commingle it with other funds; and (d) that if Tenant shall fully and timely perform all of the covenants and agreements in this Lease contained on the part of Tenant to be performed, the sum deposited, or the part or portion thereof not previously applied, shall be returned to Tenant, without interest, no later than thirty (30) days after the expiration of the Lease Term, provided Tenant has vacated the Leased Premises and surrendered possession thereof to Landlord at the expiration of the Lease Term as provided for herein.

If Tenant is in default under this Lease more than two (2) times within any twelve-month period or three (3) times within a twenty-four (24) month period, irrespective of whether or not such default is cured, then, with out limiting Landlord's other rights and remedies provided for in this Lease or at law or equity, the Security Deposit shall automatically be increased by an amount equal to three (3) months' Minimum Rent, which shall be paid by Tenant to Landlord forthwith on demand.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.1 Mutual Waiver of Subrogation Right. Whenever (a) any loss, cost, damage or expense resulting from fire, explosion, or any other insured casualty or occurrence is incurred by either of the parties to this Lease, and (b) such party is then required to be covered in whole or in part by insurance with respect to such loss, cost, damage, or expense, then the party so insured, or required to be insured, hereby releases the other party from any and all liability it may have on account of such loss, costs, damage, or expense, to the extent of any amount recovered, or which would have been recovered if so insured by reason of such insurance, and waives any right of subrogation which might otherwise exist in, or accrue to, any person on account thereof, to the full extent of such losses, costs, damages, or expenses notwithstanding any deductible in said policy, provided however, that such releases of liability and waiver of the right of subrogation shall not be operative in any case where the effect thereof is to invalidate such insurance coverage.

Section 11.2 Passageways. No permanent or temporary revocations or modification of any license, permit, or privilege to occupy, use, or maintain any passageway or structure, in, over, or under any street or sidewalk, nor any permanent or temporary deprivation of any existing right, privilege, or easement appurtenant to the Leased Premises, shall operate as, or be deemed an actual or constructive eviction of the Tenant, or in any way terminate, modify, diminish, or abate the obligation of the Tenant to pay the Fixed Annual Minimum Rent, Percentage Rent, and Additional Rent as provided in this Lease and to timely perform each and every covenant hereof.

Section 11.3 Tenant's Conflicts. Tenant hereby covenants, warrants, and represents, that by executing this Lease, and by the operation in the Leased Premises under this Lease, it is not violating, has not violated, and will not be violating any restrictive covenant or agreement contained in any other lease or contract affecting Tenant or any affiliate, associate, or any other person or entity with whom or with which Tenant is related or connected financially or otherwise. Tenant hereby covenants and agrees to indemnify, save harmless and, at Landlord's option, defend Landlord, and all parties claiming by, through and under it and any mortgagee thereof, against and from all liabilities, obligations, damages, penalties, claims, costs and expenses, including attorneys' fees, paid, suffered, or incurred by them, or any of them, as a result of any breach of the foregoing covenant. Tenant's liability under this covenant extends to the acts and omissions of any sub-tenant or concessionaire, and any agent, servant, employee, contractor or licensee of any sub-tenant or concessionaire of Tenant.

Section 11.4 Notices from One Party to the Other. Any notice or demand from Landlord to Tenant or from Tenant to Landlord shall be mailed by certified mail, return receipt requested, addressed, or facsimile (subject to tenant supplying Landlord with a facsimile number) if to Tenant, at the address of Tenant as set forth in Section 1.1.b. or such other address as Tenant shall have designated by notice in writing to Landlord, and, if to Landlord, to the place then established for the payment of Fixed Annual Minimum Rent, or such other address or addresses as Landlord shall have designated by notice in writing to Tenant. Notice shall be deemed effective via mail, three (3) days after depositing same in the U.S. Mail, properly addressed having all proper postage affixed thereto, or immediate via facsimile.

Section 11.5 Brokerage. Tenant warrants that it has had no dealings with any broker or agent in connection with this Lease other than Landlord's broker, and covenants to pay, hold harmless and indemnify Landlord from and against any and all cost, expense, or liability for any compensation, commissions and charges claimed by any other broker or other agent with respect to this Lease or the negotiation thereof.

Section 11.6 Relationship of the Parties. Nothing contained herein shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of Percentage Rent, if any, nor any other provision contained herein, nor any acts of the parties hereto, shall be deemed to create any other relationship other than Landlord and Tenant. Whenever herein the singular number is used, the same shall include the

20

making each respective request, all without charge. Instruments acknowledging such attornment; failure to do so within ten (10) days of each respective request shall be an Event of Default.

Section 11.13 Quiet Enjoyment.  Upon timely paying the Fixed Annual Minimum Rent, Percentage Rent and Additional Rent reserved hereunder and performing and faithfully observing all of the other terms, covenants and conditions of this Lease on Tenant's part to be performed and observed, Tenant shall peaceably and quietly have, hold and enjoy the Leased Premises during the Lease Term, subject, nevertheless, to the terms of this Lease, and to any mortgages, Deeds of Trust, ground or underlying leases, and other agreements and encumbrances to which this Lease is subject and subordinate.

# INTENTIONALLY OMITTED

plural, and the masculine gender shall include the feminine and neuter genders as the case may be.

Section 11.7 Estoppel Certificates.  At any time, and from time to time, Tenant agrees, upon request in writing from Landlord, to execute, acknowledge, and deliver to Landlord a statement in writing within ten (10) days from request, certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect, as modified, and stating the modification) and the dates to which the Fixed Annual Minimum Rent, Percentage Rent and Additional Rent have been paid, the term of the Lease, the initial date of Tenant's occupancy, that there are no defenses against the enforcement of this Lease, that the Landlord has not failed to perform in accordance with the terms of this Lease, and other information requested to be confirmed and certified to by Tenant.

Section 11.8 Short Form Lease.  Tenant agrees not to record this Lease, and both Landlord and Tenant agree to execute, acknowledge, and deliver, at any time after Tenant has opened for business, at the request of the other, a "Short Form Lease" suitable for recording, setting forth those terms, except Fixed Annual Minimum Rent, and Additional Rent, contained herein.

Section 11.9 Applicable Law and Construction.  This Lease shall be governed by, interpreted under, and construed and enforced in accordance with the laws of the State in which the Shopping Center is located applicable to agreements made and to be performed wholly within said State.  The invalidity or unenforceability of any provision of this Lease shall not affect or impair any other provision.  The headings of the several articles and cross-references contained herein are for convenience only and do not define, limit, or construe the contents of such articles and cross-references.

      (a)     Any claim, demand, right, or defense by Tenant that arises out of this Lease or the negotiations that preceded this Lease shall be barred unless Tenant commences an action thereon, or interposes a defense by reason thereof, within six (6) months after the date of the inaction, omission, event, or action that gave rise to such claim, demand right, or defense.

      (b)     Tenant acknowledges and understands, after having consulted with its legal counsel, that the purpose of Paragraph (a) is to shorten the period within which Tenant would otherwise have to raise such claims, demands, rights, or defenses under applicable laws.

Section 11.10 Force Majeure.  If Landlord or Tenant, as a result of strikes, lockouts or labor disputes, inability to obtain labor or materials or reasonable substitutes thereof, or acts of God, governmental restrictions, regulations or controls, enemy or hostile governmental restrictions, regulations or controls, enemy or hostile government action, civil commotion, riot or insurrection, fire or other casualty or other events similar or dissimilar to the foregoing but also beyond the reasonable control of the party obligated to perform, shall fail punctually to perform any term, covenant or condition on its part to be performed under this Lease, then such failure shall be excused and not to be an Event of Default by such party, but only to the extent and for the time occasioned by such event.  Notwithstanding anything contained herein to the contrary;

      a.     the provisions of this Section 11.10 shall not be applicable to Tenant's obligation to pay, when otherwise due and payable, the Fixed Annual Minimum Rent, Percentage Rent and Additional Rent reserved hereunder;

      b.     lack of funds nor inability to procure financing shall not be deemed to be an event beyond the reasonable control of Tenant;

      c.     in the event of any unavoidable delay as in this Section 11.10 provided, and as a condition precedent of Tenant or Landlord claiming or relying on such delay, Tenant or Landlord shall give notice of such unavoidable delay to the other party within ten (10) days after the commencement of such delay;

      d.     in no event shall any delay excuse Tenant for more than sixty (60) days.

Section 11.11 Entire Agreement.  The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Leased Premises; this document shall only become effective and binding upon the execution and delivery hereof by Landlord and Tenant.  All negotiations, considerations, representations, and understandings between Landlord and Tenant are incorporated herein and may be modified or altered only by agreement, in writing, between Landlord and Tenant; no act or omission of any employee or agent of Landlord or of Landlord's broker shall alter, change, or modify any of the provisions hereof.  If Landlord, or any successor in interest shall be an individual, land trust, joint venture, tenancy in common, firm or partnership, general or limited, there shall be no personal liability on such individual or on the parties in or of beneficiaries of such land trust, joint venture, tenancy in common, firm, or partnership in such land trust, joint venture, tenancy in common, firm, or partnership, in respect to any of the covenants or conditions of this Lease, and in the event of any default or breach by Landlord with respect to any of the terms, covenants, and conditions of this Lease to be observed, honored, or performed by Landlord, Tenant agrees and covenants to look solely to the estate and property of Landlord in the land and buildings owned by Landlord in the Shopping Center for the collection of any judgment (or any other judicial procedures requiring the payment of money by Landlord) and no other property or assets of Landlord shall be subject to levy, execution, or other procedures for satisfaction of Tenant's remedies.

Section 11.12 Binding Effect of Lease.  The covenants, agreements and obligations herein contained, except as herein otherwise specifically provided, shall extend to, bind, and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and assigns but nothing herein contained shall be construed to give Tenant a right to assign this Lease or sublet the Leased Premises without Landlord's consent, which consent shall not be unreasonably withheld, Landlord at any time and from time to time, may make an assignment of its interest in this Lease, and, in the event of such assignment, Landlord and its successors and assigns (other than the then assignee of this Lease) shall thereafter be released from any and all liability hereunder.  Tenant agrees that upon receipt of any notice of assignment by Landlord to attorn to and recognize such successor or assignee as Landlord under this Lease.  Tenant further agrees that at the request, from time to time as each such request is made, to execute, acknowledge and deliver to the party

21

S. S.

ATTEST/WITNESS

Its: _____

LANDLORD

GRAND RAPIDS ASSOCIATES

By: _____

Its: _____

ATTEST/WITNESS

_____

TENANT

SABAN SEJMEHMEDOVIC

By: _____

Its: _____

23

THIS FORM TO BE USED IF TENANT IS A SOLE PROPRIETORSHIP

STATE OF _M I_ ⎫
⎬ ss
Co. OF _Kent_ ⎭

_Saban Schuvehmedovic_ personally known to me to be the same person(s) whose name (s) is/are subscribed to the foregoing Lease, appeared before me this day in person and acknowledged that he/they signed, sealed and delivered said Lease as his/their free and voluntary act, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal this _4th_ day of _December_ , 20_07_

My Commission Expires

_Nov. 26, 2011_                    _Rick L. Bredeweg_
                                    NOTARY PUBLIC

**RICK L. BREDEWEG
NOTARY PUBLIC
OTTAWA CO., MI** _Acting in Kent_
**MY COMMISSION EXPIRES
NOV. 26. 2011**

24

*page 25*

Addendum to lease agreement. Kentwood Market Place, Suite H.

To summarize the above lease agreement, tenant agrees to pay $11.25 per square foot per month with garbage , property taxes, and water included. Tenant will pay for the gas and electric utilities. Tenant will also install a smoke eater device.

Per article VIII paragraph d. regarding normal business hours, Tenants normal business hours will be 8:00am to 10:00pm.

LANDLORD: GRAND RAPDIS ASSOCIATES, LP          DATE:

TENANT: SABAN SEHMEHMEDOVIC          DATE:

12-04-07

## EXHIBIT "C"
### "As Is"

**1.   LANDLORD'S WORK:**

None. Tenant accepts Leased Premises in an "As Is" condition.

**2.   TENANT'S WORK:   a.**

All work required under the Lease in order to open for business to the public and accommodate Tenant's intended use. Prior to the commencement of construction, Tenant shall submit to Landlord drawings, in reasonable detail, outlining Tenant's intended work. Landlord shall have a right to approve said drawings prior to the commencement of construction. Tenant's work shall comply with all applicable codes, ordinances and permit requirements. Landlord shall have the right to require any other additional documentation which Landlord in its reasonable judgment may deem necessary, including but not limited to adequate insurance, and upon completion of work, evidence that all work has been completed in accordance with the drawings submitted and in accordance with the drawings submitted and in accordance with applicable codes and ordinances, and that all work has been paid for in full.

**3.   SIGN CRITERIA:**

Sign must consist of individually lit letters. Maximum height 30", minimum height 24". Color and design of letters must be approved by Landlord.

No Sign may exceed 75% of the lineal store frontage or as otherwise provided by local code, whichever provides less signage. Sign must be installed in the center of the storefront fascia and be an equal distance from each side of the lease line.

The Tenant and his sign contractor shall be responsible for the cost of properly repairing any damage to storefront fascia during the erection of his sign. All blocking for sign support shall be by the Tenant.

Tenant must submit two (2) copies of sign drawings to the Landlord for approval before sign construction is begun.

All signs must be in accordance with city requirements. Each Tenant shall verify these requirements prior to submittal to Landlord for approval.

_____
Tenant's Initials

_____
Landlord's Initials

EXHIBIT "D"

COMMENCEMENT CERTIFICATE

CENTER NAME:
SPACE NUMBER:
SQUARE FOOTAGE: 1400
LEGAL NAME: DRINA CAFFE
DBA:
LEASE EXECUTION DATE: DECEMBER 10, 2007
LANDLORD'S WORK COMPLETE:
RENT COMMENCEMENT DATE: MARCH 10, 2008
STORE OPENING DATE:
STORE CLOSING DATE:

_____
Signature

_____
Name/Title

## RIDER 1

If Landlord chooses to relocate Tenant, Landlord shall pay the relocation cost, moving expenses for furniture, fixtures and equipment, utility hook-up charges and reasonable actual out-of-pocket expenses incurred by Tenant in connection with such relocation. Tenant shall have the right to open for business during such moving period in the Leased Premises until the new relocated site is ready to open for business.

_S. S._
**Tenant's Initials**

**Landlord's Initials**

# EXHIBIT 8

**Steven A. Jacobs (x244)**

| | |
|---|---|
| **Subject:** | FW: 2891 Radcliff, Grand Rapids MI - INSURANCE CANCELATION |
| **Attachments:** | Nations Home Loan Corporation EOP.PDF; Nations Home Loan Corporation COI.PDF |

**From:** Linda Gurns [mailto:Linda.Gurns@alliant.com]
**Sent:** Tuesday, March 14, 2017 3:57 PM
**To:** Mark Backonen
**Subject:** FW: 2891 Radcliff, Grand Rapids MI

Hi Mark –

We were advised by the insured, via email on 03/02/17, that the property was sold as of 02/22/17.  Insurance ceased as of 02/23/17.

*Thanks and have a GREAT day!!*
*Linda*
Linda Gurns, CISR
Account Manager Lead
D    847 444 2525
TF   888 973 2323
F    847 444 2768
E    Linda.Gurns@alliant.com  *(NEW EMAIL ADDRESS)*

www.alliant.com

> **From:** Jolanta Moskal
> **Sent:** Thursday, March 09, 2017 9:43 AM
> **To:** Linda Gurns <Linda.Gurns@alliant.com>
> **Subject:** FW: 2891 Radcliff, Grand Rapids MI
>
> Hi Linda,
>
> I received the below email from the lender and want to make sure that we still insure this location. I don't see anything has change in the system.
>
> Thank you!
>
> **Jolanta Moskal**
> Account Representative
> Property & Casualty
> Alliant Americas
>
> 1500 South Lakeside Drive
> Bannockburn, IL 60015
>
> D  847 444 2510
> TF  888 973 2323
> F   847 444 2768
>
> www.alliant.com
>
> CA License No. 0803093
>
> **Alliant/Mesirow**
> INSURANCE SERVICES

1

Meslrow Insurance Services, Inc.,
an Alliant-owned company

**From:** Mark Backonen [mailto:markback@readycapitalmi.com]
**Sent:** Thursday, March 09, 2017 9:24 AM
**To:** Jolanta Moskal <Jolanta.Moskal@alliant.com>
**Subject:** 2891 Radcliff, Grand Rapids MI

Good morning Jolanda, confidentially, the Radcliff property is now in foreclosure and in the redemption period.
Nations Home Loan Corporation is the Lender.
I assume we are still insured unless I hear differently.
I cannot find anything in what you sent me to say otherwise.
The owners still have their rights to the property in Michigan until the end of the redemption period.
I believe the redemption period is scheduled to expire 7-22-17.

Please advise

Best Regards,

**Mark Backonen**
Ready Capital Corporation/Nations Home Loan
C: (248)-245-6507
http://www.readycapitalmi.com


Michigan's Alternative Lender for Businesses



This email and its attachments are for the exclusive use of the intended recipients, and may contain proprietary information and trade secrets of Alliant Insurance Services, Inc. and its subsidiaries. This email may also contain information that is confidential, or otherwise protected from disclosure by contract or law. Any unauthorized use, disclosure, or distribution of this email and its attachments is prohibited. If you are not the intended recipient, let us know by reply email and then destroy all electronic and physical copies of this message and attachments. Nothing in this email or its attachments is intended to be legal, financial, or tax advice, and recipients are advised to consult with their appropriate advisors regarding any legal, financial, or tax implications.

The document(s) accompanying this transmission may contain confidential information which is legally privileged. The information is intended only for the individual specified above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking of any action in reliance on the contents of e-mailed information, except its direct delivery to the intended recipient, is strictly prohibited. If you have received this transmission in error, please contact the sender listed above immediately at (248) 539-7400.

SCHNEIDERMAN & SHERMAN, P.C., IS ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE.

TO THE EXTENT YOUR ORIGINAL OBLIGATION HAS BEEN DISCHARGED, OR IS SUBJECT TO AN AUTOMATIC STAY OF BANKRUPTCY UNDER TITLE 11 OF THE UNITED STATES CODE, THIS NOTICE IS FOR COMPLIANCE AND/OR INFORMATIONAL PURPOSES ONLY AND/OR IS NOTICE OF THE CREDITOR'S INTENT TO ENFORCE A LIEN AGAINST THE PROPERTY AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT OR AN ATTEMPT TO IMPOSE PERSONAL LIABILITY FOR SUCH OBLIGATION.

ATTENTION SERVICEMEMBERS AND DEPENDENTS: THE FEDERAL SERVICEMEMBERS' CIVIL RELIEF ACT ("SCRA") AND CERTAIN STATE LAWS PROVIDE IMPORTANT PROTECTIONS FOR YOU, INCLUDING PROHIBITING FORECLOSURE AND/OR EVICTION UNDER MOST CIRCUMSTANCES. IF YOU OR AN INDIVIDUAL IN YOUR HOUSEHOLD UPON WHOM YOU DEPEND ARE CURRENTLY IN THE MILITARY SERVICE, OR WERE RECENTLY DISCHARGED, PLEASE NOTIFY OUR OFFICE IMMEDIATELY. WHEN CONTACTING OUR OFFICE AS TO YOUR MILITARY SERVICE, YOU MUST PROVIDE POSITIVE PROOF AS TO THE SERVICEMEMBER'S MILITARY STATUS. IF YOU DO NOT PROVIDE THIS INFORMATION, WE WILL ASSUME YOU OR AN INDIVIDUAL IN YOUR HOUSEHOLD UPON WHOM YOU DEPEND ARE NOT ENTITLED TO PROTECTION UNDER APPLICABLE LAW.

# EXHIBIT 9



## GUITAR CENTER, INC.

April 21, 2017

**VIA UPS OVERNIGHT**

Bill Spatz
Grand Rapids Assoc.
141 n. Peoria, Unit 3F
Chicago, IL 60607

**RE: Notice of Default for the Lease by and between Guitar Center Stores Inc., ("Tenant") and Grand Rapids Assoc., ("Landlord") for the Premises located at 2891 Radcliff Ave., SE Kentwood, MI, 49512 ("Premises")**

Dear Mr. Spatz:

Please be advised that we have notified you on numerous occasions of the deteriorated parking lot condition at our Kentwood store. This has created a hazardous condition for our employees and customers. This has become an unacceptable situation.

The parking lot is Common Area as defined in Section 2.5 of the Lease. Landlord's obligations per section 4.2 of the Lease, "Common Area Operating Costs Defined. Landlord shall maintain and repair, or cause to be maintained or repaired, the Common Area serving the Premises."

Thus, in accordance with the Lease, this letter is notification pursuant to Section 13.4 of the Lease, that you immediately begin repair/replace the parking area within thirty (30) days upon receipt of this notification. We also wish to advise you that Guitar Center is entitled to avail itself of all remedies.

Please contact me in the event you have any questions.

Sincerely,

Lon Novatt
Vice President, Real Estate

Cc: Nations Home Loan- Mark Backonen

# Murray's Asphalt Maintenance

**Mid-Michigan's Asphalt Specialist**

30 Yrs Experience
Family owned & Operated

Murray's Asphalt
1727 Moore Rd
Woodland, MI 48897
(269)948-9369
(269)838-2312

www.murraysasphalt.net

04-26-2017

Guitar Center (Attn: Mark)
2891 Radcliffe Ave SE
Kentwood, 49512
(248)245-6507
markback@aol.com

All Seal coat prices are valid for 30 days.
All Paving prices are valid for 15 days.

Cash, checks, money orders, Visa & Mastercard
**ALL CREDIT CARD TRANSACTIONS HAVE
2.5% INTEREST FOR HOMEOWNERS AND
3.5% FOR CORPORATIONS.**

We hereby submit specifications and estimates for:

**Patching**

~1.5" Mill out 16 different areas, tack, and patch with 36A top          $__1,900.00___

We propose to furnish material & labor-complete in accordance with the above specifications for the sum of:. $____1,900
$_____One Thousand Nine Hundred                                                                 **Dollars**

With payments made as follows:  __50% due at signing, Balance paid ON completion__

Any alteration or deviation from above specifications involving extra costs will
be executed only upon written order, and will become an extra charge over an
above the estimate. All agreements contingent upon strikes, accidents, or delays
beyond our control.

Respectfully
Submitted: _Nathan Ruhle_

## Acceptance of Proposal

The above prices, specifications and conditions are satisfactory and are here-
by accepted. You are authorized to do the work as specified. Payments will be
made as outlined above.

Signature: _____

Date Of Acceptance: _____

Signature: _____

# EXHIBIT 10

# Illinois Official Reports

## Appellate Court

***Bank of America v. WS Management, Inc.*, 2015 IL App (1st) 132551**

| | |
|---|---|
| Appellate Court Caption | BANK OF AMERICA, Plaintiff-Appellant and Cross-Appellee, v. WS MANAGEMENT, INC., WILLIAM SPATZ, WENDY SPATZ, SPATZ CENTERS, INC., and ANDERSON ASSOCIATES, L.P., Defendants-Appellees and Cross-Appellants. |
| District & No. | First District, First Division Docket No. 1-13-2551 |
| Filed | May 18, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CH-10267; the Hon. Richard J. Billik and the Hon. Rodolfo Garcia, Judges, presiding. |
| Judgment | Affirmed in part; vacated and remanded in part. |
| Counsel on Appeal | David T.B. Audley, Michael T. Benz, Bryan E. Jacobson, and Mark A. Silverman, all of Chapman & Cutler LLP, of Chicago, for appellant. |
| | Alisa M. Levin, of Levin Law, Ltd., of Chicago, for appellees. |
| Panel | JUSTICE CONNORS delivered the judgment of the court, with opinion. Presiding Justice Delort and Justice Cunningham concurred in the judgment and opinion. |

**OPINION**

¶ 1       Plaintiff, Bank of America, appeals from orders of the circuit court that declined to find that spouses William Spatz (William) and Wendy Spatz (Wendy) were alter egos of Spatz Centers, Inc. (SCI), and WS Management, Inc. (WSM). Defendants, William, Wendy, SCI, WSM, and Anderson Associates, L.P. (Anderson), cross-appeal, contending: (1) the trial court should have found that certain facts and issues were precluded by collateral estoppel; (2) the trial court erred in finding that defendants violated the Uniform Fraudulent Transfer Act (Fraudulent Transfer Act) (740 ILCS 160/1 *et seq.* (West 2006)); and (3) the trial court improperly awarded attorney fees to plaintiff. We affirm the court's judgment on the collateral estoppel, Fraudulent Transfer Act, and alter ego claims, and vacate and remand on the issue of plaintiff's attorney fees.

¶ 2       As preliminary background, this case concerns plaintiff's efforts to collect a judgment that was entered against SCI in Kansas in December 2005. At various times, William or Wendy had been a shareholder or otherwise involved in SCI, which was incorporated in 1989 in Illinois and had been the general partner or manager for a group of limited partnerships, which in turn owned various shopping centers around the country. SCI's business of managing the shopping center properties generated fees for SCI. In 1997, one of the limited partnerships for which SCI was the general partner, Wichita Associates, L.P. (WALP), which did business in Kansas, executed a note with an entity of which plaintiff is the successor. WALP eventually defaulted on its obligations under the mortgage and other loan documents, and at the end of the resulting foreclosure proceedings in Kansas, plaintiff received a judgment in December 2005 against WALP and SCI jointly and severally for $1,490,708.32, which included attorney fees, costs, and expenses. WSM was incorporated in Illinois on December 12, 2005, and soon after began managing certain properties that SCI had previously managed. Anderson allegedly began managing certain properties in 2007. Meanwhile, plaintiff registered the Kansas judgment in Illinois in January 2006. Plaintiff subsequently filed a separate action alleging various claims relating to William's and Wendy's supposed efforts to avoid paying the Kansas judgment.

¶ 3                  I. BACKGROUND

¶ 4            A. Kansas Foreclosure Proceedings

¶ 5       We first provide a summary of William and SCI's involvement in the Kansas foreclosure proceedings. WALP's note with the bank listed WALP as the maker and was signed by SCI as WALP's general partner, with Wendy signing as SCI's vice president. The note also indicated that if it became necessary to employ counsel to collect or enforce the debt or protect or foreclose the security for the debt, "Maker also shall pay on demand all costs of collection incurred by [the bank], including attorneys' fees and costs reasonably incurred for the services of counsel whether or not suit be brought." On November 30, 2004, William signed an affidavit in support of a stipulated application for an appointment of a receiver for the property. SCI was added as a defendant in the foreclosure case on February 22, 2005, when the bank filed a first amended petition for declaratory judgment and other relief. A certificate of service indicated that a copy of the first amended petition was sent to William. On May 6, 2005, SCI filed an answer to the first amended petition. On June 28, 2005, a

journal entry of judgment was entered against WALP. Subsequently, the property was sold to the bank for $1.2 million, which was applied to the judgment.

¶ 6    On October 28, 2005, the bank filed a motion for partial summary judgment against SCI. In part, the bank sought payment of the unpaid principal balance on the note, which was approximately $1.4 million. The bank asserted that SCI as the general partner of WALP was jointly and severally liable for WALP's obligations. The bank also stated that WALP had failed to maintain its status as a separate, single-purpose entity, and as a result, WALP's debt obligation became fully recourse according to the language of the mortgage.

¶ 7    In response, SCI and WALP acknowledged that because of a failure to file an annual report in July 1999, WALP had forfeited its good-standing status in Kansas. However, WALP and SCI asserted that WALP had applied for and expected to be granted reinstatement of its good-standing status in Kansas, and upon reinstatement, should be treated as if its good-standing status had never lapsed.

¶ 8    On December 1, 2005, the Kansas court issued its ruling, stating that WALP had failed to maintain its status as a separate, single-purpose entity pursuant to the terms of the loan documents and that SCI and WALP failed to preserve WALP's existence. The court further stated that "[i]ssues concerning WALP's recent attempts to obtain reinstatement of its authorization to conduct business in Kansas *** are immaterial." The court also found that as WALP's general partner, SCI was jointly and severally liable for all of WALP's debts, obligations, and judgments. Accordingly, a judgment was entered against SCI and WALP jointly and severally for $1,490,708.32, which included $32,057.50 in attorney fees and expenses and $1,325.86 in costs. The ruling indicated that the judgment amount would also include "other expenses accrued and accruing, including reasonable attorneys' fees, insurance premiums, taxes, and assessments" pursuant to the terms of the note and that the judgment would accrue interest at the rate of $322.78 per day. The court also stated that plaintiffs had incurred and would continue to incur substantial costs in attempting to collect from WALP, including the cost of instituting the Kansas suit and "reasonable attorneys' fees related to [plaintiff's] collection efforts." A final order was entered on December 30, 2005. SCI and WALP subsequently appealed the judgment, but upon their motion, the appeal was dismissed on March 1, 2006.

¶ 9                          B. Motion for Turnover Against Wendy

¶ 10    Plaintiff registered the Kansas judgment in Illinois in January 2006 under case number 06 MI 600238, and citation proceedings involving SCI, William, and Wendy began. On September 18, 2008, plaintiff filed a motion for a turnover order against Wendy on September 18, 2008, seeking to order Wendy to pay plaintiff approximately $1.4 million that Wendy or an entity known as Spatz Associates purportedly owed to SCI. The motion for turnover was also filed under case number 06 MI 600238.

¶ 11    Referenced in the turnover proceedings was a "Spatz Centers Inc[.] Purchase/Sale Agreement" (purchase and sale agreement) that was undated and signed by William and Wendy. According to the purchase and sale agreement, Wendy owned SCI and William "is and always has been the President and a member of the Board of Directors." The purchase and sale agreement also indicated that Wendy wanted to own SCI's 1% general partnership interest in a number of limited partnerships. Further, as of January 1, 2005, Wendy, William, and SCI agreed that: (1) Wendy agreed to transfer her interests to William "as of the date of

- 3 -

this Agreement," SCI agreed to transfer all of its interest in the general partnership interests to Wendy, and SCI would remain the general partner of the limited partnerships; (2) Wendy agreed to forgive any debt that SCI owed her and agreed to "reasonably lend, or cause to be lent to SCI, reasonable sums of money now and in the future to insure the operations of the various properties owned by Wendy," and (3) no later than March 31, 2005, William would pay or cause to be paid $310,667.60 to Wendy for her stock in SCI.

¶ 12        Following an evidentiary hearing that was held on March 20, 2009, and April 9, 2009, before Judge Alexander White in case number 06 M1 600238, the court issued an order on October 14, 2009, denying the motion for turnover. In its order, the court stated that "[t]he only relevant inquiry *** is whether Wendy is holding assets of SCI or WALP or is otherwise obligated to pay SCI or WALP for some debt." Another key question was how a certain account in SCI's general ledger, known as the "SA Distribution account," was to be interpreted. The court stated that the SA Distribution account could be an asset account that noted obligations Wendy owed to SCI, or a clearing account containing "essentially worthless entries" that served to correct otherwise erroneous entries made in the general ledger. Ultimately, the court found that the SA Distribution account was a clearing account.

¶ 13        Apparently, the dispute involved various account adjustments and reclassifications that took place in 2005. One such reclassification was for $310,667.60. The court referenced the purchase and sale agreement, wherein William was required to pay Wendy $310,667.60 for her SCI stock, and stated that plaintiff's exhibits showed that SCI made a payment or deposit to the Spatz family account in that amount in March 2005, which was payment for the purchase price of the stock. The court further stated that the payment of the purchase price had been misclassified in SCI's March general ledger, and the SA Distribution account had been used as a clearing account to properly reclassify the payment.

¶ 14        Among other items, the court addressed two entities known as the Bell Street property and an E-Trade account, both of which had been the subjects of adjustment entries. As to the Bell Street property, the court stated that the unrebutted testimony indicated that the property was owned exclusively by Wendy and her daughter. Although entries in SCI's general ledger had erroneously indicated that SCI had an interest in the property, the SA Distribution account was used as a clearing account to correctly show that the property was not an SCI asset. The court stated that the adjustment entries did not create an interest in the realty for SCI and did not transfer any interest in the realty to Wendy, as the property was never an SCI asset. Similarly, the court found that the E-Trade account had always been Wendy's exclusive property and again the SA Distribution account had been used as a clearing account to offset correcting entries made in SCI's general ledger so that the value of the E-Trade account was not shown on SCI's general ledger as an SCI asset. The court stated that the adjustment entries for the E-Trade account "neither transferred assets to Wendy nor created any obligation on her part to SCI."

¶ 15        Overall, the court found that plaintiff did not have a factual basis for seeking a turnover order against Wendy, as there was no evidence that she received anything from SCI in 2005 and "no evidence she [owed] SCI anything as a result of anything that was done in 2005." The court also noted that although plaintiff claimed that the account known as SA or Spatz Associates meant only Wendy, certain exhibits showed that this account could also mean William and the Spatz family. Accordingly, the court disagreed that funds directed to SA or Spatz Associates meant those funds were directed to Wendy.

-4-

¶ 16        The court additionally found that various November, December, and year-end entries in the SA Distribution account did not represent actual assets and adjustment entries did not reflect "any transfers of SCI's assets to Wendy of any sort" in 2005. The court explained that plaintiff had not met its burden to show that the alleged transfers for which it sought a turnover order–including the sale of SCI stock, the sale of the Bell Street property, the proceeds of certain accounts, and other transactions–"created or preserved rights for SCI which Plaintiff, as a judgment creditor, can assume and enforce against Wendy." The court further stated that Wendy "does not own anything in which SCI has an interest" and that Wendy "does not own or control any assets of *** [SCI] and/or WALP that could be made subject to a turnover order." Additionally, the court found that plaintiff failed to show that "any assets were transferred by SCI to Wendy in 2005," that "Wendy has any assets in her possession which belong to SCI," or that "Wendy owes SCI anything as a result of anything that was done in 2005."

¶ 17                           C. Fraudulent Transfer, Mere Continuation, and Alter Ego Claims

¶ 18        Plaintiff also filed a complaint in the chancery division under case number 06 CH 10267 on May 23, 2006. This chancery case was before Judge Richard J. Billik and involved three amended complaints, the third of which was filed on September 28, 2010, and ultimately proceeded to trial. Plaintiff's third amended complaint alleged that defendants violated the Fraudulent Transfer Act (740 ILCS 160/1 *et seq.* (West 2006)) and asserted causes of action for mere continuation and alter ego. Previously, around March 2008, before the turnover proceedings started, plaintiff had presented a list of items that formed the basis of its fraudulent transfer claims "discovered to date." The listed transfers were: (1) at some point in or after 2005, SCI transferred all or nearly all of its partnership interests to Wendy for no consideration; (2) <u>WSM, rather than SCI, began managing and leasing for various limited partnerships and received all management and leasing revenue accordingly;</u> (3) William paid $310,667.60 to Wendy for the transfer of SCI stock out of SCI's account rather than his personal funds; (4) SCI made distributions in the amount of $627,328 to shareholders during 2005, after the Kansas claim was brought against SCI; (5) Wendy used SCI's line of credit at South Central Bank for personal expenses and payments, including to pay off a mortgage on the Spatz's home in the amount of $564,926.98 and invest $1 million in a hedge fund; (6) SCI made over $275,000 in cash payments to Wendy in 2005; (7) SCI made a $100,000 loan to its shareholder, either William or Wendy, in 2005; (8) Wendy took management and leasing fees due to SCI in December 2005; (9) Wendy failed to provide credit support to SCI as required by the purchase and sale agreement; (10) Wendy hid debts owed to SCI and removed them from her general ledger at year end 2005; (11) SCI's books showed that Wendy owed over $1.4 million to SCI; (12) William transferred two E-Trade accounts that were carried on SCI's books to Wendy/Spatz Associates; (13) SCI made $55,000 worth of deposits into Wendy's Merrill Lynch account during 2005; (14) SCI made extraordinary payments to management at the end of 2005; and (15) SCI loans to two limited partnerships were written off SCI's books and picked up by SA's books in November 2005, but SCI received no consideration for this transfer of assets to Wendy/Spatz Associates.

¶ 19        As noted above, plaintiff's third amended complaint related to its claims under the Fraudulent Transfer Act and its mere continuation and alter ego claims. Plaintiff alleged in

part that as a result of the Kansas judgment in December 2005, William caused SCI to stop actively producing income and cease operating as the entity that managed shopping centers owned by various limited partnerships. Plaintiff asserted that William incorporated WSM on December 12, 2005, to perform the same management and leasing functions that SCI had performed, and directed that management and leasing fees previously paid to SCI be paid to WSM. Plaintiff also alleged that around March 2007, Anderson, an entity that had been a limited partnership, started managing the limited partnerships that had been managed by WSM.

¶ 20    In support of its claims under the Fraudulent Transfer Act, plaintiff listed the transfers that were allegedly made with actual intent to hinder, delay, or defraud plaintiff, including: (1) distributions paid by SCI to Wendy or William in 2005; (2) Wendy and William's conduct of purporting to delete funds owed to SCI from Spatz Associates' books; (3) Wendy and William's use of the SCI line of credit at South Central Bank to pay off a first home mortgage, transfer $1 million to Spatz Associates, "i.e., Wendy," which was later transferred to William's brother, and make miscellaneous draws for Wendy and William's benefit and offset SCI's funds for payment on the line of credit; (4) the transfer by SCI of all or the substantial part of its 1% general partnership interest in the limited partnerships; (5) the indirect transfer of management and leasing fees from SCI to the newly formed and incorporated WSM; and (6) the indirect transfer of management and leasing fees from WSM to Anderson. As part of its requested relief, plaintiff sought punitive damages, including all attorney fees incurred after the Kansas judgment, and asserted that section 8(a)(c) of the Fraudulent Transfer Act (740 ILCS 160/8(a)(c) (West 2006)) had been construed to warrant punitive damages where appropriate. In the alternative, plaintiff contended that the loan documents and Kansas judgment provided for attorney fees, and that plaintiff was entitled to all fees incurred since the Kansas judgment.

¶ 21    Next, in addition to asserting mere continuation claims against WSM and Anderson, plaintiff also alleged that William and Wendy were alter egos of SCI and WSM. In part, plaintiff contended that SCI failed to observe corporate formalities in that Wendy was never paid the $310,667.60 for her SCI stock and there were no SCI board minutes or resolutions authorizing SCI to enter into the purchase and sale agreement. Plaintiff also contended that Wendy and/or William commingled property titled in the name of Wendy and their daughter with SCI's assets, and stated that the Bell Street property was listed on SCI's balance sheets until November 2005. Plaintiff additionally alleged that SCI failed to maintain an arm's-length relationship with Wendy, William, WSM, other family members, and/or other Spatz-related entities in part because William directed the write-off of substantial obligations Spatz Associates owed to SCI and other entities in December 2005. Plaintiff sought judgment against William and Wendy in the full amount of the Illinois registered judgment, plus additional postjudgment interest and attorney fees.

¶ 22    On November 10, 2010, Wendy filed a motion to dismiss the complaint, contending that all matters against Wendy were barred by collateral estoppel. Wendy pointed to certain claims and allegations in the fraudulent transfer list and complaint that were previously adjudicated in her favor in the turnover proceedings. In response, plaintiff asserted in part that the complaint involved claims of fraudulent transfer and alter ego liability, while the turnover proceedings against Wendy only decided the narrow issue of whether Wendy owed money to SCI pursuant to entries in SCI's general ledger. However, plaintiff admitted that

two transactions involved in the turnover proceedings were subject to collateral estoppel–the transfer of E-Trade accounts from SCI to Wendy and allegedly improper payments that SCI made to Wendy through a Merrill Lynch account. In her reply, Wendy contended in part that because a husband and wife are considered to be in privity, the finding in the turnover proceedings should also apply to William.

¶ 23    On April 7, 2011, the court denied Wendy's motion to dismiss and continued the matter to "entertain further argument on the application (if any) of collateral estoppel [effect] of Judge White's *** ruling as they pertain to the complaint against Wendy Spatz."

¶ 24    On May 20, 2011, the court entered an order stating that evidence about the E-Trade or Merrill Lynch accounts, as more fully described in the fraudulent transfer list and referenced in Wendy's motion, was precluded pursuant to collateral estoppel.

¶ 25    Subsequently, prior to trial on plaintiff's complaint, SCI, WSM, Wendy, and William filed a motion *in limine* and asserted that pursuant to collateral estoppel, the ruling in the turnover proceedings precluded relitigation on certain of plaintiff's claims and factual allegations as to all defendants. Plaintiff responded in part that there was clearly no identity of parties with respect to SCI, WSM, and William and that the turnover proceeding was only filed against Wendy. Plaintiffs further contended that the turnover proceeding could not and did not address whether Wendy or any of the other defendants owed any money to plaintiff.

¶ 26    In its ruling, the court distinguished between issues pertaining to Wendy and issues pertaining to other defendants. The court denied without prejudice the motion *in limine* as to defendants other than Wendy. The court stated that at trial, upon objection, defendants would have the burden to convince the court that collateral estoppel applied to someone other than Wendy. As to issues that involved Wendy, the court stated that, upon objection, plaintiff would have the burden to show that collateral estoppel did not apply.

¶ 27    The matter proceeded to trial, which took place on a number of dates between June 28, 2011, and November 7, 2012. The bulk of the trial's relevant testimony came from William, who testified in both plaintiff's and defendants' cases. William testified that SCI, which still existed, was incorporated in 1989 with three directors, William, Wendy, and a person named Barry Herring. According to William, Herring was last affiliated with SCI in 1995, at which point there was only one director. William was the sole director and principal of SCI before January 21, 2005. William further testified that SCI's main function had been to manage properties across the country. Additionally, SCI acted as the general partner of limited partnerships that owned shopping malls and performed a variety of management functions for the limited partnerships, such as bookkeeping, filing and paying taxes, and maintaining and leasing the properties. William stated that on formation, the limited partners mostly consisted of members of his family and friends of his immediate family.

¶ 28    SCI received a certain percentage of the rental income from the tenants of the shopping malls and William acknowledged that documents shown to him by plaintiff's counsel indicated that SCI received $395,646 in management fees and $23,112 in leasing fees in 2002, about $505,698 in management fees and $37,121 in leasing fees in 2003, $568,936 in management fees and $86,332 in leasing fees in 2004, and $477,098 in management fees and $134,605 in leasing fees in 2005. According to William, however, these documents were "notoriously inaccurate." Additionally, SCI's 2005 tax return showed gross receipts or sales of $626,540. As of January 1, 2005, William and two other people were among SCI's employees.

- 7 -

¶ 29       William testified that he first became aware of the Kansas foreclosure suit sometime in the middle to end of 2004. William stated that when SCI was named as a defendant, he was not concerned at first because the loan was nonrecourse and SCI had no liability. William became concerned later, when his attorney informed him that the bank was "trying to pierce *** the non-recourse aspect of it." William received papers relating to SCI's involvement in the case sometime in March 2005. William acknowledged that SCI's answer to the bank's amended petition, filed on May 6, 2005, reflected that he had instructed his attorney to actively defend SCI. William, however, never thought that he would lose the Kansas case. William stated that the loan required that WALP had to be registered in Kansas, and one year, William did not renew or fill out the appropriate form to renew WALP's registration. Yet, according to William, if the registration lapses and then is reinstated, it is as if the registration never lapsed. Nonetheless, the Kansas court found that because the registration had lapsed, SCI had violated the terms of the loan and the loan became recourse. After the judgment was entered, William agreed to appeal, but his attorney did not mention that William would have to put up a bond not only for the judgment, but also for substantially more than the judgment, which "sort of eliminated our desire to appeal." As a result, the attorney had the appeal dismissed. William stated that the Kansas proceedings "didn't factor into anything we did" until December 1, "when we lost."

¶ 30       William acknowledged that plaintiff registered the Kansas judgment in Illinois and issued a nonwage garnishment to SCI's bank, and as a result, SCI's bank account was frozen. William also acknowledged that WSM's articles of incorporation were filed on December 12, 2005, and stated that WSM had the same address as SCI. Per a corporate resolution, William was identified as the president and secretary of WSM and Wendy was the sole member of the board of directors and received 999 of WSM's 1,000 shares, while William owned the remaining share. According to various documents, WSM was formed to do real estate management, and William testified that WSM began performing management functions for certain limited partnerships on January 1, 2006, and around February 2006, began managing a significant number of properties that SCI had previously managed. WSM received a certain percentage of the limited partnerships' rental income. William stated that no consideration or anything of value was exchanged between SCI and WSM.

¶ 31       William also further discussed how WSM came to take over management functions from SCI. In October 2005, William decided to start WSM for development occurring in Louisiana, and by December 2005, WSM was formed. However, WSM never managed any Louisiana properties "because of things that went on here." William stated that the garnishment of SCI's account made it effectively impossible to pay employees, "we needed someone to manage," and WSM "was as good an entity as any." William stated that he made the decision that it was impractical for SCI to continue as manager for various properties, with the lien on SCI's account serving as the primary factor. William also testified that the limited partnerships determined that SCI was not in a position to conduct business as needed to function on behalf of the limited partnerships. According to William, the limited partnerships "dictated who *** was going to manage and what was going to take place."

¶ 32       More specifically, William differentiated between the limited partnerships that William or SCI controlled and those that were independent. According to William, each partner, entity, or person who controlled each limited partnership decided who it wanted to manage it as of January 1, 2006. For most of the limited partnerships, SCI was the general partner or

managing member and had the authority "to make whatever decisions regarding management it wished to make." There, William acted as the president of the general partner as well as on behalf of the partnerships and directed the limited partnerships to pay WSM instead of SCI. William testified that he directed those limited partnerships to "behave in a certain manner, in their best interest, in which case they, you know, they did what they did." William also stated that it "[d]idn't matter to me what happened" to plaintiff, as his obligation was to act in the best interest of the limited partnerships. Of the limited partnerships that did not have SCI as a general partner and made the decision to switch to WSM independently, William stated that "those entities of which I had no control over was all done on a verbal basis." William testified that there would have been conversations and "some notification of our intent or what was going on." William further stated that "ultimately, I needed approval, but from a practical point of view, I was basically saying *** we needed to move it over" because SCI's accounts were frozen. William also stated "it was their decision whether it was allowed *** to happen." By the time these conversations took place, WSM had already been created. In total, two entities had management agreements with SCI and SCI subcontracted with WSM to manage them, eight entities had SCI as their general partner, one entity was controlled by William directly, and seven properties were neither owned nor controlled by William or Wendy and independently decided to use WSM. Additionally, one property was never managed by SCI and one entity, Anderson, managed its own property. In all, WSM managed approximately 18 properties. William testified that there were no written agreements between WSM and the limited partnerships, but there were oral agreements "in the sense that there was an understanding between the parties in terms of how they were going to function together."

¶ 33    William acknowledged that a WSM working trial balance report for 2006 listed $382,575.93 in management fees and $46,081 in leasing fees. A WSM working trial balance for 2007 listed $251,075.48 in management fees. Additionally, William stated that he took over the leasing function for SCI and directed those fees to be paid to himself or various entities other than SCI, though he believed the majority of any leasing fees earned would have been deposited into WSM's account.

¶ 34    William distinguished between SCI's and WSM's different functions. William stated that SCI never stopped doing business but hired someone else to do management. According to William, SCI's obligations were to manage the partnership as a whole, such as by doing tax returns, filing annual reports, and completing corporate resolutions as required. Additionally, as long as SCI was the general partner, it had whatever liabilities were associated with the general partner and was required to perform the functions required under the limited partnership agreements. Meanwhile, WSM was a property manager that collected rents, swept the parking lots, and paid certain bills. In early 2006, William became the only SCI employee. When WSM began operating, some of its employees were from SCI, but others were not.

¶ 35    William also testified about how SCI's finances were handled after the Kansas judgment. Because the account was frozen, and any money that had been put into SCI's account would have been taken out by plaintiff, "we bypassed that and created a general journal entry but deposited the money directly into WSM." William further stated that while SCI still had money in its account, "any money that was put in there would simply be taken out. So it was not wise to deposit money into the account." William maintained that he did not divert any

- 9 -

money, but "to the degree that there was any money to be deposited in this particular case, money ceased being deposited." William was presented with an SCI bank statement for July 2007 that indicated that $3,994.21 had been deposited in SCI's account. The statement had a note on it that said, " '[m]ake sure nothing gets deposited into SCI ever without my authorization.' " William explained that the note was a reaction to his being "tired of having things deposited into SCI, such as this, that clearly didn't belong there." William acknowledged that, after the Kansas judgment was entered, people at SCI were directed to make sure no money flowed through SCI's account without William's authorization. William also acknowledged that SCI's account was zeroed out by transferring $32,056.36 to WSM, which left SCI's account with $12.40 in interest. William did not recall whether he instructed that this transfer take place, but he stated that, logically, he would have been the person to do so.

¶ 36    William acknowledged that SCI's 2006 tax return reported gross receipts or sales of $1,106 and SCI's 2007 tax return showed a loss of $2,164. William estimated that the running balance in the SCI bank account since 2005 had been around $1,000. William admitted that after December 2005, SCI was not generating any business income that could have satisfied the Kansas judgment. Additionally, William testified that after the management fees were discontinued and SCI's 1% general partnership interest was transferred to Wendy through the purchase and sale agreement, SCI was left with a small general partnership interest and it "owned some odds and ends things, like furniture, nothing of great value."

¶ 37    William testified that around March 2007, Anderson began performing management functions for certain limited partnerships. Previously, Anderson had been a limited partnership that managed itself and owned a shopping center in South Carolina. William also testified that in June or July 2010, he decided to have an entity called B&A Trust provide management and leasing services to various limited partnerships.

¶ 38    William also testified about other details of SCI's and WSM's operations. William testified that the initial capital contribution to SCI was $1,000, and that it was his custom and practice to select $1,000 as a starting point for corporations because "the forms are written in a way that that's the minimum." William further stated that his business was essentially service-oriented, there were no defined capital requirements, and in theory "we always maintain enough capital to operate the business." William also stated that he would put money in and take money out of SCI. William acknowledged that tax returns for 2004 and 2005 showed additional paid-in capital of $73,027 and that a tax return for 2006 showed additional paid-in capital of $83,128. Additionally, William stated that SCI's capital was at one time at least $400,000, but would go up and down according to accounting practices. When asked whether SCI was undercapitalized in 2005 or as of the end of 2005, William responded that for a service company, there was "not much of a requirement." William also stated that the test of adequate capitalization for SCI was "were we able to function, and the answer is, yeah, we paid our bills," at least until the Kansas judgment.

¶ 39    William testified that WSM was initially capitalized with $10, but it "certainly had enough capital to operate" and its current capitalization was substantially higher. William also stated that when WSM was formed, 1,000 shares were issued for $1 per share. As of December 31, 2006, WSM's balance sheet showed assets of about $58,000 in cash. William stated that WSM currently had positive capital and still did business. Additionally, William

- 10 -

testified that SCI and WSM had been able to operate, pay their bills, and do their business with the capital they had in place, other than when the Kansas judgment came due.

¶ 40    William also testified about a $1.7 million line of credit for SCI that was established in March 2005 and ended in March 2006. William stated that the line of credit was set up so that if SCI overdrew its account, the money would automatically be transferred from the line of credit to SCI. Additionally, the line of credit had a sweeping function, such that William and Wendy's joint checking account, known as the SA account, was connected to the line of credit. William stated that the line of credit automatically funded any shortfalls in the SA account and took any excess funds from the SA account to pay down the line of credit. William characterized these transfers as distributions and equity contributions by William since he used the SA account as his own. William also stated that when money was taken out of the SA account, the money was effectively borrowed by SCI and lent to SA. However, William stated that "every penny" that went back to the SA account was automatically given back to SCI, effectively repaying a loan. William further stated that SA ultimately borrowed and repaid money on an ongoing basis. According to William, what plaintiff claimed was Wendy using the line of credit was actually the sweeping function at work. Moreover, William stated that "[w]e never made any personal payments out of SCI." William also stated that SCI could lend money to other people, including Wendy, at its discretion. William testified that he had no reason to talk to the bank about using the line of credit to pay the Kansas judgment because he could use the money for whatever purpose SCI deemed reasonable.

¶ 41    William testified about various other uses of the line of credit that plaintiff found suspect. One such transaction was the use of the line of credit to pay off a mortgage on Wendy's condominium. William explained that bank required that the funds were used to clear title on the condominium because the condominium was used as collateral for the line of credit. William stated that SCI lent Wendy the money to pay off the mortgage and that SCI had the right to lend money to himself, Wendy, or anyone else.

¶ 42    William was also asked about a $1 million draw off the line of credit on March 24, 2005, which William stated was used as a loan/investment in a hedge fund that his brother controlled and whose funds belonged to William's father. William testified that this transaction was supposed to be a very short interim loan, was done to make money and was converted into "some sort of equity position." According to William, the funds were ultimately repaid with some interest. William stated that the hedge fund transaction was not documented because William tended not to document transactions with his father unless his father requested otherwise. However, William also testified that "[t]here was written evidence of the transaction and when it was supposed to be paid back and *** what the interest rate was going to be."

¶ 43    William also testified more generally about his practices around documenting transactions. William stated that he would document a transaction if he felt it was required and added that he had signed leases and notes with himself. Additionally, William stated that long-term transactions would be documented, meaning "[a]nything that wasn't being lent for the purpose of a short-term shortfall of cash flow, something of that nature." William also stated that "we have a lot of contracts with a lot of people that aren't necessarily written." As an example, William noted that "[e]very time we call up a landscaper and say I need you to

- 11 -

cut the grass and I'm going to pay you $500 bucks, we have a contract, but we don't document it."

¶ 44     William denied that the SCI and WSM checking accounts were used to pay for personal matters. Plaintiff's counsel presented documents from the SCI and WSM bank accounts that counsel suggested showed payments to doctors, to a recipient in Costa Rica, and for magazine subscriptions, to which William responded "[t]hey would be personal expenses." However, William testified that "we reimburse people for medical expenses as part of a semi-medical plan to help people out," the Costa Rica payments probably would have come out of a security deposit account that was maintained for a variety of entities, and the corporation admittedly received subscriptions. William further testified that his personal finances and records were run through the offices "[o]n a very superficial level," meaning that "[t]hey were not there to be accurate." Additionally, William stated that whenever possible, "we made sure that personal bills were paid out of SA and business bills were paid out of the appropriate locations." William also testified that every entity, limited partnership, and corporation had separate bank accounts, corporate filings, and annual reports. William also stated that SCI never wrote a check for a personal expense for William, Wendy, or anyone else and that any personal expenses would have been paid from the SA account.

¶ 45     William also testified that a property known as the Bell Street property ended up on SCI's books due to an accountant "who turned out to be a problem." William stated that the Bell Street property had been improperly listed as an SCI asset on SCI's books and was reclassified accordingly.

¶ 46     William also testified about invoices sent to various tenants in 2006 and 2007 that had SCI letterhead and directed payments to be made to particular limited partnerships, care of SCI. According to William, it was not unreasonable and was less confusing that SCI would continue to have bills sent. William also explained that although various invoices were sent to SCI, they were not SCI's bills, and he had tried to explain that to a vendor. William stated that the invoices were paid by WSM because the bills were the responsibility of the various limited partnerships and WSM paid them on behalf of the partnership. William stated that for years, he had tried to have the bills sent to the proper place, but he was never successful, resulting in the bills being sent to SCI.

¶ 47     Additionally, William testified about SCI's and WSM's practices around corporate formalities and records. William stated that SCI's bylaws came from a book containing various corporate documents. William recalled attending SCI director and shareholder meetings, but he stated that SCI was not required to have written meeting minutes. William also testified that he did not have documents that reflected meetings, resolutions, or actions taken because those documents were not required and often not produced. William stated that not every annual meeting was memorialized and could not recall whether a required shareholder's voting list was ever put together. William further stated that "we have waived notices" and amended bylaws from time to time to reflect the need to have meetings and the like. William also identified a series of corporate annual reports that were filed on SCI's behalf.

¶ 48     As for WSM, William testified that its bylaws were based off a standard form with some minor modifications. William agreed that WSM's first shareholders meeting took place on December 12, 2005. William further testified that because WSM's bylaws did not require an annual meeting, there would not have been a continual waiver of the annual meeting.

According to William, "[w]e'd meet *** quite frequently, all the time, shall we say?" However, the meetings did not have to be recorded unless lenders required it. William also testified that WSM had filed an annual report every year since 2006 and that annual reports were filed for every corporation and every partnership "all in good standing and continue to be in good standing." William identified corporate annual reports for WSM and WSM's articles of organization.

¶ 49     William also testified that in a situation where there is one stockholder and one director, taking notes is not required, and the bylaws do not require that meetings are documented, then "technically every time we talked to each other about the property, we had a board of directors and shareholders meeting." William maintained that "we filed all the corporate formalities in terms of what the bylaws required" and followed the requirements of the Internal Revenue Service and Illinois law.

¶ 50     William's testimony also discussed corporate resolutions. William stated that his entities produced corporate resolutions only when the bank required them. Otherwise, according to William, there was no law that required his entities to draft and adopt corporate resolutions, and further, there was no requirement for corporate resolutions to write checks and distribute money. According to William, the bylaws also did not require corporate resolutions and corporate resolutions are not done in the business world for everyday activities. William maintained that "[w]e follow the bylaws" and there was no requirement for corporate resolutions to enter into or cancel management agreements, or distribute, borrow, or lend money. William added that, "[t]he president generally has the authority to do that." As for specific transactions, William testified there was no written corporate resolution that authorized the purchase and sale agreement, as it was not required, and no corporate resolutions that authorized the $1 million loan to the hedge fund, as corporate resolutions "are not required to do things in the normal course of business." Additionally, William stated there was no resolution for the line of credit because it was not required and the bank did not require it either. William further testified that SCI made corporate resolutions "quite often," but at the insistence of lenders. William further stated that SCI would "get into corporate resolutions or meetings" if there was a change in an elected officer.

¶ 51     William also discussed SCI's relative solvency. According to William, SCI became "arguably insolvent and reasonably insolvent" around March 2006, when the line of credit was no longer available to draw against. Until then, "there was a reasonable opportunity for SCI to pay the debt, although it decided not to." William also testified that potentially until the Kansas judgment was entered, it could not be argued that SCI had more liabilities than assets.

¶ 52     William also testified about Wendy's involvement in SCI and WSM. William stated that Wendy had not been involved in the day-to-day management of SCI but had owned all of SCI's stock until December 31, 2004. William also noted that Wendy had allowed her condominium to be used as collateral for a loan for SCI, which SCI used to lend money to properties as they needed it. Further, Wendy had always owned the office locations for SCI and WSM. According to William, Wendy would have also been involved in Spatz entities where she signed loans as a guarantor or co-guarantor. For example, when WALP's lender wanted someone other than William to sign documents, William appointed Wendy vice president and she subsequently signed documents in that capacity. William further testified

- 13 -

that at various times, Wendy acted as vice president of design for SCI, but she was not an elected official after 2000.

¶ 53    Wendy testified about her own involvement in SCI and WSM. Wendy stated that she had no involvement in creating SCI, did not recall that she had been SCI's sole shareholder when SCI was incorporated, and did not recall serving as an officer or director of SCI. Wendy also stated that she never performed any management and leasing functions for SCI and that she did not have any involvement in SCI's day-to-day business operations. Wendy further testified that she "probably would not have paid attention" to the fact that SCI was the general partner of various limited partnerships, or if she knew that at some point, she did not remember it at trial. Additionally, Wendy did not know the amount of management fees that were paid to SCI each year and did not know how the management fees were calculated and paid by the limited partnerships. As to any agreements between SCI and the limited partnerships, Wendy testified that she "wouldn't know" and "wasn't involved with anything like that." Wendy did not recall attending any SCI annual meetings of directors or shareholders and did not believe that SCI still existed.

¶ 54    Additionally, Wendy did not recall the title of vice president being attributed to her when she signed loan documents and stated that the title was "not something I associated with myself. I wasn't active in the business." Wendy further stated, "You know, my husband *** discussed various things with me. As I'm about to sign something, I ask questions. You know, if I'm comfortable with it, I sign it." Wendy noted that she had signed "a variety of things and it's been over many years," and that she "[asks] the questions at the time, *** Bill and I discuss it." Wendy also testified that "when I'm going to sign something, I'm given a sort of perfunctory explanation. You can tell from my involvement that this isn't my area of expertise." Wendy stated that she trusted that William was running the business "and he runs it well." However, Wendy also stated that she "felt some ownership" in SCI.

¶ 55    Wendy also testified that she did not assist William or otherwise take the lead in creating the documents necessary to form WSM. Wendy did not recall why WSM was created or when it was formed. Wendy also did not recall being elected as WSM's sole director and stated that William ran WSM on a day-to-day basis. Wendy assumed that WSM was managing properties, but she did not "know any specifics around it." Wendy did not remember attending any WSM shareholder or board meetings after December 2005.

¶ 56    Elisheva Kalutsky, who was an accountant and had prepared SCI's tax returns, also testified. She agreed that there were periods of time when an E-Trade account was shown as being owned by SCI and acknowledged that as of the 2005 tax return, the E-Trade account that was previously carried on SCI's books was put on Wendy's individual tax return. Kalutsky was also familiar with the Bell Street property, which was owned by Wendy and her daughter. The property's revenue, expenses, and business operations were carried through SCI, which went to Wendy and Bill's tax return.

¶ 57    James Rudnicki, a business turnaround consultant, testified for plaintiff about the transfer of management and leasing contracts to WSM, commingling, and SCI's relative solvency. According to Rudnicki, SCI did not receive any reasonably equivalent value or consideration for transferring the management and leasing contracts to WSM. Rudnicki also testified that he saw evidence of commingling between SCI's and William and Wendy's assets, including $1 million that was distributed to Wendy and then paid to an entity controlled by William's brother and the use of the line of credit to pay off a mortgage on a condominium owned by

Wendy. However, Rudnicki admitted that he did not know why the line of credit was opened or why the line of credit was used to pay off the mortgage on the condominium. Rudnicki also stated that there were "constant payments" to third parties that appeared to have little, if anything, to do with managing a real estate entity. Rudnicki also testified that SCI could lend money to William or Wendy.

¶ 58     Rudnicki further stated that SCI was insolvent throughout 2005. According to Rudnicki, at any point during that year, the liabilities exceeded the assets because the liability for the Kansas judgment had existed since the beginning of 2005 and on every date that year it was probable that the Kansas lawsuit would be a liability. Rudnicki further stated that when the Kansas judgment and line of credit were taken into account, SCI's liabilities were considerably in excess of its assets in 2005. However, Rudnicki admitted that he did not perform a precise valuation of SCI's assets and liabilities. Rudnicki testified that once it became clear that the value of SCI's assets was less than the $1.4 million judgment, there was no reason to perform a more precise calculation. Additionally, Rudnicki stated that according to SCI's 2005 tax return, SCI only had $100,000 in capital and a $100,000 shareholder loan, leaving the company with no capital at that point.

¶ 59     After plaintiff presented its case, defendants moved for a directed finding pursuant to section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2012)), contending that plaintiff failed to establish a *prima facie* case for its claims. The court issued an oral ruling on October 15, 2012, and a written order on October 23, 2012. In part, the court found that plaintiff made a sufficient showing of its alter ego claims against William, but did not make a *prima facie* case that Wendy was an alter ego of SCI or WSM. The court recounted plaintiff's and defendants' arguments and noted that defendants "maintain that none of the alter ego factors that have been discussed in the cases were proven as to Wendy in such a way as to provide a solid foundation for piercing the corporate veil against her." The court stated that "[b]ased on the showing that is made thus far, *** there has not been a unity of interest in ownership, that the separate personalities of the corporation in the individual Wendy no longer existed during the relevant period." The court further stated that "[b]ased on the record it has been shown that it was William who operated SCI and WSM."

¶ 60     As part of their case, defendants called Ralph Picker, an accountant and managing principal of a certified public accounting firm. Picker testified that he did not see anything unusual in SCI's business and accounting practices, though he did see a lot of mistakes. For example, Picker saw property and accounts on the books that were not in the corporate name. Picker also stated that correction entries were made for assets that were not assets of the corporation and adjustments were made for liabilities that were not company liabilities. According to Picker, it was very common to see smaller S corporations remove assets and liabilities that should not be on their books and for entities to have unsophisticated accounting records. From his review, Picker also did not see SCI or WSM commingling funds, which Picker defined as mixing funds that do not belong to a particular entity. Additionally, Picker stated that for a line of credit, a lender would generally require a payoff of an existing mortgage. Picker further stated that it was not improper for a business entity to make a loan to an unrelated third party.

¶ 61     Picker also testified that SCI's tax return showed that it was solvent, as there was an excess of assets over liabilities. According to Picker, there was no indication in 2005 that SCI's liabilities exceeded its assets and further, there were positive retained earnings and no

deficit. Picker also stated that, among other considerations, the question of solvency must be based on a fair valuation, which plaintiff's expert, Rudnicki, did not perform. However, Picker acknowledged that he also did not perform any valuations in terms of certified valuations. Additionally, as to capitalization, Picker stated that a company does not need a certain minimum amount of capital unless it has significant loan payments to make, significant investments in capital equipment, or significant recurring obligations, but "in this case you didn't have that."

¶ 62      The court issued an oral ruling on November 19, 2012, and a written judgment on November 28, 2012. Overall, the court found that two transfers violated the Fraudulent Transfer Act: the transfer of assets under the purchase and sale agreement and, through William, SCI's arranging for the transfer of management fees, income, and compensation from the limited partnerships to WSM and Anderson, both of which were done to hinder, delay, or defraud plaintiff from pursuing the Kansas judgment. As to the latter transfer, the court stated in its ruling that the transfers occurred for no or inadequate consideration and were made to insiders for purposes of the Fraudulent Transfer Act. The court found that WSM was created in December 2005 "for purposes of arranging for fees, compensation and income that would have been received by SCI to be transferred to WSM." According to the court, there was an inference that William was aware of the Kansas litigation at least toward the end of 2004 and that William became concerned about SCI being a party after SCI was named in the suit. Additionally, the court found that there was no credible inference presented for why SCI could not have continued to manage the limited partnerships' properties after December 2005, "except for the considerations testified about arising from the Kansas judgment and the post-judgment collection efforts by [p]laintiff." The court stated that William, as the principal and person in control of SCI, decided on behalf of SCI and the limited partnerships to arrange for fees, compensation, and income to be diverted from SCI to WSM and arranged for SCI to refrain from doing business because of the garnishment and postjudgment supplemental proceedings that plaintiff initiated, which arose out of the Kansas judgment.

¶ 63      Moreover, the court found that William, who controlled SCI, remained in control of the assets transferred to WSM and Anderson and controlled those entities as well. Indeed, the court stated that William was "really the only principal in all those three concerns." Additionally, the court stated that Wendy and even William at various times "held not insignificant interests" in the limited partnerships that SCI managed or for which it served as general partner. According to the court, the transfers allowed WSM and Anderson to receive management fees, compensation, and other income that would have otherwise gone to SCI, and further, William and Wendy were "owners, officers and/or controlling persons of WSM and Anderson." At the same time, the court noted that, per her testimony, Wendy had not been involved in any way with the management or operation of SCI, WSM, and Anderson, and that her testimony conveyed the impression that she deferred to William entirely to manage, operate, and run the three entities.

¶ 64      The court further stated that the transfers of the management fees, compensation, and income, and the right to receive those funds from the limited partnerships, involved all or substantially all of SCI's assets and at least a major portion of its business before 2006. The court also stated that by arranging for the transfers of the right to receive management fees, compensation, and income, SCI through William caused SCI to become insolvent because of

- 16 -

the transfers or shortly after the transfers occurred. Additionally, the court took issue with William characterizing WSM and Anderson as entities that SCI simply hired on behalf of the limited partnerships because WSM and Anderson were not contractors, but entities that William controlled.

¶ 65     As to the alter ego claims against William, the court found that while there was some evidence that would support piercing SCI's corporate veil, "the fact of the matter is this Court has reviewed all of the evidence" and was not convinced that plaintiff proved its alter ego claim against William. The court stated that SCI had been in business for "not an insignificant period of time," had assets, and maintained a separate identity. The court acknowledged its findings that SCI was controlled by William and that William arranged for a significant part of its assets to be parted with and transferred to WSM and later Anderson, both of which William also controlled. Nonetheless, the court did not believe that plaintiff had proven that William was an alter ego of SCI or WSM. Additionally, the court found that WSM was a mere continuation of SCI, stating in its written judgment that "all liabilities, debts, and obligations of SCI, including but not limited to liability for the fraudulent transfers determined herein, the Kansas Judgment, and pre and post-judgment interest accruing on the Kansas Judgment, are the direct liabilities of WSM." The court denied plaintiff's mere continuation claim against Anderson.

¶ 66     In its written judgment, the court ▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮ ▮▮ ▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮ ▮▮ ▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮ ▮▮ ▮▮ ▮▮▮▮ around December 2005 or early 2006, and thereafter, Anderson in 2006 and B&A Trust in 2010. The court also entered money judgments against WSM and Anderson in the amount of $885,720.66 and $1,021,059.47, respectively, representing the amount of management and leasing fees received by each entity. The court permitted plaintiff leave to file a petition for attorney fees, costs, and prejudgment interest.

¶ 67     Subsequently, plaintiff apparently filed a fee petition, which was not found in the record despite a careful search. Nonetheless, it appears a fee petition was filed because a motion by defendants references a 15-page fee petition. However, the record does contain an appendix of exhibits for plaintiff's fee petition, which spans over 400 pages and includes affidavits from various attorneys who worked on this matter, as well as tables that show corresponding billing entries. Some of the entries have been partially redacted.

¶ 68     In their response to the fee petition, defendants contended in part that there was no statutory authority for fee awards under the Fraudulent Transfer Act and that the claim for mere continuation also did not authorize a fee award. Additionally, defendants asserted that there was no written contract providing for fees between plaintiff and WSM or Anderson. Defendants also stated that the court could consider reducing the amount sought because plaintiff was not successful on all of its claims. Further, defendants contended that plaintiff's appendix revealed numerous improper charges. Defendants asserted that the court should examine certain requested costs "in the context of an evidentiary hearing to ascertain whether these fees are reasonable."

¶ 69     A subsequent order indicated that a hearing on the fee petition was scheduled for June 25, 2013. On that date, the court entered an order that stated:

        "This matter coming before the Court on Plaintiff's petition for attorney's fees, costs, and prejudgment interest, the Court having heard arguments from the parties,

the petition is granted and the matter is continued for formal entry of an order with respect to the specific amounts \*\*\*. The Court notes Defendants WSM and Anderson Associates objections."

¶ 70     On July 10, 2013, the court entered a second order related to fees, stating that the court had considered the arguments of the parties on June 25, 2013, and had granted plaintiff's petition "in its entirety in open Court on that day." The court then awarded attorney fees, costs, and prejudgment interest in favor of plaintiff and against SCI, WSM, and Anderson jointly and severally. The court awarded a total of $2,242,507.28 to plaintiff, which consisted of $1,125,238.60 in attorney fees, $158,020.49 in costs, and $959,248.19 in prejudgment interest. The record does not contain a report of proceedings for June 25, 2013, or July 10, 2013. We note that it is the appellant's burden to present a sufficiently complete record of proceedings at trial to support a claim of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

## II. ANALYSIS
¶ 71

### A. Parties' Statements of Facts
¶ 72

¶ 73     On appeal, we first consider defendants' contention that plaintiff's statement of facts contains improper argument and should be stricken. In response, plaintiff withdraws any statements that we view as argumentative and asserts that defendants' statement of facts also contains argumentative comments, as well as *ad hominem* attacks against plaintiff's counsel and antagonistic comments toward the trial court judges. Neither party specifically identifies the statements each finds improper. Nonetheless, in our view, both parties' statements of facts contain statements that could be considered argumentative. See Ill. S. Ct. R. 341(h)(6) (eff. Feb. 6, 2013) (briefs should contain a statement of facts, "which shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment"). However, we decline to strike either party's statement of facts and instead disregard any offending portions. See *Hamilton v. Conley*, 356 Ill. App. 3d 1048, 1052-53 (2005). We also admonish both counsel to be mindful in the future of the requirement to avoid argument in the statement of facts. See *Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312, 319 (2003).

### B. Collateral Estoppel
¶ 74

¶ 75     We next consider defendants' contention on cross-appeal that the court improperly applied collateral estoppel because the turnover proceeding against Wendy controlled much of the case related to plaintiff's fraudulent transfer and alter ego claims. Defendants argue that in both cases, the singular point of plaintiff's claims was the source and availability of money and assets to satisfy the Kansas judgment. Defendants assert that the turnover proceedings fully examined the Kansas litigation, the use of SCI's credit line, SCI's income, assets, and financial activity in 2005, the existence, creation, and point of the SCI purchase and sale agreement, and the purported depletion of SCI assets through reclass and accounting adjustments in 2005, among other issues. Defendants further argue that there were significant overlaps among the allegations in plaintiff's complaint, plaintiff's 2008 fraudulent transfer list, and the order denying the motion for turnover. Defendants also assert that the court's order in the turnover proceeding was a final order disposing of the proceedings against

- 18 -

Wendy and that the parties were identical in that William and Wendy litigated against plaintiff in both matters.

¶ 76    Collateral estoppel was raised twice before trial: in Wendy's motion to dismiss and in the subsequent motion *in limine* as to SCI, WSM, William, and Wendy. When properly applied, collateral estoppel promotes fairness and judicial economy by preventing the relitigation of issues that have already been resolved in earlier actions. *Du Page Forklift Service, Inc. v. Material Handling Services, Inc.*, 195 Ill. 2d 71, 77 (2001). Collateral estoppel "applies when[:] [(1)] the issue decided in the prior adjudication is identical with the one presented in the current action, [(2)] there was a final judgment on the merits in the prior adjudication, and [(3)] the party against whom estoppel is asserted was a party to, or in privity with a party to, the prior adjudication." (Internal quotation marks omitted.) *United Automobile Insurance Co. v. Buckley*, 2011 IL App (1st) 103666, ¶ 39. Collateral estoppel applies to determinations of law as well as fact. *Du Page Forklift Service, Inc.*, 195 Ill. 2d at 79. Moreover, the party claiming collateral estoppel has the burden of establishing it by clear, concise, and unequivocal evidence. *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, ¶ 42. Whether the doctrine of collateral estoppel applies to a particular case is a question of law that this court reviews *de novo*. *Id*. Further, although normally we review a trial court's decision on a motion *in limine* for an abuse of discretion, where, as here, the issue involves a question of law, the standard of review is *de novo*. *Schandelmeier-Bartels v. Chicago Park District*, 2015 IL App (1st) 133356, ¶ 25.

¶ 77    Here, the primary question is whether the issues decided in the turnover proceeding against Wendy were identical with plaintiff's fraudulent transfer and alter ego claims. In the turnover proceeding, plaintiff sought to force Wendy to pay certain debts she or Spatz Associates purportedly owed to SCI that could then be used to satisfy the outstanding Kansas judgment. The court noted there were two central questions: whether a certain account, identified as the SA Distribution account, was an asset or clearing account, and whether Wendy was holding assets of SCI or WALP or was otherwise obligated to pay SCI or WALP for a debt. The court determined that the SA Distribution account was a clearing account and that various adjustments and transfers did not create an asset for SCI or obligations of Wendy to SCI. The court further found that Wendy did not own anything in which SCI had an interest, Wendy did not own or control any SCI or WALP assets that could be subject to a turnover order, and plaintiff failed to show that any assets were transferred by SCI to Wendy in 2005.

¶ 78    Meanwhile, in its complaint, plaintiff listed six transfers that were allegedly at issue, including distributions paid by SCI to William or Wendy in 2005, William and Wendy's conduct of deleting money owed to SCI from Spatz Associates' books, the use of SCI's line of credit to pay off William and Wendy's mortgage, and the transfer of management and leasing fees from SCI to WSM. Plaintiff also alleged in its complaint that Wendy was never paid $310,667.60 for her SCI stock and that William directed the write-off of the books of Spatz Associates of substantial obligations Spatz Associates owed to SCI and other entities in December 2005. Plaintiff's fraudulent transfer list, which was created in 2008 before the turnover proceedings, listed 15 allegedly fraudulent transfers, including the transfer of SCI's partnership interests in various limited partnerships to Wendy for no consideration, cash payments to Wendy in 2005, an allegation that Wendy hid debts owed to SCI and removed

- 19 -

them from her general ledger, and that SCI's books showed that Wendy owed over $1.4 million to SCI.

¶ 79    To be sure, there are superficial overlaps between some facts and issues decided in the turnover proceedings and the allegedly fraudulent transfers at issue at trial. However, the facts and issues decided in the turnover proceedings were different than those presented at trial. In the turnover order, the transfers were discussed in the narrow context of whether they showed that Wendy owed money to SCI or WALP. In contrast, a primary consideration under the Fraudulent Transfer Act is whether a debtor made a transfer with "actual intent to hinder, delay, or defraud" a creditor. 740 ILCS 160/5(a)(1) (West 2006). A claim under the Fraudulent Transfer Act considers not just whether the transfer occurred, but whether the circumstances show that the transfer was done to avoid a creditor. Numerous considerations are involved, such as whether the transfer or obligation was to an insider, when the transfer was made, whether the transfer was of substantially all of the debtor's assets, and whether the debtor became insolvent shortly before or after a substantial debt was incurred, among others. 740 ILCS 160/5(b) (West 2006). Meanwhile, the turnover order was only concerned with the result of the transfers at issue–whether Wendy had assets that belonged to SCI or WALP. Further, a claim that seeks to pierce the corporate veil based on an alter ego theory examines whether a person or entity "uses a corporation merely as an instrumentality to conduct that person's or entity's business." *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 527 (2002). This inquiry considers numerous operating practices and the relative involvement of the allegedly dominant individuals–here, William and Wendy. See *Fiumetto v. Garrett Enterprises, Inc.*, 321 Ill. App. 3d 946, 958-59 (2001) (factors at issue include inadequate capitalization, failure to issue stock, failure to observe corporate formalities, insolvency of the debtor corporation, nonfunctioning of officers or directors, and the absence of corporate records, among others). Again, the turnover proceeding only answered the question of whether Wendy owed SCI or WALP money. In this vein, in addition to correctly denying Wendy's motion to dismiss, the court also properly denied the motion *in limine* that sought to bar certain testimony and evidence as to multiple defendants, as the turnover order focused on Wendy and did not conclusively decide anything with regard to other defendants.

¶ 80    Moreover, application of collateral estoppel must be narrowly tailored to fit the precise facts and issues that were clearly determined in the prior judgment. *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 390-91 (2001). "[I]t is absolutely necessary that there [was] a finding of a specific fact in the former judgment or record that is material and controlling in that case and also material and controlling in the pending case." (Internal quotation marks omitted.) *Kessinger v. Grefco, Inc.*, 173 Ill. 2d 447, 462 (1996). The court's discussion in the turnover proceeding of the mechanics of various transfers and how they affected Wendy's obligations are not truly material and controlling in the current case, where the issues are much broader than whether transfers show that Wendy owed money to SCI and WALP.

¶ 81    Nonetheless, to the degree that the court was unsure about whether collateral estoppel should apply, it acted prudently. Where "there is any uncertainty on the point that more than one distinct issue of fact is presented to the court, [collateral] estoppel will not be applied." (Internal quotation marks omitted.) *Id.* The court, perhaps uncertain whether certain facts and issues were truly identical, selected a proper course of action that allowed objections at trial based on collateral estoppel and shifted the burden depending on which defendant was at issue. Overall, we find that the court correctly denied the application of collateral estoppel

before trial.

¶ 82                                C. Fraudulent Transfer Act

¶ 83        We next consider defendants' contention that the court erred in finding that defendants
violated the Fraudulent Transfer Act (740 ILCS 160/1 *et seq.* (West 2006)). Defendants argue
that the limited partnerships had previously hired SCI to manage the properties and were
under no obligation to work with SCI for any reason. Defendants further contend that no
transfer occurred because the limited partnerships merely delegated management to another
entity that could handle the responsibilities, which was their right to do. Moreover, according
to defendants, William did not have any reason in 2005 to believe that SCI would be liable in
the Kansas litigation and all decisions were made in the normal course of business.
Defendants also assert that William acted in good faith and note William's testimony that he
was obligated on behalf of the limited partnerships to find management that could perform.
Additionally, defendants argue that plaintiff never proved there was a "lack of reasonably
equivalent value" under the Fraudulent Transfer Act because neither expert actually valued
the management agreements and SCI's assets.

¶ 84        The standard of review of a trial court's judgment after a bench trial is whether that
judgment is against the manifest weight of the evidence. *Northwestern Memorial Hospital v.
Sharif*, 2014 IL App (1st) 133008, ¶ 25. "A finding is against the manifest weight of the
evidence only when an opposite conclusion is apparent or when the findings appear to be
unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.)
*Munson v. Rinke*, 395 Ill. App. 3d 789, 795 (2009). "In a bench trial, it is the function of the
trial judge to weigh the evidence and make findings of fact" and we may "not substitute [our]
judgment for that of the trier of fact." (Internal quotation marks omitted.) *Falcon v. Thomas*,
258 Ill. App. 3d 900, 909 (1994). Further, we will not disturb a trial court's judgment as long
as there is evidence to support it. *Sharif*, 2014 IL App (1st) 133008, ¶ 25. We also note that
"[w]e may affirm the judgment of the trial court on any basis in the record, regardless of
whether the trial court relied upon that basis or whether the trial court's reasoning was
correct." (Internal quotation marks omitted.) *Id.*

¶ 85        "The purpose of the [Fraudulent Transfer] Act is to invalidate otherwise sanctioned
transactions made with a fraudulent intent." (Internal quotation marks omitted.) *Id.* ¶ 16. The
test to determine the validity of a transfer is "whether or not it directly tended to or did impair
the rights of creditors." (Internal quotation marks omitted.) *Apollo Real Estate Investment
Fund, IV, L.P. v. Gelber*, 403 Ill. App. 3d 179, 193 (2010).

¶ 86        Under the Fraudulent Transfer Act, a transfer made by a debtor is fraudulent as to a
creditor if the debtor made the transfer:

        "(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

        (2) without receiving a reasonably equivalent value in exchange for the transfer or
obligation, and the debtor:

        (A) was engaged or was about to engage in a business or a transaction for which
the remaining assets of the debtor were unreasonably small in relation to the business
or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." 740 ILCS 160/5 (West 2006).

¶ 87      Two causes of action for fraud are permitted under the Fraudulent Transfer Act: "fraud in law" and "fraud in fact." *Apollo Real Estate Investment Fund, IV, L.P.*, 403 Ill. App. 3d at 193. Under a "fraud in law" transfer, which is set forth in section 5(a)(2) of the Fraudulent Transfer Act (740 ILCS 160/5(a)(2) (West 2006)), the "transfer is made for no or inadequate consideration, [and] the fraud is presumed." (Internal quotation marks omitted.) *Sharif*, 2014 IL App (1st) 133008, ¶ 18. Under a "fraud in fact" transfer, which is a cause of action under section 5(a)(1) of the Fraudulent Transfer Act, a party must prove that the transfer was made with actual intent to hinder, delay, or defraud the creditors. *Apollo Real Estate Investment Fund, IV, L.P.*, 403 Ill. App. 3d at 193. Defendants seem to suggest that plaintiff needed to prove both types, which is incorrect. We find that a conclusion that defendants violated the Fraudulent Transfer Act under a "fraud in fact" analysis was not against the manifest weight of the evidence.

¶ 88      A creditor can prove "fraud in fact," or actual fraud, based on the existence of certain factors or "badges of fraud." 740 ILCS 160/5(b) (West 2006); *Steel Co. v. Morgan Marshall Industries, Inc.*, 278 Ill. App. 3d 241, 251 (1996). Section 5(b) provides that "consideration may be given, among other factors, to whether:

"(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." 740 ILCS 160/5(b) (West 2006).

¶ 89      These factors are merely considerations (*Steel Co.*, 278 Ill. App. 3d at 251) and a court need not consider all 11 factors (*Sharif*, 2014 IL App (1st) 133008, ¶ 23). When the factors are present in sufficient number, "it may give rise to an inference or presumption of fraud." *Steel Co.*, 278 Ill. App. 3d at 251. At the same time, "the symptoms are not additive" and it is possible that the presence of only one factor could entitle a party to relief. *Brandon v. Anesthesia & Pain Management Associates, Ltd.*, 419 F.3d 594, 600 (7th Cir. 2005).

- 22 -

Additionally, the debtor and donee of the transfer have the burden of dispelling an implication of fraud. *Sharif*, 2014 IL App (1st) 133008, ¶ 31.

¶ 90 [redacted]. We first address defendants' contention that no transfer occurred because the limited partnerships merely delegated management to another entity and there was no testimony that "the right to do a job" is an asset. We disagree. [redacted] Under the Fraudulent Transfer Act, an "asset" is generally defined as the property of the debtor. 740 ILCS 160/2(b) (West 2006). "Transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." 740 ILCS 160/2(l) (West 2006). SCI generated significant management and leasing fees before 2006 and received a certain percentage of the rental income from shopping malls. Notwithstanding William's testimony that a set of limited partnerships independently decided to use WSM, there was ample evidence that, to the contrary, [redacted]. William testified that for most of the limited partnerships, SCI–of which William was the principal–was the general partner or managing member and directed the limited partnerships to "behave in a certain manner, in their best interest." William also testified that as to the so-called independent limited partnerships, there were conversations and "some notification of our intent or what was going on," and despite needing approval, "I was saying *** we needed to move it over" because SCI's accounts were frozen. William's testimony strongly suggested that he directed the limited partnerships, whether independent or not, to use WSM instead of SCI. After SCI arranged for WSM to receive the management fees, WSM received over $382,000 in management fees in 2006 and over $250,000 in management fees in 2007. Sources of income have been found to be assets. See *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1412 (7th Cir. 1989) (vehicle leases had value in light of object of transaction, which was to sell to the purchaser what it needed to undertake transportation responsibilities previously performed by the seller); *Blaguss Travel International v. Musical Heritage International*, 833 F. Supp. 708, 712-13 (N.D. Ill. 1993) (whether executory contract was an "asset" with "value" was a question of fact where "it is not difficult to imagine executory contracts that could provide the debtor with a steady cash flow with limited expenditure of effort and resources"). Through William, SCI "part[ed] with an asset" (740 ILCS 160/2(l) (West 2006)) by directing that management fees it previously received be paid to WSM.

¶ 91 Turning to the factors in section 5(b) of the Fraudulent Transfer Act, the evidence showed that the transfer of the management agreements from SCI to WSM was made to an insider. In addition to being the principal of SCI, William was the president and secretary of WSM and effectively controlled WSM. See 740 ILCS 160/2(g)(2)(C) (West 2006) (insiders of a debtor corporation include a person in control of the debtor). As the trial court found, William remained in control of the management fees and income in the new arrangement with WSM.

¶ 92 Additionally, before WSM began receiving the management fees, SCI had been sued in the Kansas foreclosure case. SCI was named as a defendant in the Kansas litigation on

February 22, 2005, a ruling against SCI was made on December 1, 2005, and the final order was entered on December 30, 2005. William testified that WSM began managing properties for certain limited partnerships on January 1, 2006, and a significant number of SCI's former properties around February 2006. On a related note, this evidence also shows that the transfer of the management fees to WSM occurred shortly after a substantial debt was incurred–namely, the approximately $1.4 million judgment entered in the Kansas litigation.

¶ 93    In addition, the transfer of the management fees constituted substantially all of SCI's assets. Whereas SCI's 2005 tax return showed gross receipts or sales of $626,540, its 2006 tax return, which would have been completed after WSM started managing the properties, reported gross receipts or sales of $1,106, and its 2007 tax return showed a loss of $2,164. Further, William acknowledged that a transfer of $32,056.36 out of SCI's account, which went to WSM, left SCI with a zero balance other than $12.40 in interest. William also admitted that after December 2005, SCI did not generate any business income that could have satisfied the Kansas judgment and estimated that the balance in SCI's account since 2005 had been around $1,000. Based on the evidence presented, the arrangement with WSM left SCI with very little assets.

¶ 94    Additionally, we note William's testimony about the impact of the Kansas judgment and its consequences on his decision to steer management fees to WSM. William testified that the Kansas proceedings did not factor into SCI's actions until December 1, 2005, "when we lost." William also admitted that the garnishment of SCI's account–a result of the Kansas judgment–was a primary reason for bringing in new management. William also stated that while SCI's bank account had money in it, it was not wise to deposit money into that account and that "money ceased being deposited" into SCI's account. There was also evidence that William directed that no money should be deposited into SCI's account without his authorization. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

¶ 95                    D. Wendy as Alter Ego of SCI and WSM

¶ 96    Next, we address plaintiff's contention that it presented sufficient evidence to support its claims that Wendy was an alter ego of SCI and WSM, such that these claims should have at least survived defendants' motion for a directed finding. Plaintiff asserts that Wendy used SCI's line of credit for personal expenses and payments, failed to act in her capacity as officer and sole shareholder of SCI and as sole director and 99% shareholder of WSM, and allowed her E-Trade account and the Bell Street property to be carried on the books and records of SCI, but then claimed these as her own assets at trial.

¶ 97    In a bench trial, section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2012)) allows a defendant, at the close of the plaintiff's case, to move for a finding or

judgment in his favor. In ruling on this motion, a court engages in a two-step analysis. *527 S. Clinton, LLC v. Westloop Equities, LLC*, 403 Ill. App. 3d 42, 52 (2010). First, the court must determine as a matter of law whether the plaintiff has presented a *prima facie* case, meaning the court must ask whether the plaintiff presented some evidence on every element essential to the cause of action. *Id.* Second, if the plaintiff presented some evidence on each element, the court must then consider and weigh the totality of the evidence presented, including evidence favorable to the defendant, to determine whether the *prima facie* case survives. *Hatchett v. W2X, Inc.*, 2013 IL App (1st) 121758, ¶ 35. If the trial court finds that the plaintiff has failed to present a *prima facie* case as a matter of law, the appellate standard of review is *de novo*. *Minch v. George*, 395 Ill. App. 3d 390, 398 (2009). However, if the trial court moves on to consider the weight and quality of the evidence and finds that no *prima facie* case remains, the appellate standard of review is the "manifest weight of the evidence" standard. *Id.*

¶ 98    Here, we review whether the court's finding at the directed finding stage was against the manifest weight of the evidence because the court engaged in the second part of the analysis. In its ruling, the court recounted each side's position and noted the specific evidence that each side had presented, including defendants' evidence. For example, the court noted that defendants "maintain that none of the alter ego factors that have been discussed were proven as to Wendy in such a way as to provide a solid foundation for piercing the corporate veil against her," and the court stated that, based on the record, William operated SCI and WSM. Accordingly, the court considered the weight and quality of the evidence and we will determine whether the court's ruling was against the manifest weight of the evidence.

¶ 99    A corporation is a legal entity that exists separate and apart from its shareholders, directors, and officers, who are not as a general rule liable for the corporation's debts and obligations. *Ted Harrison Oil Co. v. Dokka*, 247 Ill. App. 3d 791, 794 (1993). One of the primary purposes of doing business as a corporation is to insulate stockholders from unlimited liability for corporate activity. *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 526 (2002). However, in certain situations a court will find shareholders, directors, or officers personally responsible for corporate obligations through a remedy known as piercing the corporate veil. *Ted Harrison Oil Co.*, 247 Ill. App. 3d at 795. A corporate entity will be disregarded where it would otherwise present an obstacle to the protection of private rights or where the corporation is merely the alter ego or business conduit of the governing or dominant personality. *Id.* To pierce the corporate veil, a plaintiff must demonstrate that: (1) there is such unity of interest and ownership that the separate personalities of the corporation and individual no longer exist, and (2) the circumstances are such that adhering to the fiction of a separate corporate existence would promote injustice or inequitable consequences. *Fiumetto*, 321 Ill. App. 3d at 958.

¶ 100    In determining whether the first prong is met, a court generally will not rest its decision on a single factor, but will examine many factors, including: (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether the corporation is a mere façade for the operation of the dominant stockholders.

- 25 -

*Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 503 (2005). At trial, the party seeking to have the corporate entity disregarded must come forward with a substantial showing that the corporation is really a dummy or sham for a dominating personality. *Ted Harrison Oil Co.*, 247 Ill. App. 3d at 796.

¶ 101  We agree with the trial court that plaintiff failed to establish that Wendy was an alter ego for SCI or WSM. Wendy's involvement in SCI and WSM was marginal at best. Wendy's testimony suggested she knew very little about SCI and WSM and was barely involved in either entity. According to William, although Wendy owned the location where SCI and WSM had their offices, served as vice president of design at one point, and signed loan documents, Wendy was not involved in the day-to-day management of SCI or WSM. She recalled that she felt some ownership of SCI, but stated that her title of vice president was not something she associated with herself and did not recall one of SCI's main functions, which was to act as a general partner for various limited partnerships. Additionally, Wendy did not know the amount of management fees SCI received and did not know about any agreements between SCI and the limited partnerships. Wendy trusted that William was running the business and though she asked questions of William when asked to sign something, she also stated she was given perfunctory explanations of what she was signing. Wendy testified similarly about her lack of involvement in WSM. She stated that she did not know when WSM was formed or why WSM was created. She also did not remember being elected as WSM's sole director. Based on the evidence presented, William was in charge of SCI and WSM and Wendy played an extremely limited role. Overall, Wendy was far from being the governing or dominant personality associated with individuals who are alter egos for corporations. See *id.* at 795. Plaintiff's case-in-chief failed to establish that SCI or WSM was a sham for Wendy such that the separate personalities of Wendy, SCI, and WSM failed to exist. As such, the court properly dismissed the alter ego claims against Wendy at the directed finding stage.

¶ 102          E. William as Alter Ego of SCI and WSM

¶ 103  We next consider plaintiff's contention that William was an alter ego of SCI and WSM. Plaintiff argues that both entities were inadequately capitalized, failed to observe corporate formalities, lacked corporate records, commingled funds and failed to maintain arm's-length relationships, were insolvent, diverted assets to the detriment of a creditor, had nonfunctioning officers and directors, and were mere façades for William to shield himself from personal liability.

¶ 104  We will not reverse a finding of the trial court about piercing the corporate veil unless it is against the manifest weight of the evidence. *Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 278 Ill. App. 3d 1084, 1088 (1996). Further, as noted above, "[a] finding is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *Munson*, 395 Ill. App. 3d at 795. Further, piercing the corporate veil is a task that courts should undertake reluctantly. *Ted Harrison Oil Co.*, 247 Ill. App. 3d at 795.

¶ 105  We address each of the alter ego factors that plaintiff raises: inadequate capitalization, failure to observe corporate formalities, absence of corporate records, commingling of funds and failure to maintain arm's-length relationships, insolvency of the debtor corporation,

diversion of assets from the corporation to the detriment of creditors, nonfunctioning of other corporate officers or directors, and the corporation is a mere façade for the operation of the dominant stockholders. As we detail below, based on our analysis of the first prong of the alter ego analysis, the trial court's finding that William was not an alter ego of SCI or WSM was not against the manifest weight of the evidence.

¶ 106    The question of whether an entity is adequately capitalized is based on the policy that shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for the corporation's prospective liabilities, and moreover, that it is inequitable to allow shareholders to set up a flimsy organization just to escape personal liability. *Fontana*, 362 Ill. App. 3d at 504. A corporation's capitalization is a major consideration in deciding whether a legitimate separate corporate entity was maintained. *Amsted Industries, Inc. v. Pollak Industries, Inc.*, 65 Ill. App. 3d 545, 552 (1978). "An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability." (Internal quotation marks omitted.) *Jacobson*, 278 Ill. App. 3d at 1089.

¶ 107    Here, the evidence shows that neither SCI nor WSM were inadequately capitalized. According to William, SCI was initially capitalized with $1000. William further stated that his business was essentially service-oriented and that in theory, enough capital was always maintained to operate the business. William's testimony also suggested that SCI's capital fluctuated and at one time was at least $400,000. According to William, SCI was able to function and pay its bills until the Kansas judgment was entered. Defendants' expert, Picker, testified that there is no required minimum for capital unless a company has significant loan payments to make, significant investments in capital equipment, or significant recurring obligations, none of which were at issue here. Plaintiff points to SCI's line of credit as demonstrating that SCI was lacking in capital. However, SCI did not appear to rely on the line of credit to function. A large portion was used to loan and invest money in a hedge fund, for which SCI was eventually repaid, and another portion was used to pay off a condominium that served as collateral for the line of credit. Further, the line of credit was paid off in March 2006. There was no evidence that SCI did not have sufficient capital to run its basic business of acting as general partner and manager for the limited partnerships. As for WSM, William testified that it was initially capitalized with $10, but William also stated that when WSM was formed, 1,000 shares were issued for $1 per share. As of December 31, 2006, WSM's balance sheet showed assets of about $58,000 in cash. Like SCI, WSM principally performed management functions, and there was no evidence that WSM was unable to meet its obligations or carry out its duties. See *In re Estate of Wallen*, 262 Ill. App. 3d 61, 71 (1994) (unclear that corporation undercapitalized given nature of the business, where corporation acted merely as facilitator between buyers and sellers and did not maintain an inventory). Under these circumstances, SCI and WSM were adequately capitalized.

¶ 108    As for observing corporate formalities and maintaining corporate records, the evidence suggests that SCI and WSM were far from perfect, but not so flawed as to factor in favor of piercing the corporate veil. William testified that his entities produced corporate resolutions only when the bank required it, and moreover, corporate resolutions were not required for activities in the normal course of business. Because they were not required, there were no written corporate resolutions authorizing the purchase and sale agreement, the line of credit,

or the loan to the hedge fund. William could not recall whether a required shareholder's voting list was ever put together. Additionally, William recalled attending SCI director and shareholder meetings and stated that meetings for his entities were frequent, but that meeting minutes did not have to be recorded unless a lender required it. In addition, William testified that there were contracts that were not necessarily written, and he described an oral agreement with a landscaper. At the same time, William testified that long-term transactions were documented and that he would generally document transactions if he felt it was required. SCI and WSM had articles of incorporation and bylaws, and William stated that every entity had separate bank accounts, corporate filings, and annual reports. A number of these documents were produced at trial. William maintained that annual reports were filed for every corporation and that corporate formalities were followed when required by the bylaws, IRS, or Illinois law. Overall, though their practices resulted in fewer documents than might be desired, SCI and WSM appear to have observed basic corporate formalities and maintained various records, especially when it was required by a third party. *Contra Fontana*, 362 Ill. App. 3d at 506 (determination that corporation failed to keep and maintain corporate records not against manifest weight of evidence where there were no corporate resolutions whatsoever for certain loans, no notes or other evidence of claimed indebtedness, no corporate records of amounts borrowed for transactions, and defendant admitted he never had a written contract with a subcontractor, never took bids from subcontractors, and kept no financial records for any payments except for draw schedules filed with title companies).

¶ 109    The next factor, whether SCI, WSM, and William commingled funds and failed to maintain arm's-length relationships, also does not warrant piercing the corporate veil. What plaintiff contends is the use of the SCI line of credit for personal expenses was shown to be the line of credit's sweeping function at work. According to William, the SA account, which was William and Wendy's joint checking account, was linked to the SCI line of credit. William stated that if the SA account was overdrawn, money would automatically be lent to it, and ultimately SA borrowed and paid back money on an ongoing basis. William further stated that SCI could lend money to other people at its discretion, a proposition that plaintiff's expert, Rudnicki, agreed with. As to the other claims about SCI and WSM accounts being used for personal expenses, William explained that certain medical payments were part of a semi-medical plan and admitted that one of the corporations received subscriptions. Further, a payment to a recipient in Costa Rica was explained as likely coming from another account. William insisted that personal and business bills were paid out of their corresponding accounts and denied that SCI made personal payments. Moreover, while an E-Trade account and other assets were carried on SCI's books for a period of time, they were eventually removed–an occurrence that defendants' expert, Picker, testified was the subject of correction entries that were common for smaller corporations. Picker further stated that SCI's records had mistakes, but he did not see evidence of commingling.

¶ 110    Plaintiff also asserts that SCI and WSM operated from the same location, used the same employees, and performed the same management operations. Additionally, plaintiff notes that in 2006 and 2007, after WSM had taken over management functions, invoices were sent to SCI instead of WSM, but were paid by WSM. However, the trial court was entitled to accept William's explanations for these circumstances (see *Falcon v. Thomas*, 258 Ill. App. 3d 900, 909 (1994) (in a bench trial, the trial judge weighs the evidence and makes findings of fact)), and according to those explanations, SCI and WSM were separate. William testified

- 28 -

that because SCI remained the general partner, it was less confusing to have bills sent to it. William also mentioned the difficulties he had in explaining to whom bills should be sent, maintained that WSM paid the bills, and stated that each entity had separate bank accounts. We also note that evidence that the affairs of two corporations were interwoven relates to the liability between the two corporations, rather than the personal liability of an individual. *Amsted Industries, Inc.*, 65 Ill. App. 3d at 550.

¶ 111    Additionally, the use of the line of credit to pay off Wendy's mortgage and to loan $1 million to a hedge fund was also explained. According to William, the bank required that the mortgage on the condominium be paid off because the condominium was being used as collateral for the loan. Picker stated this was generally required by lenders. William further testified that the $1 million payment to the hedge fund was supposed to be a short interim loan and an investment. Again, there was testimony that SCI could lend money to third parties. Overall, although there was evidence that commingling occurred, such as testimony from plaintiff's expert, Rudnicki, we reiterate that in a bench trial, the trial judge weighs the evidence and makes findings of fact. *Falcon*, 258 Ill. App. 3d at 909. Further, we note that we will not disturb a trial court's judgment as long as there is evidence to support it. *Sharif*, 2014 IL App (1st) 133008, ¶ 25. A finding that SCI, WSM, and William did not commingle funds and maintained arm's length relationships was not against the manifest weight of the evidence.

¶ 112    Moving to the next consideration, there was conflicting evidence about whether SCI was insolvent and limited evidence that WSM was insolvent. According to plaintiff's expert, Rudnicki, SCI was insolvent throughout 2005 because the liability for the Kansas judgment had existed since the beginning of 2005 and when the Kansas judgment and line of credit were accounted for, SCI's liabilities exceeded its assets in 2005. Meanwhile, defendants' expert, Picker, stated that there was no indication in 2005 that SCI's liabilities exceeded its assets and that there were positive retained earnings and no deficit. For his part, William testified that SCI paid its bills and functioned until the Kansas judgment. According to William, SCI became insolvent around March 2006, when the line of credit was no longer available and the appeal process for the Kansas judgment ended. William also testified that WSM had been able to operate and pay its bills. As of December 31, 2006, WSM's balance sheet showed assets of about $58,000 in cash. In light of the conflicting opinions on the subject of solvency, the court was entitled to lend more weight to Picker's and William's views, in which SCI was not insolvent before the Kansas judgment. See *West Shore Associates, Ltd. v. American Wilbert Vault Corp.*, 269 Ill. App. 3d 175, 180 (1994) (it is function of trial judge to weigh conflicting evidence, consider the evidence in view of all the evidence in the case, and to make findings based on that evidence). Further, the evidence does not suggest that either entity was purposely kept insolvent while it operated. SCI and WSM were both able to do business, though during different times. *Contra People v. V&M Industries, Inc.*, 298 Ill. App. 3d 733, 741 (1998) (corporation insolvent where was insolvent at time of trial and was never adequately funded). That SCI was eventually drained of its assets speaks to another factor that is discussed below—whether SCI drained diverted assets to the detriment of creditors. Overall, a finding that SCI and WSM were solvent was not against the manifest weight of the evidence.

¶ 113    As we mention above, the evidence shows that SCI diverted assets to WSM to the detriment of a creditor, plaintiff. William, acting through SCI, made a deliberate effort and

-29-

the Kansas judgment to share back in good faith value. As a result of the Kansas judgment, a garnishment was served on SCI's bank account. William stated that, subsequently, money stopped being deposited in the account and that he directed that no money should flow through the account without his authorization. Further, shortly after the Kansas judgment, WSM began managing a significant number of properties that SCI had previously managed, which generated management fees for WSM—fees that SCI previously received. Meanwhile, SCI's account was zeroed out, with approximately $32,000 going to WSM. William also testified that after December 2005, SCI did not generate any business income that could have satisfied the Kansas judgment and that the running balance in SCI's account since 2005 had been around $1,000. Further, it was William who arranged for the transfer of SCI's income stream to WSM. Where SCI was the general or managing partner, he directed the limited partnerships to behave in a certain manner. As to the so-called independent limited partnerships, William's testimony described conversations and "some notification of our intent or what was going on," as well as his communicating that "from a practical point of view, I was saying *** we needed to move it over" due to the garnishment, a direct consequence of the Kansas judgment. The timing and method of using WSM to take over SCI's management functions and receive the corresponding income stream, while keeping SCI's assets low, strongly suggest that William, through SCI, diverted assets to avoid paying the Kansas judgment.

¶ 114  The evidence also suggests that SCI's and WSM's only other officer or director, Wendy, was nonfunctioning. Although Wendy testified that she felt some ownership in SCI, her other statements suggested that she deferred to William on all matters and was only superficially involved in SCI and WSM. Wendy testified that she did not recall the title of vice president being attributed to her when she signed loan documents for SCI and that she was not active in the business. When Wendy was asked to sign something, she would ask William questions and then sign the document if she was comfortable, though she also stated that she was given perfunctory explanations. Additionally, Wendy was unfamiliar with numerous aspects of SCI and WSM. Wendy testified that she "probably would not have paid attention" or did not remember that SCI was the general partner of various limited partnerships, which was a key feature of SCI. She did not know the amount of management fees that SCI received and stated that she would not know about any agreements between SCI and the limited partnerships. As to WSM, Wendy did not know when or why it was formed and did not recall being elected WSM's sole director. Wendy also did not recall attending meetings for SCI or WSM, though William testified to the existence of these meetings. Wendy's almost complete disengagement from SCI and WSM, except on paper, suggests that she was nonfunctioning.

¶ 115  Finally, we consider whether SCI and WSM were mere façades for the dominant stockholders. As to this factor, we agree with the trial court that SCI and WSM had a separate corporate existence from William. SCI and WSM had employees, filed tax returns, and functioned in their business of real estate management. SCI had existed since 1989 and records presented at trial showed that it had a track record of generating revenue. WSM, once it took over the management business, also generated positive revenue and appeared to actually manage properties, even though its origins were suspect. Though William controlled both entities, and at one point used WSM to avoid a judgment against SCI, it was not against

the manifest weight of the evidence to find that they were functioning businesses that had a history of performing specific functions, rather than mere shields for personal liability.

¶ 116    Overall, there was not such a unity of interest and ownership such that the separate personalities of SCI and William, and WSM and William, did not exist. See *Fiumetto*, 321 Ill. App. 3d at 958. Though SCI and WSM had a nonfunctioning director or officer and SCI diverted assets to WSM, the two entities still maintained separate identities from William. It was not unreasonable or arbitrary to find that the entities kept records and observed corporate formalities, albeit imperfectly, were adequately capitalized to serve their purposes, kept funds separate from William and Wendy's personal expenses, and were solvent while operating. Although we found that SCI violated the Fraudulent Transfer Act, here we considered the different question of whether William used SCI and WSM merely as an instrumentality to conduct his own business. See *Peetoom*, 334 Ill. App. 3d at 527. We acknowledge that SCI and WSM were not perfect, but plaintiff had to make a substantial showing that they were a dummy or sham for William (see *Jacobson*, 278 Ill. App. 3d at 1088), which it failed to do. Based on the consideration of the factors discussed above, the trial court's finding that William was not an alter ego for SCI and WSM was not against the manifest weight of the evidence.

¶ 117                              F. Attorney Fees

¶ 118    Lastly, defendants assert that the trial court should not have awarded attorney fees against SCI, WSM, and Anderson because there was no statutory authority for doing so and none of those entities had a contract with the bank that provided for attorney fees. Defendants argue that the Fraudulent Transfer Act (740 ILCS 160/1 *et seq.* (West 2006)) does not authorize fee awards. Additionally, defendants contend that WALP was the obligated party responsible for fees in the Kansas case and no other defendants agreed to fee-shifting. Defendants further argue that the fee petition was required to differentiate between the hours spent on fee-shifting claims and fees sought pursuant to a statute. Additionally, defendants assert that the court should have reduced the fees because plaintiff did not prevail on all claims, the fee petition contained vague and ill-defined tasks, and the fee petition contained improper overhead, such as travel expenses, long distance charges, computerized legal research, paralegal and secretarial work, and copying expenses. Defendants also assert that the court did not entertain their request for an evidentiary hearing.

¶ 119    Generally, Illinois courts follow the "American Rule," which provides that each party must bear its own attorney fees and costs, absent statutory authority or a contractual agreement. *Country Mutual Insurance Co. v. Styck's Body Shop, Inc.*, 396 Ill. App. 3d 241, 251 (2009). Additionally, a trial court has broad discretion in awarding attorney fees, and we will not reverse a decision about attorney fees absent an abuse of that discretion. *Timan v. Ourada*, 2012 IL App (2d) 100834, ¶ 29.

¶ 120    There are two grounds that plaintiff relies on to justify its attorney fees: the Fraudulent Transfer Act (740 ILCS 160/1 *et seq.* (West 2006)) and the Kansas judgment and underlying loan documents. Initially, we note that a statute or contract must allow for attorney fees by specific language, such that the provision at issue must specifically state that "attorney fees" are recoverable. *Negro Nest, LLC v. Mid-Northern Management, Inc.*, 362 Ill. App. 3d 640, 642 (2005).

¶ 121 We disagree with plaintiff's contention that attorney fees are recoverable as punitive damages under the Fraudulent Transfer Act. Plaintiff cites section 8 of the Fraudulent Transfer Act, which states that a creditor may obtain "any other relief the circumstances may require" (740 ILCS 160/8(a)(3)(C) (West 2006)), and asserts that Illinois permits trial courts to award punitive damages. However, plaintiff has failed to provide an Illinois case where attorney fees were granted under the Fraudulent Transfer Act. In fact, two cases have specifically rejected such claims, though we acknowledge that those two cases predate the current version of the Fraudulent Transfer Act. See *Kardynalski v. Fisher*, 135 Ill. App. 3d 643, 649 (1985) (denying plaintiff's claim for attorney fees "for want of statutory authority"); *Anderson v. Ferris*, 128 Ill. App. 3d 149, 156 (1984) (plaintiff not entitled to attorney fees where complaint neither specifically sought punitive damages nor did plaintiff cite any Illinois authority that would authorize such damages for this type of action). Although here, plaintiff sought punitive damages in its complaint, the circumstance remains that the current version of the Fraudulent Transfer Act does not specify that attorney fees are recoverable and Illinois courts generally refuse to allow recovery for attorney fees unless the statute specifically states that "attorney fees" are recoverable. See *Negro Nest, LLC*, 362 Ill. App. 3d at 649. We decline to follow plaintiff's cited cases from other states that provide for attorney fees or punitive damages for a fraudulent transfer claim. Though out-of-state cases should be examined when relevant, decisions of the reviewing courts of foreign jurisdictions are not binding on Illinois courts. See *Skipper Marine Electronics, Inc. v. United Parcel Service, Inc.*, 210 Ill. App. 3d 231, 239 (1991).

¶ 122 Plaintiff also contends that the Kansas judgment and underlying loan documents permit attorney fees. This argument has some merit. The mortgage note stated that if it became necessary to employ counsel to collect or enforce the debt or protect or foreclose the security for the debt, the "Maker also shall pay on demand all costs of collection \*\*\*, including attorneys' fees and costs reasonably incurred for the services of counsel." SCI signed the note as WALP's general partner. The Kansas court subsequently found SCI jointly and severally liable for all of WALP's debts, obligations, and judgments, which included attorney fees. The judgment also provided for "other expenses accrued and accruing, including reasonable attorneys' fees" and stated that plaintiff had incurred and would continue to incur substantial costs in attempting to collect the judgment, including the "reasonable attorneys' fees related to Plaintiff's collection efforts." As plaintiff asserts, this language could justify an award of attorney fees both for the Kansas judgment and the proceedings in Cook County to enforce that judgment. See *Poilevey v. Spivack*, 368 Ill. App. 3d 412, 416 (2006) (judgment supported award of postjudgment attorney fees where one clause specifically awarded specific amount of fees and costs and other clause provided for " 'reimbursement for reasonable attorney fees and costs of collection' "). Additionally, it could be argued that because WSM was found to be a mere continuation of SCI, it could also be held responsible for attorney fees. A corporation that went "through a mere change in form without a significant change in substance \*\*\* should not be allowed to escape liability." (Internal quotation marks omitted.) *Vernon v. Schuster*, 179 Ill. 2d 338, 346 (1997).

¶ 123 At the same time, the Kansas judgment provided for "reasonable attorneys' fees related to [plaintiff's] collection efforts," and the trial court's ruling did not explain whether the entirety of the proceedings in Cook County fell into that category. This matter involved years of litigation over a number of issues, and yet the court's orders on fees were sparse and did

- 32 -

not indicate on what basis plaintiff was awarded fees against SCI, WSM, and Anderson. It would have been particularly helpful to have the court's reasoning where Anderson was not found to be a mere continuation of another Spatz-related entity. Where, as here, we review the court's fee order for an abuse of discretion (*Timan*, 2012 IL App (2d) 100834, ¶ 29), we decline to speculate how broad the reach of the Kansas judgment and loan documents are without some explanation from the trial court.

¶ 124    Further, the court's order does not contain any indication of whether the requested fees were reasonable, an inquiry that involves multiple considerations. Only those fees that are reasonable are allowed, the determination of which is left to the trial court's sound discretion. *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 983 (1987). Further, the party seeking the fees always bears the burden of presenting sufficient evidence from which the trial court can render a decision as to their reasonableness. *Id.* Rather than presenting a mere compilation of hours multiplied by a fixed hourly rate or bills issued to the client, the petition for fees must specify the services performed, by whom they were performed, the time expended, and the hourly rate charged. *Id.* at 984. The trial court should also consider a variety of additional factors, such as the skill and standing of the attorneys, the nature of the case, the novelty and/or difficulty of the issues and work involved, the matter's importance, the degree of responsibility required, the usual and customary charges for comparable services, and the benefit to the client. *Id.* Additionally, the trial court "should also consider whether there is a reasonable connection between the fees and the amount involved in the litigation." (Internal quotation marks omitted.) *Heller Financial, Inc. v. Johns-Byrne Co.*, 264 Ill. App. 3d 681, 691 (1994).

¶ 125    Additionally, where a case involves some claims filed pursuant to statutes that allow for attorney fees and others not, the fee petition must distinguish between the hours spent on the statutory fee-shifting claims and the other claims. *Country Mutual Insurance Co.*, 396 Ill. App. 3d at 252. Moreover, one factor that may shift an award of fees upward or downward is the result that the plaintiff obtained, which is an important consideration when the plaintiff only prevailed on some of its claims. *Id.* at 253. There, the court must decide whether the unsuccessful claims were related to the successful claims and whether based on the level of success achieved, the hours reasonably expended were a satisfactory basis for making a fee award. *Id.*

¶ 126    As to overhead expenses, which defendants also challenge as appearing in plaintiff's fee petition, we note that expenses that an attorney regularly incurs regardless of specific litigation, including telephone charges, in-house delivery charges, in-house photocopying, check processing, newspaper subscriptions, and in-house paralegal and secretarial assistance, are not recoverable as costs of litigation. *Johnson v. Thomas*, 342 Ill. App. 3d 382, 401 (2003). These overhead expenses refer mainly to fixed expenses that are already reflected in an attorney's hourly rate and should not be apportioned to any single cause of action so as to constitute an additional charge. *Id.* at 402. However, this definition of overhead does not include charges for expenses specially incurred to third parties specifically in furtherance of a particular cause of action. *Id.* As an aside, the fee for computerized legal research does not fall neatly within the categories of overhead versus outside expenditures and some courts have made a distinction based on the billing method for each individual case. *Id.* at 403.

¶ 127    Here, the record does not indicate whether the trial court considered any of the above factors when it ruled on plaintiff's fee petition. As noted above, plaintiff's actual fee petition

was not in the record, which makes it unclear on what specific bases plaintiff sought fees. Moreover, plaintiff did not respond in its reply brief to defendants' arguments regarding the reasonableness of the requested fees. Also troubling is that defendants were apparently denied an evidentiary hearing that they requested in their response to plaintiff's fee petition. The purpose of an evidentiary hearing is to provide sufficient information to allow the court to assess intelligently the reasonableness of the fees charged (*Heller Financial, Inc.*, 264 Ill. App. 3d at 691), which would have been quite helpful here. Although a previous order stated that a hearing was scheduled, the court's orders of June 25, 2013, and July 10, 2013, both indicate that the court heard "arguments" from the parties and do not mention a hearing or state that the fees were found to be reasonable. Generally, in protracted litigation involving multiple complex issues, an evidentiary hearing should be conducted on the request of the losing party, especially if the prevailing party was represented by multiple attorneys, which may have resulted in duplicative charges, and where the prevailing party was entitled to fees and costs with respect to some claims, but not others. *Trossman v. Philipsborn*, 373 Ill. App. 3d 1020, 1058 (2007). Both of those circumstances were at play in this matter. See also *Bank of America National Trust & Savings Ass'n v. Schulson*, 305 Ill. App. 3d 941, 952 (1999) (when a party who must pay attorney fees asks for an evidentiary hearing, he is entitled to one). Moreover, the reasonableness of fees is a matter of proof, and a party ordered to pay attorney fees has the right to conduct meaningful cross-examination on the issue (*id.*), which apparently did not occur here.

¶ 128    The trial court's order leaves many unanswered questions. The appendix to the fee petition was voluminous, it contained charges that appear to qualify as overhead expenses, and many of the entries are redacted. The record does not contain reports of proceedings for June 25, 2013, and July 10, 2013, when the orders related to the fee petition were entered. The trial court's orders gave no indication of the basis for awarding fees or whether it considered the many factors at work in deciding whether the attorney fee award was reasonable, and yet plaintiff was awarded all of its requested fees. We recognize that it is the appellant's burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and that in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with the law and had a sufficient factual basis. *Foutch*, 99 Ill. 2d at 391-92. At the same time, trial judges must also justify the substance of their decisions, either orally or in writing, and explaining a ruling instills confidence in the impartiality and fairness of the judge and enhances respect for the courts. *Turczak v. First American Bank*, 2013 IL App (1st) 121964, ¶ 19. Here, because the court's orders give no indication of the basis for its decision, contained no finding of whether the fees were reasonable, and at the very least, a number of entries in the fee petition appendix appear suspect, we simply cannot determine whether the trial court abused its discretion. But *cf. Chicago Title & Trust Co. v. Chicago Title & Trust Co.*, 248 Ill. App. 3d 1065, 1072-73 (1993) (although defendants did not provide transcript of the hearing or of the trial judge's comments when fees were awarded, the court made an independent assessment of the propriety of fees where it appeared that the court carefully examined the affidavits and time records submitted, the order specified that the award represented a reasonable fee, and there were no affidavits or testimony that contradicted the trial court's finding). Accordingly, we vacate the fee award and remand the matter to the trial court to explain the basis for

awarding fees and for an evidentiary hearing on attorney fees.

¶ 129                        III. CONCLUSION

¶ 130          For the foregoing reasons, we affirm the circuit court's judgment on the issues of collateral estoppel, the Fraudulent Transfer Act, and alter ego. We vacate the fee award and remand on the issue of attorney fees.

¶ 131          Affirmed in part; vacated and remanded in part.

# EXHIBIT 11



LAWYER LOGIN

Home  /  Browse Decisions  /  B.R.  /  222 B.R.  /  222 B.R. 157 (1998)

# IN RE SPATZ

No. 97 C 5684, Adversary No. 93 A 914.                                    Email | Print | Comments (0)

**View Case**     Cited Cases     Citing Case

222 B.R. 157 (1998)

*In re William SPATZ, Debtor. Louis W. LEVIT, Trustee of the Estate of William Spatz, Plaintiff, v. William SPATZ, et al., Defendants.*

United States District Court, N.D. Illinois, Eastern Division.

June 17, 1998.

### Attorney(s) appearing for the Case

*David N. Missner, Rudnick & Wolfe, Chicago, IL, for William Spatz.*

CASTILLO, Judge.

Appellant Louis W. Levit, Trustee of the Estate of William Spatz, appeals from the bankruptcy court's ruling that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in fact under both the Bankruptcy Code and Illinois' version of the Uniform Fraudulent Transfer Act ("UFTA") [1]. The Trustee further challenges several factual findings and evidentiary rulings entered below. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, we reverse and remand.

## FACTS

An understanding of the bankruptcy proceedings requires a brief examination of the debtor's financial and business history. William Spatz conducted real estate development and management activities through various corporate and limited partnership entities. William [2] established Spatz & Co., a real estate management company, as a conduit for funds earmarked for individual real estate development projects. In 1986, William's father, David Spatz, agreed to fund several of these ventures, documenting the loan with an agreement entitled "Collateral and Assignment Agreement" [3] ("C & A"). Subsequent funding was documented by "Amendments" to the C & A. [4]

William's financial affairs reached a critical state in 1989 [5], and on June 14, 1991, several creditors filed an involuntary bankruptcy petition against William under Chapter 7 of the Bankruptcy Code. An order for relief was entered on July 30, 1991, and Levit was appointed Trustee. The bankruptcy proceedings revealed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to his... Wendy Spatz, on the eve of his personal bankruptcy. The genesis of this appeal can be traced to those transfers, which are set forth below:

Transfer 1. The first transaction actually involved two separate property transfers.

[222 B.R. 160]

First, William transferred to Wendy his one-half interest in the family's Glencoe residence [6], all of his Spatz & Co. stock, and his limited partnership interests in real estate ventures known as Highland Park I and II. As consideration for these transfers, Wendy agreed to assume the obligations for a $ 3 million loan from David to Spatz & Co., and the guarantee by William. Wendy's exposure was limited to the extent that the obligations could be satisfied by proceeds from Highland Park I and II.

Wendy then pledged her interest in the Highland Park limited partnerships to David in exchange for David's agreement to release Spatz & Co. from $3 million in loans and William from the guarantee, and to return the collateral securing the obligations.

The document evidencing the transfer, the Sale and Exchange Agreement ("Exchange Agreement"), is dated January 10, 1989. However, the Glencoe deed is dated July 6, 1990, and was not recorded until July 10, 1990.

Transfer 2. Pursuant to an agreement dated January 1, 1990, William transferred the following assets to Wendy: i) 90% of William's general partnership

interest in the Fort Wayne limited partnership; ii) 100% of his interest in the S & C Maintenance Corp.; iii) 100% of Spatz & Co. Development Corp; and iv) 100% of American Retailing Corp. The Agreement required Wendy to pay $ 25,000 for the assets.

Transfer 3. On January 11, 1990, William and David executed a Purchase and Sale Agreement ("PSA"), whereby William agreed to transfer to David: i) 76% of William's limited partnership interest in Neenah Associates; ii) 76% of his limited partnership interest in Sioux Falls Associates; iii) 5% of William's general partnership interest in Meadowland; iv) 49% of a 50% ownership interest in Spatz Real Estate Management Corp. ("SMC"); and v) 44% interest in Montgomery II Associates Limited Partnership. The defendants alleged that David paid William $1.1 million in exchange for the assets. However, the bankruptcy court determined that William had transferred the SMC interest to Wendy for no consideration and ordered her to remit the fair market value.

The Bankruptcy Action

On July 19, 1993, the Trustee filed a complaint in the bankruptcy court alleging that the transfers violated of § 548 of the Bankruptcy Code. In addition, the Trustee challenged the transfers under the "fraud in fact" (§ 5(a)(1)) and "fraud in law" (§ 5(a)(2)) provisions of the UFTA. "Fraud in fact" occurs when a debtor makes a transfer "with the intent to hinder, delay, or defraud creditors." *See* 740 ILCS 160/5(a)(1). Conversely, intent is irrelevant under a "fraud in law" theory — rather, fraud is presumed if the debtor does not receive "reasonably equivalent value" for the transferred assets and was or became insolvent at the at the time of the conveyance. *See* 740 ILCS 160/5(a)(2).

In their pre-trial brief, defendants Wendy and David requested a ruling from the bankruptcy court 1) limiting the scope of the parties' initial presentation of evidence to the valuation of the assets transferred and the consideration received; and 2) holding that the payment of full consideration was an absolute defense to the Trustee's "fraud in fact" and "fraud in law" claims. The Trustee objected, arguing that the payment of adequate consideration would be a defense only to his "fraud in law" claim. Conversely, if William made those transfers with fraudulent intent, and Wendy and David knew or should have known that William acted with such intent, then the transfers were fraudulent regardless of the consideration given under a "fraud in fact" theory.

Siding with the defendants, the bankruptcy court limited the parties' initial presentation to evidence relevant to the amount of the consideration paid and the value of the assets transferred. Apr. 30, 1997 Order. The court delineated the parties' burdens of production, directing the defendants to produce evidence establishing their contention that they paid full consideration for the assets transferred. If the defendants failed to satisfy their burden, the Trustee would then be allowed to "put into his case in a normal

[222 B.R. 161]

manner, including all matters of testimony and evidence not already heard and/or introduced." *Id.* at ¶ 2B. Conversely, "[i]f, at the conclusion of the defendants' opening case . . . the Court shall determine that defendants' case standing alone is sufficient to carry the burden of proving a complete defense under such counts, plaintiffs shall then put in such testimony and evidence as in his opinion is relevant to overcoming that testimony and evidence; provided, however, that Plaintiff's opinion as to the *relevance* of such testimony and evidence shall be subject to the *Court's determination . . .*" *Id.* at ¶ 2C (emphasis added).

The Dates the Transfers were Executed.

A hearing was conducted in accordance with the bankruptcy court's April 30, 1997 Order. The parties introduced conflicting evidence as to the dates that the first and the third transactions were actually executed. For example, the Trustee argued that Transfer 1 was not entered into on January 10, 1989, the date recorded on the Exchange Agreement, but rather at a later date. In support of his assertion, the Trustee relied primarily upon the testimony of Eugene Faigus, the former president of Spatz & Co. and person responsible for drafting most legal documentation for the various Spatz enterprises. Faigus testified that the Exchange Agreement was neither executed nor completed by the time he left Spatz & Co.'s employ in August 1990. Faigus also testified that he had prepared a UCC filing on January 30, 1989, showing William as the owner of the Highland Park I and II partnerships that were allegedly transferred to Wendy under the January 10, 1989 Exchange Agreement. Similarly, a financial statement prepared in May 1989 showed William still owning the Spatz & Co. stock.

In addition, while the Exchange Agreement purported to transfer William's Spatz & Co. stock to Wendy, William continued to receive Spatz & Co. distributions in excess of $ 6,000 per month until April 1990. The deed conveying William's one-half interest in the Glencoe residence to Wendy was not executed until July 6, 1990 and was not recorded until July 10, 1990. Finally, the Trustee introduced evidence undermining William's credibility.[7]

In response, the defendants attacked Faigus' credibility. The defendants informed the court that Faigus was disgruntled after almost losing his home to support his guarantee of certain Spatz & Co. loans, because of William's failure to honor an agreement to indemnify Faigus. Contrary to his trial testimony, Faigus testified in a prior deposition that he prepared the Exchange Agreement at the end of 1989 or early 1990. Another Spatz & Co. employee testified that Faigus was preoccupied with other matters and spent little time on Spatz & Co. business during the period Faigus claims to have worked on the agreement.

As to the May 1990 financial statement, William explained that the May 1989 document tendered by the Trustee showing William as the owner of both the Spatz & Co. stock was just a draft, and that subsequent documents prepared on May 31, 1989 and December 31, 1989 did not list William as the owner of the Spatz & Co. stock. In addition, William claimed that the Glencoe deed was not executed and recorded earlier because Faigus failed to explain the legal requirements for transferring the property. Finally, the defendants introduced tax returns and financial records recognizing the income from the property transfers, even though it would have been advantageous to delay recognition of the income for another year. The court recognized that William's credibility was questionable, but found the tax returns and financial statements to be compelling evidence that Transfer 1 occurred in January 1989. *In re Spatz*, 209 B.R. 907, 912 (Bankr. N.D.Ill.1997).

As to Transfer 3, the Trustee argued that the Sale Agreement, dated January 11, 1990, was entered into, if at all, after August, 1990. The Trustee contended that the $1.1 million that David paid to William was actually a gift or an attempt to invest in another enterprise[8], and was not paid to purchase the

[222 B.R. 162]

listed properties. In support of his contention that the Sale Agreement was backdated, the Trustee relied solely upon Faigus's testimony that he drafted the Sale Agreement in May or June of 1990. The defendants again pointed to Faigus's prior deposition where he testified that he prepared the agreement in late 1989 or early 1990. The bankruptcy court rejected Faigus's explanation that his memory was better at the time of trial, finding Faigus to be incredible. Instead the court credited the defendants' evidence, which consisted of 1) the defendants' showing that David actually paid the $1.1 million

dollars in the fall of 1989 (in a manner consistent with their prior business practices); 2) a handwritten letter dated November 29, 1989 from David asking Faigus when the agreement would be completed and requesting its prompt delivery [9]; and 3) the 1989 and 1990 tax returns for the transferred limited partnerships reflecting the transfer of William's interest in the limited partnerships to David.

Value of the Assets Transferred

The parties each introduced expert testimony on the value of the assets transferred. As to Transfer 1, the Trustee relied upon the testimony of Mary Warmus, a CPA with substantial experience in valuing business interests. The defendants relied upon William's testimony, and while William was not a CPA or a Member of the Appraisal Institute ("MAI"), the court found that William's overall experience in the real estate business qualified him as an expert. The court determined that Warmus' methodology in valuing the property was dubious and that Warmus had improperly valued the property as of January 1990, instead of January 1989. [10] The court concluded that it could not rely upon Warmus' report, noting that "[a]s a practical matter it is difficult to believe that anyone would pay three-quarters of a million dollars for a company that had never made a profit, required significant capital infusions to fund operating losses and had no long term management contracts to rely on for future profitability, even if new management could reduce costs." *Spatz*, 209 B.R. at 916. The court then refused to admit Warmus' amended report valuing the assets as of 1989, which the Trustee presented at trial.

Without Warmus' testimony, the only expert evidence the court had to rely upon was William's testimony. Unlike Warmus, William used actual (as opposed to normalized) expenses, accounted for David's loans and the contingent liabilities, and recognized that the assets were almost fully depreciated. William testified that Spatz & Co.'s primary source of income was derived from contracts with SMC management, and that it was unlikely that such contracts would remain in effect if an outsider were to purchase Spatz & Co. Based upon this testimony, the court concluded that Spatz & Co. had no value as of the date of the transfer, January, 1989.

As to Transfers 2 and 3, the defendant introduced the expert testimony of William A. McCann, an experienced real estate appraiser and consultant, as well as William's testimony on the value of the property transferred. Once again, the Trustee sought to rely upon the expert opinion of Mary Warmus. The bankruptcy court found that while Warmus had experience valuing businesses, she had no expertise in valuing real estate. Therefore,

> because several of the interests transferred could only be valued by valuing the real estate owned by the partnerships, this Court concluded that Ms. Warmus was not qualified to testify as an expert of the real estate entities. Accordingly, Ms. Warmus was not permitted to testify on the values of Fort Wayne, Sioux Falls, Neenah, and Meadowlane. The Court did, however, permit her to comment and opine on the relevance of comparable sales available for those properties. The Trustee, therefore, had no expert testimony concerning the value of Fort Wayne.

*Spatz*, 209 B.R. at 918.

The court determined that William's interest in the Fort Wayne property was worth $ 24,381, and that S & C Maintenance Corp., Spatz & Co. Development Corp., and American Retailing Corp. had no value. [11]

David's Transfer of $1.1 million

Finally, as to Transfer 3, the court determined that David paid William $1.1 million for 76% limited partnership interests in Neenah Associates L.P. and Sioux Falls Associates L.P.; as well as a 5% general partnership interest in Meadowlane L.P.; a 49% of a 50% ownership interest in Spatz Real Estate Management Corp ("SMC"); and a 44% interest in Montgomery II Associates Limited Partnership. The Trustee argued that the $1.1 million was actually a gift to William and that instead of selling his SMC interest to David, William had given it to Wendy.

As to the evidence concerning the nature of the transaction, the Sioux Falls and Neenah income tax returns reveal that William's interests were transferred to David. In addition, Burt Chudacoff, the other 50% owner of the SMC stock, testified that William told him that William had sold the SMC stock and the other property to his father for $1.1 million. Chodacoff further revealed that William later changed his story and admitted that he had given his interest in SMC to Wendy.

The valuation evidence demonstrated that, at the time of the hearing, Neenah and Sioux Falls were still under construction, had failed to secure tenants, and were close to being 100% financed. The court determined that the total value of the properties transferred to David was approximately $235,000.

The court valued SMC at $50,000 at the time of the transfer, even though William had been consistently receiving distributions in excess of $80,000 per year. The evidence established that SMC was profitable because it was able to subcontract work to Spatz & Co. at a below market rate, enabling William and Chudacoff to split the excess through SMC proceeds. The evidence demonstrated that Spatz & Co. would not agree to perform the contracts for SMC at a below market rate if William were not receiving SMC profits. Accordingly, the court concluded that the risk of contract cancellations and the "sweetheart deal" with Spatz & Co. substantially reduced its value to an outside investor. However, the court also concluded that William transferred SMC to Wendy for no consideration. Accordingly, the court ordered Wendy to remit $50,000, the fair market value of SMC, to the debtor's estate.

After receiving the parties' evidence, the court addressed the Trustee's fraud in law and fraud in fact contentions. Having determined that the defendants had paid full consideration for the assets transferred (with the exception of the SMC transfer to Wendy), the court ruled that this constituted an absolute defense to the Trustee's action and entered judgement for the defendants. The Trustee appeals.

## STANDARD OF REVIEW

In reviewing the bankruptcy judge's ruling, we sit as an appellate court. We review the bankruptcy court's findings of fact for clear error. Fed.R.Bankr.P. 8013. We apply a de novo standard when reviewing the bankruptcy court's legal interpretations. *In re Birkenstock*, 87 F.3d 947, 951 (7th Cir. 1996).

## ANALYSIS

On appeal, the Trustee challenges the bankruptcy court's legal conclusion that full consideration is an absolute defense to fraud in fact, contests certain evidentiary rulings, and asks this Court to reject several factual

[222 B.R. 164]

findings as clearly erroneous. We will review each issue in turn.

### I. FRAUDULENT TRANSFERS

The Trustee claimed that William's transfers to Wendy and David violated both § 548 of the Bankruptcy Code and § 5 of the UFTA. Both statutes recognize fraud in fact and fraud in law. Because the provisions of the UFTA parallel § 548 of the Bankruptcy Code, findings made under the Bankruptcy Code are applicable to actions under the UFTA. *In re Randy*, 189 B.R. 425, 433 (Bankr.N.D.Ill.1995). The critical distinction between the two, for purposes of the instant case, is the statute of limitations.

#### 1. Statute of Limitations

The bankruptcy court correctly found that the Trustee was barred from seeking relief under the federal fraudulent transfer statute. *See* 11 U.S.C. § 548. Section 548 of the Bankruptcy Code provides that a "trustee may avoid any transfer of an interest of the debtor in property . . . that was made or incurred on or within one year before the date of the filing of the petition." 11 U.S.C. § 548(a). Because the bankruptcy petition was not filed until June 14, 1991, only transfers made on or after June 14, 1990 fall within the scope of § 548's avoidance powers. The bankruptcy court found that all of the transactions in question occurred before that date, rendering the Trustee's attempt to avoid under § 548 untimely.

This is not the end of our inquiry, however, because the Trustee also alleged violations of the UFTA. The bankruptcy court ruled that all of the transfers were beyond the reach of the preference provision of the UFTA. However, we find that the Trustee's action is timely under § 5 of the UFTA, pursuant to the Bankruptcy Code's strong arm provision.

The Seventh Circuit has held that "[u]nder the strong-arm provision of the Bankruptcy Code, 11 U.S.C. § 544(b), the trustee can avoid any transaction of the debtor that would be voidable by any unsecured creditor under state law. . . . The trustee need not identify the creditor, so long as the creditor exists." *In re Image Worldwide, Ltd.*, 139 F.3d 574 (7th Cir.1998) (citations omitted).

In determining whether an action is timely under § 544(b), we look to § 546 of the Bankruptcy Code. Pursuant to § 546 of the Bankruptcy Code, the Trustee may bring a state law action under the Bankruptcy Code's strong arm provision within two years after his appointment. Section 546 provides that:

> (a) An action or proceeding under section 544 . . . of this title may not be commenced after the earlier of —
>
> (1) two years after the appointment of a trustee under section 702, 1104, 1163, 1302, or 1202 of this title; or
>
> (2) the time the case is closed or dismissed.

11 U.S.C. § 546(a).

However, section 544(b) specifically contemplates that the action will be brought pursuant to state law. The relevant state law, the UFTA, has its own limitations provision. The UFTA provides that the Trustee can bring a fraudulent transfer action within the later of four years after the transfer was made or within one year after the transfer was or reasonably could have been discovered. 740 ILCS 160/10.

In determining the appropriate statute of limitations for UFTA actions brought under § 544(b) of the Bankruptcy Code, courts have reconciled the seemingly conflicting limitations periods by applying a two part test. The bankruptcy court *In re Martin* neatly summarized the process:

> The applicable state statute of limitations is only relevant to the first part of the test, which requires the action to be maintainable under the state statute of limitations as of the commencement of the bankruptcy proceeding. Once the bankruptcy petition is filed, 11 U.S.C. § 546 governs the time for bringing the action, and it requires the action be brought within the earlier of two years after the trustee is appointed or before the close of the bankruptcy proceeding. Under this analysis, it is immaterial if the limitations period accrues during the pendency of the bankruptcy case.

[222 B.R. 165]

*In re Martin*, 142 B.R. 260, 265 (Bankr. N.D.Ill.1992). [12] *See also In re Gerardo Leasing, Inc.*, 173 B.R. 379 (Bankr.N.D.Ill. 1994); *In re Topcor, Inc.*, 132 B.R. 119 (Bankr.N.D.Tex.1991) (stating that the state limitations period is relevant only in analyzing whether the claim was barred prior to the bankruptcy filing); *In re Dry Wall Supply, Inc.*, 111 B.R. 933 (D.Colo.1990) (same).

Applying this test to the instant case, we must first determine whether the Trustee could have brought a timely action under the UFTA at the time the bankruptcy petition was filed. The bankruptcy court determined that Transfer 1 (the earliest transaction that the Trustee seeks to avoid) occurred in January 1989. The bankruptcy petition was filed on June 14, 1991. Applying the UFTA's four year statute of limitations, we find that all of the transactions were potentially voidable at the time the bankruptcy petition was filed. Turning to the second part of the test, we note that the Trustee was appointed on July 30, 1991, and filed this suit on July 19, 1993 — narrowly satisfying § 546's two year limitations period. Accordingly, the Trustee's action to avoid William's transfers dating back to January 1989 was timely. [13]

#### 2. The Illinois Uniform Fraudulent Transfer Act

Having determined that the Trustee's action is timely under § 5 of the UFTA only, we begin our substantive analysis with an examination of the bankruptcy court's ruling. In the proceedings below, the bankruptcy court found that defendants paid full consideration for the assets transferred. The court then determined that this was an absolute defense to both fraud in fact and fraud in law. The bankruptcy court stated, and both parties concede, that "[o]bviously full consideration is a defense to constructive fraud [fraud in law] claims. The legal issue presented by this case is whether payment of full consideration is an absolute defense to claims of fraud in fact, regardless of the debtor's intent." *In re Spatz*, 209 B.R. 902, 927 (Bankr.N.D.Ill.1997).

Arguing that it is not, the Trustee directed the bankruptcy court's attention to § 9(a) of the UFTA, which requires defendants to prove both *good faith* and *full consideration* to establish an affirmative defense to fraud in fact. 740 ILCS § 160/9. The bankruptcy court disagreed, finding that only § 5, not § 9, of the UFTA was relevant to the court's inquiry. The Trustee then cited numerous Illinois cases, dating back to 1890, in support of his argument that full consideration is not an absolute defense to fraud in fact. The bankruptcy court distinguished the Trustee's cases, stating that:

> in each of these cases the transfer did in fact hinder, delay, or defraud creditors for reasons unrelated to the amount of consideration, and in any

in each of those cases the transfer did in fact hinder, delay, or defraud creditors for reasons unrelated to the amount of consideration, and in any event there was never any proof of full consideration. Those cases, therefore, support the view that the focus is on whether the creditors were actually hindered or delayed in collecting from the transferor, in other words, the effect of the transfer on creditors.

*Spatz*, 209 B.R. at 928.

The defendants argued that if William received full consideration, then his estate suffered no damage and there can be no remedy. The defendants relied upon "very strong dicta" from the Seventh Circuit's decision in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) in support of this proposition. *Spatz*, 209 B.R. at 927. In *Scholes*, the receiver for corporations owned by a Ponzi scheme principal brought fraudulent transfer actions against the principal's former spouse, one of the Ponzi scheme investors, and religious organizations that received funds from the corporations. The court determined that, as a matter of law, neither the Ponzi scheme investor nor the religious organizations paid valuable consideration for the property transferred by the corporations. While analyzing the receiver's claims under his fraud in law theory, Judge Posner discussed the distinction between fraud in law and fraud in fact:

> If [the receiver] does prove fraudulent intent, however, and thus 'fraud in fact', then explicitly under the new statute as implicitly under the old the transfer is deemed fraudulent even if it is in exchange for 'valuable' consideration. There almost certainly was intent to defraud here on the part of [the principal] and through him the corporations, but it is not the basis on which the receiver defends the judgment he obtained in the district court, except with regard to the ex-wife, of which more later. If valuable consideration means full consideration, then even if there is intent to defraud there can be no harm to creditors, since the debtor's estate has not been depleted by a cent. So why is there a separate concept of fraud in fact? . . . There are two answers. The first is evidentiary. If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly. . . . Second, if fraudulent intent is proved, then . . . the defendant . . . must return the entire payment he received rather than just the amount by which it exceeded the consideration. . . .

*Scholes*, 56 F.3d at 757 (emphasis added).

Siding with the defendants, the bankruptcy court acknowledged that "[t]he problem with [the *Scholes*] language is that it is dicta, because none of the defendants actually paid full consideration." *Spatz*, 209 B.R. at 927 (emphasis added). Despite this, the bankruptcy court determined that the *Scholes'* court's statement that the defendants' fraud in fact burden is merely to prove that the fraud was harmless evidenced "a clear statement of the Seventh Circuit's opinion that a showing of commensurate consideration will defeat a fraudulent transfer claim, even if the plaintiff has proven fraudulent intent." *Spatz*, 209 B.R. at 928. In applying this conclusion to the Spatz transfers, the bankruptcy court stated that:

> The appropriateness of this conclusion is even more apparent when we consider the practical effect of one of the transactions challenged here. David Spatz paid the Debtor $1.1 million for interests in four closely held entities. . . . It is difficult to comprehend how any creditor is hindered in its collection efforts when unmarketable interests are replaced with cash in excess of the value of those interests.

*Id.* at 930.

We find that the bankruptcy court's attempt to expand the *Scholes* holding to the instant case was erroneous. Both of the parties and the bankruptcy court acknowledge that Judge Posner's statements regarding fraud in fact — made while ruling upon the receiver's fraud in law claim — were pure dicta. [14] Reliance upon dicta for guidance,

[222 B.R. 167]

however, does not compel reversal. Reversal is required because the bankruptcy court's ruling and interpretation of *Scholes* runs contrary to the express language and scheme of the UFTA, as well as the numerous state and federal decisions interpreting it.

*a. Statutory Interpretation*

We first look to the language of the statute in determining whether full consideration is an absolute defense to fraud in fact. *See Reves v. Ernst & Young*, 507 U.S. 170, 177, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993); *United States v. Ranum*, 96 F.3d 1020, 1029 (7th Cir.1996), *cert. denied*, ___ U.S. ___, 117 S.Ct. 773, 136 L.Ed.2d 718 (1997). "If the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Reves*, 507 U.S. at 177, 113 S.Ct. 1163 (citations and internal quotations omitted).

Section 5 of the UFTA provides that:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor:
>
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
>
> (b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:
>
> (1) the transfer or obligation was to an insider;
>
> (2) the debtor retained possession or control of the property transferred after the transfer;
>
> (3) the transfer or obligation was disclosed or concealed;
>
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) the transfer was of substantially all the debtor's assets;
>
> (6) the debtor absconded;
>
> (7) the debtor removed or concealed assets;
>
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

obligation incurred;

> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

740 ILCS § 160/5 (emphasis added).

The plain language of § 5(a)(1) requires only evidence of fraudulent intent to trigger recovery. To find that inadequate consideration is an element of fraud in fact would require us to read an additional element into the provision. Such a course of action is inappropriate as both the Seventh Circuit and the Illinois Supreme Court have directed that "courts should not insert words into legislative enactments when the statute otherwise presents a cogent and justifiable legislative scheme." *Id.* (quoting *Hayes v. Mercy Hosp. & Med. Ctr.*, 136 Ill.2d 450, 456, 145 Ill.Dec. 894, 557 N.E.2d 873, B75 (1990)); *see also Hinkle v. Henderson*, 85 F.3d 298, 304 (7th Cir.1996) (unambiguous statutes given their "plain and ordinary meaning"). This is particularly true in the instant case, as the UFTA unambiguously defines the role inadequate

[222 B.R. 168]

consideration plays in both fraud in fact and fraud in law actions.

In determining whether fraudulent intent exists under § 5(a)(1), the UFTA directs courts to consider eleven factors, referred to as "badges of fraud". While the adequacy "of the consideration received by the debtor" is one of the eleven badges of fraud enumerated in the statute — the eighth, to be exact — no one factor is dispositive to a finding of fraud. *See Frank IX & Sons, Inc. v. Phillipp Indus., Inc.*, 1997 WL 534509, at \*8 (N.D.Ill. Aug. 25, 1997) ("section 5(b)'s list of 'badges of fraud' is not all-inclusive, and the court may also consider other evidence"); *Falcon v. Thomas*, 258 Ill.App.3d 900, 911 629 N.E.2d 789, 796 (4th Dist.1994) (same); *Alan Drey Co. v. Generation, Inc.*, 22 Ill.App.3d 611, 618, 317 N.E.2d 673, 679 (Ill. App.1974) ("[t]hese indicia or 'badges of fraud' are not conclusive of fraud, but merely afford a basis from which its existence may be properly inferred.") The defendants cannot explain why, if the drafters intended that full consideration should operate to negate fraudulent intent under the fraud in fact provision, they chose to include inadequate consideration as only one of eleven factors weighed in determining intent. *See Henderson*, 85 F.3d at 304 (finding that defendant's statutory interpretation ignored the "specific and clear" language and the scheme of the statute).

More importantly, if the drafters wanted the payment of full consideration to operate as an absolute defense to fraud in fact, they could have easily done so. Indeed, in the very next paragraph of the UFTA, the drafters made full consideration an absolute defense to fraud in law by requiring the plaintiff to prove that "the debtor made the transferor incurred the obligation . . . without receiving 'reasonably equivalent value'" under § 5(a)(2). The legislature could have easily incorporated this convention into § 5(a)(1), but chose not to do so. *See United States v. Hayward*, 6 F.3d 1241, 1246 (7th Cir.1993) (refusing to insert statutory language that Congress "could have easily inserted" but "chose not to do so"). This speaks volumes about the different roles the drafters envisioned consideration playing in the fraud in fact and fraud in fact actions under the UFTA.

Finally, the defendants' reading of § 5 is at odds with the general structure of the UFTA's fraudulent transfer provisions. *See Hayward*, 6 F.3d at 1246 ("[a]long with looking at the language of the statute section in question, part of a court's analysis includes examining the language and design of the statute as a whole"). Section 5 explains that fraud in fact hinges upon a debtor's intent, and then details the "badges of fraud" useful in determining intent. Once a plaintiff has established fraudulent intent, the only defense to fraud in fact is set forth in § 9 of the UFTA. Section 9 of the UFTA provides:

> (a) a transfer or obligation is not voidable under paragraph (1) of subsection (a) of Section 5 against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

740 ILCS § 160/9(a) (emphasis added).

Federal courts have recognized that a defense under § 9 of the UFTA consists of two elements: reasonably equivalent value and good faith. *See In re Thomason*, 202 B.R. 768 (Bankr.D.Colo.1996); *In re Randy*, 189 B.R. 425, 444 (Bankr.N.D.Ill.1995) (requiring both good faith and reasonably equivalent value under § 9's parallel provision in the Bankruptcy Code); *In re Minnesota Utility Contracting*, 110 B.R. 414 (D.Minn.1990). Similarly, Illinois courts have consistently held that only good faith and fair consideration are a defense to fraud in fact. *See, e.g., Kennedy v. Four Boys Labor Service, Inc.*, 279 Ill.App.3d 361, 216 Ill.Dec. 160, 664 N.E.2d 1088 (2nd Dist.1996). Even prior to the adoption of the UFTA, Illinois protected transferees who took in good faith and gave fair consideration from a conveyance made with fraudulent intent. *See Alan Drey Co., Inc. v. Generation, Inc.*, 22 Ill.App.3d 611, 317 N.E.2d 673 (1st Dist.1974) (purchaser who gives valuable consideration without notice of the fraud is protected from a fraud in fact finding). The Illinois Supreme Court recognized this rule as early as the eighteen hundreds. *See Jewett v. Cook*, 81 Ill. 260 (1876) (finding that if a purchaser had notice of the grantor's fraudulent intent *or* if he

[222 B.R. 169]

purchased the property at a grossly inadequate price without notice, his title will not be protected against creditors).

If we were to reject these cases and instead accept the defendants' position that the payment of full consideration was an absolute defense to fraud in fact, not only would the "good faith" element of § 9 be superfluous, but there would be no need for the legislature to have drafted § 9 at all. *Ranum*, 96 F.3d at 1030 (rejecting the defendant's statutory interpretation because it would require the court to conclude that other parts of the statute were "redundant and unnecessary.") Such a result renders the defendants' position untenable. *Hinkle*, 85 F.3d at 304 (refusing to accept defendant's interpretation, as it failed to account for how the provision interacted with other provisions).

In summary, the clear and unambiguous language of § 5(a)(1) directs that only fraudulent intent triggers liability under a fraud in fact theory. While *inadequate* consideration is one "badge of fraud" to be considered in analyzing intent, the inclusion of ten other factors undermines the defendants' contention that the reverse must also be true — that is, that *adequate* consideration negates any other evidence of fraudulent intent. More damaging to the defendants' position is the fact that the UFTA expressly provided a defense to fraud in fact, but requires that the transferee take both "in good faith and for reasonably equivalent value." 740 ILCS 160/9. The defendants have failed to direct us, and we have not discovered, any legislative intent requiring a contrary conclusion. [15] Accordingly, under the plain language of the UFTA, we can only conclude that full consideration is not, as a matter of law, an absolute defense to fraud in fact.

*b. Cases Interpreting the UFTA and their Application to the Spatz Transfers*

The Trustee's assertion that conveyances made with fraudulent intent are actionable even if the transferee gave valuable consideration finds strong support in Illinois state decisions (*T.I. Gendron v. Chicago and North Western Transp. Co.*, 139 Ill.2d 422, 436, 151 Ill.Dec. 545, 564 N.E.2d 1207, 1214-1215

(1990) (the Illinois Supreme Court quoted its earlier ruling that "[t]here must be evidence to show a fraudulent intent before a conveyance made upon a valuable consideration may be held fraudulent."); *In re Liquidation of MedCare HMO*, 294 Ill.App.3d 42, 52, 228 Ill.Dec. 502, 689 N.E.2d 374, 381 (1997) ("[i]n fraud in fact cases, since actual consideration has been given for the transfer, a specific intent to defraud must be alleged and proved."), federal district court caselaw (*Frank IX & Sons, Inc. v. Phillipp Indus., Inc.*, 1997 WL 534509, at *7 (N.D.Ill. Aug. 25, 1997)) (Judge Coar finds that even if "the transfer of property was made for valuable consideration, [the debtor's] actions were fraudulent in fact because the transfers were made to `hinder, delay, or defraud' a creditor."); *United States v. Kitsos*, 770 F.Supp. 1230, 1235 (N.D.Ill.1991) (Judge Shadur quotes the Illinois Supreme Court's ruling that "[t]here must be evidence to show a fraudulent intent before a conveyance made upon valuable consideration may be held fraudulent."), and federal bankruptcy caselaw, *In re Gillissie*, 215 B.R. 370, 375 (Bankr. N.D.Ill.1997) ("[t]he distinction between `fraud in fact' and `fraud in law' cases is derived from whether or not there was any consideration for the conveyance under attack.").

The bankruptcy court reviewed the cases cited by the Trustee, but concluded that unlike those cases, there was simply no damage to the creditors in the instant case. [16] However,

[222 B.R. 170]

even if we were to accept the bankruptcy court's interpretation of these cases, the bankruptcy court's pretrial ruling prevented the Trustee from introducing such evidence. The court's April 30, 1997 order limited the evidence presented to that relating to the value of the assets transferred and the consideration given. *See* Fed.R.Civ.P. 52(c) [17] (enabling a judge to enter judgment of partial findings once "a party has been *fully* heard on an issue."); Advisory Committee's Note (1991 Amendment) (stating that a judgment on partial findings may be made after the court has heard *all* of the evidence bearing on the crucial issue of fact).

Moreover, we cannot conclude that the bankruptcy court's rulings were harmless because the evidence the Trustee sought to introduce was precisely calculated to show that William conveyed the assets to hinder, delay, or defraud his creditors. For example, in valuing the SMC stock, the court properly determined the fair market value. The bankruptcy court noted that while William was receiving substantial proceeds from his SMC interests those proceeds stemmed from sweetheart deals that would cease to exist if an outsider were to purchase the stock. The court adjusted the fair market value of the interests downward to account for the lapse of the sweetheart agreements, and the court determined that the transferees were liable for only that amount. So, how can creditors be damaged if William received fair market value for these assets? Easily, when the assets are transferred to insiders. Wendy, William's own daughter, owns the stock. William can access and control it. In the event William needs additional money, Wendy has received large SMC distributions from SMC money. He can have these funds at his disposal. In other words, if William removes the real William's assets, shelters it well (put one quarter of one million dollars from the debtor's own company SMC stock to Wendy) for possibly only $500,000).

Therefore, we must reverse the bankruptcy court's ruling. On remand, the bankruptcy court is directed to allow the Trustee to present evidence of William's fraudulent intent pursuant to the eleven statutory factors set forth in § 5 of the UFTA. If the bankruptcy court determines that the evidence fails to establish fraudulent intent, a finding for defendants is then appropriate. However, if the "badges of fraud" are present in a sufficient number, then the defendants bear the burden of establishing that they paid full consideration for the assets transferred and that they entered into the transaction in good faith. In the absence of such a showing, the transfers are voidable, and Wendy and David must return the transferred assets and forfeit the consideration given.

II. THE BANKRUPTCY COURT'S EVIDENTIARY RULINGS

The Trustee attempts to persuade this Court to apply a *de novo* standard of review to a number of the bankruptcy court's findings by characterizing them as the application of "incorrect legal standards." The Trustee asserts that the bankruptcy court applied incorrect legal standards when it: 1) disregarded the valuations that the defendants had previously placed upon the transferred assets; 2) treated David Spatz' loans to Spatz & Co. as valid deductions from the value of the Spatz & Co. stock; and 3) refused to admit Warmus' expert testimony. However, the bankruptcy court did not disregard the valuations William had previously placed upon the transferred assets. The court examined the prior financial statements, but afforded them little weight in light of other conflicting evidence of value and William's explanation that these were

[222 B.R. 171]

merely optimistic projections of value. Similarly, whether the funds David channeled to Spatz & Co. were a gift or a loan is not a legal question subject to *de novo* review, but a question of fact. [19] The defendants presented sufficient evidence that the money was a loan, not a gift, to prevent us from ruling that the bankruptcy court's ruling was clear error.

Next, the Trustee challenges the bankruptcy court's refusal to admit Warmus' expert testimony as to the value of real estate because "Ms. Warmus is a CPA with experience valuing businesses, but not real estate. Because several of the interests transferred by William could only be valued by valuing the real estate owned by the partnerships, this Court concluded that Ms. Warmus was not qualified to testify as an expert on the real estate entities." *Spatz*, 209 B.R. at 918.

The Trustee points to Rule 702 of the Federal Rules of Evidence in support of his contention that the bankruptcy court should have admitted Warmus' testimony. Rule 702 provides that:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

The Trustee essentially argues that the rule must be construed in favor of admissibility, contending that courts have construed Rule 702 liberally, excluding "an expert opinion only if it is so fundamentally unsupported that it cannot help the fact finder." *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990); 4 WEINSTEIN'S FEDERAL EVIDENCE ch. 702 (1997). [20]

The Trustee overstates his position. The Supreme Court has ruled abuse of discretion is the proper standard of review of a lower court's decision to admit or reject expert testimony. *General Elec. Co. v. Joiner*, ___ U.S. ___, ___, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997). Similarly, the Seventh Circuit has held that "[t]he decision whether to admit evidence is a matter `peculiarly within the competence of the trial court and will not be reversed absent a clear abuse of discretion.'" *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1293 (7th Cir.1988).

In the instant case, the record demonstrates that Warmus had extensive training, education, and experience in valuating businesses. The bankruptcy court clearly agreed with this, but found her real estate valuation background lacking. On appeal, the Trustee notes that Warmus has conducted over 130 business interest valuations since 1983, of which approximately one-third involved primarily real estate. Warmus is a member of the Business

business interest valuations since 1989, of which approximately one-third involved primarily real estate. Warmus is a member of the Business Valuation Association and the American Society of Appraisers. In addition, Warmus utilized substantially the same method that the defendants' expert, William McCann, used for valuing the property in question.

The defendants counter that Warmus conceded at her deposition that she was valuing almost exclusively real estate in determining the fair market value of the Transfer 3 properties. And while Warmus claimed that one-third of the approximately 130 business valuations she had performed involved predominantly

[222 B.R. 172]

real estate, she admitted that in 3 out of 4 instances she had obtained the valuation for the real estate involved from a real estate appraiser. Moreover, the real estate involved was predominantly farm land and industrial property. Warmus admitted that she had never valued a strip shopping mall before, or independently determined a capitalization rate for a shopping center.

We find that the bankruptcy court conducted an extensive *voir dire* examination of Ms. Warmus' qualifications prior to disqualifying her expert testimony. In light of Ms. Warmus' lack of training, experience, and education in the real estate appraisal field, we cannot conclude that the trial court abused its discretion in finding that she was not qualified to give expert testimony in this area.

Finally, the Trustee challenges several of the bankruptcy judge's evidentiary rulings, without citation to authority. [21] Specifically, the Trustee claims that the bankruptcy court erred by 1) unduly restricting the Trustee's examination into William's credibility; 2) the admission of the first of a three page letter written in 1989; 3) the admission of unsigned drafts of the PSA which were not offered until trial; 4) the admission of William's critique of Warmus' report which was not offered until trial; 5) the refusal to admit Warmus' amended report valuing the Transfer 1 properties as of 1989; and 6) the disparate treatment given the plaintiff and the defense on issues of admissibility.

As to his first challenge, the Trustee will have a full opportunity to examine William's credibility during the "intent" phase of the proceedings on remand. We have reviewed the remaining challenges, and, were we the trying court in this case, we might have ruled in favor of the Trustee on some of the evidentiary issues raised. However, this Court is not in a position to reweigh the evidence or substitute our judgment for that of the bankruptcy court. *Dugan v. United States*, 18 F.3d 460, 463 (7th Cir.1994). And the Trustee has failed to establish that "no reasonable person could agree with the [bankruptcy] court." *Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 966 (7th Cir. 1996) (quoting *Mares v. Busby*, 34 F.3d 533, 535 (7th Cir.1994)). Therefore, we affirm the bankruptcy court's evidentiary rulings.

III. BANKRUPTCY COURT'S FACTUAL FINDINGS

The Trustee challenges as clearly erroneous the bankruptcy court's credibility determinations; valuation of SCM at only $ 50,000; conclusion that David paid $1.1 million for the Neenah-Sioux Falls group of properties; and finding that neither the PSA nor the Exchange agreements were back dated.

The Trustee argues we should reverse the bankruptcy judge's ruling to the extent that he awarded any weight to William's testimony and disregarded Faigus' testimony. Initially we note that reviewing courts afford great deference to a trial judge's credibility determinations. The Seventh Circuit has observed that:

> The trial court . . . has 'the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject[s]' reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused and nervous speech patterns in contrast with merely looking at the cold pages of an appellate record.

*United States v. Duarte*, 1 F.3d 644, 651 (7th Cir.1993), *cert. denied*, 510 U.S. 1058, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994).

In a number of important respects, the bankruptcy judge's findings were based upon William's testimony — testimony that was contradicted by Faigus. It is clear that the

[222 B.R. 173]

bankruptcy court doubted the credibility of both witnesses, finding that they each had motives to color the truth. However, the court relied upon the fact that while William had been deposed seventeen times, his responses were both consistent and reliable. Conversely, Faigus's testimony changed critically over time, explaining only that his memory was better at trial. [22] Moreover, the bankruptcy court expressly relied upon the fact that William's testimony was supported by documentary evidence. A fair reading of the opinion reveals that the court might not have accepted William's statements in the absence of this corroborating documentation. [23] We cannot agree that the trial court erred.

Next, the Trustee asserts that the bankruptcy court committed clear error in valuing SMC at only $50,000, because the valuation was improperly based upon the court's conclusion that SMC was profitable only to William. In reaching this conclusion, the bankruptcy judge stated that:

> SMC had an even more serious problem than the risk of cancellation of the management agreements. As noted, Spatz & Co. agreed to manage the properties for SMC at a below market fee only because that arrangement allowed the Debtor to collect an additional cut. If the Debtor lost or sold his entire interest in SMC to a stranger, he would have had no reason to allow Spatz & Co. to continue that sweet-heart arrangement, and SMC could not have replicated it. Undoubtedly, SMC would have had to find other, less advantageous means to do the work, reducing the return to the subsequent owner, even if the management agreements were not canceled.

*Spatz*, 209 B.R. at 925.

The Trustee contends that "there is absolutely no credible support for the conclusion that `SMC could not have replicated' its arrangements with Spatz & Co. . . . . Nothing in the record even hints at such a conclusion other than William's completely self-serving testimony." Trst. Br. at 43. To the contrary, there is ample evidence — independent of William's testimony — that Spatz & Co. agreed to perform services for SCM at a rate well below the market. William's testimony that he would not allow Spatz & Co. to continue providing services at a rate below the market if he were not receiving the profits from SCM is not self serving, it's common sense. In addition, Chudacoff testified that a purchaser would be able to rely only on one year's distributions from SMC because the management contracts were terminable at will and they were SMC's sole source of income.

The bankruptcy judge relied upon accepted valuation methods in reaching his conclusion, and properly accounted for the nature of SMC's arrangement with Spatz & Co. Therefore, we will not reverse the court's determination as clearly erroneous. However, we agree with the Trustee that if the bankruptcy court finds that William made the transfer with fraudulent intent, and Wendy cannot establish a defense under § 9, Wendy "must return the

entire payment [s]he received." *Scholes*, 56 F.3d at 757. [24]

[222 B.R. 174]

Finally, the parties presented conflicting evidence as to whether 1) David transferred the $1.1 million to William in exchange for the purchase of the Neenah and Sioux Falls properties, or for some other purpose; and 2) whether the various agreements were back dated. The Trustee's evidence on these issues is not so compelling as to require us to reverse the bankruptcy court's findings of fact.

## CONCLUSION

It is apparent from a reading of the opinion that the bankruptcy court expended significant effort and took great care in reviewing both the evidence and the applicable law. In ruling that the defendants payment of full consideration was an absolute defense to fraud in fact, the bankruptcy court relied on language contained in the *Scholes* decision in a good faith attempt to predict how the Seventh Circuit would resolve the current dispute. While we, especially as a district court, hate to overturn a well reasoned decision of our esteemed colleague in the bankruptcy court, we conclude that the bankruptcy court's result conflicts with the plain language of the UFTA and requires reversal.

The Trustee's dispute with the bankruptcy court's evidentiary rulings and factual findings did not fare as well. While all of the issues were hotly disputed, as a reviewing court, we are not in a position to retry the case. All of the bankruptcy court's rulings were grounded in both fact and law, and will therefore be upheld. Finally, the Trustee has requested that we remand this case to a different bankruptcy court. We disagree that the facts of this case warrant such an action and decline to do so. We remain confident that the very capable and experienced bankruptcy court will conduct a fair hearing on remand which is fully consistent with this opinion. The bankruptcy court's opinion is affirmed in part, and reversed and remanded in part.

## FootNotes

1. The UFTA was promulgated in 1984 by the National Conference of Commissioners on Uniform State laws and approved in 1985 by the American Bar Association. Illinois enacted the UFTA on January 1, 1990. Before adopting the UFTA, Illinois fraudulent transfer law was patterned after the Statute of Elizabeth. *See* 1 GLENN, Fraudulent Conveyances and Preferences § 60 (3d ed.1940) (citing 13 Eliz. Ch. 5 (1570)). The Statute of Elizabeth enabled creditors to pursue fraudulently transferred property and authorized criminal sanctions. Must subsequent statutory provisions and common law developments, however, authorize civil penalties only. *Id.*

2. Because the debtor and the defendants share the same last name, this Court, as did the bankruptcy court before us, will refer in these parties by their first names.

3. These transactions were actually documented by two sets of agreements. William and David offered no explanation as to why two sets of virtually identical documents were prepared. The major distinction between the two documents was that in the first set, the individual amounts loaned in connection with each entity were set forth, and the subsequent Amendments contained handwritten notations by David requesting "only total figures." Conversely, the second set of C & A documents ("C & A II") showed only totals and contained no such notation.

4. The subsequent Amendments were dated January 3, 1987, January 3, 1988, January 8, 1989, and in the case of C & A II, January 5, 1990.

5. On February 16, 1989, Heller Financial, Inc. commenced foreclosure proceedings against a shopping center owned by one of William's ventures, Park Place Associates. On April 20, 1989, Balcor Real Estate Finance, Inc. commenced enforcement proceedings in Colorado which ultimately resulted in a judgment against William for over $5 million. William's attempts to protect his properties via foreclosure and Chapter 11 bankruptcy were unsuccessful.

6. Levit sought to set aside the transfer of the Glencoe residence in a separate proceeding. That dispute was settled in 1992, and the Glencoe residence is not at issue in this case.

7. The bankruptcy court prevented the Trustee from presenting further evidence on this issue on the basis that it was not relevant to the valuation of the assets or the consideration transferred.

8. The Trustee argued that David transferred at least a portion of the $1.1 million to purchase the West Bank property.

9. The Trustee questioned the authenticity of this letter, noting that it purported to be only the first of a three-page letter and that the defendants claimed they could not locate the other two pages. In addition, David's testimony on cross-examination regarding this third transaction was contrary to his testimony on direct examination. The bankruptcy court credited the discrepancy to David's age and fading memory, not an intent to deceive.

10. The court concluded that this error was of great significance because by valuing Spatz & Co. as of 1990, instead of 1989, the liability to David of more than $2 million was no longer reflected on the balance sheet, but had been discharged by the Exchange Agreement.

11. The Fort Wayne property was a shopping center in Fort Wayne, Indiana. SMC Maintenance Corp. was formed in the early 1980's to do maintenance for shopping centers. Wannus had valued this property at $10,000 based upon an equity balance of $9,951 shown on the balance sheets. Further investigation revealed, however, that this amount reflected accounts receivable from an unknown debtor, and therefore was valueless. The Trustee conceded that Spatz & Co. Development Corp. and American Retailing Corp. had no value.

12. The *Martin* court rejected *In re Josefik*, 72 B.R. 393 (Bankr.N.D.Ill.1987), which held that when the bankruptcy court is applying state substantive law (such as the UFTA), only the state statute of limitations should apply. The *Martin* court noted that *Josefik* improperly relied upon the Seventh Circuit's holding in *Suslick v. Rothschild Secur. Corp.*, 741 F.2d 1000 (7th Cir.1984) (holding that in the absence of a federal statute of limitations, the relevant state statute of limitations applies). However *Suslick* involved the Securities Act of 1933 and § 10 of the Securities and Exchange Act of 1934—neither of

which contain a specified statute of limitations. Conversely, the Bankruptcy Code does provide a limitations period in § 546. Accordingly, the *Suslick* rule does not apply, and *Josefik's* reliance upon *Suslick* as a basis for its holding was erroneous.

13. Shortly after Illinois adopted the UFTA, the Illinois Institute for Continuing Legal Education published Professor Steven Resnicoff's article entitled "Fraudulent Transfers", which illustrates how these various statutes of limitation work together. Steven Resnicoff, *Fraudulent Transfers*, IL-CLE 8-1 (1993). Resnicoff explains that

> it is possible to bring an avoidance action under § 544(b) even if the state statute of limitations has elapsed as long as it elapsed after the filing of the bankruptcy petition. Assume, for example, that (1) the statute of limitations under the applicable state's UFTA is six years; (b) a transfer fraudulent under such UFTA occurred on January 1, 1987; (c) the debtor filed a Chapter 11 bankruptcy petition on December 30, 1992; and (d) the bankruptcy trustee was appointed for the debtor on June 30, 1993. Because the state statute of limitations had not yet expired when the bankruptcy petition was filed, the first time limit under the Code was met. Consequently, the trustee could file an avoidance action under Code § 546 until the earlier of a[sic] (a) two years after his appointment or (b) the closing or dismissal of the bankruptcy case.

*Id.* at 41 (emphasis added).

14. In addition, the *Scholes* court appears to contradict itself by acknowledging that "if [a plaintiff] does prove fraudulent intent, however, and thus 'fraud in fact', then explicitly under the new statute as implicitly under the old the transfer is deemed fraudulent even if it is in exchange for 'valuable' consideration," *Id.* at 757 (emphasis added). And, while addressing the receiver's fraud in fact claim against the principal's ex-wife, Judge Posner acknowledged "[i]nadequacy of consideration is not an element of fraud in fact". *Id.* at 759.

15. The bankruptcy court noted that while modern fraudulent conveyance statutes derived from the Statute of Elizabeth, 13 Eliz. Ch. 5 (1570), which was penal in nature, the modern statutes are purely restitutionary. *Spatz*, 209 B.R. at 930, n. 46. We disagree. While the modern fraudulent conveyance statutes are not, like their English predecessor, criminal statutes, recovery under the fraud in fact provision of the UFTA is not purely restitutionary. To the contrary, transferees deemed to have participated in the fraud (unable to establish both good faith and full consideration) not only must return the property transferred, but must also forfeit whatever amount of consideration was paid.

16. This conclusion fails to account for the fact that the transfers allowed the debtor to convert his assets into cash. *See Alan Drey Co. v. Generation, Inc.*, 22 Ill.App.3d 611, 619, 317 N.E.2d 673, 680 (1974) (finding fraud where the debtor converted substantial assets into cash "which could he more easily placed beyond the reach of creditors.").

17. Federal Rule of Civil Procedure 52(c) is made applicable to adversary proceedings in bankruptcy by Bankruptcy Rule 7052.

18. The bankruptcy court and the defendants contend that it would be unreasonable for an outside investor pay more than $ 50,000 for SMC in light of the sweetheart deal with Chudacoff and Spatz & Co. However, it would be equally unreasonable for William to sell his SMC interest to an outside investor for $ 50,000 in light of the fact that William was receiving $ 900,000 from SMC annually.

19. The Trustee cites *Falcon v. Thomas*, 258 Ill.App.3d 900, 196 Ill.Dec. 244, 629 N.E.2d 789 (4th Dist.1994) in support of his contention that the bankruptcy court used an incorrect legal standard in treating David's loans as gifts. *Falcon* holds that "where the challenged transaction involves an immediate family member as a preferred creditor, defendant has the burden of showing . . . a valid and subsisting order which would be preferred and payment for which would be exacted regardless of the debtor's fortune or misfortune." *Id.* at 910, 196 Ill.Dec. 244, 629 N.E.2d at 796. The *Falcon* court considered the evidence in light of the relationship between the debtor and the transferees — just as the bankruptcy court in the instant case did. Moreover, the bankruptcy court cited *Falcon* for the proposition that "where transfers to family members are involved, a closer scrutiny is applied" (*Spatz*, 209 B.R. at 910, n. 3), but found that, unlike the *Falcon* defendants, David had satisfied his burden.

20. While the Trustee also cites *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir.1994), we find that *Buscaglia* is not controlling in the instant case, where the bankruptcy judge excluded the testimony based upon lack of expertise, and not fear of undue prejudice.

21. The Court reminds the Trustee of the Seventh Circuit's admonishment that "[l]osers in a trial can go hunting for relief on appeal with a rifle or a shotgun. The rifle is better. As we have noted, the shotgun approach may hit the target with something but it runs the risk of obscuring significant issues by dilution." *Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 955 (7th Cir.1996) (citing *United States v. Levy*, 741 F.2d 915, 924 (7th Cir.), *cert. denied*, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984)). Even though this Court allowed the Trustee to file a brief in excess of fifty pages, a number of his arguments were underdeveloped due to the sheer number of issues raised on appeal.

22. The Trustee characterizes the court's conclusion that Faigus was incredible as flawed because the court based its determination upon unreliable evidence. In addressing the factors relied upon by the bankruptcy court, the Trustee argues that Faigus' deposition and trial testimony weren't really inconsistent, and that the testimony that Faigus was preoccupied with other matters during the time Faigus claims he drafted the Exchange Agreement was unjustified and irrelevant. What the Trustee cannot argue away (although he tries) is the fact that while Faigus testified that the Exchange Agreement was not executed when he left Spatz & Co. in August, 1990, even the Trustee concedes that Wendy began receiving distributions from the Spatz & Co. stock transferred under the Exchange Agreement in May, 1990. The Trustee makes no attempt to explain how Wendy could have been receiving the distributions in May if the transfer document was not executed in August.

23. Contrary to the Trustee's assertions, most of the testimony relied upon bankruptcy court was supported by documentary evidence. While the Trustee claims that this evidence was unreliable, the bankruptcy court did not err in finding otherwise.

24. The Trustee argues that the bankruptcy court erred by ignoring the distributions in valuing the stock. Under the § 550(a) of the Bankruptcy Code, the Trustee is entitled to recover property transferred with the intent to defraud, delay, or hinder creditors. 11 U.S.C. § 550(a). No one disputes this. Without citation to authority, however, the Trustee claims that "[s]imilarly, the value of that property must, of necessity, take into account the potential for such distribution." Trst. Brf. at 26. Contrary to the Trustee's assertion, the bankruptcy court fully acknowledged the value that the stock held for an insider. In determining its fair market value, however, the court properly recognized that a prudent investor would not purchase the stock based upon

# EXHIBIT 12



## Commercial Electronic Office® - Transaction Search
## Date/Time Printed: 01/22/2018, 12:37 PM PST

Check 276241 - 13199.65 USD





## Item Details

| | | | |
|---|---|---|---|
| Account Number | | Item Sequence Number | 008713621817 |
| Account Name | GUITARCENTESTI | Bank ID | 121000248 |
| Check | 276241 | | |
| Amount | 13199.65 USD Debit | | |
| Status | Check Paid | | |
| Posting Date | 10/04/2016 | | |
| As of Date | 10/04/2016 | | |



Check 277001 - 16529.32 USD





## Item Details

| | | | |
|---|---|---|---|
| Account Number | | Item Sequence Number | 008718218443 |
| Account Name | **GUITARCENTESTI** | Bank ID | 121000248 |
| Check | 277001 | | |
| Amount | **16529.32 USD Debit** | | |
| Status | **Check Paid** | | |
| Posting Date | 11/08/2016 | | |
| As of Date | 11/08/2016 | | |



Check 277619 - 16529.32 USD





## Item Details

| | | | |
|---|---|---|---|
| Account Number | | Item Sequence Number | 008211173065 |
| Account Name | GUITARCENTESTI | Bank ID | 121000248 |
| Check | 277619 | | |
| Amount | 16529.32 USD Debit | | |
| Status | Check Paid | | |
| Posting Date | 12/07/2016 | | |
| As of Date | 12/07/2016 | | |





**Commercial Electronic Office® - Transaction Search**

**Date/Time Printed: 06/08/2017, 11:36 AM PDT**

Reference 279079 - 16529.32 USD Debit USD





## Item Details

| | | | |
|---|---|---|---|
| Account Number | | Item Sequence Number | 008815608798 |
| Account Name | GUITARCENTESTI | Bank ID | 121000248 |
| Check | 279079 | | |
| Amount | 16529.32 USD Debit | | |
| Status | **Check Paid** | | |
| Posting Date | 02/06/2017 | | |
| As of Date | 02/06/2017 | | |
| | | | |
| Additional Item Details | 0000057 -000000178262525 | | |
| | CHECK | | |



# EXHIBIT 13

**Casey Wheatman**

| | |
|---|---|
| **From:** | Jarrod Morgan |
| **Sent:** | Monday, May 16, 2016 10:06 AM |
| **To:** | Todd Radeke |
| **Cc:** | GC R and M |
| **Subject:** | RE: Guitar Center # 338 Grand Rapids, MI | HVAC repair reimbursement inquiry |

Hi Todd,

We looked back and you folks have reimbursed us 100% in the past, for repairs over $500. (including a replacement in 2012)

Also, the verbiage does not mention anything about responsibility for a difference in excess of; it simply states that repairs/replacements with a cost of $500 or greater, are responsibility of the Landlord.

I'm sure this was put in in the lease intentionally to address the older units, since I can see that there were existing units on the building when we took possession.

Thanks,

**Jarrod Morgan**
**Facilities Manager**
**Guitar Center Inc.**
**(818)735-8800 Ext: 2027**
**(818)735-7923 Fax**
**jmorgan@guitarcenter.com**

The information in this email is confidential. It is intended solely for the addressee and access to this e-mail by anyone else is unauthorized.

**From:** Todd Radeke [mailto:tradeke@outlook.com]
**Sent:** Monday, May 16, 2016 8:39 AM
**To:** Jarrod Morgan <jmorgan@guitarcenter.com>
**Subject:** Re: Guitar Center # 338 Grand Rapids, MI | HVAC repair reimbursement inquiry

My interpretation of the paragraph below states LL is only responsible for the difference over $500.


Todd Radeke
Property Manager
Radeke Management, LLC
14 N. Peoria St., Suite 3F
Chicago, IL 60607
P: 312-733-4033 ext 2
Direct: 312-637-5328
F: 312-733-8633
E: tradeke@outlook.com

This message and any attachments are solely for the intended recipient and may contain information that is

1

# EXHIBIT 14

Attached are the requested invoices

Office Depot closed in 2015 and is no longer sharing the water or the water expense

I have attached our invoice and copies of the two water bills that we have paid in 2016.

The total owed by Guitar Center is $ 558.60

--

Thank you,


Pamela J Glines, Acctg Dept Mgr

Spatz Development

14 N Peoria St, 3F

Chicago IL 60607

312-637-5329 p (Please note new number)

312-733-8633 f

---

This email has been checked for viruses by Avast antivirus software.
www.avast.com

---

This email has been checked for viruses by Avast antivirus software.
www.avast.com

--
Thank you,

# EXHIBIT 15

IPAY: 0070433

2520 1 EP 0.452 *0070433 S1
GOOTJES ASSOCIATES INC.
7025 DUTTON INDUSTRIAL DR
CALEDONIA MI 49316

*8022*

WS MANAGEMENT, INC.
14 N. PEORIA STREET, 3F
CHICAGO IL 60607

**Account Name:** Grand Rapids Associates

| **Account Number:** | **Subscriber Name:** | **Amount:** | **0000100014** |
|---|---|---|---|
| KentwoodMarketplace | WS MANAGEMENT, INC.<br>14 N. PEORIA STREET, 3F<br>CHICAGO, IL 60607 | 732.42 | |

**Date** 10/24/2016

**Total** $732.42

**GRAND RAPIDS ASSOCIATES LLC**

CHECKOMATIC.COM · (800) 555-6374

**1005**

GOOTJES ASSOCIATES, INC.

| Date | Type | Reference | Original Amt. | Balance Due | 12/30/2016 Discount | Payment |
|------|------|-----------|---------------|-------------|---------------------|---------|
| 12/16/2016 | Bill | 54486 | 2,270.00 | 2,270.00 | | 2,270.00 |

Check Amount   2,270.00

LS Operating Account

2,270.00

# EXHIBIT 16

**COFFEE FLAMINGO**
2897 RADCLIFF ST, SE, SUITE G
KENTWOOD, MI 49512

01-02-16

Pay to the Order of _Sptz Center 100_

_seven hundred and 00/100_

**FIFTH THIRD BANK**

For _rent januor 2016_

->071001232<- South Central Bank
0819894901040001000000010

Posting Date                    2016

DB/CR Indicator

Amount

Posting Check Number

Posting Account Number

Posting Seq Number

Tran Code

ABA/RT Number



**COFFEE FLAMINGO**
2897 RADCLIFF ST. SE, SUITE G
KENTWOOD, MI 49512

08-31-16

Pay to the
Order of... *Spatz Center, INC*

*seven hundred and oo/*

**FIFTH THIRD BANK**

For *rent for august 2016*

⑉072400052⑈ 716582759⑈ 1740

100003585 09/13/2016 0100040004
CDT A/C OF WITHIN PAYEE ABSENT ENDT
LAKESIDE BANK, CHICAGO, IL
312-435-5100          >>071001504<<

Posting Date

DB/CR Indicator

Amount

Posting Check Number

Posting Account

Posting Seq Number

Tran Code

ABA/RT Number

# EXHIBIT 17




## Payment Coupon

**MULTIPLE PAYMENT COUPONS ENCLOSED**

Please indicate amount paying $ _____

| Account Number | 4765 947 0002 5 |
| --- | --- |
| Due Date: | April 13, 2017 |
| Total Due: | $233.87 |

95224 1 SP 0.453 **T332*2*P00*M03
GRAND RAPIDS ASSOCIATES
ACCOUNT PAYABLE
STE 3F
14 N PEORIA ST
CHICAGO IL 60607-2646

Mail Payments To:

DTE Energy
P.O. Box 740786
Cincinnati OH 45274-0786

For address corrections, please visit dteenergy.com
or call 800.477.4747.

Return upper portion with your payment          618737448
Keep lower portion for your records

**MULTIPLE PAYMENT COUPONS ENCLOSED**

## Contact Information

| Gas Leak or Gas Emergency | 800.947.5000 |
| --- | --- |
| Customer Service or Power Outage | 855.DTE.4BIZ (855.383.4249) |
| Hearing-Impaired TDD Line | 800.888.6886 (Mon-Fri 8am-5pm) |
| Web Site | dteenergy.com |

## Summary of Charges

| Account Number | 4765 947 0002 5 |
| --- | --- |

| | |
| --- | --- |
| Account Balance as of Feb 23, 2017 | 553.80 |
| Payment Received Mar 06, 2017 Thank You! | − 553.80 |
| Balance Prior to Current Charges | 0.00 |
| Current Charges | |
| DTE Gas Company Gas Commercial Heating | 233.87 |
| Total Current Charges | 233.87 |
| Account Balance as of March 22, 2017 | $233.87 |

Your current charges are due on April 13, 2017. A 2% late payment charge will be applied if paid after the due date.

## Important Information

Let DTE help your business manage its energy use. Learn about our online tools and enter to win an energy efficiency makeover for your business at dteenergy.com/businesscontest.

The 2017 Michigan Battle of the Buildings begins! Join this friendly competition to learn from other businesses as you work to reduce your energy use. Learn more and enter by March 31 at michiganbattleofthebuildings.org.

Be safe. Before snaking a plugged home or business sewer line, call MISS DIG at 811 to have utility lines that might cross the path of the sewer line located and marked. Learn more at www.dteenergy.com/crosabore

On March 28, we will begin a system upgrade that will continue until April 3, 2017. During this upgrade period, our self-service channels, and billing and payment programs/options, will be unavailable. More info: dteenergy.com/FAQ.

# EXHIBIT 18

Account: **1000 3614 3822**



**Count on Us®**

| **Questions:** | | |
|---|---|---|
| Visit: **ConsumersEnergy.com** | **Amount Due:** | **$266.68** |
| Call us: **800-805-0490** | **Please pay by:** | **February 27, 2017** |

▷ **Reminder – Previous amount due
01/27/17. Please pay previous amount
to avoid credit action. Thank you.**

C/O SPATZ CENTERS
GRAND RAPIDS ASSOC
14 N PEORIA ST STE 3F
CHICAGO IL 60607-2646

▷ **Service Address:**
2897 RADCLIFF AVE SE #D
GRAND RAPIDS MI 49512-1793

### February Energy Bill

Service dates: January 05, 2017 - February 02, 2017 (29 days)

**Total Electric Use** (kWh - kilowatt-hour)



◁ ACTUAL

☼ 2015  ▧ 2016  ■ 2017

| **February Electric Use** | Cost per day: | kWh per day: | Prior 12 months electric use: |
|---|---|---|---|
| **283** kWh | **$3.70** | **10** | **4,243** kWh |
| February 2016 use: 470 kWh | | | |




**STAY SAFE: Call 9-1-1 and 800-477-5050.**
We'll respond day or night.

**Downed power lines.**
Stay 25 feet away. Call from
a safe location.

**If you smell natural gas.**
If the "rotten egg" odor of
gas is apparent, call from
a safe location.

# Select Your Own
# Bill Due Date

You have an **upgraded meter with enhanced technology** that
provides more **accurate meter reads** and tools to **monitor your
energy use online.**

You also may select your own bill due date. *Some restrictions apply.*

Learn more at www.ConsumersEnergy.com/smartenergy